# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CENTRAL VALLEY AG COOPERATIVE, and CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN,<br><br>Plaintiffs,<br><br>vs.<br><br>DANIEL K. LEONARD, SUSAN LEONARD, THE BENEFIT GROUP, INC., ANASAZI MEDICAL PAYMENT SOLUTIONS, INC., CLAIMS DELEGATE SERVICES, LLC, LINUS G. HUMPAL, and GMS BENEFITS, INC.,<br><br>Defendants. | 8:17CV379<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Motion for Temporary Restraining Order and for an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted, ECF No. 3, filed by Plaintiffs Central Valley Ag Cooperative (Central Valley), and Central Valley Ag Cooperative Health Care Plan (the Plan). Also before the Court is Plaintiffs' Motion for Hearing Regarding Temporary Restraining Order, ECF No. 26.

The Court held an evidentiary hearing on Plaintiffs' Motion for Temporary Restraining Order (TRO) on October 17, 2017. All parties were represented. Plaintiffs submitted a brief, ECF No. 3-1, and evidence, ECF Nos. 4, 18, before the hearing. Defendants Anasazi Medical Payment Solutions, Inc. (AMPS), and its subsidiary Claims Delegate Services, LLC (Claims Delegate), also submitted evidence before the hearing. ECF No. 19. Defendants Linus G. Humpal and The Benefit Group, Inc. (the Claims Administrator), submitted a brief, ECF No. 22, and evidence, ECF No. 21. At the

hearing, Plaintiffs offered further evidence that lacked proper foundation and was not received. No other party offered further evidence. For the reasons stated below, the Motion for TRO will be denied, and the Court concludes that no further hearing for preliminary injunctive relief is warranted at this time.

## BACKGROUND

**1. The Parties**

The Plan is a self-funded group health and disability plan, governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461, administered by Central Valley. The Plan identifies Central Valley as its primary fiduciary under ERISA. ECF No. 21-1, Page ID 354, 448.

Defendant Humpal is the President of the Claims Administrator, with whom Central Valley contracted to perform certain administrative services related to the Plan, including processing of claims. The relationship between Central Valley and the Claims Administrator was governed by an Administrative Services Agreement, *see* ECF No. 21-3, Page ID 484, that delineated the Claims Administrator's services and set the fees for its services.

The Plan designated Claims Delegate as a Plan fiduciary for purposes related to hospital and facility claims, see ECF No. 21-1, Page ID 354, stating that Claims Delegate would review and make benefit determinations on all post-service hospital and facility claims. AMPS, Claims Delegate, the Claims Administrator, Central Valley, and

the Plan entered into an Referenced Based Reimbursement (RBR) Services Agreement that defined the duties of AMPS and Claims Delegate with respect to the Plan.

Defendants Daniel K. Leonard, Susan Leonard, and GMS Health Benefits, Inc. (collectively Brokers), brokered the initial agreements between the Plaintiffs and the Claims Administrator. Counsel for the Brokers represented that this was the extent of the Brokers' relationship with the Plaintiffs.

## 2. Timeline of Events

According to Plan documents, the Plan went into effect on January 1, 2013. ECF No. 21-1, Page ID 448. AMPS, Claims Delegate, the Claims Administrator, Central Valley, and the Plan entered into the RBR Services Agreement effective January 1, 2016. ECF No. 4-1, Page ID 76. Central Valley and the Claims Administrator also entered into the Administrative Services Agreement, effective January 1, 2016. Plaintiffs allege that shortly after Claims Delegate's retention, claims payments to health care providers under the Plan virtually ceased. Providers complained the Plan was not paying them for services rendered to Plan participants, and Plan participants were subjected to collection efforts by physicians and other providers. Several providers refused to render further services to Plan participants, their spouses, and their dependents. Plaintiffs allege the Plan also lost benefits from its stop-loss insurance carrier due to the extended claim disputes.

On May 19, 2016, Nebraska Methodist Hospital filed a lawsuit captioned *The Nebraska Methodist Hospital et al. v. Cooperative Producers Inc. Group Benefit Plan et*

*al.,* Case No. CI 16-4230, in the District Court of Douglas County, Nebraska (the "Nebraska Methodist Lawsuit"). At issue in that lawsuit are claims submitted to the Plan. A similar lawsuit has been pending in the District Court of Douglas County, Nebraska, since 2015. On November 28, 2016, counsel for AMPS, Claims Delegate, and the Claims Administrator contacted counsel for Central Valley to answer questions about the Nebraska Methodist Lawsuit. On June 21, 2017, counsel for AMPS, the Claims Delegate, and the Claims Administrator issued a report on the Nebraska Methodist Lawsuit to Carl Dickinson, Central Valley's CEO. Counsel issued a follow-up report to Dickinson on October 3, 2017. Neither Dickinson nor any agent or representative of Central Valley responded to the reports.

On January 1, 2017, Central Valley terminated the Administrative Services Agreement with the Claims Administrator. However, Central Valley asked the Claims Administrator to handle claims for health care services provided before January 1, 2017, during what the parties refer to as a "run-out period," lasting through September 30, 2017. On October 2, 2017, Central Valley and the Claims Administrator extended their Run-Out Services Agreement, through December 31, 2017. ECF No. 21-1, Page ID 451.

On October 11, 2017, Plaintiffs filed this lawsuit and their Motion for Temporary Restraining Order. ECF Nos. 1, 3. Plaintiffs allege that the Defendants breached their fiduciary duty to the Plan. Plaintiffs also allege that Defendants engaged in a criminal enterprise, in violation of the Racketeer Influenced Corrupt Organizations Act (RICO),

18 U.S.C. § 1961 et seq. Plaintiffs seek to recover Plan assets; to acquire restitution for lost Plan assets resulting from Defendants' actions in breach of fiduciary duties; to receive payment for damages arising from prohibited and party-in-interest transactions; and to receive damages for Defendants' RICO violations.

### 3. Request for Injunctive Relief

In their Motion, Plaintiffs request a TRO and preliminary injunction with the following provisions:

> 1. Order to prohibit Defendants from exercising any power or authority over any bank accounts containing Plan assets;
>
> 2. Order to enjoin each Defendant from performing any services on behalf of CVA, the Plan, or Plan participants;
>
> 3. Order to Prohibit Defendants from representing CVA and the Plan in any litigation, including *Nebraska Methodist Hospital, et. al. v. Cooperative Producers, Inc. Group Benefit Plan, et. al.,* Case No. CI 16-4230, District Court of Douglas County, Nebraska;
>
> 4. Order to expedite discovery;
>
> 5. Order that Bill Kenedy and Taylor Pugh of Lutz accounting firm will immediately commence a forensic audit of the Plan's monetary transactions (including medical claims payments) at Defendants' cost and that Defendants shall cooperate with such forensic audit;
>
> 6. Order to Compel Defendants to immediately provide all documents listed in Exhibit 4 to the forensic auditor as per paragraph 5;
>
> 7. Order that such forensic audit be presented to this Court for review and approval;
>
> 8. Order that Robert M. Slovek, Kutak Rock LLP, be appointed as counsel for CVA and the Plan to represent these Plaintiffs in the *Nebraska Methodist* litigation; to identify and appropriately direct payment of outstanding and unresolved participant claims from Plan Years 2015 and 2016; to negotiate stop-loss insurance coverage with regard to these

claims; and, to take whatever further action is necessary to resolve Plan administration issues for these Plan Years;

9. Order that an expedited hearing on the preliminary injunction shall be had pursuant to Rule 65(b)(3), Fed. R. Civ. P., on a date and at a time set by the Court; and

10. Order that no security shall be required to be posted by Plaintiffs.

Motion, ECF No. 3, Page ID 49-50.

At the hearing, Plaintiffs did not oppose a consolidation of the TRO hearing and the request for preliminary injunction,[1] but Defendants did not consent to consolidation.

**STANDARD OF REVIEW**

Courts in the Eighth Circuit apply the factors set forth in *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc), when determining whether to issue a TRO or a preliminary injunction. *See S.B. McLaughlin & Co., Ltd. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989) (approving the use of *Dataphase* factors for analyzing a TRO motion). Those factors are: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase*, 640 F.2d at 114. "No single factor is determinative." *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp.

---

[1] Plaintiffs' request for a preliminary injunction is procedurally unclear. Their Motion is styled as a motion for Temporary Restraining Order And for an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted. No separate motion for a preliminary injunction under Fed. R. Civ. P. 65(a) has been filed. However, in its prayer, the Motion asks the Court "to issue a TRO and preliminary injunction." ECF No. 3, Page ID 49. Plaintiffs have since filed a motion for a full evidentiary hearing on whether a preliminary injunction should issue. ECF No. 26. Accordingly, the Court construes the Motion as one for both a TRO and preliminary injunction.

2d 970, 974 (D. Neb. 2008). The movant bears the burden of establishing the propriety of the TRO. *See Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011).

**DISCUSSION**

Some of Plaintiffs' requests are moot. They ask for an order prohibiting Defendants from representing Central Valley and the Plan in any litigation, including the Nebraska Methodist Lawsuit. They also ask the Court to appoint Robert M. Slovek of Kutak Rock, LLP, as counsel for Central Valley and the Plan in the Nebraska Methodist Lawsuit. However, counsel for AMPS, Claims Delegate, and the Claims Administrator, already moved to withdraw in that action. *See* ECF Nos. 194, 19-5. Defendants' voluntary withdrawal moots these requests.

Plaintiffs' remaining requests also will be denied because *Dataphase* factors do not favor a TRO or preliminary injunction. "A temporary restraining order is an extraordinary remedy, and the movant bears the burden of establishing its propriety." *Kuper Indus., LLC v. Reid*, 89 F. Supp. 3d 1005, 1010 (D. Neb. 2015) (citing *Roudachevski v. All-American Care Ctrs., Inc.,* 648 F.3d 701, 705 (8th Cir. 2011)). Plaintiffs have not shown any imminent threat of irreparable harm that cannot be compensated with money damages, and they have not shown that the other *Dataphase* factors favor the injunctive relief requested.

**1. Threat of Irreparable Harm**

"To succeed in demonstrating a threat of irreparable harm, 'a party must show

that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski,* 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n,* 109 F.3d 418, 425 (8th Cir. 1996)). The Eighth Circuit has held that "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Grasso Enterprises, LLC v. Express Scripts, Inc.,* 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003)).

### A. Imminence of Harm

Plaintiffs have failed to demonstrate that an immediate injunction is necessary to protect Plan assets or to preserve documentation related to Defendants' actions.

#### 1. *Protection of Plan Assets*

Plaintiffs specifically request an order prohibiting Defendants from exercising any power or authority over any bank accounts containing Plan assets; and an order enjoining each Defendant from performing any services on behalf of Central Valley, the Plan, or Plan participants. Yet Plaintiffs have long been aware of Defendants' alleged wrongdoing and each of the Defendants has either ceased providing services or is performing specific services at Central Valley's request.

According to Plaintiffs' own allegations, Central Valley was aware of the Defendants' alleged breaches of fiduciary duty months—or years—before Plaintiffs requested the TRO. For example, Central Valley acknowledges it became aware of claim repricing and provider disputes as early as August 2015. In March 2016, it

contends that it discovered Claims Delegate and AMPS artificially deflated reimbursement amounts for Plan Year 2015. In October 2016, it learned of provider lawsuits against the Plan. These issues were significant enough that Plaintiffs discontinued Defendants' services as to new claims after January 1, 2017. Yet, Plaintiffs did not request a TRO until October 11, 2017.

Most of the Defendants have ceased providing services to the Plaintiffs. Counsel for the Brokers represent that the Brokers no longer provide any services or perform any work on behalf of the Plaintiffs. Plaintiffs offer no evidence that the Brokers have access to any Plan assets or accounts, so a TRO against the Brokers to protect Plan assets is unnecessary.

Similarly, a TRO is unnecessary to prevent AMPS and Claims Delegate from performing further services or accessing Plan assets. Communications between the parties confirm that AMPS and the Claims Delegate have not processed, nor will they process, claims arising after January 1, 2017. Until the day the Motion for TRO was filed, AMPS and Claims Delegate performed only run-out services specifically provided for in the RBR Services Agreement. *See* ECF No. 19-8, Page ID 203. AMPS and Claims Delegate have represented that, upon learning of this action, they ceased providing any services to Central Valley and the Plan. Karge Decl. ¶ 15, ECF No. 19-6, Page ID 183. Plaintiffs offered no evidence that AMPS or Claims Delegate have access to Plan accounts or assets. Accordingly, Plaintiffs have not shown any ongoing wrongdoing on

the part of these Defendants that requires immediate injunctive relief to protect Plan assets.

The only Defendants providing services to Plaintiffs and with potential access to Plan assets are the Claims Administrator and Humpal.[2] On October 2, 2017, less than two weeks before requesting a TRO, Central Valley contracted with the Claims Administrator to perform services through the end of 2017. The Claims Administrator's services and its power over accounts containing Plan assets is derived from the Administrative Services Agreement. Section 6.4 of that Agreement states that if Central Valley requests the Claims Administrator to process claims on a run-out basis after termination of the Administrative Services Agreement, all relevant terms of that Agreement apply for as long as the Claims Administrator processes claims for the Plan. See ECF No. 21-3, Page ID 487-88. Central Valley specifically requested the Claims Administrator to continue to provide services through December 31, 2017. See ECF No. 21-1, Page ID 451. Thus, while it is true that the Claims Administrator has access to Plan assets and accounts, such access is at the express and very recent request of Central Valley.

Central Valley offers no explanation as to what transpired in the nine days between the date it renewed its agreement with the Claims Administrator and the date of its Motion for TRO.

---

[2] Humpal's actions were taken solely in the course and scope of his employment with the Claims Administrator. Humpal Dec. ¶ 14, ECF No. 21-1, Page ID 351. Plaintiffs offer no evidence that Humpal acted independent of his duties as an employee. Accordingly, the Court addresses claims against Humpal and the Claims Administrator together.

At the hearing, Plaintiffs noted that agreements with alternative claims administrators were not in place when Central Valley signed the Run-Out Services Agreement with the Claims Administrator. Yet, Plaintiffs acknowledge they knew of the Claims Administrator's alleged wrongdoing when that agreement was executed. Accordingly, Plaintiffs have not shown that a TRO is necessary to prevent imminent harm to Plan assets.

### 2. *Court-Supervised Discovery*

Plaintiffs request a TRO for expedited discovery; for appointment of two experts for an immediate forensic audit of the Plan's monetary transactions, at Defendants' cost; and to compel Defendants to provide all documents listed in Exhibit 4, filed at ECF No. 4-4. Plaintiffs also request the forensic review be conducted under the Court's supervision, subject to the Court's approval. Plaintiffs note that an immediate, court-supervised forensic review is necessary to determine what participant claims should have been paid and in what amount; what claims remain outstanding; what claims should be paid under the Plan's stop loss policy; and what Plan assets have been transferred, diminished, converted, or misappropriated.

A discovery process is available to the Plaintiffs through the Federal Rules of Civil Procedure. Spoliation rules protect against destruction of potentially relevant evidence. *See Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004); *see also Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("Spoliation of evidence is the destruction or significant alteration of evidence, or the

failure to preserve property for another's use as evidence in pending or reasonable foreseeable litigation.").

Central Valley has the power, under the terms of the Plan document, to conduct an audit of claims. The Plan provides: "In addition to the Plan's medical record review process, the Plan Administrator [Central Valley] . . . may use its discretionary authority to utilize an independent bill review and/or claim audit program or service for a complete claim." Plan, ECF No. 19-9, Page ID 225. As to the Claims Administrator specifically, Central Valley has audit rights under the Administrative Services Agreement. Section 5.3 of the Administrative Services Agreement provides: "[The Claims Administrator] will, within thirty (30) days following written notice from [Central Valley], allow [Central Valley] or an authorized agent to inspect or audit records and files maintained by [the Claims Administrator] at the administrative offices of [the Claims Administrator] during normal business hours." ECF No. 21-3, ECF No. 487. It does not appear that Central Valley exercised its audit powers under the Plan or the Administrative Services Agreement before this litigation. Defendants have represented to the Court that they will cooperate in an audit, if requested by Central Valley, and will produce any non-proprietary claim documentation. Accordingly, Plaintiffs have failed to demonstrate that a court-supervised audit is necessary to enforce Plaintiffs' rights.

### B. Adequate Remedy at Law

"The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover,* 359 U.S.

500, 506–07 (1959). "It is well established that '[i]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.'" *Grasso Enter.*, 809 F.3d at 1040 (quoting *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009)). Generally, an award of damages, rather than an injunction, is appropriate where the harm has already occurred. *See CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) (concluding that plaintiff had not shown a threat of irreparable harm because "the harm to [the plaintiff], to a large extent, has already occurred.").

Plaintiffs argue that an order enjoining Defendants from performing services and accessing Plan assets is necessary to prevent actions that may diminish the Plan assets. As noted above, all Defendants except for the Claims Administrator have ceased performing any services on Plaintiffs' behalf. The Claims Administrator is providing services at the express and very recent request of Central Valley, and has a contractual obligation to do so. If Plaintiffs wish to terminate the extension of the Administrative Services Agreement for the run-out period, the Plaintiffs have an adequate legal remedy—a notice of termination under the Administrative Services Agreement.

Damages to the Plan, if any, should be measurable. Plaintiffs state that "at a minimum, [Plaintiffs] have suffered and continue to suffer monetary damages in excess of $3 million due to the artifices and devices of the Defendants. Furthermore, upon information and belief, in excess of $1 million in Plan Assets has been diverted to the

13

use and benefit of Defendants." Pl. Br. at 19, ECF No. 3-1, Page ID 63. Thus, Plaintiffs have described their potential loss in terms of measurable money damages.

Nevertheless, Plaintiffs argue that without the records requested in their TRO, "[i]t will be impossible to properly determine what participant claims should have been paid and in what amount; what claims remain outstanding; what claims should be paid under the Plan's stop loss policy; and what Plan assets have been transferred, diminished, converted, or misappropriated." Pl. Br. at 19, ECF No. 3-1, Page ID 70. Yet Plaintiffs have access to records through their contractual rights and discovery rules. Once the records are obtained, any harm to Plan assets or to Central Valley should be measurable in money damages.

## 2. Balance of the Harms

"When deciding whether a preliminary injunction should issue, a district court also weighs the threat of irreparable harm to the movant against the injury the injunction would inflict on other parties. *Paisley Park Enters., Inc. v. Boxill*, 253 F. Supp. 3d 1037 (D. Minn. 2017) (citing *Dataphase*, 640 F.2d at 114). Plaintiffs have not shown any threat of irreparable harm, and a TRO in the form requested would harm Defendants. Although most Defendants have stopped rendering services to Plaintiffs, a TRO would permit Plaintiffs to circumvent the terms of the pending agreement with the Claims Administrator, and standard discovery procedures. Defendants would bear the financial burden of a court-ordered audit under the TRO as sought by the Plaintiffs, even though

14

audit procedures exist under the Plan document and the agreements between the parties. Accordingly, the balance of harms weighs against issuance of a TRO.

### 3. Likelihood of Success on the Merits

At this stage, and on the evidence in the record, the Court cannot conclude that Plaintiffs are likely to succeed on their claims. Their causes of action boil down to two principal theories: (1) Breach of fiduciary duty under ERISA, and (2) violations of RICO.

ERISA requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." *Tussey v. ABB, Inc.*, 850 F.3d 951, 958 (8th Cir. 2017); *see also* 29 U.S.C. § 1104(a). Under ERISA,

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Plaintiffs' evidence of breach includes the affidavit of Plan participant Brad Bousquet, who affirmed that a hospital brought collection proceedings against him and his wife after AMPS failed to process a bill. *See* ECF No. 18-4. Plaintiffs' evidence also includes an affidavit from Chad Van Cleave, Vice President of Finance at Columbus Community Hospital, who affirmed that the Hospital sued AMPS and the Claims Administrator in the Nebraska Methodist litigation because the Hospital believed they advised Central Valley to breach contracts governing the Hospital's

preferred provider network for Plan year 2015. *See* ECF No. 18-5. Based on these affidavits and the allegations in the Verified Complaint, Plaintiffs assert that Defendants diverted funds from the Plan for the use and benefit of Defendants.

Although Plaintiffs' allegations under ERISA are serious, the Court cannot conclude that Plaintiffs are likely to succeed. The Plan documents themselves raise questions about whether Defendants are even fiduciaries of the Plan. For example, the Plan states:

> **CLAIMS ADMINISTRATOR IS NOT A FIDUCIARY.** A Claims Administrator is not a fiduciary under the Plan by virtue of paying claims in accordance with the Plan's rules as established by the Plan Administrator [Central Valley].

Plan at 89, ECF No. 19, Page ID 310. There is also a question as to whether the claims processing practices violated the Plan or the RBR Services Agreement. The practice of "balance billing" by AMPS and Claims Delegate—which is at the heart of Plaintiffs' causes of action—appears to have been contemplated by the parties at the time they entered into the RBR Services Agreement. *See* ECF No. 18-1, Page ID , 116, 119.

Plaintiffs also failed to show that they are likely to succeed on their RICO claims. RICO prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). RICO "is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011).

"To establish their civil claim under RICO, [Plaintiffs] must show that the [Defendants] engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *H & Q Props. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (internal citations omitted). "The requirements of § 1962(c) must be established as to each individual defendant." *Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008).

Plaintiffs allege that all Defendants committed indictable offenses under 18 U.S.C. §§ 1341 and 1343. These alleged offenses include providing false information and reports regarding claims paid and cost savings, and false reports to Central Valley regarding the cost of claims. Although Plaintiffs' Complaint was verified, the RICO violations are conclusory recitations of the law. Plaintiffs have offered no evidence to support the RICO claims. Under RICO, a complaint must state "the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001). The Court cannot discern from the Complaint how any representations were false, nor can it identify how Defendants misappropriated any Plan funds. Accordingly, Plaintiffs have not shown that they are likely to succeed on their RICO claims, nor their ERISA claims.

4. **Public Interest**

In determining whether to issue a preliminary injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of

injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In this case, Plaintiffs demonstrated no potential threat to the public interest. Plaintiffs have long known of Defendants' alleged behavior without seeking equitable relief, and continued to use Defendants' services. No Plan participants are being denied medical care as a result of Defendants' behavior. For those Plan participants who were subjected to collection proceedings, Plaintiffs negotiated with providers to pay the claims. *See e.g.*, Bousquet Aff. ¶ 11, ECF No. 18-4, Page ID 151. If Defendants' actions were improper, Plaintiffs can be compensated for their damages. Accordingly, Plaintiffs have not shown that the public interest favors a TRO.

## 5. Need for Further Hearing

In their Motion for Hearing, ECF No. 26, Plaintiffs argue that an additional three-hour hearing is necessary. Plaintiffs' concern focuses on the Claims Administrator's expressed intent to perform its remaining obligations under the Run-Out Services Agreement.

If Plaintiffs wish to terminate their agreement with the Claims Administrator, they can do so without the need for Court intervention. Section 6.2.c. of the Administrative Services Agreement, that governs the Run-Out Services Agreement, states the Agreement may be terminated by the non-breaching party in the event of a material breach, provided that the breaching party fails to correct such breach within fifteen days of receiving written notification of the breach by the non-breaching party. See ECF No. 21-3, Page ID 488. Thus, if Plaintiffs believe the Claims Administrator

breached its duties, Plaintiffs may terminate the Agreement without resort to injunctive relief.

Similarly, the RBR Services Agreement contains a termination clause. Under that clause, Claims Delegate or any party to the RBR Services Agreement may terminate the Agreement for any reason with ninety-days prior notice to the other parties. In the event of breach, a party also may terminate the Agreement with notice and an opportunity to cure.

Plaintiffs have not exercised their right to terminate either the Administrative Services Agreement or the RBR Services Agreement. No party at the hearing agreed to terminate service contracts or waive its existing contractual rights. Plaintiffs' Motion for Hearing does not provide any meritorious basis for further consideration of Plaintiffs' request for injunctive relief.

## CONCLUSION

Plaintiffs did not demonstrate a threat of irreparable harm, and no other *Dataphase* factor favors issuance of a TRO or preliminary injunction. Further consideration of Plaintiffs' request for a preliminary injunction is unwarranted based on the evidence before the Court at this time.

Accordingly,

IT IS ORDERED:

1. Plaintiffs' Motion for Temporary Restraining Order and for an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted, ECF No. 3, is denied; and

2. Plaintiffs' Motion for Hearing Regarding Temporary Restraining Order, ECF No. 26, is denied.

Dated this 26th day of October, 2017.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge