# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CENTRAL VALLEY AG COOPERATIVE and CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN<br><br>*Plaintiff,*<br><br>v.<br><br>LINUS G. HUMPAL, DANIEL K. LEONARD, SUSAN LEONARD, THE BENEFIT GROUP, INC, ANASAZI MEDICAL PAYMENT SOLUTIONS, INC. d/b/a/ ADVANCED MEDICAL PRICING SOLUTIONS, CLAIMS DELEGATE SERVICES, LLC and GMS BENEFITS, INC.<br><br>*Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>CIVIL ACTION NO. 8:17-cv-379<br><br>JURY TRIAL REQUESTED |

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiffs, Central Valley Ag Cooperative ("Central Valley") and the Central Valley Ag Cooperative Health Care Plan (the "Plan") (collectively, "Plaintiffs") file this First Amended Verified Complaint against Defendants, Linus G. Humpal ("Humpal"), Daniel K. Leonard and Susan Leonard (collectively "the Leonards"), The Benefit Group, Inc. ("TBG"), Anasazi Medical Payment Solutions, Inc. d/b/a/ Advanced Medical Pricing Solutions ("AMPS"), Claims Delegate Services, LLC ("CDS"), and GMS Benefits, Inc. ("GMS") (collectively, "Defendants"), under ERISA §502 and RICO[1] in order to bring Plan assets back into the welfare benefit plan and in support thereof, would respectfully show as follows:

---

[1] "ERISA" means the Employee Retirement Income Security Act of 1974, and "RICO" means the Racketeering Influenced and Corrupt Organization Act.

## JURISDICTION AND VENUE

1.      Jurisdiction is proper in this Court under 28 U.S.C. §1331 because Plaintiffs allege claims under the following federal statutes: the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(e)(1), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964(c).

2.      This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of this Court, and each Defendant systematically and continuously conducts business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over each of them.

3.      Venue is proper under 29 U.S.C. §1132(e)(2) because Nebraska is the location where the Plan was, and is, currently administered, and where the breaches of fiduciary duty, acts of racketeering, and party-in-interest transactions took place that caused loss of plan assets of the Plan.

## THE PARTIES AND THEIR RESPECTIVE ROLES AS TO THE PLAN AND THIS LITIGATION

## CVA AND THE PLAN

4.      Plaintiff CVA is a Nebraska corporation with its principal place of business at 2803 N. Nebraska Ave., York, NE 68467.  CVA provides farm planning, supplies, and services to members of its cooperative in Nebraska, Kansas, and Iowa.  *See* http://www.cvacoop.com. CVA is the sponsor and plan administrator of the Plan.  CVA is a fiduciary of the Plan under ERISA §3(21)(A)(i) and (iii).

5.      CVA is the named surviving entity of a merger between United Farmer's Cooperative ("UFC") and Central Valley AG Cooperative Non-stock ("CVA Non-stock").  Each

entity had its own group employee health and welfare plan prior to the entities' corporate merger in 2014.

6.      In 2012, UFC's (now CVA) health plan was fully-insured.

7.      In 2012, UFC (now CVA) was approached by the Leonards, for themselves, and on behalf of GMS, and Humpal, for himself and on behalf of TBG, with a proposal to change the UFC health and welfare plan from a fully insured plan to a self-funded plan.  The Leonards and Humpal, who were in a position of trust and confidence with regard to UFC, often rendered compliance advice to CVA concerning the Plan, and represented to UFC that changing to a self-funded plan would help manage costs.  UFC relied upon the Leonards and Humpal's advice and amended UFC's group health plan from a fully-insured plan to a self-funded plan.

8.      UFC (now CVA) established its self-funded health and welfare plan in 2013.

9.      The relationship and transactions between CVA and the Defendants named herein began with UFC and the UFC health plan, and arose from the trusted relationship of CVA and the Plan with insurance agent and benefits consultants, GMS (including its owners, Defendants Daniel and Susan Leonard) and third-party administrator, TBG (including its owner, Humpal) in 2012.

## THE CVA SELF-FUNDED HEALTH PLAN

10.     Plaintiff Plan is an employee health and welfare benefit plan that, for the time periods relevant to this litigation, was, and currently is, sponsored by Plaintiff CVA.  The Plan is self-funded by CVA and through participant contributions that are deducted from wages.  The Plan year is the calendar year.

11.     The Plan is the surviving group health plan of the merger of the UFC group health plan and the fully-insured group health plan of Central Valley AG Cooperative Non-Stock.

12.     The Plan is an employee benefit plan within the meaning of ERISA §3(1), and is subject to Title I of ERISA and its fiduciary standards.  The Plan is required to file Form 5500s for each plan year, and to have a fiduciary audit submitted with its Form 5500.

13.     The Plan is an employee welfare benefit plan under ERISA and the group health plan of an applicable large employer for purposes of the Patient Protection and Affordable Care Act.

14.     To limit the maximum potential liability with regard to aggregate claims, UFC (and later CVA) purchased an excess liability insurance (stop-loss insurance) policy for the Plan from Berkley Life/Health Insurance for the Plan year 2014, Companion Life Insurance Company for the Plan year 2015, and from United States Fire Insurance Company for the Plan year 2016. TBG and/or Humpal and GMS and/or the Leonards advised UFC (and later CVA) in procuring stop-loss insurance coverage for the Plan.

### DEFENDANTS GMS AND THE LEONARDS

15.     Defendant GMS Benefits, Inc. is the trade name for Group Marketing Services, Inc., a Nebraska corporation with its principal place of business at 17445 Arbor Street, Suite 200, Omaha, NE 68130.  GMS provides insurance broker and employee benefit plan consulting services to employers.  *See* http://gmsbenefits.net.  GMS may be served through its registered agent Daniel K. Leonard, 17445 Arbor Street, Suite 200, Omaha, NE 68130.

16.     Defendant Daniel K. Leonard is an individual who resides in Nebraska.  Daniel Leonard owns GMS, in whole or in part, and serves as the Vice President of GMS and was, at all

material times, the agent, employee, representative, and/or alter ego of defendant GMS, and was acting for himself and within the course and scope of such agency or employment.

17.     Defendant Susan Leonard is an individual who resides in Nebraska.   Susan Leonard is the wife of Daniel Leonard and owns GMS, in whole or in part.   Susan Leonard was, at all material times, the agent, employee, representative, and/or alter ego of defendant GMS, and was acting for herself and within the course and scope of such agency or employment.

18.     At all times relevant to this Complaint, the Leonards—through GMS—served UFC (and later CVA) as insurance broker, employee benefits consultants, and trusted advisors. The Leonards counseled and assisted UFC/CVA on the Plan's design, legal compliance aspects, administration, and by procuring stop-loss insurance coverage for the Plan.

19.     GMS and the Leonards received compensation from Plan assets and/or CVA for services provided to CVA and the Plan.   Upon information and belief, certain compensation received by GMS and/or the Leonards was not disclosed to either CVA or the Plan, either as to amount or source, although GMS and the Leonards had a duty to disclose such compensation.

20.     GMS and the Leonards received compensation in exchange for influencing CVA and the Plan to engage in transactions with the enterprise comprised of TBG, Humpal, GMS, the Leonards, AMPS, and CDS (hereinafter, the "Enterprise"), as described herein.

21.     GMS and the Leonards are parties in interest under ERISA §3(14)(A) with regard to the Plan.

22.     GMS and the Leonards acted knowingly, intentionally, and willfully as to all actions taken with regard to CVA and the Plan that are alleged in this litigation.

## DEFENDANTS TBG AND HUMPAL

23.     Defendant Linus G. Humpal is an individual who resides in the state of Nebraska.

24.     Upon information and belief, Humpal is an owner and officer of TBG.

25.     At all material times, Humpal was the officer, agent, employee, representative, partner, and/or alter ego of defendants TBG and AMPS, and was acting for himself and within the course and scope of such partnership, agency, or employment.

26.     Defendant TBG is a Nebraska corporation with its principal place of business at 11906 Arbor St., #100, Omaha, NE 68144.  According to its website, TBG provides plan design, medical bill review, and claims administrative services. *See* http://tbgco.com.   TBG may be served though its agent Linus G. Humpal, 11904 Arbor Street, #100, Omaha, NE 68144.

27.     According to its website, TBG is a business "partner" of AMPS.

28.     TBG and/or Humpal receive compensation, directly or indirectly, from AMPS and/or CDS.  TBG and/or Humpal did not disclose to CVA or the Plan compensation received from AMPS and CDS, in whole or in part, although TBG and Humpal had a legal duty to do so.

29.     TBG receives compensation that is paid from Plan assets.

30.     TBG receives compensation from CVA.

31.     TBG and Humpal received compensation in exchange for influencing CVA and the Plan to engage in transactions with the Enterprise, as described herein.

32.     At all times relevant to this Complaint, the third party administrator ("TPA") for the Plan was TBG.  TBG drafted and provided CVA with its group health plan documents from 2013 through 2016.

33.    In addition to its TPA services, TBG adjusted, reviewed, and paid claims under the Plan during the period January 1, 2013 through December 31, 2014.

34.    The 2016 Plan document stated that TBG was the Claims Administrator for the Plan and would "process Claims and answer medical benefit and Claim questions." *See* Doc. 19-9, p.3.  In addition, the RBR Program Services Agreement provides that TBG, as the Third Party Administrator ("TPA") will "process all Hospital Claims, all Hospital Claim Appeals, and will be responsible for making benefit determinations on first Appeals and sending out required notices regarding such determinations in accordance with the Plan Document." *See* Doc. No. 19-8, §3.01(d).

35.    For the time period relevant to this litigation, Humpal and TBG were trusted advisors to CVA with respect to the Plan.  Humpal introduced CVA to AMPS and CDS, and advised CVA to utilize AMPS' and CDS' services with respect to the Plan.

36.    Humpal and TBG did not disclose to CVA or the Plan the full nature and scope of AMPS' and CDS' business methodologies with regard to services AMPS and CDS rendered to the Plan, although Humpal and TBG had a legal duty to do so.

37.    For the time period relevant to this litigation, TBG and Humpal are fiduciaries of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) with regard to the design and terms of the Plan document; with regard to cost savings mechanisms for claims processing; and with regard to the decision to retain AMPS and CDS.

38.    TBG and Humpal are each a party in interest under ERISA §3(14)(A), with respect to the Plan for all time periods relevant to the litigation.

39.     TBG and Humpal acted knowingly, intentionally, and willfully as to all actions taken with regard to CVA and the Plan alleged in this litigation.

## DEFENDANTS AMPS AND CDS

40.     Defendant AMPS is an Arizona corporation with its principal place of business at 35 Technology Parkway South, Suite 100, Peachtree Corners, GA 30092.   AMPS conducts business in Nebraska through its website and its partnership with TBG.  AMPS represents in its marketing materials that it provides "cost containment services for self-funded employers."  *See* http://advancedpricing.com.  AMPS may be served through its registered agent CT Corporate Systems, 3800 N. Central Ave. #460, Phoenix, AZ 85012.

41.     Defendant CDS is a Florida limited liability company with its principal place of business at 420 Technology Parkway, Norcross, FL 30092.  On or around August 1, 2014, CDS became a wholly owned subsidiary of AMPS.  For all periods relevant to this litigation, CDS conducted business in Nebraska, both on its own and through its parent company AMPS.  CDS represents in marketing materials and other client communications that it "provides 'Reference Based Reimbursement' programs for self-funded employer health care plans." CDS states in marketing materials and other client communications that its services include review and auditing of hospital and health care provider claims.  CDS may be served through its registered agent CT Corporation Systems, 1200 South Pine Island Road, Plantation, FL 33324.  CDS is a subsidiary of AMPS.

42.     CDS is an alter ego of AMPS.

43.     AMPS and CDS are business "partners" with TBG and Humpal in the administration of the Plan and all of AMPS' and CDS' services to the Plan.

---

**FIRST AMENDED VERIFIED COMPLAINT**                                        Page 8

44.     AMPS and CDS received compensation as a result of the actions of the Enterprise.

45.     At all time periods relevant to this litigation, AMPS is a fiduciary of the Plan, within the meaning of ERISA §3(21)(A)(i) and (iii), as to whether the Plan should be amended to reflect AMPS' medical bill review and reference based pricing and reimbursement processes; setting out-of-network reimbursement rates for health care provider claims; negotiation of direct provider contracts; medical bill or claim review; reference based pricing and reference based reimbursement of claim; and the determination of what health claims should be paid and in what amount they should be paid.

46.     As to all time periods relevant to this litigation, AMPS is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) as to AMPS' cost containment programs utilized by the Plan (including but not limited to reference based pricing and reference based reimbursement); what health care claims will be paid; and in what amount claims will be paid by the Plan.

47.     CDS is a partner with TBG and Humpal in the administration of the Plan.

48.     As to all time periods relevant to the litigation, CDS is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) as to the AMPS' cost containment programs utilized by the Plan; the determination of whether claims should be subject to review by AMPS; and whether the claims should be paid or not paid due to factors such as perceived or actual medical errors, balance billing amounts, or improper charges.  Furthermore, CDS is a named fiduciary of the Plan under the terms of the Plan document. *See* Doc. 19-9, p.3.

---

49.     AMPS and CDS are fiduciaries of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) as to the design and implementation of the legal advocacy program called Legal Plan Membership which was offered to participants of the Plan as a benefit.  AMPS and CDS represented that the legal advocacy program would protect the participants against health care provider "balance billing."

50.     AMPS and CDS receive compensation, as a result of the activities of the Enterprise, from Plan assets and from CVA.  Certain compensation received by AMPS and CDS with respect to services rendered to CVA and the Plan was not disclosed to either CVA or the Plan, although AMPS and CDS had a duty to do so.

51.     AMPS and CDS are each a party in interest under ERISA §3(14)(A) with respect to the Plan.

52.     AMPS and CDS acted knowingly, intentionally, and willfully with regard to all actions taken with respect to CVA and the Plan described in this litigation.

## FACTS CONCERNING AMPS' AND TBG'S MANDATES FOR PLAN TERMS AND CONDITIONS

53.     AMPS and CDS, through Humpal, TBG, the Leonards, and GMS, presented the "RBR" scheme to CVA and the Plan as a cost-savings mechanism.

54.     Customarily, reference based pricing or reference based reimbursement is a type of discount pricing program where insurance companies and large self-funded plans (via preferred provider contracts) negotiate discounts with certain health care providers in areas where there is competition among health care providers.  In these discount pricing programs, the insurance companies or plans steer their insureds or participants to certain providers in exchange for substantial discounts for services rendered.  These arrangements are negotiated in advance of

---

**FIRST AMENDED VERIFIED COMPLAINT**                                    Page 10

any services being provided to the insureds or participants, and are typically utilized only for services that are common, and are performed by a large number of health care providers, such as a colonoscopy, so that extensive competition among providers exists and provides a motivation for the providers to accept discounts.

55.     Reference base pricing programs and reference based reimbursement programs are not generally accepted in the insurance or self-funded plan community as pricing or reimbursement mechanisms for **all** or ***a majority*** of health care services.  In fact, In 2014, 2015 and 2016, federal agencies, including the Federal Trade Commission and the Department of Labor, warned against the use of such programs in any broad capacity for self-funded group health plans because of the omission of quality of care considerations, the dependency on vast competition among providers needed for such programs to be successful, and potential conflicts with the Patient Protection and Affordable Care Act ("ACA") maximum out-of-pocket expense mandates.

56.     CVA and the Plan were unaware of the warnings by federal agencies concerning broad-based reference based pricing and reference based reimbursement programs at the time the RBR scheme was presented to them.  AMPS, CDS, Humpal, TBG, and GMS represented they were knowledgeable in reference based reimbursement and pricing programs, and CVA and the Plan relied upon them and their representations.  From October 30, 2015 to August 17, 2016, AMPS, CDS, Humpal, TBG and GMS represented to CVA and the Plan that their RBR scheme was of the type of reference based reimbursement program that was accepted by the insurance and employee benefit plan community as the "wave of the future."

---

**FIRST AMENDED VERIFIED COMPLAINT**                                           Page 11

57.     Based upon the representations of Defendants, CVA and the Plan thought they were getting the RBR program identified in Paragraph 53 (*supra*) of this First Amended Complaint.  However, the RBR scheme CVA and the Plan received was nothing like that RBR program for the following reasons:

    a.  AMPS' RBR scheme applied to ***all*** health services provided to Plan participants, whether or not participants had choices among health care providers and whether or not quality services were provided by health care providers;

    b.  AMPS' RBR scheme, when applied to the Plan's design, guaranteed Plan participants would be subject to balance billing from the health care providers;

    c.  AMPS' RBR scheme failed to put PPO contracts in place with providers before services were rendered to participants and thus failed to assure health care providers agreed to discounts;

    d.  AMPS' RBR scheme shifted  health care costs to participants and violated ACA mandates; and

    e.  AMPS' RBR scheme allowed AMPS, TBG, and CDS to take their fees on purported "savings" in claim costs ***before, rather than following*** complete claim adjudication, and thus before payments to health care providers had been resolved.

58.     AMPS' RBR Program Services Agreement mandated that the Plan be amended to include a list of "Required Modifications." These "Required Modifications" changed the Plan materially, impacting the health plan "structure, design, concepts, definitions, terms and provisions" applicable to all health benefit claims submitted to the Plan.  The result of the

---

**FIRST AMENDED VERIFIED COMPLAINT**                                         Page 12

amendments that AMPS dictated be made to the Plan (commencing January 1, 2016) was that AMPS and CDS were given total discretion and authority to determine what amount of money was going to be paid to which health care provider on each and every claim.

59.     Based upon AMPS' directions for plan amendments, TBG created the Plan document as it existed for the 2016 plan year (the "2016 Plan") (and as the Plan was operated in the 2015 plan year by TBG and CDS without CVA's knowledge or consent).

60.     The 2016 Plan provides for "Option 1," "Option 2," and "Option 3."  Employees working 40 hours per week could choose to participate in Option 1, a high-deductible health plan, or Option 2, a low-deductible health plan.  "Option 3," ostensibly available to employees working 30 hours to 39 hours per week is identified in the 2016 Plan, but the terms and conditions of Option 3 are not described in the 2016 Plan document.

61.     TBG, AMPS, and CDS intentionally omitted a description of "Option 3" in the 2016 Plan document, upon information and belief, because the lower deductible amounts cut into the "savings" made possible by the Plan through the RBR scheme and, consequentially, cut into the monetary amounts Defendants would be able to pay to themselves.

62.     The 2016 Plan provides that participants must pay deductibles, co-insurance, and out-of-pocket maximum amounts, but not balance billed amounts.  However, AMPS and CDS intentionally and willfully designed the 2016 Plan so that it virtually assured that health care providers would not be paid by the Plan as customary in the providers' medical practices in the geographic region, and thus attempts by health care providers to collect balances of bills from participants were therefore certain to occur.

63.     Although they had a legal duty as a fiduciary to do so, AMPS and CDS, for themselves and through Humpal and TBG, never disclosed to the Plan or CVA that the methodologies for health claims established by the RBR scheme would assuredly subject *all* Plan participants to balance billing and collection efforts by health care providers *for virtually all material health claims*.   In fact, Humpal represented to CVA in a meeting held in the CVA offices in York, Nebraska, on October 30, 2015 that providers would "love" a 185% reimbursement under this RBR scheme, and that the providers, the Plan participants and CVA would be very happy with the cost savings the RBR scheme would provide.

64.     The 2016 Plan document contains definitions of certain terms, such as "Allowable Expense," "Billing Review," "Clean Claim," "CMS Cost Ratio," "Covered Expense," "Errors," "Excess," "Excessive Charges," "Fair and Reasonable Consideration," "Invalid Charges," "Permitted Payment Levels," "Reasonable," and "Usual and Customary," which, when applied under the 2016 Plan's provisions governing when, how, and in what amount claims would be paid under the Plan, placed health care provider payments for services rendered to Plan participants substantially below what is considered commercially reasonable in the geographic region of the Plan.   Further, the Plan document drafted by TBG was, and is non-compliant with the mandates of the Patient Protection and Affordable Care Act ("ACA") because, as a matter of document drafting and plan operation, it exposes Plan participants to fees that exceed maximum out-of-pocket cost limitations under the ACA.

65.     The 2016 Plan document, by its terms and as administered by AMPS and CDS, rendered the Plan an artifice and device to deceive CVA, the Plan, and its participants into

believing AMPS and CDS were achieving savings in claims paid by the Plan when no such savings were actually realized or could ever possibly be realized.

66.     Via mail, electronic mail, and through the AMPS and TBG websites, AMPS, CDS, TBG, Humpal, GMS, and the Leonards (the "Enterprise") communicated the artifice and device of the 2016 Plan and its purported claim experience to CVA, the Plan, and the Plan participants for the purpose of diverting Plan assets to themselves and for their own use.

67.     The 2016 Plan's provisions effectively put the Plan's claim reimbursement rates at levels so low that no reasonable health care provider would render services to the Plan's participants.  AMPS and CDS set reimbursement rates low as an artifice and device to deceive CVA, the Plan, and the participants into thinking that AMPS and CDS were rendering valuable services to the Plan and that the Plan was experiencing savings in claims when the Plan was not.

68.     The 2016 Plan's provisions, in form and operation, rendered group health plan coverage for participants economically illusory, and shifted the risk of monetary loss from the Plan to the Plan's participants.  Upon information and belief, the form and operation of the 2016 Plan was an artifice and device for AMPS and CDS to defer assets of the Plan to themselves, TBG, GMS, Humpal, and the Leonards.

69.     The 2016 Plan's provisions allow 365 days (or about 1 year) for health care providers or participants to submit claims.  The delay in claims submission was an artifice and device of AMPS and CDS intended to make it appear that the Plan was achieving savings in claims costs, when it was not.  By email and mail, AMPS and CDS, directly and through TBG, Humpal, GMS, and the Leonards communicated to CVA and the Plan that $1 million in savings was achieved when, in fact, the Plan was sustaining losses.  Upon information and belief, the

Enterprise of AMPS, CDS, TBG, Humpal, GMS, and the Leonards used such artifice and device to divert assets of the Plan to themselves for their own use.

70.     The year deadline for submitting claims put various otherwise late-filed claims, i.e., those submitted outside the customary filing deadlines for health plans and health insurance, outside the time limits of the Plan's stop-loss or reinsurance coverage. The 2016 Plan document shifted the risk of monetary loss from the stop-loss carrier to the Plan and, ultimately, to CVA and the Plan participants. Upon information and belief, the form and operation of the 2016 Plan, specifically the delay in claims processing caused by late-filed and slow processed claims, was an artifice and device for the Enterprise members, AMPS and CDS, to defer assets of the Plan to themselves, TBG, GMS, Humpal and the Leonards.

71.     The 2016 Plan gives the "Claims Delegate" absolute discretion and authority to determine when, and in what amount, any claims are paid. The "Claims Delegate" is CDS. The authority for determining claims under the RBR Program Services Agreement is AMPS.

72.     AMPS and CDS are fiduciaries with regard to all medical claims submitted by health care providers and participants under the 2016 Plan's terms and conditions.

73.     The RBR Program Services Agreement provides that the Claims Delegate, i.e., CDS, will enroll all Plan participants in a "Legal Plan Membership" with the "Legal Club of America." The "Legal Plan Membership" is intended to allow CDS and the attorney retained by the participant the authority to defend the participant against collection action and litigation by health care providers seeking to be paid for services rendered.

74.     The Legal Plan Membership was AMPS' and CDS' artifice and device to placate participants who became subject to collection and litigation because the Plan did not pay health

care providers who rendered services to the participants. AMPS and CDS used the artifice and device of the Legal Plan Membership to create, for Plan participants, the appearance of a remedy for damages that AMPS and CDS knew when they marketed their services via websites, electronic mail, and regular mail, directly and through TBG and Humpal, were certainly going to occur.

75.    Using the artifice and devices described in paragraphs 51 through 73 above, the actions of AMPS and CDS, with regard to claims submitted to the Plan in the 2015 and 2016 plan years, were so restrictive and commercially unreasonable, and the Plan's ability to pay claims so obstructed, that the Plan suffered losses of plan assets in excess of $3 million due to:

   a.   The uncertainty caused by claims for medical services that remained outstanding and un-submitted by health care providers for a year after the closing of the plan year;

   b.   The loss of stop-loss insurance coverage due to late filed claims and unresolved claims in the administrative appeal process provided under the Plan;

   c.   The loss of stop-loss coverage under the aggregate claims provisions of the stop-loss policy due to the stop-loss carrier's uncertainty as to whether the number and amount of medical claims caused the policy aggregate limits to be reached, or whether it was AMPS' and CDS' claims and review activities that caused the stop-loss policy limits to be exceeded;

   d.   Payments to health care providers over and above what AMPS and CDS caused the Plan to pay in order to settle health care provider claims, avoid litigation, and allow participants to be treated for their medical conditions; and

---

e. Losses sustained by the Plan as a result of paying sums that health care providers billed participants, and pursued in collections, in order to protect participants from charges that exceeded what AMPS and CDS would pay under the RBR model.

**FACTS OF TRANSACTIONS AND EVENTS
MATERIAL TO AMPS' AND CDS' ARTIFICE AND DEVICE
OF THE PLAN DESIGN AND OPERATION**

76. In a teleconference on October 21, 2014, Humpal, acting as an agent of TBG, with GMS (the Leonards) and CDS, and with CDS' agreement (without the Plan's or CVA's knowledge), approached CVA about hiring CDS to review the medical claims submitted to the Plan for errors.  For the Plan Year 2015, the Plan was committed to the claim payment schedule in PPO contracts with its health care providers, so CVA anticipated CDS' work would involve resolving errors in claims or duplicate claims, rather than any negotiations over pricing.  Relying upon the position of trust and confidence CVA had in TBG and Humpal, CVA agreed to CDS' services reviewing claims for errors.  This event commenced the relationship of CVA and the Plan with CDS and, ultimately, with AMPS.

77. During a plan status meeting on April 6, 2015, with CVA at the CVA York, Nebraska office, attended by Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood for CVA and Daniel and Susan Leonard for GMS, GMS (conveying information developed by TBG and GMS) represented that numerous billing errors had been discovered in Plan claim administration by CDS and that the Plan had saved more than $1 million since CVA hired CDS.  This representation of fact was consistent with the marketing message of AMPS (as shown by AMPS' website) and was false.  The apparent monetary savings in Plan claims resulted from the failure of CDS and TBG to process or pay claims.  CVA and the Plan had no knowledge of this

and, therefore, relied upon Humpal's and TBG's representations concerning savings in Plan claims experience, which were communicated to CVA and the Plan via email, as well as in person.

78.     In August 2015, CVA received a letter from First Health, the Plan network provider, stating that it would no longer work with the Plan because claim repricing was taking place in violation of the Plan's PPO contracts with the health care providers. First Health stated that providers were not receiving compensation within the terms of their contracts from the Plan. First Health alleged the Plan was breaching its contracts with health care providers.

79.     CVA was unaware of any repricing that was being done with regard to Plan health claims and contacted Humpal and TBG to secure information on behalf of the Plan and its participants regarding access to services in the communities where the participants lived and why the health care providers were taking the position the PPO contracts had been breached. Humpal (for himself and TBG) told CVA that the providers were simply angry because of all of the errors that had been discovered by CDS. Humpal never disclosed that any repricing of medical claims was being done by CDS. In fact, the majority of hospital and other large claims to the Plan were not being processed to resolution or being paid by CDS and TBG. Delay in claims processing and claims repricing was part of the artifice and device CDS and AMPS utilized to cause CVA and the Plan to believe money was being saved, and to divert assets of the Plan to the Enterprise, i.e., CDS, AMPS, TBG, Humpal, GMS, and the Leonards. CVA relied upon Defendants' representations and the promises that CVA and the Plan had been given by Defendants. CVA believed that, based upon these representations and the written reports GMS

and TBG were providing, that CDS was realizing savings due to identification and correction of errors, rather than repricing of claims or discounting health care provider's services.

80.    Upon information and belief, false and misleading communications, made by the members of the Enterprise concerning claims and claims repricing were made by electronic mail, regular mail, and AMPS' and TBG's websites to CVA, the Plan, Plan participants, and health care providers.

81.    For claims under $10,000, CDS would pay according to the fee schedule. However, upon information and belief, in all claims over $10,000, CDS would pay claims at a level that was commercially unreasonable.  CDS and AMPS used complete discretion as to what claims would be paid and in what amount claims would be paid.

82.    On September 30, 2015, CVA, specifically Carl Dickinson, Don Swanson, Tim Esser, and Peggy Hopwood had a Plan teleconference with Daniel and Susan Leonard, GMS (who were acting on behalf of themselves, TBG and GMS) where different network provider and plan design options were presented to CVA for the 2016 plan year.  Originally, this meeting was intended to be in the CVA offices in York, Nebraska, but GMS was unprepared to present all the plan design options at the time.

83.    A second renewal meeting was held in the CVA York, Nebraska office on October 30, 2015.  This meeting included Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter for CVA; Daniel and Susan Leonard, GMS; and Humpal, TBG. In this meeting Humpal (for himself and TBG) represented he was unable to obtain contracts with providers in the customary provider networks due to arguments over what amount would be paid by the Plan for services.   It was at this meeting that the AMPS Reference Based

Reimbursement ("RBR") pricing model and other AMPS services were presented to CVA by Humpal, TBG, and the Leonards, GMS, for the Plan.

84.    For himself and TBG, Humpal, the Leonards and GMS stated that AMPS—in partnership with TBG—had developed a "reimbursement methodology based on the fair market value of the services rendered" and that this was the best option for CVA and the Plan.  Humpal, TBG, the Leonards and GMS represented that RBR, coupled with CDS' claim review services, "guaranteed savings" for the Plan.  Humpal's and the Leonards' verbal communications to CVA at that October 30, 2015 meeting mirrored, almost word for word, the content of the marketing materials on AMPS' website.

85.    The statements of fact made at the October 30, 2015 meeting, closely tracked the statements and representations made on the web pages and videos contained on AMPS' website at http://advancedpricing.com. For example:

a.    Humpal represented, on behalf of TBG and AMPS, that AMPS provided services in out-of-network pricing; direct provider contract negotiations; medical bill review; and reference based pricing (reference based reimbursement or "RBR").

b.    Humpal represented, on behalf of TBG and AMPS, that RBR was the "wave of the future" and "guaranteed savings."

c.    Humpal represented that the RBR method pushed the cost of health care to its lowest price, by, among other things, forcing health care providers to accept a percentage of Medicare for all services rendered.

d.    On behalf of himself, TBG, and AMPS, Humpal represented that he had investigated the RBR method and spoken with hospitals, and that the hospitals

were happy to be paid 185% of Medicare, even though it was lower than the usual and customary rates for health care services.  Humpal represented that 185% was the suggested RBR percentage and that this percentage would result in savings for the Plan.  Humpal represented health care providers would "love" receiving 185% of Medicare for their services.

e.  Humpal failed to advise CVA or the Plan that a 185% reimbursement rate would prevent the Plan from taking advantage of flat fees and bundled cost arrangements hospitals commonly rely upon to save insurers and group health plans money.

f.  At the time of Humpal and TBG's representations to CVA, AMPS displayed on its website a map of the United States showing the amount of savings a self-funded group health plan would achieve utilizing AMPS' services.  For Nebraska, AMPS stated its processes of provider contract negotiations and RBR would save the Plan 59% of gross billed charges or claims, and the medical claims review would save 7.8% of health provider claims reviewed.  Humpal represented a similar level of savings to CVA and the Plan.  Further, upon information and belief, the U.S. map demonstrating savings by state did not depict factual savings AMPS methodologies had realized for actual clients.  The U.S. map information was a fallacy utilized by AMPS to draw in clients.

g.  On behalf of himself, TBG, and AMPS, Humpal stated that RBR pricing was the new way that insurance was going to work, and that providers were no longer going to be able to overcharge for services or balance bill participants for services rendered.

---

h. For himself, TBG and AMPS, Humpal represented AMPS would negotiate new agreements with the health care providers who customarily rendered services to participants of the Plan, and would bring the Plan's claims cost down. Furthermore, Humpal represented that hospitals would be "happy" to be paid 185% of Medicare for their services.

86. Communications regarding RBR, claims review, and other AMPS and CDS services were made to CVA and the Plan by AMPS and CDS through Humpal, TBG, The Leonards, and GMS verbally, via telephone, through email, and, indirectly via AMPS' website which, upon information and belief, was reviewed and used by Humpal and TBG. The communications regarding RBR were patently false and misleading.

87. Relying on AMPS', Humpal's and the Leonards' representations that: AMPS would negotiate provider contracts that would lead to claims savings; representations by Humpal providing details on how the RBR pricing would function; and, the relationship of trust and reliance upon the combined expertise of Humpal and the Leonards in the area of self-funded health plan design, legal compliance and operation, CVA and the Plan agreed to the RBR option and to retain AMPS and CDS for all AMPS' described services for the 2016 plan year of the Plan. CVA also relied upon the representations it had been provided by Humpal, TBG, GMS, the Leonard, and CDS in regard to its 2015 claims processing, and savings purportedly received, in continuing to trust representations concerning the RBR option.

88. At the time of Humpal's meetings with CVA and the Plan, the AMPS website contained a video of AMPS' CEO, Mike Dendy, discussing the RBR, or "reference based pricing" strategy. In the video, Dendy represented that RBR worked "like a defined contribution

---

plan concept for group health plans.  The Plan would control cost by reimbursing claims for certain procedures at a flat, defined rate, and participants would therefore be motivated to "shop" for the health care provider willing to render services for that rate.  In other words, under AMPS' protocol, the Plan would pay, for example, $12,000 for an appendectomy.  Participants who needed an appendectomy would, on their own, need to find a health care provider to render services for $12,000, or would have to pay the provider for any sums over that amount.  Humpal (and TBG) did *not* disclose this portion of AMPS' RBR concept to CVA and the Plan, although they had a fiduciary duty to do so.

89.     The AMPS website also contains information for third-party administrators and insurance agents, like Humpal and the Leonards, on how to sell AMPS to self-funded health plans and the employers who sponsor such plans.

90.     Although he had a legal duty to do so, Humpal (on behalf of himself and TBG) did not disclose to CVA or the Plan the AMPS website.

91.     On January 19, 2016, based upon the representations of Humpal, TBG, GMS, the Leonards, and AMPS, CVA signed the RBR Program Services Agreement (the "RBR Agreement") with AMPS and CDS for the January 1, 2016 to December 31, 2016 Plan Year.

92.     The RBR and claims pricing model of AMPS and CDS, the claims review services, the defined contribution concept, and all other programs described on AMPS' website are an artifice and device that AMPS uses to bring self-funded health plan assets under AMPS' and CDS' control so that such plan assets may be diverted to the Enterprise's use.

93.     This artifice and device was, and currently is, utilized by the Enterprise, through AMPS and CDS, to divert assets of other self-funded health plans, such as the self-funded health plans of Goodrich Dairy, Inc. and Nissan of Omaha, for the Enterprise's benefit.

94.     During the latter part of the 2015 Plan year, without the knowledge of the Plan or CVA, AMPS was already repricing the Plan's claims through the services that CDS was rendering to the Plan.  Without the knowledge of the Plan or CVA, participant health claims were already tangled up in conflicts between health care providers and CDS, AMPS, and TBG over the amount of money the Plan would pay for services rendered to participants of the Plan. CDS was using the artifice and device of claims repricing to divert assets of the Plan to the Enterprise during the 2015 plan year, and prior to the execution of the RBR Agreement.

95.     Under the terms of the RBR Agreement, AMPS was paid 10 percent of all *gross hospital claims* submitted to the Plan (whether or not the Plan's terms allowed such claims), and TBG was paid 2.5 percent of all *gross hospital claims* (in addition to its administration fees). AMPS and CDS knew that the Plan assets diverted to their use were substantially more than any savings in claims payments that could be achieved via the RBR, claims repricing, claims review, and other programs AMPS and CDS directly and indirectly marketed and sold to sponsors and self-funded health plans.

96.     In fact, the Plan received no monetary or other benefit from the services AMPS and CDS provided.  The RBR program, claims repricing, claims review, and other services of AMPS and CDS are an artifice and device to divert the assets of self-funded employee group health plans to the Enterprise.

97.     On April 19, 2016, CVA, represented by Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter, had a meeting in the CVA offices in York, Nebraska with Daniel and Susan Leonard, GMS, and Humpal, Julie Maschka, and Natalie Osorio Skutt (TBG's General Counsel), TBG.   AMPS' CEO, Michael Dendy participated in the meeting by telephone.  The meeting was about CVA's discovery that, contrary to representations made at the October 30, 2015 meeting by AMPS and CDS through Humpal and TBG, the Plan did not have any provider contracts in place because TBG and AMPS did not negotiate any such contracts. CVA was told at that time that AMPS' preferred strategy and process was to fight the claims as they were received by the Plan and push the providers to accept reimbursement based on a percentage of Medicare.  This was the first time CVA learned any fact that would have put CVA on notice that the RBR pricing scheme was intended to push the risk of loss upon Plan participants and put them on the front lines in any dispute with health care providers over the monetary amounts they were receiving in payment of their claims to the Plan.  CVA was completely unaware, however, that virtually every claim made to the Plan of any substantial amount was going to be subject to payment in a meager amount under the RBR pricing scheme designed by AMPS and CDS.

98.     The AMPS strategy, revealed at the April 19th meeting, was to have health care providers sign contracts for their reimbursement rates with the Plan at the lower reimbursement rate the health care providers settled upon in order to be paid by the Plan because, AMPS represented, the providers would be in a lesser bargaining position if they were looking for payment.

---

**FIRST AMENDED VERIFIED COMPLAINT**                                          Page 26

99.     Because AMPS did not negotiate with providers prior to services being rendered, the Plan was prevented from enjoying the customary 35-40 percent or other prices or discounts given to insurance companies and health plans for health provider services in the geographic region of the Plan.  AMPS and CDS, by and through TBG and Humpal, utilized this artifice and device to divert the assets of the Plan to the Enterprise.

100.     Also in the spring of 2016, CVA discovered that there were significant issues with claims from 2015.  On March 31, 2016, CVA had a meeting with several employees at the offices of TBG in Omaha, Nebraska where employees were discussing issues resulting from TBG, AMPS and CDS' claim administration.  CVA discovered in this meeting that CDS and AMPS had artificially deflated the reimbursement amount of aggregate claims for plan year 2015, and hospitals were refusing to accept the lower payments CDS (who was repricing claims in 2015) was offering.  The result was that the Plan participants themselves were being pursued for collection.

101.     AMPS and CDS, by and through TBG and Humpal, utilized this artifice and device to divert the assets of the Plan to the Enterprise.

102.     Participants began calling CVA and TBG because health care providers were denying them services unless they paid "up front" or agreed in writing to pay for health care provider services due to the Plan's failure to pay claims at any reasonable commercial rate for the geographic region of the Plan.  Participants of the Plan were unable to access health services as a result of the actions of the Enterprise.

103.     AMPS and CDS, by and through TBG and Humpal, utilized this artifice and device to divert the assets of the Plan to the Enterprise.  As a result, Plan participants were

unable to access services that should have been provided to them under the Plan.  Participants paid claims themselves that should not have been paid in order to avoid creditor collections personnel from contacting them and risking negative entries on their credit histories.

104.    On June 27, 2016, CVA (Tim Esser and Rick Smithpeter) held a meeting by telephone with representatives of TBG (Dan Jaard) and AMPS (CEO, Michael Dendy and Sales Manage, John Powers) to discuss the fact that there were still no provider contracts in place and claims were not being processed in a timely manner.  AMPS acknowledged that the contract problem was their fault and promised to resolve the issue. AMPS did not disclose that it was already engaging in repricing of medical claims or balance billing negotiations with health care providers at this meeting or that providers were refusing to agree to AMPS' monetary offers on claims.  AMPS also failed to disclose that a lawsuit had been filed by a number of health care providers a month prior, in May 2016, against CVA's Plan and other employers (i.e., the "Nebraska Methodist Litigation"), seeking to enforce the PPO contracts they had in place, which CDS and TBG had circumvented.  AMPS did not disclose to CVA that counsel, Fraser Stryker P.C. LLO had already been asked by AMPS to defend the "CVA Flex Benefit Plan" (a misnomer for the CVA Plan) and was, in fact, in the process of drafting an Answer to file on behalf of the Plan.

105.    AMPS and CDS, by and through TBG and Humpal, utilized this artifice and device to divert the assets of the Plan to the Enterprise.  These Defendants concealed the existence of the Nebraska Methodist litigation in a deliberate effort to conceal the problems with the scheme and to induce CVA to continue to use the services of TBG, GMS, AMPS and CDS.

106.    During the third quarter of 2016, CVA began receiving telephone calls from Plan participants regarding the fact that health care providers were taking collection efforts against them. Health care providers made litigation threats against CVA and the Plan.

107.    In October and November 2016, CVA began visiting hospitals to negotiate payment terms in order to stop the collection efforts against the Plan participants and allow participants to receive services from those hospitals, which for many participants were their only hospital option within a reasonable geographic distance of the smaller communities in which most of them live.  As a result of these efforts, CVA and the Plan incurred additional claims fees in order to protect participants from collection action by health care providers.

108.    AMPS and CDS, by and through TBG and Humpal, utilized this artifice and device to divert the assets of the Plan to the Enterprise.  However, by late in 2016, AMPS' and CDS' artifice and device was unraveling.

109.    The Plan had a stop-loss policy with Companion Life Insurance Company for the 2015 plan year, and United States Fire Insurance Company for plan year ending in 2016.

110.    On November 10, 2016, CVA (Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter) met with Humpal (for himself and TBG) and Beau Reid and Tammy Hayes of Holmes Murphy (the agents for stop loss insurance) regarding continued stop-loss coverage for the 2016 claims that had not been paid as of the end of the year.  CVA was reassured by Humpal, TBG, that everything was covered.  In fact, Humpal specifically stated that "anything incurred and submitted will be paid" and that CVA was "fine."  CVA took this to mean they would be covered for the claims.  However, Humpal's statement was not true. Humpal knew the statement was not true when he made it.   Humpal made the statement in order

to prevent CVA from realizing it and the Plan were being damaged by AMPS' and CDS' methods of analyzing and processing claims.

111.    Because Defendants TBG and GMS failed to negotiate and obtain tail coverage on the stop loss insurance agreements by the end of 2016, claims that were delayed in processing or appeals—due to litigation or disagreements with providers—were outside the coverage period of the stop loss policy and CVA and the Plan became liable for the payment of the claims.

112.    In October 2016, CVA and the Plan were told by Grant Matthies, Omaha Silverstone Group that group health plans served by AMPS and CDS had been sued by several hospitals for failure to pay claims pursuant to the rates contractually agreed upon. *See Nebraska Methodist Hospital, et. al. v. Cooperative Producers, Inc. Group Benefit Plan, et. al.,* Case No. CI 16-4230, District Court of Douglas County, Nebraska (i.e., the "Nebraska Methodist Litigation").  CVA inquired with Humpal by telephone on or around October 10, 2016, who admitted to the litigation, but did not disclose that CVA or the Plan were named defendants in the litigation, although he had a legal duty to do so.

113.    Later, in early November 2016, CVA discovered that the "Flex Benefit Plan" (a misnomer for the Plan) was a defendant in the litigation, that counsel for TBG, AMPS, and CDS was handling the lawsuit—purportedly on behalf of all defendants— including CVA, and that Fraser Stryker P.C. LLO had filed an Answer on CVA's behalf in in the Nebraska Methodist Litigation in mid-June 2016.  Thus, CVA and the Plan were being represented in litigation, and were defendants in litigation, without CVA and the Plan's consent or knowledge.

114.    AMPS, CDS, TBG, and Humpal intentionally concealed the Nebraska Methodist Litigation from CVA and the Plan to hide the artifices and devices that were their RBR, claims

repricing, claims review, and other programs and their own diversion of assets of the Plan to the Enterprise's use.  Further, AMPS, CDS, TBG and Humpal failed to disclose that another lawsuit had been filed by health care providers suing over the RBR methodology and AMPS' and CSD' claim administration practices in 2015, *Nebraska Methodist Hospital et al., v. State Law Enforcement Bargaining, et al.,* Case No. 15-0004249, Dist. Ct. Douglas County, State of Nebraska.

115.   On December 28, 2016, in an email to Rick Smithpeter, Natalie Osorio Skutt, TBG General Counsel, states: "So CVA was named in lawsuit over the summer," "AMPS is paying for the legal costs," and that "Fraser Stryker P.C. LLO represented them in this."  Skutt states: "I do not think they [AMPS] will cover legal fees if CVA uses any other counsel."  In reliance upon these representations, having been lulled into believing they were in good hands, and in order to avoid the monetary consequences to the Plan that Skutt described in the December 28th email, CVA signed a representation letter with Fraser Stryker P.C. LLO (attorneys Timothy J. Thalken and Emily R. Langdon) on December 28, 2017, not noticing that the representation letter was dated months earlier, on May 24, 2016.  CVA had no contact from the attorney representing TBG, AMPS, and all the defendant plans, including CVA's Plan until months later.  Several notable events occurred in connection with the litigation presently before this Court:

   a.   Mr. Thalken filed a Motion to Withdraw as counsel to the Plan in the Nebraska Methodist Litigation on October 16, 2017.

   b.   Later in the late afternoon of October 16th, and prior to any entry of an Order on the Motion to Withdraw in the Nebraska Methodist Litigation, Mr. Thalken and

Ms. Elizabeth Culhane entered their appearance in this litigation and filed a brief taking a position adverse to the CVA Plan.

c.  On October 17, 2017, Ms. Culhane appeared in a capacity adverse to CVA and the Plan in a hearing before this Court, along with Ms. Langdon. Thus, Mr. Thalken and Ms. Langdon entered an appearance with this Court on October 16th and 17th for Defendant, TBG, taking positions directly adverse to current client, Flex Benefit Plan (i.e., the CVA Plan) and before any permitted withdrawal from the Nebraska Methodist Litigation.

d.  Mr. Thalken received his Order permitting his withdrawal in the Nebraska Methodist Litigation on October 18, 2017.

e.  Currently, therefore, Thalken and Fraser Stryker P.C. LLO is representing TBG in violation of the Model Rule of Professional Conduct 1.9(a) because, at the time it entered an appearance on behalf of TBG, it was still representing the Flex Benefit Plan (i.e., the CVA Plan) and the interests of CVA and TBG are materially adverse and CVA and the Plan have not consented to such representation.

116.  Effective January 1, 2017, CVA hired a new third party administrator and broker, thereby discontinuing the services of TBG, AMPS, CDS, Humpal, GMS, and the Leonards' services. The new third-party administrator, and all other regional third-party administrators, refused, however, to process 2015 and 2016 Plan year run-off claims for the Plan due to the activities of TBG, AMPS, CDS, and the RBR scheme. At the close of September 2017, CVA was compelled by the circumstances to renew TBG's contract for administration of the small number of run-off claims that remained unprocessed because no other third-party administrator

would agree to process the Plan's claims for the years AMPS and CDS were vendors of the Plan. CVA could not leave Plan participants without any place to send claims for their health benefits.

117.    Defendants' deceitful business practices forced CVA to expend significant time and resources, identifying, disputing, appealing, and negotiating over-denied and artificially depressed claims.   CVA and the Plan have suffered, and continue to suffer, monetary damages in excess of $3 million due to the artifices and devices of the Enterprise and separate Defendants. Upon information and belief, in excess of $1 million in Plan assets has been diverted to the use and benefit of the Enterprise members as a result of the activities of the Enterprise as alleged herein.

## CLAIMS FOR RELIEF

### A.  Breach of Fiduciary Duty Claims

118.    All of the factual allegations set forth above in paragraphs 1 through 117 are incorporated by reference as though set forth herein.

119.    "Fiduciary status under ERISA is a functional concept, and if Defendants have acted like a fiduciary, they may have incurred fiduciary obligations." *Walsh v. Principal Life Ins. Co.,* 266 F.R.D. 232, 241 (S.D. IA 2010).   In other words, ERISA imposes fiduciary obligations on individuals who are not named as fiduciaries, but nonetheless exercise actual authority over plan assets.   Furthermore, the Eighth Circuit has stated that "courts should construe the term fiduciary broadly under ERISA, and in favor of finding that a fiduciary duty exists." *Id.* at 241, *Olson v. E.F. Hutton & Co., Inc.,*957 F.2d 622, 625 (8th Cir. 1992)(citing *Consol. Beef Indus. V. N.Y. Life Ins. Co.,* 949 F.2d 960, 964 (8th Cir. 1991).   TBG, Humpal, AMPS and CDS are all

fiduciaries because, in their various roles, they exercised authority over Plan assets as described herein.  CDS is also a named fiduciary in the 2016 Plan Document.

120.    A fiduciary has a duty to perform its obligations and responsibilities under the Plan prudently, in the best interest of the participants and beneficiaries, and in accordance with the terms of the Plan document.  29 U.S.C. §1104(a)(1).  Defendants TBG, AMPS, CDS, and Humpal all breached this duty by utilizing the artifices and devices described herein to divert plan assets to themselves.

### Claim 1: Breach of Fiduciary Duty Under §502(a)(2) by TBG

121.    All of the factual allegations set forth above in paragraphs 1 through 120 are incorporated by reference as though set forth herein.

122.    As previously stated, although TBG is not a named fiduciary under the Plan document, TBG is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) because it had authority over Plan assets, exercised discretion regarding the design and terms of the Plan document; with regard to cost savings mechanisms for claims processing; and with regard to the decision to retain AMPS and CDS.

123.    As part of its fiduciary duty, TBG had the legal duty to provide full, fair, and prompt disclosure to CVA of all facts within its knowledge which were or could have been material to matters within TBG's relationship with CVA. *Howe v. Varity Corp.,* 36 F.3d 746, 753-54 (8th Cir. 1994).  The facts show that TBG breached this legal duty.

124.    The number of fiduciary breaches committed by TBG is astounding.  However, specific examples are shown by the following omissions and/or actions:

---

**FIRST AMENDED VERIFIED COMPLAINT**                                    Page 34

    a.   Drafting an illusory plan document which shifted the risk for losses from the repricing scheme to the Plan participants and CVA;

    b.   Failing to act in the best interests of participants by causing the Plan to engage AMPS and CDS' services which exposed participants to collection activities from providers;

    c.   Failing to notify CVA that no provider contracts were in place, even after representing to CVA that there would be contracts prior to claims being incurred;

    d.   By providing false and misleading information to CVA about the repricing that was being performed by AMPS and CDS, even after CVA received a letter from First Health refusing to do further business with the Plan;

    e.   Failing to notify CVA that a significant number of hospitals were refusing to accept the repricing payments; and

    f.   Failing to notify CVA that it had been sued by a number of hospitals.

125.    TBG further breached its fiduciary duty by misrepresenting to CVA that it had investigated the RBR pricing system, that the Plan would see "guaranteed cost savings," and that hospitals were happy to receive payment in the amount of 185% of Medicare.  All of these representations were made in order to induce CVA to choose the RBR pricing option from AMPS.  These misrepresentations were material because without them, and the trust that CVA had in Humpal and TBG, CVA would not have signed the RBR Agreement with AMPS, a relationship which directly benefited TBG and other Enterprise members.  As a result of CVA's reliance on TBG's misrepresentations, the Plan was damaged in the amount of claims payments that it has incurred as a result of provider's refusal to accept the repricing performed by AMPS

and CDS and the amount of excessive fees paid by CVA and the Plan to TBG and AMPS. *Howe v. Varity Corp.,* 36 F.3d 746, 753-54 (8th Cir. 1994) (An ERISA fiduciary has a duty to avoid making material misrepresentations.)

126. In taking these and other actions, TBG failed to act in a manner which was solely in the interest of participants and beneficiaries or to act with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

127. TBG is liable under ERISA §409 to make good any losses incurred by the Plan as a result of TBG's breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

128. As a result of TBG's breach of fiduciary duties, the Plan suffered damages in excess of $3 million.

### Claim 2: Breach of Fiduciary Duty Under §502(a)(2) by AMPS

129. All of the factual allegations set forth in paragraphs 1 through 128 above are incorporated by reference as though set forth herein.

130. As to all time periods relevant to this litigation, AMPS is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) as to AMPS' cost containment programs utilized by the Plan (including but not limited to reference based pricing and reference based reimbursement); what health care claims will be paid; and in what amount claims will be paid by the Plan.

131. The following actions by AMPS breached its fiduciary duty to the Plan:

   a. Failure to negotiate provider contracts prior to the participants incurring claims;

    b.   Engaging in a repricing scheme which caused payments to providers to be in amounts less than are reasonable and customary in this geographic region;

    c.   Failing to inform CVA and the Plan that hospitals were refusing payments;

    d.   Failed to settle claims and caused CVA to settle claims on its own behalf; and

    e.   Failing to act in the best interest of participants because the arbitrary repricing scheme exposed them to collections due to arbitrarily unpaid claims.

132.    In taking these, and other, actions, AMPS failed to act in a manner which was solely in the interest of participants and beneficiaries or with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

133.    AMPS is liable under ERISA §409 to make good any losses incurred by the Plan as a result of its breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

134.    As a result of AMPS's breach of fiduciary duties, the Plan suffered damages in excess of $3 million.

### Claim 3: Breach of Fiduciary Duty Under §502(a)(2) by CDS

135.    All of the factual allegations set forth in paragraphs 1 through 134 above are incorporated by reference as though set forth herein.

136.    CDS named fiduciary of the Plan. Doc. No. 19-9, p.3.

137.    CDS breached its fiduciary duty by:

    a.   Engaging in the repricing scheme orchestrated by AMPS and TBG and exposing CVA to litigation from hospitals and plan participants;

    b.   Failing to act in the best interest of participants by exposing them to collection for arbitrarily unpaid claims; and,

    c.   Failing to pay claims in accordance with the terms of the plan document.

138.    In taking these and other actions, CDS failed to act in a manner which was solely in the interest of participants and beneficiaries or with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

139.    CDS is liable under ERISA §409 to make good any losses incurred by the Plan as a result of CDS' breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

140.    As a result of CDS' breach of fiduciary duty, the Plan suffered damages in excess of $3 million.

### Claim 4: Breach of Fiduciary Duty Under §502(a)(3) by Humpal

141.    All of the factual allegations set forth in paragraphs 1 through 140 above are incorporated by reference as though set forth herein.

142.    Humpal is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) because he exercised authority over Plan assets, exercised discretion regarding the design and terms of the Plan document, the processing of claims on behalf of the Plan, handling of claim appeals, with regard to cost savings mechanisms for claims processing; and with regard to the decision to retain AMPS and CDS.

143.    Humpal is liable for breach of fiduciary duty based on the following misrepresentations made to CVA:

a. In order to induce CVA to adopt AMPS' RBR pricing strategy, Humpal misrepresented that he had investigated the RBR pricing model, that the Plan would have provider contracts in place prior to incurring claims, that the RBR pricing model would result in "guaranteed savings to the Plan," and that "hospitals were happy, under the terms of the RBR Agreement, to be paid 185% of Medicare."

b. When CVA received a letter from First Health stating that it would no longer do business with the Plan, Humpal misrepresented why First Health was angry. Humpal stated that First Health was "angry about all errors found by CDS" and never mentioned the true reason, that hospitals were angry about AMPS' and CDS' repricing.

c. Humpal never disclosed how AMPS' and CDS' repricing worked or that the Plan and its participants would be liable for the amount charged by the providers that was over what AMPS, CDS, and TBG would allow to be paid.

d. Humpal misrepresented that there was a purported $1 million savings to the Plan as a result of hiring CDS. The facts show that there was no actual savings, but instead, a delay in claims appeals which made the figures look more favorable to the Plan.

e. Humpal made false representations regarding the availability of stop-loss coverage for the 2016 outstanding claims.

f. Humpal knew that CVA and the Plan had been sued by various hospitals, but never disclosed this fact to CVA or the Plan.

144.    Humpal knew that each of the representations were false at the time they were made and he knew that CVA and the Plan were relying in his statements in determining whether to adopt AMPS' RBR pricing model and how to respond to providers and participants regarding unpaid claims.  As a result of this material misrepresentations, CVA and the Plan were damaged in excess of $3 million.  *Howe v. Varity Corp.,* 36 F.3d 746, 753-54 (8th Cir. 1994) (An ERISA fiduciary has a duty to avoid making material misrepresentations.)

145.    Humpal may be personally liable to the Plan for actions that have harmed the Plan. 29 U.S.C. §1109; *Shaw v. McFarland Clinic, P.C.,* 231 F. Supp2d 924, 935 (S.D. IA 2002).

146.    Furthermore, because Defendant Humpal failed to negotiate and obtain tail coverage on the stop-loss insurance coverage for the 2016 plan year claims that had not yet been paid, CVA became liable for these additional payments.

147.    In taking these and other actions, Humpal failed to act in a manner which was solely in the interest of participants and beneficiaries or with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

148.    Humpal is liable under ERISA §409 to make good any losses incurred by the Plan as a result of Humpal's breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

### Claim 5: Breach of Fiduciary Duty Under §502(a)(3) by the Leonards

149.    All of the factual allegations set forth in paragraphs 1 through 148 above are incorporated by reference as though set forth herein.

150.    The Leonards are liable as non-fiduciary service providers to the Plan for the breach of fiduciary duty by TBG and Humpal because they knowingly participated in the violations against the Plan. 29 U.S.C. §1105.  Further, the Leonards are liable for failing to disclose to CVA and the Plan that the RBR method resulted in the Plan failing to comply with the ACA, although the Leonards had a legal duty to do so.

151.    The facts, as outlined above, show that the Leonards were aware of the partnership between TBG, Humpal, and AMPS.  The Leonards knew that TBG and Humpal were fiduciaries of the Plan and that they owed special duties to the Plan as a result of this relationship.   They were aware of the excessive and double fees charged by TBG, the misrepresentations that TBG and Humpal made to the Plan and CVA relating to purported savings, provider agreements, how the RBR pricing scheme worked, and whether it was lawful for the Plan to rely on RBR pricing. However, the Leonards never informed CVA or the Plan that these representations were false.  Instead, they permitted TBG and Humpal to proceed with their scheme against the Plan and breaches of fiduciary duties because the relationships between the Plan, CVA, TBG, and Humpal resulted in a financial gain for the Leonards.

152.    Furthermore, the Leonards reviewed the 2016 Plan document and falsely represented to CVA that the Plan was compliant with the Affordable Care Act.

153.    As a result of the Leonards' knowing participation in TBG and Humpal's breach of fiduciary duties, the Leonards are liable to the Plan for the damages it incurred as a result of these breaches.

### B. Prohibited Transactions

154.    All of the factual allegations set forth in paragraphs 1 through 153 above are incorporated by reference as though set forth herein.

155.    In addition to the duties and obligations of fiduciaries, ERISA defines certain types of transactions in which fiduciaries may not engage or cause their plans to engage. These prohibited transaction appear in §406 of ERISA and essentially prohibit certain transactions between a plan and a party in interest or between a plan and a fiduciary. 29 U.S.C. §1106. Defendants TGB and AMPS engaged in prohibited transactions with the Plan.

### Claim 6: Breach of Fiduciary Duty Under §502(a)(3) by TBG for Engaging in a Prohibited Transaction

156.    All of the factual allegations set forth in paragraphs 1 through 155 above are incorporated by reference as though set forth herein.

157.    TBG further breached its responsibility, obligations, and duties as a fiduciary by engaging in transactions prohibited by 29 U.S.C. §1106, including: (a) providing services to the Plan for which it knowingly and fraudulently received excessive and unreasonable compensation; and (b) dealing with the assets of the Plan for its own interest and account. None of the exemptions set forth in 29 U.S.C. §1108 are applicable to these transactions.

158.    As a result of TBG's participation in a prohibited transaction, the Plan was damaged in excess of $3 million.

**Claim 7: Breach of Fiduciary Duty Under §502(a)(3) by AMPS for Engaging in a Prohibited Transaction**

159.     All of the factual allegations set forth in paragraphs 1 through 158 above are incorporated by reference as though set forth herein.

160.     AMPS further breached its responsibility, obligations and duties as a fiduciary by engaging in transactions prohibited by 29 U.S.C. §1106, including: (a) providing services to the Plan for which it knowingly and fraudulently received excessive and unreasonable compensation; and (b) dealing with the assets of the Plan for its own interest and account.  None of the exemptions set forth in 29 U.S.C. §1108 are applicable to these transactions.

161.     As a result of AMPS' participation in the prohibited transaction, the Plan was damaged in excess of $3 million.

**Claim 8: Attorney's Fees Under §502(g)**

162.     All of the factual allegations set forth in paragraphs 1 through 161 above are incorporated by reference as though set forth herein.

163.     As a result of the separate Defendant's breaches of fiduciary duties, Plaintiffs are entitled to attorney's fees and costs under 29 U.S.C. §1132(g)(1).

**Claim 9: RICO Allegations**

164.     All of the factual allegations set forth in paragraphs 1 through 163 above are incorporated by reference as though set forth herein and, with the factual allegations below, support Plaintiffs' claims under RICO.

165.     At all relevant times there has been, and continues to be, an association-in-fact between TBG, Humpal, the Leonards, GMS, AMPS, and CDS.  This association-in-fact is an

**FIRST AMENDED VERIFIED COMPLAINT**                                           Page 43

"Enterprise" within the meaning of 18 U.S.C. §1961(4). At all relevant times this Enterprise has been, and continues to be, engaged in, and its activities have affected and continue to affect, interstate commerce.

166. The Enterprise is separate and distinct from TBG, Humpal, GMS, the Leonards, AMPS, and CDS.

167. The purpose of the Enterprise has been and continues to be to induce companies that have health and welfare benefit plans for their employees, such as CVA, to utilize the Enterprise and its participants to administer such plans using the RBR pricing scheme. The purpose of the Enterprise is to transfer and convert health and welfare benefit plan assets to the Enterprise members. TBG, Humpal, GMS, the Leonards, AMPS, and CDS aid and assist each other in furthering the purpose of the Enterprise.

168. Misrepresentations made, and artifices utilized by members of the Enterprise that both induced CVA and the Plan to contract with and utilize the RBR scheme, to falsely communicate that the RBR scheme was saving the Plan money, and to keep CVA "in the deal" so that the Enterprise could convert and transfer Plan assets to its members include, but are not limited to:

   a. Acting for the Enterprise, in a meeting on October 30, 2015, at the CVA York, Nebraska office between CVA (Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter), GMS (Daniel Leonard and Susan Leonard) and TBG (Humpal), Humpal told CVA that he had investigated the RBR pricing model, that the Plan would have provider contracts in place prior to incurring claims, that the RBR pricing model would result in "guaranteed savings to the

Plan," and that "hospitals were happy, under the terms of the RBR Agreement, to be paid 185% of Medicare."  These representations were false and Defendants knew them to be false when the representations were made.

b.   At the October 30, 2015 meeting Humpal represented to CVA that RBR pricing was the new way that insurance was going to work, and that providers were no longer going to be able to overcharge for services or balance bill participants for services rendered.  These representations were false and Defendants knew them to be false when the representations were made.

c.   In the October 30, 2015 meeting, Humpal represented to CVA that AMPS would negotiate new agreements with the health care providers who customarily rendered services to participants of the Plan, and would bring the Plan's claims cost down.  Furthermore, Humpal represented that hospitals would be "happy" to be paid 185% of Medicare for their services. These representations were false and Defendants knew them to be false when the representations were made.  AMPS did not negotiate any health care provider agreements in advance of implementing the RBR scheme.  These representations were false and Defendants knew them to be false when the representations were made.  Further, the implementation of the RBR scheme in advance of any provider written agreements caused CVA to breach provider agreements in 2015, and to be charged at the "no contract" rate for health care services in 2016.

d.   Throughout the time period of TBG's and GMS' communications with CVA and the Plan, and through the time of the filing of the Original Verified Complaint,

---

**FIRST AMENDED VERIFIED COMPLAINT**                                    Page 45

AMPS displayed on its website to the public a map of the United States showing the amount of savings a self-funded group health plan would achieve utilizing AMPS' services.  For Nebraska, AMPS stated its processes of provider contract negotiations and RBR would save the Plan 59% of gross billed charges or claims, and the medical claims review would save 7.8% of health provider claims reviewed.  Humpal represented a similar level of savings to CVA and the Plan. Further, upon information and belief, the U.S. map demonstrating savings by state did not depict factual savings AMPS methodologies had realized for actual clients.  The U.S. map information was a fallacy utilized by AMPS to draw in clients, including CVA and the Plan, through Humpal.

e. On April 19, 2016, the meeting in the CVA office in York, Nebraska with CVA (Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter), TBG (Julie Maschka, Humpal and TBG's General Counsel, Natalie Osorio Skutt), GMS (Daniel Leonard and Susan Leonard), with AMPS' CEO Mike Dendy on the telephone. CVA was told for the first time, that AMPS had not negotiated any direct contracts for RBR program pricing with health care providers for 2016.  Humpal and AMPS stated that the acquisition of direct health care provider contracts would be top priority and that AMPS would negotiate and settle participant claims with health care providers after services were rendered where no direct contracts existed.   AMPS, TBG (Humpal) and GMS (the Leonards) represented this was the best and most effective strategy and they

---

stated they were unaware that any providers were refusing to accept the Plan's payment amounts on claims. This representation was false.

f. On June 27, 2016, CVA (Tim Esser and Rick Smithpeter) met with AMPS/CDS by telephone. TBG and Humpal attended the meeting in person. Mike Dendy, CEO, and John Powers, Sales Manager, were on the phone for AMPS and CDS. In that call, CVA questioned AMPS about the fact no direct health care provider contracts were in place and there were problems with claims being processed and paid. AMPS responded that it did not negotiate any provider contracts. AMPS stated that the better strategy was to negotiate with health care providers and settle claims paid in accordance with the RBR scheme after services to participants were provided. This representation was false. AMPS knew that its strategy would result in substantially all the Plan's participants being subject to collection efforts, including litigation, as a result of its strategy.

g. In the July 26, 2016 meeting in the CVA York, Nebraska offices, CVA (Carl Dickenson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter) met with GMS (Daniel and Susan Leonard) and TBG (Humpal) and was provided with several reports for the "Mid-term Review," including a report prepared by Katie Brown of TBG called "Central Valley Ag Cooperative Monthly Reporting Package" (the "Package"). The Package was provided with several documents conveying information for the meeting, including:

---

**FIRST AMENDED VERIFIED COMPLAINT**                                    Page 47

1. A spreadsheet, six (6) pages in length, seventy (70) claims per page (420 claims) of numerical descriptions of "completed claims," including "AMPS additional savings" and AMPS fees paid;

2. "Top Ten Claims" showing the amount claimed, and the savings purportedly achieved by AMPS, which totaled approximately $278,000;

3. A narrative from Hannah Iman to Linie Humpal representing that out of roughly 640 claims processed in 2016, AMPS has had "issues with 8."

4. Pie charts representing that 18% of all claims made were paid by participants and 82% of claims were paid by the Plan;

5. A spreadsheet showing only thirty-four (34) claims "Returned for Adjudication."

The Package's contents, taken as a whole, are false and misleading.  Looking at the entries in small type on the spreadsheets and other documents in the Package, CVA reasonably concluded that, of all the claims processed in 2016, only thirty-four (34) were in dispute and in appeal, and only eight (8) participants were upset about claim disputes.  Because of the facts revealed by the Package, CVA reasonably believed that the Plan was covering 82% of all participant claims, and that CVA and the Plan had saved approximately $278,000 on the top ten claims submitted.  All the facts conveyed by the Package were misleading.  The "Returned for Adjudication" claims depicted in the Package only spanned the

period June 2015 through December 31, 2105, with a single claim returned for March 2016.  Thus, with the exception of one claim that was processed in 2016, the Package totally omitted any 2016 Plan Year claims that were to be "Returned for Adjudication" by participants or their health care providers.  Thus, none of the claims submitted by the participants and health care providers that would ultimately show the AMPS/CDS paid amounts to be in dispute for the 2016 Plan Year were revealed, or even estimated, in the information provided in the Package.  Claim "Savings" conveyed by the Package, were illusory at best, and a blatant lie at worst.   Moreover, the almost 9 month delay in CVA's ability to recognize the amount of claims Returned to Adjudication led CVA to falsely believe AMPS and CDS were achieving great savings for the Plan (and commensurately being paid for the savings) when, in fact no savings were actually being achieved.

h.  GMS (by the through Susan Leonard) and TBG (by and through Humpal) emailed monthly and periodic quarterly reports commencing in August 2015 through July 2016.  The reports are published under TBG and GMS' trademarks.  The last email transmitting the cumulative reports was emailed by Susan Leonard, GMS, to Rick Smithpeter on August 17, 2016.  The "Savings Report TBG" shows "AMPS" additional savings on benefit claims per month as a result of the RBR scheme, and corresponding "AMPS" fees that were paid from the Plan.  The "RBR Savings Report" under CDS' trademark, shows alleged monthly gross and net Plan monetary savings from the RBR scheme and "CDS Fees" that were paid

from Plan assets. The amount of monetary savings shown on the Savings Report TBG, and the RBR Savings Report (collectively, the "Reports") are false and misleading. The RBR program did not save CVA, the Plan, or its participants, any money. Defendants knew the Reports were false when they transmitted them. CVA and the Plan relied on the Reports and thus were induced to maintain Defendants' services.

1. As a small example, one of the Explanation of Benefits forms processed by TBG on February 22, 2017 and mailed to a Plan participant on March 6, 2017, show—as a result of the RBR scheme— that AMPS paid $1,008.02 on a $6,457.75 emergency room claim. The ACA mandates that emergency room claims are paid at the 100% level.

2. AMPS and CDS fees were paid on "savings" on this claim in the month in which the claims were processed and paid, despite the fact that it is common knowledge that the ACA requires emergency room charges to be paid at 100%. TBG was also paid on "savings." However, contrary to the Reports, and the payment to AMPS and CDS, no savings were actually achieved by AMPS or CDS, because the participant (and virtually all other Plan participants) was pursued for the balance remaining on each of these claims. AMPS and CDS knew that the health care providers were not going to accept the amounts they were paid by the Plan at the time they had TBG and GMS issue

reports reflecting "savings" to CVA and the Plan due to the ACA's mandates. The "savings" representation was, and is, completely false. Upon information and belief, TBG, AMPS and CDS kept all the money they were paid, despite the fact that the "savings" that formed the basis for their compensation was not, ultimately, realized.

i.    When preparing to decide whether to keep TBG, AMPS and CDS' services, CVA asked GMS to show it what the reimbursement rates were for claims paid by a large insurance company. On October 20, 2016, Susan Leonard, GMS, sent Rick Smithpeter an email showing him that Blue Cross Blue Shield generally negotiated a 37% discount on the aggregate of all health care provider services. The insurance company therefore paid 63% of claims. TBG, AMPS and CDS, without any agreement with providers, discounted 65% the aggregate claims submitted to the Plan and which AMPS and CDS reviewed, and paid only 35% of the claims, leaving participants holding the liability bag provided to them by the RBR scheme equal to approximately 65% of the claim amounts.

169.   In addition, the Legal Membership Program was nothing more than an administrative letter-writing campaign intended and designed to prevent CVA and the Plan from realizing that the RBR Program was achieving no savings for CVA, the Plan and the participants whatsoever, and that Plan assets were being diverted from the Plan to Defendants. The RBR Program Agreement's representations concerning the Legal Membership Program were false. The RBR Program Services Agreement provided to CVA and the Plan, signed by Mike Dendy, AMPS CEO, provides that the Claims Delegate, i.e., CDS, will enroll all Plan participants in a

"Legal Plan Membership" with the "Legal Club of America."  The "Legal Plan Membership" is intended to allow CDS and the attorney retained by the participant the authority to defend the participant against collection action and litigation by health care providers seeking to be paid for services rendered.  However the Legal Plan Membership, and the processes conveyed to CVA and the Plan by the RBR Program Services Agreement in writing are patently false.

     a. For example, a spouse of a Plan participant suffered a serious illness for which she received health care services in February through October 2016.  Due to the unreasonably small payment on claims processed by AMPS, CDS and TBG (i.e., upon information and belief, the Plan paid less than 35%) the participant was subject to "balance billed" amounts exceeding $120,000.   The participant began receiving threats from collection agencies in October 2016 and notified TBG and AMPS, who communicated with the participant by emails commencing at least on February 6, 2017.  Contrary to the representations that an attorney would be assigned to defend the participant, AMPS' response was to have a low level staff person send the participant a "Patient Balance Bill Kit" and commence a form letter communication campaign with the collection agencies.

     b. When responding to the participant's worried communications about his credit, the staff member, AMPS Coordinator, Hannah Inman responded by email on January 24, 2017, "I know the word 'collections' can be very unnerving but something most members do not realize is that just because the account was moved to a collection agency does not mean it will show on your credit report." … "In the last 4 years of me handling this program (granted it changed a bit this last year) I

have never had a members [sic] credit be harmed so I do not foresee that happening to you." When no progress was made on the balance billed accounts for many months, AMPS communicated to the participant via emails stating that the claim dispute was going through "some processes."

c. On February 2, 2017, in an email from AMPS to the participant, AMPS stated "We are working as quickly as we can to complete this task. We do have to work through some processes that we do not have control over." At no time did any Plan participant get to retain an AMPS recommended counsel, or have an attorney to represent the participant. In fact, no participant had the Legal Membership Program resolve the participant's balance billed amount. Either the Plan or the participant paid the disputed claims.

170. The purpose of the Enterprise is to willfully and intentionally, convert and transfer monetary Plan assets to AMPS, CDS, TGG, Humpal, GMS, and the Leonards in an amount that exceeds $2 million over the Plan years 2015 and 2016.

171. TBG, Humpal, GMS, the Leonards, AMPS, and CDS have directly and indirectly conducted and participated in the affairs of the Enterprise in the District of Nebraska, and elsewhere, through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1) and (5), thereby violating 18 U.S.C. §1962(c).

172. The pattern of racketeering activity, as described in allegations of fact above, and below, consisted of multiple acts indictable under 18 U.S.C. §§ 664, 1341, 1343, and 1954, which are acts of "racketeering activity" within the meaning of 18 U.S.C. §1961(1)(B). These acts were carried out repeatedly and continuously beginning in at least 2012 and continuing

through the present.  These acts were related because they had a common goal, were affected by similar means, and had similar results and a common victim.  These acts were continuous and posed a threat of continuing racketeering activity, in that they were part of the Enterprise's regular way of doing business.  The acts thus established and were part of a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).

173.    Upon information and belief, the pattern of racketeering activity also has consisted of similar acts by participants in the enterprise against other companies, including but not limited to the Goodrich Dairy, Inc., and Nissan of Omaha, in connection with the administration of those companies' health and welfare benefit plans.

174.    As part of the pattern of racketeering activity, beginning in 2012 and continuing to the present, in connection with administering CVA's Plan, TBG, Humpal, GMS, the Leonards, AMPS, and CDS, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, including the mail and wires, employed manipulative and deceptive devices and contrivances, among other things, to induce CVA to enter into the RBR Agreement, to fraudulently conceal and misrepresent the actual amounts paid to hospitals, and to cause CVA to pay TBG and AMPS substantial sums of money in excess of the amounts to which it was entitled, by (1) employing devices, schemes, and artifices to defraud; (2) making untrue statements of material facts and omitting material facts; and, (3) engaging in acts, practices and courses of business that would and did operate as a fraud and deceit upon CVA and the Plan. These acts are indictable under 18 U.S.C. §§1341 and 1343.  This pattern of racketeering activity included, but was not limited to:

a. Periodic mailing, emailing, and telephone calls presenting false and misleading information to CVA and the Plan as to the claims paid and accepted by hospital providers and misrepresenting the actual cost of the CVA claims;

b. Providing false and misleading information relating to "cost savings" on their websites, in emails, and in telephone calls with CVA employees;

c. Reports generated by Humpal, on behalf of TBG, transmitted to CVA and the Plan through the mail, email, and by telephone which set forth false information as to the actual cost of the claims made by CVA employees under the Plan for the subject year and purported savings;

d. Website, email, and mail communications to the Plan participants regarding Legal Plan Membership; and

e. Email, mail, and telephone communications regarding TBG's, Humpal's, AMPS' and CDS' services described herein above.

175.    As a further part of the pattern of racketeering activity, beginning in 2012 and continuing to the present, TBG, Humpal, GMS, the Leonards, AMPS, and CDS, directly and indirectly, repeatedly, unlawfully and willfully converted to its own use and the use of other participants in the Enterprise, monies and assets of funds connected with the Plan, an employee welfare benefits plan covered by Title 1 of ERISA.  These acts are indictable under 18 U.S.C. §664.

176.    In addition, and in furtherance of the Enterprise's pattern of racketeering activity, beginning in at least 2012 and continuing to the present, TBG, Humpal, GMS, the Leonards, AMPS, and CDS, directly and indirectly, repeatedly and willfully received, agreed to receive, or

solicited a fee, kickback, commission, or money with the intent to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning the Plan, or was a person who directly or indirectly gave or offered, or promised to give or offer any fee, kickback, commission, or money from the Plan.  As such, these acts are indictable under 18 U.S.C. §1954.

177.    As a direct and proximate result of the foregoing violations of 18 U.S.C. §1962(c), CVA and the Plan have been damaged in their business or property in an amount in excess of $3 million.  Pursuant to 18 U.S.C. §1964(c), CVA and the Plan should recover treble damages and the costs of this suit, including attorney's fees.

### Claim 10: Affirmative Injunctive Relief

178.    All of the factual allegations set forth in paragraphs 1 through 177 above are incorporated by reference as though set forth herein.

179.    With regard to their claim for injunctive relief, CVA and the Plan request that each Defendant be enjoined from performing any services on behalf of CVA, the Plan, and Plan participants.   Further, CVA and the Plan will be requesting the Court order a forensic audit to be conducted of the Plan for plan years 2015 and 2016, and that independent counsel and auditors be appointed for the Plan.

180.    Plaintiffs further request that each Defendant be order to turn over all books and records, whether electronic or paper, relating to CVA, the Plan, or Plan participants to CVA.

**JURY DEMAND**

181.   Plaintiffs hereby demand a trial by jury to determine all issues of liability and damages as to the RICO claims.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(A)   Permanently enjoining each Defendant from violating the provisions of Title 1 of ERISA;

(B)   Affirmative injunctive relief in the form of enjoining each Defendant from performing any services on behalf of CVA, the Plan, or Plan participants;

(C)   Ordering an accounting of all Plan assets from Dec. 1, 2014 to the present at Defendant's expense;

(D)   Appointing an Independent Fiduciary at Defendants' expense to re-adjudicate all claims that were processed by CDS from 2013 through 2016, to resolve all health care provider claims and restore to the Plan all excess amounts it was required to pay, over and above what it would have paid under customary provider contract terms, plus interest and all unjust enrichment or profits resulting from the conduct of Defendants alleged in this Complaint;

(E)   Ordering TBG, AMPS, CDS to pay all reasonable costs and expenses of the Independent Fiduciary in re-adjudicating the claims set forth above and the reasonable costs and expenses associated with correcting all improperly adjudicated claims identified in this Complaint;

---

(F)     Requiring each Defendant to disgorge all unjust enrichment or profits received as a result of fiduciary breaches and diversion of plan assets committed by them or for which they are liable;

(G)     Attorney's fees and costs pursuant to ERISA §502(g);

(H)     Treble damages and costs of suit, including attorney's fees pursuant to 18 U.S.C. §1964(c); and

(I)     Such other and further relief as this Court may deem appropriate and just.

**Verification Attached to this Original Verified Complaint**

Dated this 31st Day of October, 2017.

**Respectfully Submitted,**

JACKSON LEWIS, P.C.

By:     */s/ Kathleen R. Barrow*_____
        Michaelle L. Baumert, NE Bar #20948
        Kathleen R. Barrow, NE Bar #25152
        10050 Regency Circle, Suite 400
        Omaha, Nebraska 68114
        Phone: (402) 391-1991
        Fax:   (402) 391-7363
        Email: michaelle.baumert@jacksonlewis.com
        Email: barrowk@jacksonlewis.com

        ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of said filing to all counsel of record.

*/s/ Kathleen R. Barrow*
Kathleen R. Barrow

4828-3061-2307, v. 1