IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CENTRAL VALLEY AG COOPERATIVE, and CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN,<br><br>Plaintiffs,<br><br>vs.<br><br>ANASAZI MEDICAL PAYMENT SOLUTIONS, INC., et. al;<br><br>Defendants. | **8:17CV379**<br><br>**FINDINGS  AND RECOMMENDATION** |

Plaintiff Central Valley Ag Cooperative ("CVA") provides farm planning, supplies, and services to members in Nebraska, Kansas, and Iowa. CVA is the sponsor, plan administrator, and fiduciary of Plaintiff Central Valley Ag Cooperative Health Care Plan (the "Plan"), a group employee health and welfare plan.

Defendants Daniel K. Leonard, Susan Leonard, and GMS Health Benefits, Inc. (collectively "Broker defendants") brokered an Administrative Services Agreement between CVA and Defendant The Benefit Group, Inc. ("TBG"), acting by and through its President, Defendant Linus G. Humpal ("Humpal"). Under the Administrative Services Agreement, TBG agreed to provide services for administering the Plan, including claim processing. CVA designated Defendant Claims Delegate Services, LLC ("CDS"), a subsidiary of Defendant Anasazi Medical Payment Solutions, Inc. ("AMPS"), as a Plan fiduciary to review and make benefit determinations on all post-service hospital and facility claims.

Plaintiffs seek recovery under the Employee Retirement Income Security Act of 1974, (ERISA), and the Racketeering Influenced and Corrupt Organization Act (RICO), claiming Defendants failed to properly review and pay claims, and unlawfully profited from their misconduct. Plaintiffs request an order granting injunctive relief, and for payment of damages, treble damages under RICO, disgorgement of profits, costs, and attorney fees.

PROCEDURAL BACKGROUND..................................................................................3
STANDARD OF REVIEW ......................................................................................5
PLAINTIFFS' PROPOSED THIRD AMENDED COMPLAINT .......................................6
ANALYSIS.........................................................................................................19
   I.   Standing to Assert ERISA and RICO Claims......................................19
     A.   Plaintiffs' Article III Standing ...........................................................19
     B.   Plan's Right to Recover under ERISA ............................................21
     C.   Plan's Right to Recover under RICO ..............................................23
   II.   ERISA Claims.....................................................................................25
     A.   Claims for Breach of Fiduciary Duty and Prohibited Transactions ...............25
        1.   AMPS: Breach of Fiduciary Duty and Prohibited Transactions.................25
           a.   Breach of Fiduciary Duty: 29 U.S.C. § 1109...........................25
           b.   Prohibited Transactions: 29 U.S.C. § 1106 ...........................28
        2.   CDS: Breach of Fiduciary Duty ...............................................29
        3.   TBG: Breach of Fiduciary Duty and Prohibited Transactions....................30
           a.   Breach of Fiduciary Duty: 29 U.S.C. § 1109...........................30
           b.   Prohibited Transactions: 29 U.S.C. § 1106 ...........................33
        4.   Humpal: Breach of Fiduciary Duty ...........................................33
     B.   Non-Fiduciary ERISA Claims.................................................34
        1.   The Leonards: Non-Fiduciary Liability for Aiding Fiduciary Violations .......34
        2.   GMS and the Leonards: Prohibited Transactions by Non-Fiduciaries .......36
   III.   RICO Claims.....................................................................................37
   IV.   Claim for Injunctive Relief .................................................................41
   V.   Claim for Attorney Fees .....................................................................41
RECOMMENDATION .........................................................................................42

PROCEDURAL BACKGROUND

Plaintiffs filed their initial complaint and a motion for temporary restraining order against Defendants on October 11, 2017. (Filing Nos. 1-4). After the motion for TRO was denied on October 26, 2017, (Filing No. 33), Plaintiffs filed an Amended Complaint on October 31, 2017, (Filing No. 34), and a Second Amended Complaint on November 15, 2017. (Filing No. 35).[1]

Defendants filed motions to dismiss the Second Amended Complaint. (Filing Nos. 36, 38, and 40). Plaintiffs did not respond to the motions to dismiss. Instead, they filed a motion for leave to file a Third Amended Complaint, explaining that in all relevant respects, the proposed Third Amended Complaint includes the allegations within the prior complaint but adds allegations based on information obtained after the Second Amended Complaint was filed. Plaintiffs further request additional time to respond to Defendants' motions to dismiss so the court can first consider Plaintiffs' motion for leave to file the Third Amended Complaint. (Filing No. 43). Defendants argue that despite the additional allegations, CVA's motion for leave to file the Third Amended Complaint should be denied as futile. Defendants opposition to the motion to amend raises substantially the same arguments presented in support of their motions to dismiss the Second Amended Complaint.

Under the unique procedural posture presented, and in the interest of preserving the resources of the parties and the court, the undersigned magistrate judge will determine whether Plaintiffs' proposed Third Amended Complaint fails

---

[1] The Second Amended Complaint was filed without leave of the court, but Defendants are not challenging the filing on that basis.

to state a claim, addressing not only Defendants' arguments opposing Plaintiffs' motion to amend, but any additional arguments in favor of their motions to dismiss the Second Amended Complaint.

For the reasons discussed below, Plaintiffs' motion to file a Third Amended Complaint, (Filing No. 43), should be granted in part and denied in part. Plaintiff CVA should be granted leave to file the proposed Third Amended Complaint, provided it is revised to remove the following claims:

- The RICO or ERISA claims filed by Plaintiff Central Valley Ag Cooperative Health Care Plan;
- Plaintiffs' RICO claims against all Defendants;
- Plaintiffs' ERISA claims against Humpal in his personal capacity;
- Plaintiffs' ERISA claim against the Leonards for falsely stating the 2016 Plan complied with the Affordable Care Act (ACA); and
- Plaintiffs' independently and separately alleged claims for attorney fees and for injunctive relief.

And with the filing of the proposed Third Amended Complaint as revised, Defendants' motions to dismiss the Second Amended Complaint, (Filing Nos. 36, 38, and 40) should be denied as moot.[2]

---

[2] Plaintiffs submitted minimal substantive briefing on the requisite elements of their ERISA and RICO claims, (Filing No. 43-1), while filing a proposed Third Amended Complaint that is 73 pages long, repetitious, and containing many conclusory statements. Defendants argue the court should condition Plaintiffs' leave to file a proposed Third Amended Complaint on first paying Defendants' fees and costs for moving to dismiss the Second Amended Complaint, explaining Plaintiffs used Defendants' briefing to draft the newest iteration of Plaintiffs' claims.

Having very carefully perused the arguments on the motions to dismiss along with the proposed Third Amended Complaint, the court is convinced Plaintiffs used Defendants' briefs to repair gaps in the Second Amended Complaint, resulting in what in now before the court. That said, plaintiffs often use briefing on motions to dismiss as a guide for amending pleadings. But in this case, the pending motion to amend was filed after Plaintiffs filed a Second Amended Complaint without leave of the court, as Plaintiffs' sole response to Defendants' motions to dismiss, and after Defendants cooperatively produced documents to Plaintiffs in the hope that the complaint would be voluntarily dismissed rather than amplified—thus Defendants' consternation.

## STANDARD OF REVIEW

Fed. R. Civ. P. 15(a)(2) provides that once the time for pleading as a matter of course has expired, amendments to pleadings are allowed only with the written permission of the opposing party or leave of the court. Courts are encouraged to allow amendments liberally. (Shen v. Leo A. Daly Co., 222 F.3d 472, 478 (8th Cir. 2000).

> [A] district court can refuse to grant leave to amend a pleading only where it will result in undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment.

Dennis v. Dillard Dept. Stores, Inc., 207 F.3d 523, 525 (8th Cir. 2000) (internal citations omitted); see also K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 899 (8th Cir. 2002) (noting futility constitutes a valid reason for denial of leave to amend).

Leave to amend should be denied as futile "where the proposed amendment would not cure the defect the party sought to correct." Asbury Square, L.L.C. v. Amoco Oil Co., 218 F.R.D. 183, 195 (S.D. Iowa 2003); see also Mississippi River Revival, Inc. v. City of Minneapolis, 319 F.3d 1013, 1018 (8th Cir. 2003); K-tel, Int'l, Inc., 300 F.3d at 899; Wiles v. Capitol Indemnity Corp., 280 F.3d 868, 871 (8th Cir. 2002); Ingrim v. State Farm Fire & Cas. Co., 249 F.3d 743, 745-46 (8th Cir. 2001). That is, "a court may deny a motion for leave to amend for futility if the proposed amendments would not save the party's claim

---

In the end, the court will not order Plaintiffs to pay Defendants' fees and costs for filing their motions to dismiss. But Plaintiffs are cautioned that for any future motions to amend, the court will entertain Defendants' fee applications if Plaintiffs' proposed amendments could have been known and raised in their Third Amended Complaint.

from dismissal." Asbury Square, L.L.C., 218 F.R.D. at 195 (citing Mississippi River Revival, Inc., 319 F.3d at 1018).

PLAINTIFFS' PROPOSED THIRD AMENDED COMPLAINT

Plaintiffs' proposed Third Amended Complaint, the allegations of which are considered true when deciding whether leave to amend would be futile, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), alleges:

The Plan is an employee benefit plan within the meaning of ERISA and is sponsored by CVA. The Plan covers over 700 participants who rely upon the Plan's benefits to cover the costs of their health care in the same manner as a group health insurance policy. It is self-funded through participant contributions deducted from employee wages, with stop-loss coverage purchased yearly to limit the maximum potential liability with regard to aggregate claims. (Filing No. 43-2, at CM/ECF pp. 4-5, ¶¶ 10, 12, 15-17).

In exchange for compensation received from Plaintiffs, the Broker defendants assisted CVA as insurance brokers, employee benefits consultants, and trusted advisors regarding the Plan's design, legal compliance aspects, and administration, and in procuring stop-loss insurance coverage for the Plan. The Broker defendants did not disclose to Plaintiffs the compensation they received for influencing CVA and the Plan to engage in the transactions outlined in the Complaint. (Filing No. 43-2, at CM/ECF p. 7, ¶¶ 22-26).

Defendant Humpal is an owner and officer of TBG, and TBG is a partner of AMPS. TBG was the Plan's third party administrator, drafting the group health plan documents provided to CVA for 2013 through 2016 and adjusting,

reviewing, and paying claims under the Plan from January 1, 2013 through December 31, 2014.

As reflected in the website information posted by TBG and AMPS, TBG and Humpal, AMPS and CDS (a shell entity of AMPS), and the Broker defendants were members of a partnership (the Enterprise) and an association-in-fact which was separate and distinct from their collective actions related to CVS or the Plan. (Filing No. 43-2, at CM/ECF pp. 12, 14-15, ¶¶ 54, 66). The Enterprise exists to lure companies, like CVA, to offer employee health and welfare benefit plans administered using Medical Based Review ("MBR")[3] and a Reference Based Review (RBR)[4] pricing scheme that, in effect, converts Plan assets to the Enterprise rather than properly paying employee health care bills. (Filing No. 43-2, at CM/ECF pp. 17, 35-36, ¶¶ 69, 105-06). Defendants arbitrarily depress the amount of money paid to health care providers on individual participant claims; claim "savings amounts" on individual claims; and then pay themselves out of Plan assets based upon the claimed "savings." (Filing No. 43-2, at CM/ECF p. 66, ¶ 192).

The Enterprise operated in interstate commerce, causing damage to participants in eight states, including Nebraska. (Filing No. 43-2, at CM/ECF p. 15, 69, ¶¶ 66, 67, 199). Its conduct was carried out repeatedly and continuously beginning in at least 2012 and continuing through the present for a common goal,

---

[3] The Third Amended Complaint defines Medical Based Review ("MBR") as "a cost-savings mechanism that determines whether health care provider charges are appropriate for the medical condition of the participant or beneficiary, necessary, customary and reasonable in charge amount." (Filing No. 43-2, at CM/ECF p. 18, ¶ 72).

[4] The Third Amended Complaint defines reference based reimbursement ("RBR") as "a type of discount pricing program where insurance companies and large self-funded plans (via preferred provider contracts) negotiate discounts with certain health care providers in areas where there is competition among health care providers." (Filing No. 43-2, at CM/ECF p. 18, ¶ 72)

by similar means, with similar results and a common victim. These acts, as part of the Enterprise's regular way of doing business—not only with Plaintiffs, but also for other group health plans—were part of a "pattern of racketeering activity." (Filing No. 43-2, at CM/ECF p. 67, 69, ¶ 194, 198).

During a telephone conference on October 21, 2014, Humpal, acting as an agent and/or the alter ego of TBG and AMPS, along with the Broker defendants, contacted CVA and suggested that CVA hire CDS to review the Plan's medical claims. Unbeknownst to CVA, CDS had already agreed to perform this service for CVA, beginning with the 2015 Plan year. (Filing No. 43-2, at CM/ECF pp. 7, 29, ¶¶ 29, 89).

For the 2015 Plan year, CVA was committed to PPO contracts for Plan payments, so as to that year, CDS's review would be limited to resolving errors. In reliance on Humpal's advice, CVA began its relationship with CDS and ultimately AMPS. But Humpal did not disclose the full nature and scope of AMPS' and CDS' business methodologies. In addition to receiving compensation from both CVA and the Plan, Humpal and TBG also received compensation from AMPS and CDS, but they did not disclose this income source to Plaintiffs. (Filing No. 43-2, at CM/ECF pp. 8-10, 29, ¶¶ 32-37, 41, 43, 89).

During a meeting in April of 2015, the Broker defendants told CVA's representatives that CDS had uncovered numerous billing errors and had saved the Plan more than $1 million. This claim, also conveyed by email, was developed by TBG and the Broker defendants and was false. The Plan's appearance of financial health and liquidity was actually the result of CDS' and TBG's failure to timely process pending claims. (Filing No. 43-2, at CM/ECF pp. 29-30, 69, ¶¶ 90, 199).

CDS and AMPS forwarded invoices to Humpal and TBG for payment, and without providing any notice to Plaintiffs, Humpal and TBG determined whether the claims would be paid from Plan assets and in what amount. (Filing No. 43-2, at CM/ECF p. 10, ¶ 44). AMPS instructed TBG to ignore PPO contract rates, and to deeply discount hospital claims for payment based on AMPS' determination of what medical care was appropriate, and it was paid for doing so, while never advising Plaintiffs of the claim or how the hospitals and AMPS were paid, (Filing No. 43-2, at CM/ECF pp. 21-23, ¶ 74(c-d)). In August 2015, CVA received notice from First Health, the Plan's network provider, that it would no longer work with the Plan because it was discounting or re-pricing the amounts paid to providers in violation of the Plan's PPO contracts. (Filing No. 43-2, at CM/ECF p. 30, ¶ 91). When confronted by CVA, Humpal and TBG did not disclose the re-pricing and payment delays, instead explaining the providers were angry because CDS found so many billing errors. The Enterprise conveyed this false information to Plaintiffs and the Plan participants by email and posted it on AMPS' and TBG's websites. (Filing No. 43-2, at CM/ECF p. 31, ¶ 93). CVA believed Humpal and TBG, and it continued to rely on their services to the Plan.

Without Plaintiffs' knowledge, in late 2015, AMPS was repricing the Plan's claims and creating conflicts with health providers through the services that CDS was rendering to the Plan. (Filing No. 43-2, at CM/ECF p. 36, ¶ 107). For claims under $10,000, CDS paid according to the fee schedule, but in all claims over $10,000, CDS paid a commercially unreasonable amount. CDS and AMPS used complete discretion in deciding what claims would be paid and in what amount. (Filing No. 43-2, at CM/ECF p. 31, ¶ 94).

In September and October 2015, CVA had discussions with the Broker defendants, Humpal, and TBG regarding the Plan for 2016. Humpal represented that the Plan could not contract with customary provider networks because of disagreements over payments for services. Humpal, TBG, and the Broker defendants suggested implementing AMPS' RBR pricing model as the best option for CVA, with its "guaranteed savings," and payments based on the fair market value of services rendered being the "wave of the future." (Filing No. 43-2, at CM/ECF pp. 19, 31-33, ¶¶ 74, 95-97, 98(g)). The statements explaining the RBR pricing closely tracked AMPS' posted website information. (Filing No. 43-2, at CM/ECF p. 32, ¶¶ 97-98). Although federal agencies had warned against the broad use of such programs in self-funded plans, (Filing No. 43-2, at CM/ECF p. 18, ¶ 73), Plaintiffs were unaware of these warnings at the time. (Filing No. 43-2, at CM/ECF p. 19, ¶ 74).

Humpal, on behalf of himself, TBG and AMPS, represented that based on his investigations of the RBR pricing method, health care providers and hospitals would "love" to receive 185% of the Medicare reimbursement amount, and he agree to negotiate new agreements with the providers to that effect. But Humpal never explained that by using a 185% reimbursement rate, CVA was foregoing the flat fee and bundled cost arrangements typically used by insurers and group plans to save money, and he did not explain that Plan participants would bear the responsibility of finding a doctor who would accept the RBR-defined rate or face paying any sum in excess of that amount. The communications regarding use of the RBR pricing method, which were made by telephone, email and indirectly through AMPS' website, boasted health care savings that were inflated, false and misleading. (Filing No. 43-2, at CM/ECF pp. 33-35, 57, ¶¶ 98-99, 101-02, 190(a-d)).

Plaintiffs believed the representations of AMPS, Humpal and TBG, and the Broker defendants regarding not only the anticipated RBR savings for the 2016 Plan year, but also the savings CDS had secured from reviewing the Plan's 2015 claims processing. In reliance on those representations, Plaintiffs agreed to implement the RBR pricing option and to retain AMPS and CDS for all of AMPS' described services for the 2016 plan year. (Filing No. 43-2, at CM/ECF pp. 19-20, ¶¶ 75-76). On January 19, 2016, CVA signed the RBR Program Services Agreement (the "RBR Agreement") with AMPS and CDS for the January 1, 2016 to December 31, 2016 Plan year. (Filing No. 43-2, at CM/ECF p. 34-35, ¶ 100, 104). The RBR Agreement implemented "Required Modifications" to its employee health plan which changed the "structure, design, concepts, definitions, terms and provisions" applicable to all health benefit claims submitted to the Plan, and afforded AMPS and CDS abusive discretionary authority over Plan payments. (Filing No. 43-2, at CM/ECF p. 24, ¶ 77). Defendants disclosed the 2016 Plan document to Plaintiffs and the Plan participants, and the purported 2016 Plan savings to Plaintiffs, by mail and email. (Filing No. 43-2, at CM/ECF p. 25-26, 69, ¶¶ 80, 82, 199).

Under the RBR agreement, in exchange for their services to the Plan, AMPS was paid 10 percent, and TBG was paid 2.5 percent (in addition to its administration fees) of all gross hospital claims. AMPS and CDS applied deep and unsupported discounts to the health provider claims to create the illusion of savings and increase their compensation. As to 30% of small claims, AMPS, CDS and TBG caused the Plan to pay more than the retail price to health care providers (without any review) and billed and collected fees for "savings" they did not earn. AMPS' MBR and RBR programs were applied to all health services irrespective of the choice of providers or the quality of care, served to irrationally and abusively discount services while increasing the compensation owed to

Defendants, and resulted in a remaining balance owed and billed directly to the Plan participants on virtually every health claim. (Filing No. 43-2, at CM/ECF pp. 20, 24-25, ¶¶ 76(a) and 78). The 2016 Plan's provisions afforded health care providers 365 days to submit a claim, intentionally creating the false appearance that the Plan was achieving savings when it was actually losing money, (Filing No. 43-2, at CM/ECF p. 25, ¶ 82).

As a result, while the RBR Agreement appeared to provide a legitimate MBR and RBR payment process, it was actually perpetrating a fraud upon CVA, the Plan, and its participants by deceiving them to believe AMPS and CDS were achieving savings on claims paid by the Plan when no such savings were actually, or could ever possibly, be realized. AMPS' MBR and RBR schemes shifted health care costs to the Plan participants, rendering the Plan both unaffordable and inconsistent with providing the minimum value of care mandated by the Affordable Care Act (ACA). (Filing No. 43-2, at CM/ECF pp. 20, 23-25, 36, 52, 66, 70, ¶¶ 74, 79, 81, 108-109, 165, 192(a) & 200).

Meanwhile, Plan assets were being diverted to the Enterprise, with AMPS, TBG, and CDS collecting fees for alleged "savings" in claim costs before, rather than after, the claims were fully resolved. For every prescription that was not filled at a hospital, Defendants received a $3.00 kickback, a charge which was never disclosed to Plaintiffs, (Filing No. 43-2, at CM/ECF p. 24, 67, ¶¶ 74(k) and 192(c));. The CVA Plan assets were commingled with the assets of other plans, with Defendants collecting the interest on funds remaining in the bank because Plan payment checks were rejected by the providers and never cashed. (Filing No. 43-2, at CM/ECF p. 26, 67, ¶ 82(a) and 192(d)). And by allowing 365 days to submit claims, Defendants could shift the risk of monetary loss to the Plan and its participants and thereby assure larger commissions from stop-loss carriers

because claims against the carrier would not be presented to the carrier before the claim deadline. (Filing No. 43-2, at CM/ECF p. 26-27, 66, ¶¶ 82(b-c), 83, 192(b)).

On April 19, 2016, CVA met with Defendants or their representatives regarding CVA's recent discovery that no 2016 provider contracts were negotiated for the Plan. They were informed at that meeting that instead of provider contracts, AMPS preferred to fight the claims as they were received and, with the providers in a weak bargaining position, push the providers to accept reimbursement based on a percentage of Medicare reimbursement. Plaintiffs now realized that AMPS' methods could prompt disputes between Plan participants and their providers, but Plaintiffs were not aware of the meager amounts AMPS and CDS were paying on the claims received. And without contracted rates, Plan participants did not enjoy the customary 35-40% discount afforded to insurers and other group plans. (Filing No. 43-2, at CM/ECF pp. 23, 37-38, 59, ¶¶ 74(h), 110-12, 190(e)).

In the Spring of 2016, CVS discovered that the claims administration used by TBG, AMPS and CDS in 2015 had artificially deflated the reimbursement amount of aggregate claims, hospitals were refusing to accept the lower payments, and Plan participants were facing collection actions. (Filing No. 43-2, at CM/ECF p. 38, ¶ 113). Participants were reportedly denied health care services outright, or they were required to pay a reasonable rate for services upfront or agree in writing to pay that rate, before receiving health care. (Filing No. 43-2, at CM/ECF p. 38, ¶ 115). In their role as Plan fiduciaries, AMPS and CDS had claimed the Plan included a legal advocacy program which allowed CDS and its counsel to defend and protect Plan participants from balance billing by health care providers. In reality, as explained by examples cited within the

Third Amended Complaint, an AMPS staff person would send the participant a "Patient Balance Bill Kit" along with letters assuring the participant that the issue was being processed, and would commence a form letter communication campaign with the collection agencies. (Filing No. 43-2, at CM/ECF p. 64, ¶ 191).

In June of 2016, when CVA met by telephone with representatives of AMPS and in person with TBG and Humpal, to discuss the continued lack of contract health care providers and delayed claims processing, AMPS acknowledged responsibility for the lack of contracts. But in an effort to retain CVA's business and its ability to divert Plan assets to the Enterprise, it did not disclose that it was already engaged in re-pricing claims and negotiating balances, and that a number of lawsuits were filed in May 2016 to enforce PPO contracts CDS and TBG had circumvented. (Filing No. 43-2, at CM/ECF pp. 39-40, ¶¶ 117-18).

In July of 2016, TBG disclosed several false and misleading reports to CVA during a Mid-Term Review, including 1) a spreadsheet of "completed claims," "AMPS additional savings," and AMPS fees paid; 2) a "Top Ten Claims" report which indicated AMPS' achieved savings totaling $278,000; 3) a narrative from Hannah Iman to Linie Humpal stating AMPS had "issues with 8" of the roughly 640 claims processed in 2016; and 4) pie charts depicting 82% of the claims were paid by the Plan, and only 18% by its participants. But with the exception of one claim processed in 2016, the Mid-Term Review package totally omitted any 2016 Plan Year claims that were to be "Returned for Adjudication" by participants or their health care provider, the Claims Savings were either illusory or a blatant lie, and due to the nine-month claim adjudication delay, the reports reflected great savings when no real savings were being achieved. (Filing No. 43-2, at CM/ECF pp. 60-62, ¶ 190(g)).

Between August 2015 and July 2016, to induce CVA to maintain the Defendants' services, the Broker defendants emailed monthly and quarterly reports to CVA under TBG's and GMS' trademarks which falsely reported monetary savings resulting from the RBR Program. The report reflected discounts for emergency room care instead of the 100% coverage required under the Affordable Care Act (ACA), meaning the Plan participants were required to pay the unpaid balance. (Filing No. 43-2, at CM/ECF p. 62, ¶ 190(h)).

Unlike the 63% coverage provided by large insurers, TBG, AMPS and CDS "paid only 35% of the claims, leaving participants holding the liability bag provided to them by the RBR scheme equal to approximately 65% of the claim amounts." (Filing No. 43-2, at CM/ECF p. 64, ¶ 190(i)). By the third quarter of 2016, CVA received notice of collection efforts against Plan participants, and health care providers were threatening litigation against CVA and the Plan. (Filing No. 43-2, at CM/ECF p. 40, ¶ 119). CVA began negotiating directly with hospitals in October and November of 2016 to stop the collection efforts and protect the Plan participants, incurring additional expenses for these efforts. (Filing No. 43-2, at CM/ECF pp. 40, 59-60, ¶¶ 120, 190(f)).

TBG and GMS failed to obtain stop loss coverage by the end of 2016, so claims that were delayed due to litigation or appeals were not covered by insurance and the Plan became liable for the claims. (Filing No. 43-2, at CM/ECF p. 41, ¶ 124). In late September 2016, Plaintiffs were notified of lawsuits against TBG for failing to play claims. When CVA confronted Humpal with this information, Humpal acknowledged litigation existed, but he did not disclose that CVA and the Plan were also named defendants or that their interests were being represented in that litigation. AMPS, CDS, TBG, and Humpal intentionally

concealed the litigation against Plaintiffs to continue concealing their diversion of Plan assets to the Enterprise's use. (Filing No. 43-2, at CM/ECF p. 41-42, ¶¶ 125-27).

Effective January 1, 2017, CVA hired a new third party administrator and broker, thereby discontinuing the services of TBG, AMPS, CDS, Humpal, and the Broker defendants. (Filing No. 43-2, at CM/ECF p. 42, ¶ 129). However, the new administrator would not process the remaining 2015 and 2016 claims. So as to those claims, CVA had to renew its contracts with TBG to secure processing. (Filing No. 43-2, at CM/ECF p. 43, ¶ 129-30).

Payments to AMPS and CDS were hidden from the Plaintiffs and the Plan's stop-loss carriers by classifying the amounts as payments to health care providers. If checks to health care providers were not cashed, Humpal and TBG retained the funds in commingled accounts rather than crediting CVA. By commingling funds, Humpal, TBG and the other Defendants were able to receive non-disclosed monetary benefits from the Plan's assets that they otherwise would not have received. (Filing No. 43-2, at CM/ECF p. 10-11, ¶ 45-47).

Together, Humpal, TBG, CDS, and AMPS exercised complete discretion, authority, dominion, and control over the Plan's assets, payments, and financial affairs, with CVA receiving no information concerning Plan payments and processing absent a dispute or threatened litigation. (Filing No. 43-2, at CM/ECF pp. 8-9, 12-13, 31, ¶¶ 38-40, 53, 60, 94). AMPS, CDS, TBG and Humpal decided what, if anything, would be disclosed to CVA, the Plan, and its participants. (Filing No. 43-2, at CM/ECF p. 13, ¶ 60).

For claims incurred from January 2014 and throughout 2017, TBG decided which health care providers and vendors would be paid by the Plan, and in what amount. (Filing No. 43-2, at CM/ECF p. 8, ¶ 38). It did not request direction as to Plan payments from CVA, and it did not disclose individual claim or vendor invoice information to CVA or the Plan in a manner that permitted CVA to exercise discretion concerning payments or to identify improper claim administration. (Filing No. 43-2, at CM/ECF pp. 8-9, 12, 31, ¶¶ 38-40, 53, 94).

CDS is named as a fiduciary within the Plan, and it determined whether claims should be reviewed by AMPS or paid by the Plan after considering perceived or actual medical errors, balance billing amounts, or improper charges. (Filing No. 43-2, at CM/ECF p. 13, ¶ 61). The 2016 Plan gave CDS absolute discretion and authority to determine when, and in what amount, any claims were paid. (Filing No. 43-2, at CM/ECF p. 27, ¶ 84).

As a Plan fiduciary, AMPS determined whether the Plan should be amended to reflect its bill review and RBR pricing and reimbursement processes; set out-of-network reimbursement rates for health care provider claims; negotiated direct provider contracts; reviewed medical bills or claims; determined RBR pricing and reimbursement, and determined which claims would be paid and in what amount. (Filing No. 43-2, at CM/ECF p. 12-13, ¶ 56). It exercised complete control over payment decisions, never requesting any input from CVS over the Plan's payment on any specific participant claim. (Filing No. 43-2, at CM/ECF p. 13, ¶¶ 57-59).

Defendants, acting in concert and consistent with the goals of the Enterprise, operated in secret to keep Plaintiffs from discovering how the Plan money was being spent; that the Plan was paying money to AMPS and CDS

while denying or paying ridiculously low amounts on health care claims and concealing the disputes over those payment decisions. (Filing No. 43-2, at CM/ECF p. 15, ¶ 68). Specifically, Plaintiffs allege:

- Defendants concealed the amounts paid to AMPS, and to other vendors providing non-health care related services, by making the payments appear to be for health care services in Plan accounting documents.

- Defendants provided bulk claims payment reports to Plaintiffs and its stop loss carrier underwriting administrator so Defendants could conceal the unreasonably discounted payments being extended to health care providers, and the payments to AMPS, TBG and other nondisclosed vendors which were not health claim payments.

- There was no communication by and between Defendants and CVA or the Plan concerning individual claim determinations made on health care providers' claims, purported "savings" amounts on individual claims, or amounts invoiced to the Plan and paid to vendors on individual claims.

- Defendants refused to disclose their reasons for failing to pay health care providers, asserting their methodologies are a "trade secret."

- Defendants provided Explanation of Benefit forms ("EOBs") to participants which falsely stated a "$0.00" balance remained due, thereby concealing from the Plan and its participants that health care providers would ultimately invoice large balances due for services rendered.

- Defendants commingled Plan assets with those of other plans to divert the CVA Plan assets to the Enterprise, with CVA Plan participant and beneficiary health claim data also comingled with the data of other plans.

- Checks made payable to health care providers, but never cashed, were not credited back to the CVA Plan account. These funds, the amount of which is unknown at this time, cannot be found.

(Filing No. 43-2, at CM/ECF p. 12, 14, 16-17, 68, ¶¶ 55, 63, 68, 195, 196, 197).

## ANALYSIS

Defendants raise several arguments in opposition to Plaintiffs' motion to amend. As an threshold matter, Defendants Humpal and TBG argue the Plan lacks standing to assert ERISA or RICO claims. As to the ERISA claims, Defendants each argue they were not a fiduciary and breached no duties owed to Plaintiffs. In addition, Humpal argues that the Third Amended Complaint includes no allegations against Humpal in his personal capacity, and no allegations sufficient to pierce TBG's corporate veil. As to the RICO claims, Defendants assert the Third Amended Complaint fails to sufficiently allege the existence of an enterprise. Finally, Defendants assert attorney fees and injunctive relief are remedies, not theories of recovery, and to the extent Plaintiffs purport to allege stand-alone claims for attorney fees and injunctive relief, such claims must be dismissed.

I.      Standing to Assert ERISA and RICO Claims.

A.      Plaintiffs' Article III Standing.

"Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010). "[T]he party invoking federal jurisdiction bears the

burden of establishing its existence." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).

AMPS and CDS argue Plaintiffs lack Article III standing to assert any claims against them because Plaintiffs have failed to allege: 1) an "injury in fact;" 2) a sufficient "causal connection between the injury and the conduct complained of;" and 3) a likelihood that the injury will be redressed by a favorable decision. (Filing No. 39, at CM/ECF p. 25) (citing Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341, 189 L. Ed. 2d 246 (2014), quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks omitted)). "'Injury in fact' is an invasion of a legally cognizable right." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009). The injury-in-fact requirement helps to ensure that each plaintiff has a "personal stake in the outcome of the controversy." Susan B. Anthony List, 134 S. Ct. at 2341.

AMPS and CDS argue Plaintiffs have failed to allege any damage arising from their conduct. The Third Amended Complaint alleges AMPS created, promoted, and assisted in implementing a claim review and payment process that ignored PPO contract rates and deeply discounted health provider claims. Plaintiffs allege that as a result of AMPS' pricing and payment methods, health providers refused to enter into contracts with the Plan. In addition, Plaintiffs allege AMPS and CDS failed to properly perform claims review, processing, and payment services, yet they withdrew payments for their services from the Plan, resulting in depletion of its assets. (Filing No. 43-2, at CM/ECF pp. 21-23, ¶ 76(c-d)). When Plan participants who received collection notices discovered the legal services AMPS had promised were virtually nonexistent, CVA incurred expenses negotiating directly with hospitals to protect Plan participants. (Filing No. 43-2, at CM/ECF pp. 40, 59-60, ¶¶ 120, 190(f)). Plaintiffs claim they have incurred losses

in excess of $6 million for the costs and expenses of re-adjudicating and correcting all improperly adjudicated claims. (Filing No. 43-2, at CM/ECF pp. 28-29, 43, 71, ¶¶ 88, 130, 202). Plaintiffs request injunctive relief to permit a thorough audit of the Plan's financial records currently within AMPS' and CDS' possession, for disgorgement of unearned profits, and damages. (Filing No. 43-2, at CM/ECF p. 71, ¶¶ 202-205).

Plaintiffs' Third Amended Complaint alleges injuries to the Plan and CVA arising from the alleged improper conduct of AMPS and CDS, and it seeks equitable and legal remedies for those injuries. Plaintiffs have Article III standing to assert claims for recovery against AMPS and CDS.

B.      Plan's Right to Recover under ERISA.

Plaintiffs' proposed Third Amended Complaint asserts the following claims for ERISA recovery:

- Defendants TBG, AMPS, and CDS breached fiduciary duties owed to the Plan, in violation of 29 U.S.C. § 1132(a)(2), by diverting plan assets to themselves, (Filing No. 43-2, at CM/ECF pp. 44-49, ¶¶ 134-153);

- Defendant Humpal breached fiduciary duties owed to the Plan, in violation of 29 U.S.C. § 1132(a)(3), by misrepresenting and concealing material facts when informing Plaintiffs regarding the Plan and its implementation, (Filing No. 43-2, at CM/ECF pp. 49-51, ¶¶ 154-161);

- The Leonards are liable as non-fiduciary service providers to the Plan for knowingly participating in TBG's and Humpal's breach of fiduciary duty to the Plan, and for falsely stating the 2016 Plan document complied with the ACA, in violation of 29 U.S.C. § 1132(a)(3), (Filing No. 43-2, at CM/ECF pp. 51-52, ¶ 164-166);

- Defendants GMS and the Leonards engaged in prohibited transactions with the Plan in violation of 29 U.S.C. §§1106(a)(1)(C-D) by knowingly and fraudulently receiving excessive and unreasonable compensation,

transferring assets of the plan to a party in interest, or using plan assets for their own benefit, (Filing No. 43-2, at CM/ECF pp. 54-56, ¶¶ 172-183); and

- Defendants TGB and AMPS engaged in prohibited transactions with the Plan in violation of 29 U.S.C. §1106(b) by receiving excessive and unreasonable compensation and dealing with Plan assets for their own interest and account, (Filing No. 43-2, at CM/ECF p. 53, 56, ¶¶ 167-171, 184-186).

Humpal, TBG, AMPS, and CDS assert the Plan, itself, lacks standing to bring a civil action under ERISA. (Filing No. 37, at CM/ECF p. 35; Filing No. 39, at CM/ECF p. 25, n. 5). To resolve this issue, the court must decide whether the Plan is within the class of plaintiffs Congress authorized to sue for an alleged ERISA violation. Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1387 (2014).

Plaintiffs allege claims for breaches of fiduciary duty, and for violations of 29 U.S.C. § 1106, which prohibits fiduciaries from engaging in transactions between the plan and a party in interest. Under 29 U.S.C. § 1109, plan fiduciaries are personally liable for breaching their duties to the plan. Claims for recovery against fiduciaries can be pursued by only the Secretary of Labor and participants, beneficiaries, and fiduciaries, (29 U.S.C. §§ 1109, 1132(a)(2)), and only participants, beneficiaries, and fiduciaries can sue for injunctive relief (29 U.S.C. § 1132(a)(3)). So an ERISA plan does not have standing to sue under 1132(a) for breach of fiduciary duties or for engaging in prohibited transactions, (29 U.S.C. § 1106), unless the Plan itself is a plan participant, beneficiary or fiduciary. Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc., 185 F.3d 978, 983 (9th Cir. 1999); see also Ne. Dep't ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund, 764 F.2d 147, 154 (3d Cir. 1985); Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assur. Co., 700 F.2d 889, 890 (2d Cir. 1983). While an ERISA Plan could be authorized to sue

for recovery under §1132(a) if it is a beneficiary or participant in another plan, or it exercises discretionary authority over the management or administration of a separate plan or its assets and is suing as a fiduciary of that separate plan, (Local 159, 185 F.3d at 982; 29 U.S.C. § 1132(d)(1)), those facts are not alleged in this lawsuit. As such, the Third Amended Complaint fails to state an ERISA claim for recovery by the Plan.

C.      Plan's Right to Recover under RICO.

For similar reasons, the undersigned magistrate judge concludes the Plan cannot, in its own name, pursue a claim under RICO. A plaintiff seeking recovery under RICO must be a "person injured in his business or property." 18 U.S.C.A. § 1964(c). A person is broadly defined to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

An ERISA plan can hold a legal or beneficial interest in "plan assets." Those assets are defined consistent with "ordinary notions of property rights." Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 647 (8th Cir. 2007). The assets of an ERISA plan includes "any property, tangible or intangible, in which the plan has a beneficial ownership interest," and include any property held in trust on behalf of the plan. Department of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4 (May 5, 1993).

But an ERISA plan is not an individual, and interpreted under common law trust principles,[5] it is also not an entity. At common law, a trust cannot sue or be sued because it "is not a juristic person." Larson v. United Healthcare Ins. Co.,

---

[5] ERISA is modeled on trust law, with common-law trust principles guiding its interpretation. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (2006).

723 F.3d 905, 914 (7th Cir. 2013); Lazenby v. Codman, 116 F.2d 607, 609 (2d Cir. 1940) (A "trust is not a juristic person and the trustee is the only party entitled to bring suit to enforce the defendants' liability."). ERISA departs from the common law of trusts by stating an "employee benefit plan may sue or be sued under this subchapter as an entity," 29 U.S.C.A. § 1132(d)(1)) (emphasis added)), the subchapter being Title 29, Chapter 18, Subchapter I "Protection of Employee Benefit Rights." Section 1132(d)(1) does not state that a plan is an entity, or that the plan itself may sue as an entity for recovery under any non-ERISA theories of recovery, including RICO.

An ERISA plan is a scheme comprised of rules defining a beneficiary's rights and providing for their enforcement. Pegram v. Herdrich, 530 U.S. 211, 212 (2000). While the Plan in this lawsuit, like a trust, allegedly holds plan assets for the benefit of its participants, it is neither an "individual" nor an "entity" capable of suing for recovery under RICO. 18 U.S.C. § 1961(3). As such, Plaintiffs' Third Amended Complaint fails to state a claim for recovery by the Plan itself under RICO.

Accordingly, the undersigned magistrate judge finds that under the facts alleged, named Plaintiff Central Valley Ag Cooperative Health Care Plan is not within the class of plaintiffs authorized to file suit under ERISA or RICO, and its claims should be dismissed. Plaintiff CVA is the Plan's Administrator, sponsor, and named fiduciary. (Filing No. 43-2, at CM/ECF p. 3, ¶ 4). As such, CVA may pursue an ERISA lawsuit on behalf of the Plan. All discussion hereafter shall refer to CVA as the sole Plaintiff in this lawsuit.

II.    <u>ERISA Claims</u>.

A.    Claims for Breach of Fiduciary Duty and Prohibited Transactions.

CVA alleges TBG, AMPS, and CDS violated their fiduciary duties to the Plan by diverting plan assets to themselves, (Filing No. 43-2, at CM/ECF pp. 44-49, ¶¶ 134-153), and Humpal breached fiduciary duties owed to the Plan by misrepresenting and concealing material facts when communicating with CVA regarding the Plan. (Filing No. 43-2, at CM/ECF pp. 49-51, ¶¶ 154-161). CVA further alleges that AMPS and TBG breached fiduciary duties by engaging in prohibited transactions. Each of these defendants argue CVA's Third Amended Complaint fails to state an ERISA claim against them.

1.    AMPS: Breach of Fiduciary Duty and Prohibited Transactions.

a.    Breach of Fiduciary Duty: 29 U.S.C. § 1109.

AMPS argues that despite Plaintiff's conclusory allegations to the contrary, AMPS is not a Plan fiduciary and cannot be liable under 29 U.S.C. § 1109. AMPS argues it is not named as a fiduciary or otherwise identified in any of the Plan documents at issue. (Filing No. 48, at CM/ECF p. 6).

A person may be a plan fiduciary even if not named as such in plan documents. Under 29 U.S.C. § 1002(21)(A), a person is a plan fiduciary to the extent:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002 (21)(A).

AMPS argues it performed "purely ministerial functions" for the Plan and "is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan." (Filing No. 39, at CM/ECF p. 22) (citing 29 C.F.R. § 2509.75 at D-2).

After AMPS and CDS moved to dismiss the Second Amended Complaint for failure to state a claim, CVA moved to file its Third Amended Complaint, adding several allegations responsive to AMPS' and CDS' briefing on their motion to dismiss. CVA's allegations in the proposed Third Amended Complaint are assumed to be true for the purposes of its motion to amend.

The Third Amended Complaint alleges AMPS provided advice on amending the Plan to include AMPS' MBR and RBR reimbursement processes, set out-of-network reimbursement rates for health care provider claims, negotiated (or failed to negotiate when it promised to do so) direct provider contracts, performed medical bill and claim review, and determined what claims should be paid and in what amount. Plaintiff alleges AMPS violated these duties by engaging in a repricing scheme which caused providers to be paid unreasonably low amounts; received assets of the Plan without rendering valuable services to earn them; failed to negotiate provider contracts before

participants incurred claims, failed to inform CVA that hospitals were refusing payments, failed to disclose to Plan participants the nature, scope and amount of personal liability they would owe to their health care providers as a result of the RBR claims administration scheme, failed to timely settle claims, and failed to act in the best interest of participants when it implemented an arbitrary repricing scheme that exposed them to collection actions arising from arbitrarily unpaid claims. (Filing No. 43-2, at CM/ECF p. 12-13, 47-48, ¶¶ 56, 144). The complaint alleges that rather than a fixed rate, AMPS' compensation was calculated based on the value of claims made and Plan savings.

AMPS and CDS argue that "[t]his lawsuit is simply an after-the-fact disagreement about the value of the contractual services purchased by Plaintiffs, wherein Plaintiffs represented and warranted that they understood the services that they were buying." (Filing No. 48, at CM/ECF p. 12). However, "[a] person may become a fiduciary with respect to compensation if a plan gives the person control over factors, such as claims determinations, that determine the amount of that person's compensation, as sourced from plan assets." In re UnitedHealth Grp. PBM Litig., 2017 WL 6512222, at *9 (D. Minn. Dec. 19, 2017).

Assuming the allegations within the proposed Third Amended Complaint are true, AMPS exercised considerable discretion over how claims were reviewed and paid, and those decisions influenced the amount owed to AMPS under its contract with CVA. The Plaintiff's allegations support a finding that AMPS served as a Plan fiduciary and violated its fiduciary duties to the Plan. Plaintiff's ERISA claims against AMPS for breach of fiduciary duty are not futile.

b.    Prohibited Transactions: 29 U.S.C. § 1106.

Pursuant to 29 U.S.C. § 1106(a)(1), a plan fiduciary cannot "engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest," or "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(C-D). AMP argues CVA's complaint fails to state a claim for engaging in a prohibited transaction because "AMPS' compensation was clearly disclosed in the RBR Agreement at the same time that the Plan converted to the RBR model and appointed CDS as a limited fiduciary (for the first time)." (Filing No. 39, at CM/ECF p. 27). AMPS states "the Plan cannot now complain that AMPS engaged in a prohibited transaction by accepting the compensation the Plan contractually agreed to pay." (Filing No. 39, at CM/ECF p. 27).

CVA's proposed Third Amended Complaint alleges AMPS "provid[ed] services to the Plan for which it knowingly and fraudulently received excessive and unreasonable compensation; and (b) deal[t] with the assets of the Plan for its own interest and account." (Filing No. 43-2, at CM/ECF p. 185). It alleges that although the contract for compensating AMPS appeared legitimate on its face, it perpetuated a fraud upon the Plan by implementing a payment scheme which "irrationally and abusively discounted services" thereby raising AMPS' compensation (and that of other Defendants) while unreasonably failing to pay the plan participants' health care providers. (Filing No. 43-2, at CM/ECF p. 20, ¶ 76). "Parties may not use shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control." Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1220 (2d Cir. 1987).

Plaintiff's allegations, considered true for the purposes of the pending motion, state a claim against AMPS for engaging in prohibited transactions in violation of 29 U.S.C. § 1106. Plaintiff's ERISA claims against AMPS should not be stricken as futile.

2.      CDS: Breach of Fiduciary Duty.

The proposed Third Amended Complaint alleges "CDS is an alter ego of AMPS. CDS is a 'shell' entity of AMPS. As a matter of accounting, all of the financial transactions with the CVA Plan and the health care providers were undertaken by AMPS. There is no mention of CDS in the Plan's financial records." (Filing No. 43-2, at CM/ECF p. 12, ¶ 53).

Plaintiff's proposed Third Amended Complaint alleges "CDS is a named fiduciary of the Plan under the terms of the Plan document," and functioned as a fiduciary in determining "whether claims should be subject to review by AMPS; and whether the claims should be paid or not paid due to factors such as perceived or actual medical errors, balance billing amounts, or improper charges." (Filing No. 43-2, at CM/ECF p. 13, ¶ 61). Plaintiff alleges CDS engaging in the repricing scheme orchestrated by AMPS and TBG and exposed CVA to litigation from hospitals and plan participants, failed to disclose to Plan participants the nature, scope and amount of personal liability they would incur to their health care providers as a result of RBR claims administration, failed to act in the best interest of participants by exposing them to collection for arbitrarily unpaid claims, and fail to pay claims in accordance with the terms of the plan document. (Filing No. 43-2, at CM/ECF p. 48, ¶ 150).

29

Considered as true for the purposes of the pending motion, these allegations indicate CDS was both a named and functional fiduciary of the Plan, and it violated those fiduciary duties. Plaintiff's ERISA claims against CDS for breach of fiduciary duty are not futile.

3.     TBG: Breach of Fiduciary Duty and Prohibited Transactions.

a.     Breach of Fiduciary Duty: 29 U.S.C. § 1109.

TBG argues the Third Amended Complaint fails to state a claim against TBG for breach of fiduciary duty, citing Judge Smith Camp's order denying Plaintiff's motion for a Temporary Restraining Order as support for that conclusion. The order states:

> The Plan documents themselves raise questions about whether Defendants are even fiduciaries of the Plan. For example, the Plan states:
>
>> CLAIMS ADMINISTRATOR [The Benefit Group] IS NOT A FIDUCIARY. A Claims Administrator is not a fiduciary under the Plan by virtue of paying claims in accordance with the Plan's rules as established by the Plan Administrator [Central Valley].

(Filing No. 33, at CM/ECF p. 16).

In and of itself, the foregoing language does not foreclose Plaintiff's attempt to amend its complaint to state an ERISA claim against TBG. Like the allegations against AMPS, the court must consider whether TBG functioned as a fiduciary (see 29 U.S.C.A. § 1002 (21)(A)) even though it was not named as such in the Plan documents.

After TBG's motion to dismiss identified the deficiencies in CVA's Second Amended Complaint, CVA moved to file a its proposed Third Amended Complaint, adding the following allegations:[6]

> On claims incurred from January 1, 2014 through December 31, 2017, TBG determined what health care providers would be paid by the Plan, and what vendors would be paid, and in what amount. TBG never requested any direction from CVA or the Plan as to amounts to pay health care providers or vendors on any participant, spouse or beneficiary claim. TBG never disclosed individual claim or vendor invoice information to CVA or the Plan in any fashion that would have permitted CVA to exercise discretion concerning payment or be put on notice of an impropriety with regard to the claim administration process.

> Operationally, TBG and AMPS exercised complete authority and control over Plan assets by determining what payments would be made out of Plan assets, to whom such payments would be made, and in what amount . . .

> . . .[D]uring 2014, 2015, 2016, and through mid-October of 2017[,] neither TBG nor Humpal contacted CVA or the Plan for direction as to the payment of a specific claim or vendor invoice at the time such claim or invoice was submitted to the CVA Plan for payment. Until a participant notified CVA and the Plan of a dispute or threatened litigation (which occurred months or years after claims were initially processed) TBG and Humpal completely controlled what financial information CVA, the Plan and the participants received concerning participant health benefit claims.

(Filing 43-2, at CM/ECF pp. 8-9, ¶¶ 38-40).

---

[6] Defendants TBG and Humpal vehemently object to what they perceive as a pleading maneuver, stating the new allegations were added to survive dismissal and they are blatantly false. Rule 11 letters were sent. At this procedural juncture, the court must assume the allegations are true. Determining the credibility of those allegations cannot be addressed at this time.

While the Plan documents do not name TBG as a fiduciary, as the previously quoted allegations indicate, the proposed Third Amended Complaint alleges TBG exercised discretionary authority and discretionary control over the management of the Plan and the disposition of its assets. At the outset, TBG may have been assigned to perform only ministerial duties, but if it expanded those duties and began making discretionary decisions on the Plan's behalf, it became a Plan fiduciary. Harold Ives Trucking Co. v. Spradley & Coker, Inc., 178 F.3d 523, 526 (8th Cir. 1999). As such, it may be liable as a fiduciary under ERISA. 29 U.S.C. § 1002(21)(A).

CVA alleges TBG violated its fiduciary duties to the Plan by drafting an illusory plan document which shifted the risk of loss from RBR pricing to the Plan participants and CVA; failed to act in the best interests of participants by causing the Plan to engage AMPS and CDS' services, thereby exposing participants to bill collection from providers; failed to disclose to Plan participants the nature and scope of their personal liability for the unpaid portion of claims when RBR claims processing is used; failed to notify CVA that no provider contracts were in place, even after promising to secure such contracts; provided false and misleading information to and concealing material information from CVA concerning the impact of RBR pricing; failed to notify CVA that a significant number of hospitals were refusing to accept RBR repricing payments; failed to notify CVA that it had been sued by a number of hospitals; and comingled Plan funds with unrelated plans or entities, using the earnings generated and the "float" on checks never cashed by health care providers for the benefit of Defendants. (Filing No. 43-2, at CM/ECF pp. 45-46, ¶ 137).

These alleged actions support a claim that TBG was a functional fiduciary of the Plan, and they sufficiently state an ERISA claim against TBG for breach of

fiduciary duty. The ERISA claim under 29 U.S.C. § 1132(a) against TBG is not futile.

      b.     Prohibited Transactions: 29 U.S.C. § 1106.

Plaintiff alleges TBG provided services to the Plan for which it knowingly and fraudulently received excessive and unreasonable compensation, and it used the assets of the Plan for its own interest and account. (Filing No. 43-2, at CM/ECF p. 53, ¶ 170), As previously stated, the proposed Third Amended Complaint alleges TBG alleged played an integral role in handling these Plan assets, and as a result of TBG's actions and inactions, Defendants used earnings generated by failing to properly pay claims and from the "float" created when checks were not cashed by health care providers (because they unwilling to accept unreasonably low payments).

Such allegations, assumed to be true for the purposes of the pending motion, support CVA's claim that TBG violated ERISA by self-dealing and by transferring Plan assets for the use or benefit of itself and the co-defendants. 29 U.S.C. § 1106(a)(1)(C-D). CVA's proposed Third Amended Complaint alleges the elements of an ERISA claim against TBG for engaging in prohibited transactions.

      4.     Humpal: Breach of Fiduciary Duty.

CVA asserts Humpal violated his fiduciary duty to the Plan by misrepresenting information and concealing material facts when he explained the Plan and its performance. (Filing No. 43-2, at CM/ECF pp. 49-51, ¶¶ 154-161). Plaintiff alleges Humpal's false statements and concealment occurred while Humpal acted on his own behalf and when he was acting within the course and

scope of his partnership, agency, or employment for TBG. (Filing No. 43-2, at CM/ECF p. 7, ¶ 23).

Humpal argues Plaintiff cannot assert a valid claim against Humpal in his personal capacity because Humpal's actions were taken in the course and scope of his employment for TBG. (Filing No. 37, at CM/ECF pp. 17-18). "[A]bsent piercing the corporate veil, officers of a corporation cannot be held liable for ERISA obligations undertaken by the corporation." Marshall v. Baggett, 616 F.3d 849, 853 (8th Cir. 2010). CVA has not alleged any facts that would justify piercing the corporate veil in this case, or that Humpal's alleged acts were committed in his personal capacity and outside the course and scope of his employment. As such, no actionable ERISA claim has been alleged against Humpal in his individual capacity. See Stark v. Audio Mktg. Sols., Inc., 2010 WL 3789572, at *3 (D. Neb. Sept. 21, 2010).

B.    Non-Fiduciary ERISA Claims.

1.    The Leonards: Non-Fiduciary Liability for Aiding Fiduciary Violations.

CVA alleges the Leonards, as non-fiduciary service providers to the Plan, knowingly participating in TBG's and Humpal's breach of fiduciary duty to the Plan, and falsely stated the 2016 Plan document complied with the ACA. (Filing No. 43-2, at CM/ECF pp. 51-52, ¶ 164-166).

Equitable remedies may be ordered against non-fiduciaries who engage in activities with plan fiduciaries when they knew or should have known that those activities would violate duties owed to plan beneficiaries. Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 251 (2000); see also Arakelian v.

Nat'l W. Life Ins. Co., 755 F. Supp. 1086, 1089 (D.D.C. 1990); Brock v. Hendershott, 840 F.2d 339, 342 (6th Cir. 1988). Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1220 (2d Cir. 1987); Thornton v. Evans, 692 F.2d 1064, 1079 (7th Cir. 1982) ("[A] remedy lies under ERISA against non-fiduciaries who conspire with fiduciaries in breach of ERISA-imposed duties.").

Plaintiff's proposed Third Amended Complaint alleges the Leonards—the owners of GMS—secretly received compensation from TBG, AMPS, and CDS for influencing CVA and the Plan to engage in transactions with TBG, AMPS, and CDS. (Filing No. 43-2, at CM/ECF p. 7, ¶¶ 23-24). It further alleges that along with TBG, AMPS and CDS, the Leonards and GMS worked to transfer Plan assets to the defendants while denying or paying unreasonably low amounts on claims. (Filing No. 43-2, at CM/ECF p. 15, ¶¶ 68-69)). CVA alleges the Leonards knew that TBG (and Humpal) were Plan fiduciaries. The proposed Third Amended Complaint states:

> [The Leonard] were aware of the excessive and double fees charged by TBG, the misrepresentations that TBG and Humpal made to the Plan and CVA relating to purported savings, provider agreements, how the RBR pricing scheme worked, and whether it was lawful for the Plan to rely on RBR pricing. However, the Leonards never informed CVA or the Plan that these representations were false. Instead, they permitted TBG and Humpal to proceed with their scheme against the Plan and breaches of fiduciary duties because the relationships between the Plan, CVA, TBG, and Humpal resulted in a financial gain for the Leonards.

(Filing No. 43-2, at CM/ECF p. 52, ¶ 164). Plaintiffs further allege the Leonards reviewed the 2016 Plan document and falsely represented to CVA that the Plan was compliant with the Affordable Care Act. (Filing No. 43-2, at CM/ECF p. 52, ¶ 165).

As to Plaintiff's claim that the Leonards are liable for aiding TBG, AMPS, and CDS in breaching their duties to the Plan, the facts alleged state an ERISA claim. But there is no allegation linking the Leonards' alleged false statements regarding ACA compliance to any breach of fiduciary duty to the Plan; that is, there is nothing to indicate that these statements were made to assist TBG, AMPS, and CDS in their alleged efforts to divert assets from the Plan.

Assuming the truth of all facts alleged, CVA's claims for equitable relief against the Leonards for aiding the fiduciaries' violation of duties owed under ERISA are not futile. However, the proposed Third Amended Complaint fails to state an ERISA claim against the Leonards for falsely stating the 2016 Plan was ACA-compliant.

2.    GMS and the Leonards: Prohibited Transactions by Non-Fiduciaries.

Plaintiff alleges GMS and the Leonards are liable under ERISA for knowing and fraudulent receipt of excessive and unreasonable compensation, and for transferring plan assets to a party in interest or using them for their own benefit. (Filing No. 43-2, at CM/ECF pp. 54-56, ¶¶ 172-183).

CVA's proposed Third Amended Complaint alleges GMS and the Leonards knowingly, but secretly as to CVA, received money or "kickbacks" from TBG and AMPS for providing false reports to CVA regarding the Plan's performance, and for failing to attend certain meetings held by TBG and AMPS with CVA. (Filing No. 43-2, at CM/ECF pp. 55-56, ¶¶ 174-183). This conduct, considered true for the purposes of the pending motion, is a violation of 29 U.S.C. § 1106(a)(1)(C-D) and supports a claim for equitable relief for engaging in prohibited transactions in violation of ERISA. Harris Tr. & Sav. Bank, 530 U.S. at 251.

In summary, the proposed Third Amended Complaint fails to state an ERISA claim against Humpal in his personal capacity, and fails to state an ERISA claim against the Leonards for falsely stating the 2016 Plan complied with the Affordable Care Act (ACA). In all other respects, Plaintiff's ERISA claims are not futile.

III.     RICO Claims.

The proposed Third Amended Complaint asserts Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1962(c). To bring a civil claim for recovery under RICO, the plaintiff must prove: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Crest Const. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (citing 18 U.S.C.A. § 1962(c)). "RICO provides a private right of action for any person 'injured in his business or property by reason of a violation of' its substantive prohibitions," but it "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." Crest Const. II, Inc., 660 F.3d at 353.

All Defendants argue the proposed Third Amended Complaint fails to state a RICO claim because it fails to adequately allege the existence of an "enterprise."[7]

---

[7] Defendants also argued the Second Amended Complaint lacked sufficient particularity and failed to allege a pattern of racketeering. These arguments are not address because they may now be moot since the proposed Third Amended Complaint added many specific allegations of false statements mailed and emailed to CVA, and more importantly, because I find that the proposed Third Amended Complaint fails to adequately allege the existence of a RICO enterprise.

For RICO purposes, an enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Nelson v. Nelson, 833 F.3d 965, 968 (8th Cir. 2016). An enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Boyle v. United States, 556 U.S. 938, 945 (2009) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

Here, Plaintiff alleges "AMPS and CDS created a partnership with TBG and Humpal that was separate and distinct from the services these entities rendered in the administration of the Plan and all of AMPS' and CDS' customary claims review services. The Leonards and GMS also are members of the partnership." (Filing No. 43-2, at CM/ECF p. 12, ¶54). In support of this claim, CVA begins by stating:

> TBG and Humpal represent on TBG's website that a "partnership" exists between TBG and AMPS. AMPS' website, in turn, describes a "partnership" with third party administrators and brokers, such as TBG and GMS. The partnership is the "Enterprise" as identified herein.

(Filing No. 43-2, at CM/ECF p. 15, ¶68). It thereafter outlines several allegations of Defendants allegedly working together to commit fraud against Plaintiff.

Asserting the existence of a "partnership"—whether cited in a civil complaint or posted on a defendant's website—is a conclusory statement. The daisy-chain of partner relationships described in paragraph 68 of the proposed Third Amended Complaint does not establish that Defendants formed a

partnership entity—as opposed to network of referrals among their respective businesses. While the proposed Third Amended Complaint is voluminous, other than listing fraudulent activities Defendants allegedly committed together, it provides no facts explaining the relationship between the defendants, and conclusory statements that a "partnership" existed cannot, alone, support the finding of a RICO enterprise.

Plaintiff may be attempting to allege an "association-in-fact" enterprise. An association-in-fact enterprise has "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946. While an association-in-fact enterprise need not have regular meetings or a chain of command, "it does need some sort of discrete existence and structure uniting its members in a cognizable group." Nelson, 833 F.3d at 968. It must be comprised of something more than a pattern of racketeering activity. Id. To determine if the alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering activity, the court must decide whether the enterprise would still exist if the predicate acts were removed from the equation. Crest Const. II, Inc., 660 F.3d at 354-55.

The proposed Third Amended Complaint alleges TBG and AMPS, TBG and Humpal, AMPS and CDS, and the Broker defendants formed an enterprise which operates in eight states (and therefore effects interstate commerce; Filing No. 43-2, at CM/ECF p. 15, 67, ¶¶ 67, 68, 193), and it uses false promises and information as a means to persuade companies to offer employee benefit plans administered under the MBR and RBR pricing scheme promoted by AMPS, with the goal of secretly converting employee health plan assets to the enterprise. (Filing No. 43-2, at CM/ECF pp. 17, 35-36, ¶¶ 69, 105-06). The proposed Third

Amended Complaint alleges the enterprise has engaged in this conduct since 2012 for a common goal, by similar means, with similar results, and with not only CVA, but other group health plans. (Filing No. 43-2, at CM/ECF p. 67, 69, ¶ 194, 198).

The gravamen of the proposed Third Amended Complaint is that the defendants acted together to convince CVA to change from an insured to a self-funded employee health care plan for the purpose of committing fraud and depleting plan assets to Defendants' own use. Aside from its conclusory statements, Plaintiff's allegations describe a relationship between the defendants that is built entirely on committing fraud; that is, the only factor that links all these parties together and defines them as a distinct group is their direct or indirect participation in an alleged scheme to defraud. Stephens, Inc. v. Geldermann, Inc., 962 F.2d 808, 815 (8th Cir. 1992). As such, the proposed Third Amended Complaint fails to adequately allege the existence of a RICO enterprise. Nelson v. Nelson, 833 F.3d 965, 968 (8th Cir. 2016) (holding an enterprise was not sufficiently alleged where plaintiff's complaint stated the defendants performed various discrete tasks within their fields of expertise as part of an overarching scheme to defraud); Illinois Farmers Ins. Co. v. Guthman, 2017 WL 3971867, at *3 (D. Minn. Sept. 7, 2017) (dismissing RICO allegations for failure to state a claim where the alleged scheme to defraud several insurers was conducted by an individual defendant, his company, and several chiropractors who received kickbacks for ordering unnecessary MRIs; no association-in-fact enterprise exists if the relationship between the defendants is made up entirely of fraud).

Since there can be no RICO claim without an enterprise, Plaintiff's proposed Third Amended Complaint fails to state a claim for recovery under RICO.

IV.     Claim for Injunctive Relief.

Claim 12 of the proposed Third Amended Complaint is titled as a claim for "Affirmative Injunctive Relief." (Filing No. 43-2, at CM/ECF p. 71). As recently stated by this court,

> "[N]o independent cause of action for injunction exists." Plan Pros, Inc. v. Zych, No. 8:08CV125, 2009 WL 928867, at *2 (D. Neb. Mar. 31, 2009); see also, Henke v. Arco Midcon, L.L.C., 750 F. Supp. 2d 1052, 1059-60 (E.D. Mo. 2010) ("Injunctive relief ... is a remedy, not an independent cause of action."); Christensen v. PennyMac Loan Servs., LLC, 988 F. Supp. 2d 1036, 1046 (D. Minn. 2013) ("The claim for injunctive relief is a request for a remedy, not a separate cause of action.").

Affiliated Foods Midwest Coop., Inc. v. Supervalu Inc., 2017 WL 2222916, at *2 (D. Neb. May 19, 2017) (Gossett, M.J.).

As previously stated, CVA has adequately alleged ERISA claims for which the remedy of injunctive relief may be available. But to the extent Claim 12 purports to be a separate and independent claim for "injunctive relief," it would not survive a Rule 12(b)(6) motion to dismiss and should be stricken as futile. Id. (citing Motley v. Homecomings Fin., LLC, 557 F. Supp. 2d 1005, 1014 (D. Minn. 2008)); Henke, 750 F. Supp. 2d at 1060.

V.     Claim for Attorney Fees.

Claim 10 of the proposed Third Amended Complaint is titled "Attorney's Fees Under §502(g)." (Filing No. 43-2, at CM/ECF p. 56). Pursuant to 29 U.S.C.A. § 1132(g)(1), the court may, in its discretion, allow a participant, beneficiary, or fiduciary to recover reasonable attorney's fee and costs for

pursuing an ERISA claim. As such, a claim for attorney fees in this context is a remedy afforded under ERISA, and not an independent claim. To the extent Claim 10 purports to be a claim for "attorney fees" separate and independent of the ERISA claims, it should be stricken as futile.

## RECOMMENDATION

IT HEREBY IS RECOMMENDED to the Honorable Laurie Smith Camp, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b), that:

1)    The motion to amend filed by the Plaintiffs (Filing No. 43) be granted in part and denied in part. Plaintiff CVA should be permitted to file its proposed Third Amended Complaint, provided it first amends the proposed complaint:

a)    To identify CVA as the sole plaintiff, and

b)    To remove:

    i.    All claims against all Defendants asserting a claim for relief under RICO (Claim 11);

    ii.    All ERISA claims against Humpal in his personal capacity (Claim 4);

    iii.    The ERISA claim against the Leonards for falsely stating the 2016 Plan was ACA-compliant (Claim 5, ¶ 165); and

    iv.    The stand-alone claims for attorney fees and injunctive relief (Claims 10 and 12).

2)    With the filing of the revised proposed Third Amended Complaint, Defendants' motions to dismiss, (Filing Nos. 36, 38, and 40), should be denied as moot.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

March 29, 2018.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge