## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CENTRAL VALLEY AG COOPERATIVE, for itself and as Fiduciary of the CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN | ) ) ) ) ) ) | |
| *Plaintiff,* | ) ) | CIVIL ACTION NO. 8:17-cv-379 |
| v. | ) ) | |
| DANIEL K. LEONARD, SUSAN LEONARD, THE BENEFIT GROUP, INC, ANASAZI MEDICAL PAYMENT SOLUTIONS, INC. d/b/a/ ADVANCED MEDICAL PRICING SOLUTIONS, CLAIMS DELEGATE SERVICES, LLC and GMS BENEFITS, INC. | ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## THIRD AMENDED COMPLAINT

Plaintiff, Central Valley Ag Cooperative ("CVA" or "Plaintiff"), for itself and as fiduciary of the Central Valley Ag Cooperative Health Care Plan files this Third Amended Complaint against Defendants, Daniel K. Leonard and Susan Leonard (collectively "the Leonards"), The Benefit Group, Inc. ("TBG"), Anasazi Medical Payment Solutions, Inc. d/b/a/ Advanced Medical Pricing Solutions ("AMPS"), Claims Delegate Services, LLC ("CDS"), and GMS Benefits, Inc. ("GMS") (collectively, "Defendants"), under ERISA §502 in order to bring assets of the Central Valley Ag Cooperative Health Care Plan (the "Plan") back into the welfare benefit plan and in support thereof, would respectfully show as follows:

## JURISDICTION AND VENUE

1.     Jurisdiction is proper in this Court under 28 U.S.C. §1331 because Plaintiffs allege claims under the following federal statute: the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(e)(1).

2.     This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and each Defendant systematically and continuously conducts business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over each of them.

3.     Venue is proper under 29 U.S.C. §1132(e)(2) because Nebraska is the location where the Plan was, and is, currently administered, and where the breaches of fiduciary duty took place that caused loss of plan assets of the Plan.

## THE PARTIES AND THEIR RESPECTIVE ROLES AS TO THE PLAN AND THIS LITIGATION

## CVA AND THE PLAN

4.     Plaintiff CVA is a Nebraska corporation with its principal place of business at 2803 N. Nebraska Ave., York, NE 68467.  CVA provides farm planning, supplies, and services to members of its cooperative in Nebraska, Kansas, and Iowa.  *See* http://www.cvacoop.com. CVA is the sponsor and plan administrator of the Plan.  CVA is a fiduciary of the Plan under ERISA §3(21)(A)(i) and (iii).

5.     CVA is the named surviving entity of a merger between United Farmer's Cooperative ("UFC") and Central Valley AG Cooperative Non-stock ("CVA Non-stock").  Each entity had its own group employee health and welfare plan prior to the entities' corporate merger in 2014.

---

6.      In 2012, UFC's (now CVA) health plan was fully-insured.

7.      In 2012, UFC (now CVA) was approached by the Leonards, for themselves, and on behalf of GMS, and Linus G. Humpal ("Humpal"), on behalf of TBG, with a proposal to change the UFC health and welfare plan from a fully insured plan to a self-funded plan.  The Leonards and Humpal/TBG, who were in a position of trust and confidence with regard to UFC, often rendered compliance advice to CVA concerning the Plan, and represented to UFC that changing to a self-funded plan would help manage costs.  UFC relied upon the advice of the Leonards and Humpal/TBG and amended UFC's group health plan from a fully-insured plan to a self-funded plan.

8.      UFC (now CVA) established its self-funded health and welfare plan in 2013.

9.      The relationship and transactions between CVA and the Defendants named herein began with UFC and the UFC health plan, and arose from the trusted relationship of CVA with insurance agent and benefits consultants, GMS (including its owners, Defendants Daniel and Susan Leonard) and third-party administrator, TBG (including its owner, Humpal) in 2012.

## THE CVA SELF-FUNDED HEALTH PLAN

10.     The Plan is an employee health and welfare benefit plan that, for the time periods relevant to this litigation, was, and currently is, sponsored by Plaintiff CVA.  The Plan is self-funded by CVA and through participant contributions that are deducted from wages.  The Plan year is the calendar year.

11.     The Plan is the surviving group health plan of the merger of the UFC group health plan and the fully-insured group health plan of Central Valley AG Cooperative Non-Stock.

---

12.     The Plan is an employee benefit plan within the meaning of ERISA §3(1), and is subject to Title I of ERISA and its fiduciary standards.  The Plan is required to file Form 5500s for each plan year, and to have a fiduciary audit submitted with its Form 5500.

13.     The Plan is an employee welfare benefit plan under ERISA and the group health plan of an applicable large employer for purposes of the Patient Protection and Affordable Care Act.

14.     Based upon the census provided by TBG, the Plan covers over 700 participants, their spouses, and dependents who are residents of Kansas, Nebraska, South Dakota, and Iowa. Health claim transactions concerning participant benefits under the Plan took place in these States.

15.     Participants of the Plan expect that the Plan will insure them against losses arising from their medical care, the care of their spouses, and the care of their dependents.  Participants rely upon the Plan's benefits to cover the costs of their healthcare in the same manner as a group health insurance policy.

16.     CVA intended for the Plan to cover the health claims of participants, their spouses and their dependents similar to the group health insurance policies it utilized to fund the Plan in years prior to 2012, and in compliance with the Patient Protection and Affordable Care Act.

17.     To limit the maximum potential liability with regard to aggregate claims, UFC (and later CVA) purchased an excess liability insurance (stop-loss insurance) policy for the Plan from Berkley Life/Health Insurance for the Plan year 2014, Companion Life Insurance Company for the Plan year 2015, and from United States Fire Insurance Company for the Plan year 2016. TBG and GMS and/or the Leonards advised UFC (and later CVA) in procuring stop-loss

**THIRD AMENDED COMPLAINT**                                                    Page 4

insurance coverage for the Plan.  The stop loss carriers conduct business in Greenwich, Connecticut (Berkley) and New York (Companion and United States Fire).

## DEFENDANTS GMS AND THE LEONARDS

18.     Defendant GMS Benefits, Inc. is the trade name for Group Marketing Services, Inc., a Nebraska corporation with its principal place of business at 17445 Arbor Street, Suite 200, Omaha, NE 68130.  GMS provides insurance broker and employee benefit plan consulting services to employers.  *See* http://gmsbenefits.net.  GMS may be served through its registered agent Daniel K. Leonard, 17445 Arbor Street, Suite 200, Omaha, NE 68130.

19.     Defendant Daniel K. Leonard is an individual who resides in Nebraska.  Daniel Leonard owns GMS, in whole or in part, and serves as the Vice President of GMS and was, at all material times, the agent, employee, representative, and/or alter ego of defendant GMS, and was acting for himself and within the course and scope of such agency or employment.

20.     Defendant Susan Leonard is an individual who resides in Nebraska.  Susan Leonard is the wife of Daniel Leonard and owns GMS, in whole or in part.  Susan Leonard was, at all material times, the agent, employee, representative, and/or alter ego of defendant GMS, and was acting for herself and within the course and scope of such agency or employment.

21.     At all times relevant to this Complaint, the Leonards—through GMS—served UFC (and later CVA) as insurance broker, employee benefits consultants, and trusted advisors. The Leonards counseled and assisted UFC/CVA on the Plan's design, legal compliance aspects, administration, and by procuring stop-loss insurance coverage for the Plan.

22.     GMS and the Leonards received compensation from Plan assets and/or CVA for services provided to CVA and the Plan.  Certain compensation received by GMS and/or the

---

Leonards i.e., the compensation received as a result of the scheme described below was not disclosed to either CVA or the Plan, either as to amount or source, although GMS and the Leonards had a duty to disclose such compensation.

23.     GMS and the Leonards received compensation in exchange for influencing CVA and the Plan to engage in transactions with TBG, GMS, the Leonards, AMPS, and CDS, as described herein.

24.     GMS and the Leonards are parties in interest under ERISA §3(14)(A) with regard to the Plan.

25.     GMS and the Leonards acted knowingly and intentionally as to all actions taken with regard to CVA and the Plan that are alleged in this litigation.

## DEFENDANT TBG

26.     Defendant TBG is a Nebraska corporation with its principal place of business at 11906 Arbor St., #100, Omaha, NE 68144.  According to its website, TBG provides plan design, medical bill review, and claims administrative services. *See* http://tbgco.com.   TBG may be served though its agent Linus G. Humpal, 11904 Arbor Street, #100, Omaha, NE 68144. Humpal is TBG's owner and acted as TBG's agent with respect to the actions alleged in this Complaint.

27.     According to its website, TBG is a "partner" of AMPS.

28.     TBG received compensation, directly or indirectly, from AMPS and/or CDS. TBG did not disclose to CVA or the Plan compensation received from AMPS and CDS, in whole or in part, although TBG had a legal duty to do so.

29.     TBG receives compensation that is paid from Plan assets.

---

30.     TBG receives compensation from CVA.

31.     TBG received compensation in exchange for influencing CVA and the Plan to engage in transactions with the Defendants, as described herein.

32.     At all times relevant to this Complaint, the third party administrator ("TPA") for the Plan was TBG.  TBG drafted and provided CVA with its group health plan documents from 2013 through 2016.

33.     In addition to its TPA services, TBG adjusted, reviewed, and paid claims under the Plan during the period January 1, 2013 through December 31, 2014.

34.     On claims incurred from January 1, 2014 through December 31, 2017, TBG determined what health care providers would be paid by the Plan, and what vendors would be paid, and in what amount.  TBG never requested any direction from CVA or the Plan as to amounts to pay health care providers or vendors on any participant, spouse or beneficiary claim.  TBG never disclosed individual claim or vendor invoice information to CVA or the Plan in any fashion that would have permitted CVA to exercise discretion concerning payment or be put on notice of an impropriety with regard to the claim administration process.

35.     Operationally, TBG and Defendant AMPS exercised complete authority and control over Plan assets by determining what payments would be made out of Plan assets, to whom such payments would be made, and in what amount.  CVA approved aggregate funding requests, but did not determine any individual claim or vendor payment amounts.  The "Checks Pending Register by Group" ("Register") documents that were attached to TBG's weekly funding requests did not contain sufficient information for CVA to consider or to allow CVA to spot improprieties in claim administration.  In fact, CVA has discovered in recent months that

**THIRD AMENDED COMPLAINT**                                              Page 7

substantial payments were sent to vendors that were never disclosed or authorized by CVA to provide services of any kind to the Plan.

36.     At no time during 2014, 2015, 2016, and through mid-October of 2017 did TBG contact CVA for direction as to the payment of a specific claim or vendor invoice at the time such claim or invoice was submitted to the Plan for payment.  Until participants notified CVA and the Plan of a dispute or threatened litigation (which occurred months or years after claims were initially processed) TBG completely controlled what financial information CVA, the Plan and the participants received concerning participant health benefit claims.

37.     The 2016 Plan document stated that TBG was the Claims Administrator for the Plan and would "process Claims and answer medical benefit and Claim questions." *See* Doc. 19-9, p.3.  In addition, the RBR Program Services Agreement provides that TBG, as the Third Party Administrator ("TPA") will "process all Hospital Claims, all Hospital Claim Appeals, and will be responsible for making benefit determinations on first Appeals and sending out required notices regarding such determinations in accordance with the Plan Document." *See* Doc. No. 19-8, §3.01(d).  Operationally, TBG, CDS and AMPS acted with complete discretion and authority as to the disbursement of Plan assets on all health care provider claims.

38.     For the time period relevant to this litigation, TBG was a trusted advisor to CVA with respect to the Plan.  TBG introduced CVA to AMPS and CDS, and advised CVA to utilize AMPS' and CDS' services with respect to the Plan.

39.     TBG did not disclose to CVA or the Plan the full nature and scope of AMPS' and CDS' business methodologies with regard to services AMPS and CDS rendered to the Plan, although TBG had a legal duty to do so.  Further, TBG did not disclose to Plan participants the

nature and scope of their liability to health care providers, although TBG had a legal duty to do so.

40.     TBG made determinations regarding whether AMPS/CDS would be paid from Plan assets, in what amount AMPS would be paid, and whether to honor invoices submitted by AMPS.  CVA and the Plan had no access to this information and AMPS invoices were never disclosed to these Plaintiffs while TBG was acting as Plan administrator.

41.     TBG was notified when checks to health care providers were not endorsed and cashed.  TBG failed to credit CVA or the Plan with these rejected check amounts, and left these funds in comingled accounts, thus retaining the funds and earnings on the funds (i.e., interest) to be used for Defendants' benefit.

42.     TBG concealed payments to AMPS/CDS and other service providers from CVA, from the Plan, and from the Plan's stop loss carrier by hiding amounts paid to AMPS/CDS, and other non-health care services providers in the paid health care claims accounting records, thus disguising these amounts as payments to health care providers.

43.     TBG comingled the CVA Plan assets with other plan assets and assets from other sources, thereby creating a MEWA in furtherance of its own interests and the interests of the Defendants.  The comingling of funds allowed TBG and the other Defendants to receive non-disclosed monetary benefits from the Plan's assets that they otherwise would not have received.

44.     For the time period relevant to this litigation, TBG is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) with regard to the design and terms of the Plan document; with regard to cost savings mechanisms for claims processing; and with regard to the decision to retain AMPS and CDS.

**THIRD AMENDED COMPLAINT**                                                              Page 9

45.     TBG is a party in interest under ERISA §3(14)(A), with respect to the Plan for all time periods relevant to the litigation.

46.     TBG acted knowingly and intentionally as to all actions taken with regard to CVA and the Plan alleged in this litigation.

## DEFENDANTS AMPS AND CDS

47.     Defendant AMPS is an Arizona corporation with its principal place of business at 35 Technology Parkway South, Suite 100, Peachtree Corners, GA 30092.   AMPS conducts business in Nebraska and elsewhere through its website and its partnership with TBG.  AMPS represents in its marketing materials that it provides "cost containment services for self-funded employers."  *See* http://advancedpricing.com.  AMPS may be served through its registered agent CT Corporate Systems, 3800 N. Central Ave. #460, Phoenix, AZ 85012.

48.     Defendant CDS is a Florida limited liability company with its principal place of business at 420 Technology Parkway, Norcross, FL 30092.  On or around August 1, 2014, CDS became a wholly owned subsidiary of AMPS.  For all periods relevant to this litigation, CDS conducted business in Nebraska and elsewhere, both on its own and through its parent company AMPS.  CDS represents in marketing materials and other client communications that it "provides 'Reference Based Reimbursement' programs for self-funded employer health care plans." CDS states in marketing materials and other client communications that its services include review and auditing of hospital and health care provider claims.  CDS may be served through its registered agent CT Corporation Systems, 1200 South Pine Island Road, Plantation, FL 33324. CDS is a subsidiary of AMPS.

49.     CDS is an alter ego of AMPS.  CDS is a "shell" entity of AMPS.  As a matter of accounting, all of the financial transactions with the CVA Plan and the health care providers were undertaken by AMPS.  There is no mention of CDS in the Plan's financial records.

50.     AMPS and CDS received compensation as a result of their "partnership" with TBG which diverted Plan assets from participants to Defendants, and were paid out of comingled funds held in accounts of TBG and which included the Plan's funds.

51.     At all time periods relevant to this litigation, AMPS is a fiduciary of the Plan, within the meaning of ERISA §3(21)(A)(i) and (iii), as to whether the Plan should be amended to reflect AMPS' medical bill review and reference based pricing and reimbursement processes; setting out-of-network reimbursement rates for health care provider claims; negotiation of direct provider contracts; medical bill or claim review; reference based pricing and reference based reimbursement of claim; and the determination of what health claims should be paid and in what amount they should be paid.

52.     Operationally, AMPS exercised complete control over what participant health benefit claims would be paid by the Plan, what amount of money AMPS would be paid by the Plan, and what amount health care providers would receive from the Plan.

53.     At no time did AMPS ever request CVA to direct it or CDS as to the payment of Plan assets on any specific participant claim that AMPS or CDS reviewed.

54.     As to all time periods relevant to this litigation, AMPS is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) as to AMPS' cost containment programs utilized by the Plan (including but not limited to reference based pricing and reference based

reimbursement); what health care claims will be paid; and in what amount claims will be paid by the Plan.

55.     Operationally, AMPS, CDS, and TBG exercised complete dominion and control over all the Plan's financial affairs and what, if anything, would be disclosed to CVA, the Plan, and its participants.  Defendants acted in concert and in secret to conceal their activities and income from Plan assets from Plaintiff and the Plan participants.

56.     As to all time periods relevant to the litigation, CDS is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) as to the AMPS' cost containment programs utilized by the Plan; the determination of whether claims should be subject to review by AMPS; and whether the claims should be paid or not paid due to factors such as perceived or actual medical errors, balance billing amounts, or improper charges.  Furthermore, CDS is a named fiduciary of the Plan under the terms of the Plan document. *See* Doc. 19-9, p.3.

57.     AMPS and CDS are fiduciaries of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) as to the design and implementation of the legal advocacy program called Legal Plan Membership which was offered to participants of the Plan as a benefit.  AMPS and CDS represented that the legal advocacy program would protect the participants against health care provider "balance billing."  AMPS and CDS (and the other Defendants) failed, however, to disclose to Plan participants the nature, scope and amount of monetary liability they would owe to health care providers as a result of the reference based reimbursement procedures AMPS and CDS would use in connection with claims administration.  AMPS and CDS (and the other Defendants) also failed to disclose to Plan participants that virtually all significant claims

administered by them would subject the participants to monetary liability for balances due providers who rendered health care services to participants.

58.    AMPS and CDS receive compensation from Plan assets and from CVA. Compensation received by AMPS and CDS with respect to services rendered to CVA and the Plan was not disclosed to either CVA or the Plan, although AMPS and CDS had a duty to do so.

59.    AMPS and CDS are each a party in interest under ERISA §3(14)(A) with respect to the Plan.

60.    AMPS and CDS acted knowingly and intentionally with regard to all actions taken with respect to CVA and the Plan described in this litigation.

## FACTS CONCERNING AMPS' AND TBG'S MANDATES FOR PLAN TERMS AND CONDITIONS

61.    AMPS and CDS, through TBG, the Leonards, and GMS, presented the "MBR" and "RBR" schemes to CVA and the Plan as a cost-savings mechanism.

62.    Medical Based Review ("MBR") is intended to be a cost-savings mechanism that determines whether health care provider charges are appropriate for the medical condition of the participant or beneficiary, necessary, customary and reasonable in charge amount.  Customarily, reference based pricing or reference based reimbursement ("RBR") is a type of discount pricing program where insurance companies and large self-funded plans (via preferred provider contracts) negotiate discounts with certain health care providers in areas where there is competition among health care providers.  In these discount pricing programs, the insurance companies or plans steer their insureds or participants to certain providers in exchange for substantial discounts for services rendered.  These arrangements are negotiated in advance of any services being provided to the insureds or participants, and are typically utilized only for services

that are common, and are performed by a large number of health care providers, such as a colonoscopy, so that extensive competition among providers exists and provides a motivation for the providers to accept discounts.

63.   Reference based pricing programs and reference based reimbursement programs are not generally accepted in the insurance or self-funded plan community as pricing or reimbursement mechanisms for **_all_** or **_a majority_** of health care services.  In fact, in 2014, 2015 and 2016, federal agencies, including the Federal Trade Commission and the Department of Labor, warned against the use of such programs in any broad capacity for self-funded group health plans because of the omission of quality of care considerations, the dependency on vast competition among providers needed for such programs to be successful, and potential conflicts with the Patient Protection and Affordable Care Act ("ACA") maximum out-of-pocket expense mandates.

64.   CVA was unaware of the warnings by federal agencies concerning broad-based reference based pricing and reference based reimbursement programs at the time the RBR scheme was presented to them.   AMPS, CDS, TBG, and GMS represented they were knowledgeable in reference based reimbursement and pricing programs, and CVA relied upon them and their representations.  From October 30, 2015 to August 17, 2016, AMPS, CDS, TBG and GMS represented to CVA and the Plan that their RBR scheme was of the type of reference based reimbursement program that was accepted by the insurance and employee benefit plan community as the "wave of the future."

65.   Based upon the representations of Defendants, CVA and the Plan thought they were getting the RBR program identified in Paragraph 62 (*supra*) of this Third Amended

---

**THIRD AMENDED COMPLAINT**                                                     Page 14

Complaint.  CVA anticipated there might be some amount of balance billings for participants as a result of the RBR program.

66.     However, the medical based review or "MBR" and RBR scheme perpetrated upon CVA and the Plan was nothing like legitimate MBR and RBR programs.  The contracts between Defendants, CVA and the Plan, and the CVA Plan document purport to be legitimate, but operationally, they were not followed and/or the broad fiduciary discretion provided to Defendants allowed them to exploit the Plan and its assets improperly for their own gain.  The MBR and RBR services actually perpetrated upon CVA, the Plan and the Plan participants was nothing like what CVA and the Plan contracted to receive for the following reasons:

      a.  AMPS' MBR and RBR schemes applied to *all* health services provided to Plan participants, whether or not participants had choices among health care providers and whether or not quality services were provided by health care providers.  The MBR and RBR schemes irrationally and abusively discounted services (and correspondingly raised AMPS' and  the other Defendants' compensation), by unreasonably failing to pay health care providers;  For example,

         i.  since filing the Second Amended Complaint, Plaintiff has discovered some of the details of the handling of a $49,925.20 claim for medical services rendered to a participant of the Plan by Nebraska Methodist on June 23, 2015.   Shortly after receiving this claim from Nebraska Methodist, Defendants declared that they had discovered $41,925.23 in "savings" for Plaintiff and the Plan and issued a check to Nebraska Methodist for $7,999.97.  On or about September 29, 2015, Defendants

---

**THIRD AMENDED COMPLAINT**                                                                 Page 15

paid *themselves* $8,833.18 for these "savings" that they had allegedly achieved.  (The PPO discount agreements that applied to this 2015 claim would have required the Plan to pay $37,443.90 on this claim.)  This claim settled for $21,565.00 in the context of the *Nebraska Methodist* litigation. Defendants made no contribution to this settlement by the Plan with Nebraska Methodist, including refusing to return the $7,999.97 CVA remitted to TBG to pay the claim that Nebraska Methodist rejected, and refusing to return any part of the $8,833.18 fee AMPS had already taken for itself.  All told (and not including its own attorney's fees, audit costs, and other expenses associated with having this claim in the Nebraska Methodist litigation), the Plan has made payment on this $49,925.20 claim at a total of $38,398.15, which is about *$1,000 more* than the Plan would have paid on this claim on its own with the simple PPO discount it already had in place, without Defendants' services at all, and CVA's Plan would not have been involved in litigation.

ii.   AMPS Invoice number 262377 demonstrates that Columbus Community Hospital sent a bill to the Plan for services rendered on 2/17/2015, in the amount of $15,781.91.   After the Hospital's PPO discount and the participant's deductible amount, the balance due on the bill was $12,405.86.   AMPS directed TBG to pay only $10,142.62, and this amount was paid by CVA to TBG.  AMPS took a fee of $489.59.  The Hospital, however, refused to cash the check issued by TBG.  In the

*Nebraska Methodist* litigation, the claim settled for $9,099.08. Defendants never credited the Plan for the $10,142.62 previously paid. Thus, the total amount the Plan paid on this claim was $16,986.52 (inclusive of AMPS' fee), which is $7,325.43 more than the Plan would have owed Columbus Community Hospital under the PPO contract.

b.  AMPS has paid 30% of smaller claims submitted by health care providers at greater than retail value, and has invoiced and received payment from the CVA Plan assets by TBG, despite the fact that no savings have been achieved as the Plan paid more than retail (non-PPO –discount) rates.

c.  A Medical Bill Review report ("Report") on Claim number 20151130318, dated 5/6/15, reflects Methodist Women's Hospital treated a Plan participant baby suffering respiratory distress for 20 days in its NICU. The Report (maintained in secret by Defendants) reflects that AMPS expressly directed the PPO contract payment schedule be ignored. The Report reflects that Methodist Women's Hospital billed $50,657.46 to the Plan. However, AMPS instructed TBG to pay only $29,923.20. The Report reflects that deep discounts were applied to the Hospital's claim for reasons which included that: the charges were "integral" to health care services charged elsewhere; the charges were not reasonable and customary; and the charges were not necessary. In support of AMPS' determinations relating to the care of the baby's respiratory ailments, the Report references various medical publications, including the American Academy of Orthopedic Surgeons. On this matter, AMPS was paid $2,420.97 (AMPS Invoice

---

**THIRD AMENDED COMPLAINT**                                                   Page 17

262844) on unrealized "savings." These transactions were not disclosed to CVA or the Plan at the time they occurred.

d.  Medical Bill Review report ("Review) on Claim number 20151470206, dated 6/3/2015, reflects a bill submitted by Columbus Community Hospital relating to a Plan participant who was treated in the emergency room for chest pain.  The Hospital billed the Plan $8,385.50.  AMPS expressly directed that PPO contract rates be ignored and directed TBG to pay only $3,131.17 on the claim.  In support of the rationale, AMPS cited the same list of medical publications as it purportedly relied upon in determining payment on the claims paid for the infant in NICU, including the American Academy of Orthopedic Surgeons and the American Society of Anesthesiologists.  AMPS was paid $1,475.60 by the Plan for purportedly "saving" the CVA Plan $5,254.33.  These transactions were not disclosed to CVA or the Plan at the time they occurred.

e.  Defendants' scheme discounted virtually all substantive medical claims submitted to the Plan by health care providers in a similar fashion for claims incurred or presented in the 2014 through October 2017 time period.  During this period, AMPS and the other Defendants took compensation from the Plan, and retained these amount despite knowing that the so-called "savings" amounts they claimed are false;

f.  AMPS' MBR and RBR schemes, when applied to the Plan's design, guaranteed Plan participants would be subject to balance billing from the health care providers;

---

g.  AMPS' MBR and RBR scheme failed to provide participants with the health insurance that participants were entitled to expect for claims incurred during the 2015 and 2016 Plan Years;

h.  AMPS' RBR scheme failed to put PPO contracts in place with providers before services were rendered to participants and thus failed to assure health care providers agreed to discounts, and also increasing the amount of fees AMPS took out of the Plan's assets;

i.  AMPS' RBR scheme shifted  health care costs to participants and violated ACA mandates by failing to provide "minimum value" to participants from the Plan and rendering the Plan unaffordable; and

j.  AMPS' RBR scheme allowed AMPS, TBG, and CDS to take their fees on purported "savings" in claim costs ***before, rather than following*** complete claim adjudication, and thus before payments to health care providers had been resolved.  The health claims became embroiled in litigation, but AMPS, TBG, and CDS did not refund any money CVA or the Plan paid on "savings" never achieved.

k.  The scheme perpetrated upon CVA, the Plan and the participants caused all non-hospital provided medications, i.e., those filled by participants at pharmacies to pay $3 per prescription filled to Defendants as a kickback.  This revenue was never disclosed to CVA, the Plan or the participants and constituted Plan assets that should have been deposited back into the Plan account.

---

67.     AMPS' RBR Program Services Agreement mandated that the Plan be amended to include a list of "Required Modifications." These "Required Modifications" changed the Plan materially, impacting the health plan "structure, design, concepts, definitions, terms and provisions" applicable to all health benefit claims submitted to the Plan.  The result of the amendments that AMPS dictated be made to the Plan (commencing January 1, 2016) was that AMPS and CDS were given total discretion and authority to determine what amount of money was going to be paid to which health care provider on each and every claim.  Operationally, AMPS and CDS exercised abusive discretionary authority over what amounts would be paid from Plan assets to health care providers, rendering Plan participants essentially without health insurance.

68.     Although they had a legal duty as a fiduciary to do so, AMPS and CDS, for themselves and through TBG, never disclosed to the Plan, the Plan participants, or CVA that the methodologies for health claims established by the RBR scheme would assuredly subject *all* Plan participants to balance billing and collection efforts by health care providers *for virtually all material health claims*.   In fact, TBG represented to CVA in a meeting held in the CVA offices in York, Nebraska, on October 30, 2015 that providers would "love" a 185% reimbursement under this RBR scheme, and that the providers, the Plan participants and CVA would be very happy with the cost savings the RBR scheme would provide.  The actual sums AMPS directed be paid to health care providers came nowhere near the 185% reimbursement rate, contrary to TBG's representations.

69.     The 2016 Plan document, by its terms and as administered by TBG, AMPS and CDS operationally, deceived CVA, the Plan, and its participants into believing AMPS and CDS

were achieving savings in claims paid by the Plan when no such savings were actually realized or could ever possibly be realized.

70.     The 2016 Plan's provisions, in form and operation, rendered group health plan coverage for participants economically illusory, and shifted the risk of monetary loss from the Plan to the Plan's participants.   In sum the Plan ceased to be "insurance" for the Plan participants.  The form and operation of the 2016 Plan allowed AMPS and CDS to improperly defer assets of the Plan to themselves, TBG, GMS, and the Leonards.

71.     The 2016 Plan's provisions allow 365 days (or about 1 year) for health care providers or participants to submit claims.  The delay in claims submission was intended by Defendants to make it appear that the Plan was achieving savings in claims costs, when it was not.  By email and mail, AMPS and CDS, directly and through TBG, GMS, and the Leonards communicated to CVA and the Plan that $1 million in savings was achieved when, in fact, the Plan was sustaining losses.  In this way, the Defendants further improperly diverted assets of the Plan to themselves.  For example:

      a.  Since the CVA Plan assets were comingled with the assets of many other Plans administered by TBG, revenues from checks returned by health care providers that would not accept AMPS' low payments on claims earned interest while sitting in the bank.  Defendants paid themselves interest from the earnings on money that never went to health care providers.

      b.  Defendants earned larger monetary commission rates from stop loss carriers because the 1-year period for filing claims contained in the Plan document virtually assured that claims would not be presented to the Plan for payment

within the stop loss carrier time limit for claim submissions. Thus, Defendants were able to assure stop loss carriers that they would deliver a client that would save the carrier money.

c. Defendants caused language to appear in stop loss carrier contract that only claims delivered or in appeal would be considered for coverage. However, operationally, participants were told they owed $0 on claims AMPS processed. Participants never filed appeals until months later when their health care providers began pursuing them from collections. Thus, claims that should have been covered by stop loss were left outside the coverage period.

72. Thus, the year deadline for submitting claims put various otherwise late-filed claims, i.e., those submitted outside the customary filing deadlines for health plans and health insurance, outside the time limits of the Plan's stop-loss or reinsurance coverage. The 2016 Plan document shifted the risk of monetary loss from the stop-loss carrier to the Plan and, ultimately, to CVA and the Plan participants. The operation of the 2016 Plan, specifically the delay in claims processing caused by late-filed and slow processed claims, allowed Defendants to earn greater commission rates, hide the true value of health benefit the Plan ultimately would be called upon to pay and to defer assets of the Plan to themselves.

73. The 2016 Plan gives the "Claims Delegate" absolute discretion and authority to determine when, and in what amount, any claims are paid. The "Claims Delegate" is CDS, a shell corporation of AMPS.

74.     AMPS and CDS are fiduciaries with regard to all medical claims submitted by health care providers and participants operationally in 2015 and under the 2016 Plan's terms and conditions.

75.     The RBR Program Services Agreement provides that the Claims Delegate, i.e., CDS, will enroll all Plan participants in a "Legal Plan Membership" with the "Legal Club of America."  The "Legal Plan Membership" is intended to allow CDS and the attorney retained by the participant the authority to defend the participant against collection action and litigation by health care providers seeking to be paid for services rendered.

76.     AMPS and CDS used the Legal Plan Membership to placate and to create, for CVA, the Plan, and for Plan participants, the appearance of a remedy for damages that AMPS and CDS knew when they marketed their services via websites, electronic mail, and regular mail, directly and through TBG were certainly going to occur.

77.     Using the scheme described in the paragraphs above, the actions of AMPS and CDS, with regard to claims submitted to the Plan in the 2015 and 2016 plan years, were so restrictive and commercially unreasonable, and the Plan's ability to pay claims so obstructed, that the Plan suffered losses of plan assets in excess of $6 million due to:

    a.  The uncertainty caused by claims for medical services that remained outstanding and un-submitted by health care providers for a year after the closing of the plan year;

    b.  The loss of stop-loss insurance coverage due to late filed claims and unresolved claims in the administrative appeal process provided under the Plan;

---

**THIRD AMENDED COMPLAINT**                                                     Page 23

    c.   The loss of stop-loss coverage under the aggregate claims provisions of the stop-loss policy in 2016 due to AMPS and TBG's concealment of payments made to AMPS and other vendors by listing the payments as for health benefit claims on financial reports;

    d.   Payments to health care providers over and above what AMPS and CDS caused the Plan to pay in order to settle health care provider claims, avoid litigation, and allow participants to be treated for their medical conditions; and

    e.   Losses sustained by the Plan as a result of paying sums that health care providers billed participants, and pursued in collections, in order to protect participants from charges that exceeded what AMPS and CDS would pay under the MBR and RBR models.

**FACTS OF TRANSACTIONS AND EVENTS**
**MATERIAL TO**
**THE PLAN DESIGN AND OPERATION**

78.    In a teleconference on October 21, 2014, Humpal, acting as an agent of TBG, with GMS (the Leonards) and CDS, and with CDS' agreement (without the Plan's or CVA's knowledge), approached CVA about hiring CDS to review the medical claims submitted to the Plan for errors. For the Plan Year 2015, the Plan was committed to the claim payment schedule in PPO contracts with its health care providers, so CVA anticipated CDS' work would involve resolving errors in claims or duplicate claims, rather than any negotiations over pricing. Relying upon the position of trust and confidence CVA had in TBG, GMS and the Leonards, CVA agreed to CDS' services reviewing claims for errors. This event commenced the relationship of CVA and the Plan with CDS and, ultimately, with AMPS.

---

79.     During a plan status meeting on April 6, 2015, with CVA at the CVA York, Nebraska office, attended by Carl Dickinson, Don Swanson, Tim Esser, and Peggy Hopwood for CVA and Daniel and Susan Leonard for GMS, GMS (conveying information developed by TBG and GMS) represented that numerous billing errors had been discovered in Plan claim administration by CDS and that the Plan had saved more than $1 million since CVA hired CDS. This representation of fact was consistent with the marketing message of AMPS (as shown by AMPS' website) and was false.  The false monetary savings in Plan claims resulted from the failure of CDS and TBG to process or pay claims.  CVA and the Plan had no knowledge of this and, therefore, relied upon GMS's, the Leonard's and TBG's representations concerning savings in Plan claims experience, which were communicated to CVA and the Plan via email, as well as in person.

80.     In August 2015, CVA received a letter from First Health, the Plan's network provider, stating that it would no longer work with the Plan because claim repricing was taking place in violation of the Plan's PPO contracts with the health care providers.  First Health stated that providers were not receiving compensation within the terms of their contracts from the Plan. First Health alleged the Plan was breaching its contracts with health care providers.

81.     CVA was unaware of any repricing that was being done with regard to Plan health claims and contacted Humpal and TBG to secure information on behalf of the Plan and its participants regarding access to services in the communities where the participants lived and why the health care providers were taking the position the PPO contracts had been breached.  Humpal (for TBG) told CVA that the providers were simply angry because of all of the errors that had been discovered by CDS.  Humpal never disclosed that any repricing of medical claims was

**THIRD AMENDED COMPLAINT**                                                    Page 25

being done by CDS.  In fact, the majority of hospital and other large claims to the Plan were not being processed to resolution or being paid by CDS and TBG.  Delay in claims processing and claims repricing was part of the scheme CDS and AMPS utilized to cause CVA and the Plan to believe money was being saved, and to divert assets of the Plan to the Defendants.  CVA relied upon these and similar representations by Defendants and the promises that CVA and the Plan had been given by Defendants.  CVA believed that, based upon these representations and the written reports GMS and TBG were providing, that CDS was realizing savings due to identification and correction of errors, rather than repricing of claims or discounting health care provider's services.

82.     Upon information and belief, false and misleading communications, made by the Defendants concerning claims and claims repricing were made by electronic mail, regular mail, and AMPS' and TBG's websites to CVA, the Plan, Plan participants, and health care providers.

83.     For claims under $10,000, CDS would pay according to the fee schedule. However, upon information and belief, in all claims over $10,000, CDS would pay claims at a level that was commercially unreasonable.  CDS and AMPS used complete discretion as to what claims would be paid and in what amount claims would be paid.

84.     On September 30, 2015, CVA, specifically Carl Dickinson, Don Swanson, Tim Esser, and Peggy Hopwood had a Plan teleconference with Daniel and Susan Leonard, GMS (who were acting on behalf of themselves, TBG and GMS) where different network provider and plan design options were presented to CVA for the 2016 plan year.  Originally, this meeting was intended to be in the CVA offices in York, Nebraska, but GMS was unprepared to present all the plan design options at the time.

85.    A second renewal meeting was held in the CVA York, Nebraska office on October 30, 2015.  This meeting included Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter for CVA; Daniel and Susan Leonard, GMS; and Humpal for TBG. In this meeting Humpal (for TBG) represented he was unable to obtain contracts with providers in the customary provider networks due to arguments over what amount would be paid by the Plan for services.  It was at this meeting that the AMPS Reference Based Reimbursement ("RBR") pricing model and other AMPS services were presented to CVA by Humpal, on behalf of TBG, the Leonards and GMS, for the Plan.

86.    For TBG, Humpal, the Leonards and GMS stated that AMPS—in partnership with TBG—had developed a "reimbursement methodology based on the fair market value of the services rendered" and that this was the best option for CVA and the Plan.  Humpal, on behalf of TBG, the Leonards and GMS represented that RBR, coupled with CDS' claim review services, "guaranteed savings" for the Plan.  Humpal's and the Leonards' verbal communications to CVA at that October 30, 2015 meeting mirrored, almost word for word, the content of the marketing materials on AMPS' website.

87.    The statements of fact made at the October 30, 2015 meeting, closely tracked the statements and representations made on the web pages and videos contained on AMPS' website at http://advancedpricing.com. For example:

   a.    Humpal represented, on behalf of TBG and AMPS, that AMPS provided services in out-of-network pricing; direct provider contract negotiations; medical bill review; and reference based pricing (reference based reimbursement or "RBR").

b. Humpal represented, on behalf of TBG and AMPS, that RBR was the "wave of the future" and "guaranteed savings."

c. Humpal, on behalf of TBG and AMPS, represented that the RBR method pushed the cost of health care to its lowest price, by, among other things, forcing health care providers to accept a percentage of Medicare for all services rendered.

d. On behalf TBG and AMPS, Humpal represented that he had investigated the RBR method and spoken with hospitals, and that the hospitals were happy to be paid 185% of Medicare, even though it was lower than the usual and customary rates for health care services.  Humpal, on behalf of TBG and AMPS, represented that 185% was the suggested RBR percentage and that this percentage would result in savings for the Plan.  Humpal, on behalf of TBG and AMPS, represented health care providers would "love" receiving 185% of Medicare for their services.

e. While acting on behalf of TBG and AMPS, Humpal failed to advise CVA or the Plan that a 185% reimbursement rate would prevent the Plan from taking advantage of flat fees and bundled cost arrangements hospitals commonly rely upon to save insurers and group health plans money.

f. At the time of Humpal's representations to CVA on behalf of TBG and AMPS, AMPS displayed on its website a map of the United States showing the amount of savings a self-funded group health plan would achieve utilizing AMPS' services. For Nebraska, AMPS stated its processes of provider contract negotiations and RBR would save the Plan 59% of gross billed charges or claims, and the medical claims review would save 7.8% of health provider claims reviewed.  Humpal, on

---

**THIRD AMENDED COMPLAINT**                                                                 Page 28

behalf of TBG and AMPS, represented a similar level of savings to CVA and the Plan. Further, upon information and belief, the U.S. map demonstrating savings by state did not depict factual savings AMPS methodologies had realized for actual clients. The U.S. map information was a fallacy utilized by AMPS to draw in clients.

    g. On behalf of TBG and AMPS, Humpal stated that RBR pricing was the new way that insurance was going to work, and that providers were no longer going to be able to overcharge for services or balance bill participants for services rendered.

    h. For TBG and AMPS, Humpal represented that AMPS would negotiate new agreements with the health care providers who customarily rendered services to participants of the Plan, and would bring the Plan's claims cost down.

88. Communications regarding RBR, claims review, and other AMPS and CDS services were made to CVA and the Plan by AMPS and CDS through Humpal, on behalf of TBG, The Leonards, and GMS verbally, via telephone, through email, and, indirectly via AMPS' website which, upon information and belief, was reviewed and used by Humpal on behalf of TBG and AMPS. The communications regarding RBR were patently false and misleading.

89. Relying on AMPS', TBG's and the Leonards' representations that: AMPS would negotiate provider contracts that would lead to claims savings; representations by Humpal on behalf of AMPS and TBG providing details on how the RBR pricing would function; and, the relationship of trust and reliance upon the combined expertise of Humpal and the Leonards in the area of self-funded health plan design, legal compliance and operation, CVA and the Plan agreed to the RBR option and to retain AMPS and CDS for all AMPS' described services for the 2016

plan year of the Plan.  CVA also relied upon the representations it had been provided by TBG, GMS, the Leonards, and CDS in regard to its 2015 claims processing, and savings purportedly received, in continuing to trust representations concerning the RBR option.

90.     At the time of Humpal's meetings with CVA and the Plan, the AMPS website contained a video of AMPS' CEO, Mike Dendy, discussing the RBR, or "reference based pricing" strategy.  In the video, Dendy represented that RBR worked "like a defined contribution plan concept for group health plans".  The Plan would control cost by reimbursing claims for certain procedures at a flat, defined rate, and participants would therefore be motivated to "shop" for the health care provider willing to render services for that rate.  In other words, under AMPS' protocol, the Plan would pay, for example, $12,000 for an appendectomy.  Participants who needed an appendectomy would, on their own, need to find a health care provider to render services for $12,000, or the participant would have to pay the provider for any sums over that amount.  TBG did *not* disclose this portion of AMPS' RBR concept to CVA and the Plan, although it had a fiduciary duty to do so.

91.     The AMPS website also contains information for third-party administrators and insurance agents, like Humpal and the Leonards, on how to sell AMPS to self-funded health plans and the employers who sponsor such plans.

92.     Although he had a legal duty to do so, Humpal (on behalf of TBG) did not disclose to CVA or the Plan the AMPS website.

93.     On January 19, 2016, based upon the representations of TBG, GMS, the Leonards, and AMPS, CVA signed the RBR Program Services Agreement (the "RBR Agreement") with AMPS and CDS for the January 1, 2016 to December 31, 2016 Plan Year.

---

**THIRD AMENDED COMPLAINT**                                                    Page 30

94.     The MBR and RBR and claims pricing model of AMPS and CDS, the claims review services, the defined contribution concept, and all other programs described on AMPS' website were used to bring self-funded health plan assets under AMPS' and CDS' control so that such plan assets may be diverted to the Defendants' use.

95.     During the latter part of the 2015 Plan year, without the knowledge of the Plan or CVA, AMPS was already repricing the Plan's claims through the services that CDS was rendering to the Plan.  Without the knowledge of the Plan or CVA, participant health claims were already tangled up in conflicts between health care providers and CDS, AMPS, and TBG over the amount of money the Plan would pay for services rendered to participants of the Plan. CDS was using the claims repricing to divert assets of the Plan to the Defendants during the 2015 plan year, and prior to the execution of the RBR Agreement.

96.     Under the terms of the RBR Agreement, AMPS was to be paid, at most, 10 percent of all *gross hospital claims* submitted to the Plan (whether or not the Plan's terms allowed such claims), and TBG was paid 2.5 percent of all *gross hospital claims* (in addition to its administration fees).  AMPS was not complying with the RBR Agreement with respect to its fees.  AMPS and CDS applied deep, arbitrary and un-supported discounts to health care provider claims in order to increase illusory "savings" to the Plan and, correspondingly, their own compensation.  For small claims, AMPS, CDS and TBG caused the Plan to pay more than retail price to health care providers (without any review) and billed and collected fees for "savings" they did not earn.

97.     In fact, the Plan received no monetary or other benefit from the services AMPS and CDS provided.  The MBR and RBR programs, claims repricing, claims review, and other

services of AMPS and CDS were a scheme to divert the assets of self-funded employee group health plans to the Defendants.

98.    On April 19, 2016, CVA, represented by Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter, had a meeting in the CVA offices in York, Nebraska with Daniel and Susan Leonard, GMS, and Humpal, Julie Maschka, and Natalie Osorio Skutt (TBG's General Counsel), for TBG.   AMPS' CEO, Michael Dendy, participated in the meeting by telephone.   The meeting was about CVA's discovery that, contrary to representations made at the October 30, 2015 meeting by AMPS and CDS through Humpal and TBG, the Plan did not have any provider contracts in place because TBG and AMPS did not negotiate any such contracts. CVA was told at that time that AMPS' preferred strategy and process was to fight the claims as they were received by the Plan and push the providers to accept reimbursement based on a percentage of Medicare.  This was the first time CVA learned any fact that would have put CVA on notice that the RBR pricing scheme was intended to push the risk of loss upon Plan participants and put them on the front lines in any dispute with health care providers over the monetary amounts they were receiving in payment of their claims to the Plan.  CVA was completely unaware, however, that virtually every claim made to the Plan of any substantial amount was going to be subject to payment in a meager amount under the RBR pricing scheme designed by AMPS and CDS.

99.    The AMPS strategy, revealed at the April 19th meeting, was to have health care providers sign contracts for their reimbursement rates with the Plan at the lower reimbursement rate the health care providers settled upon in order to be paid by the Plan because, AMPS

represented, the providers would be in a lesser bargaining position if they were looking for payment.

100.    Because AMPS did not negotiate with providers prior to services being rendered, the Plan was prevented from enjoying the customary 35-40 percent discount, or other prices or discounts given to insurance companies and health plans for health provider services in the geographic region of the Plan.  AMPS and CDS, by and through TBG, utilized this scheme to divert the assets of the Plan to the Defendants.

101.    Also in the spring of 2016, CVA discovered that there were significant issues with claims from 2015.  On March 31, 2016, CVA had a meeting with several employees at the offices of TBG in Omaha, Nebraska where employees were discussing issues resulting from TBG, AMPS and CDS' claim administration.  CVA discovered in this meeting that CDS and AMPS had artificially deflated the reimbursement amount of aggregate claims for plan year 2015, and hospitals were refusing to accept the lower payments CDS (who was repricing claims in 2015) was offering.  The result was that the Plan participants themselves were being pursued for collection.

102.    AMPS and CDS, by and through TBG, utilized this scheme to divert the assets of the Plan to the Defendants.

103.    Participants began calling CVA and TBG because health care providers were denying them services unless they paid "up front" or agreed in writing to pay for health care provider services due to the Plan's failure to pay claims at any reasonable commercial rate for the geographic region of the Plan.  Participants of the Plan were unable to access health services as a result of the actions of the Defendants.

**THIRD AMENDED COMPLAINT**                                                    Page 33

104.    AMPS and CDS, by and through TBG, utilized this scheme to divert the assets of the Plan to the Defendants.   As a result, Plan participants were unable to access services that should have been provided to them under the Plan.   Participants paid claims themselves that should not have been paid in order to avoid creditor collections personnel from contacting them and risking negative entries on their credit histories.

105.    On June 27, 2016, CVA (Tim Esser and Rick Smithpeter) held a meeting by telephone with representatives of TBG (Dan Jaard) and AMPS (CEO, Michael Dendy and Sales Manager, John Powers) to discuss the fact that there were still no provider contracts in place and claims were not being processed in a timely manner.   AMPS acknowledged that the contract problem was their fault and promised to resolve the issue. AMPS did not disclose that it was already engaging in repricing of medical claims or balance billing negotiations with health care providers at this meeting or that providers were refusing to agree to AMPS' monetary offers on claims.   AMPS also failed to disclose that a lawsuit had been filed by a number of health care providers a month prior, in May 2016, against CVA's Plan and other employer Plans (i.e., the "Nebraska Methodist Litigation"), seeking to enforce the PPO contracts they had in place, which CDS and TBG had circumvented.   AMPS did not disclose to CVA that counsel, Fraser Stryker P.C. LLO had already been asked by AMPS to defend the "CVA Flex Benefit Plan" (a misnomer for the CVA Plan) and had, in fact, drafted and filed an Answer on behalf of the Plan.

106.    AMPS and CDS, by and through TBG, utilized this scheme to divert the assets of the Plan to the Defendants.   These Defendants concealed the existence of the Nebraska Methodist litigation in a deliberate effort to conceal the problems with the scheme and to induce CVA to continue to use the services of TBG, GMS, AMPS and CDS.

**THIRD AMENDED COMPLAINT**                                          Page 34

107.    During the third quarter of 2016, CVA began receiving telephone calls from Plan participants regarding the fact that health care providers were taking collection efforts against them. Health care providers made litigation threats against CVA and the Plan.

108.    In October and November 2016, CVA began visiting hospitals to negotiate payment terms in order to stop the collection efforts against the Plan participants and allow participants to receive services from those hospitals, which for many participants were their only hospital option within a reasonable geographic distance of the smaller communities in which most of them live.  In order to protect Plan participants from collection actions by health care providers, CVA and the Plan incurred additional claims fees.

109.    AMPS and CDS, by and through TBG, utilized this scheme to divert the assets of the Plan to the Defendants.   However, by late in 2016, AMPS' and CDS' scheme was unraveling.

110.    The Plan had a stop-loss policy with Companion Life Insurance Company for the 2015 plan year, and United States Fire Insurance Company for plan year ending in 2016.

111.    On November 10, 2016, CVA (Carl Dickinson, Don Swanson, Tim Esser, Peggy Hopwood and Rick Smithpeter) met with Humpal (for TBG) and Beau Reid and Tammy Hayes of Holmes Murphy (the agents for stop loss insurance) regarding continued stop-loss coverage for the 2016 claims that had not been paid as of the end of the year.  CVA was reassured by Humpal for TBG, that everything was covered.   In fact, Humpal specifically stated that "anything incurred and submitted will be paid" and that CVA was "fine."   CVA took this to mean they would be covered for the claims.   However, Humpal's statement was not true. Humpal knew the statement was not true when he made it.   Humpal made the statement in order

**THIRD AMENDED COMPLAINT**                                                       Page 35

to prevent CVA from realizing it and the Plan were being damaged by AMPS' and CDS' methods of analyzing and processing claims.

112.    Because Defendants TBG and GMS failed to negotiate and obtain tail coverage on the stop loss insurance agreements by the end of 2016, claims that were delayed in processing or appeals—due to litigation or disagreements with providers—were outside the coverage period of the stop loss policy and CVA and the Plan became liable for the payment of the claims.

113.    On or around September 30, 2016, CVA and the Plan were told by Grant Matties, Omaha Silverstone Group, that TBG had been sued by several hospitals for failure to pay claims pursuant to the rates contractually agreed upon. *See Nebraska Methodist Hospital, et. al. v. Cooperative Producers, Inc. Group Benefit Plan, et. al.,* Case No. CI 16-4230, District Court of Douglas County, Nebraska (i.e., the "Nebraska Methodist Litigation").  Shortly thereafter, during a meeting at CVA's offices, CVA asked Humpal about the Nebraska Methodist Litigation. Humpal admitted that the litigation existed, but did not disclose that CVA or the Plan were named defendants in the litigation, although TBG had a legal duty to do so.  Instead, Humpal stated that the litigation was "no big deal."

114.    Later, in early November 2016, CVA discovered that the "Flex Benefit Plan" (a misnomer for the Plan) was a defendant in the litigation, that counsel for TBG, AMPS, and CDS was handling the lawsuit—purportedly on behalf of all defendants—including CVA's Plan, and that Fraser Stryker P.C. LLO had filed an Answer on the Plan's behalf in in the Nebraska Methodist Litigation in mid-June 2016.  Thus, CVA and the Plan were being represented in litigation, and were defendants in litigation, without CVA and the Plan's consent or knowledge.

115.    AMPS, CDS, and TBG, intentionally concealed the Nebraska Methodist Litigation from CVA and the Plan to hide the scheme that was their RBR, claims repricing, claims review, and other programs and their own diversion of assets of the Plan to the Defendants' use.  Further, AMPS, CDS, and TBG failed to disclose that another lawsuit had been filed by health care providers suing over the RBR methodology and AMPS' and CDS's claim administration practices in 2015, *Nebraska Methodist Hospital et al., v. State Law Enforcement Bargaining, et al.,* Case No. 15-0004249, Dist. Ct. Douglas County, State of Nebraska.

116.    On December 28, 2016, in an email to Rick Smithpeter, Natalie Osorio Skutt, TBG General Counsel, states: "So CVA was named in lawsuit over the summer," "AMPS is paying for the legal costs," and that "Fraser Stryker P.C. LLO represented them in this."  Skutt states: "I do not think they [AMPS] will cover legal fees if CVA uses any other counsel."   In reliance upon these representations, having been lulled into believing they were in good hands, and in order to avoid the monetary consequences to the Plan that Skutt described in the December 28th email, CVA signed a representation letter with Fraser Stryker P.C. LLO (attorneys Timothy J. Thalken and Emily R. Langdon) on December 28, 2016, not noticing that the representation letter was dated months earlier, on May 24, 2016.  CVA had no contact from the attorney representing TBG, AMPS, and all the defendant plans, including CVA's Plan, until months later.

117.    Effective January 1, 2017, CVA hired a new third party administrator and broker, thereby discontinuing the services of TBG, AMPS, CDS, GMS, and the Leonards.  The new third-party administrator, and all other regional third-party administrators, refused, however, to

**THIRD AMENDED COMPLAINT**                                                                     Page 37

process 2015 and 2016 Plan year run-off claims for the Plan due to the activities of TBG, AMPS, CDS, and the RBR scheme.  At the close of September 2017, CVA was compelled by the circumstances to renew TBG's contract for administration of the small number of run-off claims that remained unprocessed because no other third-party administrator would agree to process the Plan's claims for the years AMPS and CDS were vendors of the Plan.  CVA could not leave Plan participants without any place to send claims for their health benefits.

118.    Defendants' deceitful business practices forced CVA to expend significant time and resources, identifying, disputing, appealing, and negotiating over-denied and artificially depressed claims.  Defendants' deceitful RBR scheme resulted in at least $5.3 million in gross claims contested by the health care providers and participants in 2015 and at least $4.7 million in gross claims contested in 2016.   CVA, the Plan and the participants have suffered, and continue to suffer, monetary damages in excess of $6 million due to the actions of Defendants.  Upon information and belief, in excess of $1 million in Plan assets has been diverted to the use and benefit of the Defendants as a result of the activities as alleged herein.

## CLAIMS FOR RELIEF

### A.  Breach of Fiduciary Duty Claims

119.    All of the factual allegations set forth above in paragraphs 1 through 118 are incorporated by reference as though set forth herein.

120.    "Fiduciary status under ERISA is a functional concept, and if Defendants have acted like a fiduciary, they may have incurred fiduciary obligations." *Walsh v. Principal Life Ins. Co.,* 266 F.R.D. 232, 241 (S.D. IA 2010).  In other words, ERISA imposes fiduciary obligations on individuals who are not named as fiduciaries, but nonetheless exercise actual authority over

plan assets, particularly where, as here, Defendants have exercised complete discretion as to what claims will be paid by the Plan and in what amount.  Furthermore, the Eighth Circuit has stated that "courts should construe the term fiduciary broadly under ERISA, and in favor of finding that a fiduciary duty exists." *Id.* at 241, *Olson v. E.F. Hutton & Co., Inc.,* 957 F.2d 622, 625 (8th Cir. 1992)(citing *Consol. Beef Indus. V. N.Y. Life Ins. Co.,* 949 F.2d 960, 964 (8th Cir. 1991).  TBG, AMPS and CDS are all fiduciaries because, in their various roles, they exercised authority over Plan assets as described herein.  CDS is also a named fiduciary in the 2016 Plan Document.

121.    A fiduciary has a duty to perform its obligations and responsibilities under the Plan prudently, in the best interest of the participants and beneficiaries, and in accordance with the terms of the Plan document.  29 U.S.C. §1104(a)(1).  Defendants TBG, AMPS, and CDS, all breached this duty by taking the actions described herein to divert plan assets to themselves.

## **Claim 1: Breach of Fiduciary Duty Under §502(a)(2) by TBG**

122.    All of the factual allegations set forth above in paragraphs 1 through 121 are incorporated by reference as though set forth herein.

123.    As previously stated, although TBG is not a named fiduciary under the Plan document, TBG is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) because it had authority over Plan assets, exercised discretion regarding the design and terms of the Plan document; with regard to cost savings mechanisms for claims processing; and with regard to the decision to retain AMPS and CDS.

124.    As part of its fiduciary duty, TBG had the legal duty to provide full, fair, and prompt disclosure to CVA of all facts within its knowledge which were or could have been

material to matters within TBG's relationship with CVA. *Howe v. Varity Corp.,* 36 F.3d 746, 753-54 (8th Cir. 1994). The facts show that TBG breached this legal duty.

125. The number of fiduciary breaches committed by TBG is astounding. However, specific examples are shown by the following omissions and/or actions:

    a. Drafting an illusory plan document which shifted the risk for losses from the repricing scheme to the Plan participants and CVA;

    b. Failing to act in the best interests of participants by causing the Plan to engage AMPS and CDS' services which exposed participants to collection activities from providers;

    c. Failing to disclose to Plan participants the nature and scope of their personal liability for claims left unpaid under the RBR claims administration scheme;

    d. Failing to notify CVA that no provider contracts were in place, even after representing to CVA that there would be contracts prior to claims being incurred;

    e. By providing false and misleading information to CVA about the repricing that was being performed by AMPS and CDS, even after CVA received a letter from First Health refusing to do further business with the Plan;

    f. Failing to notify CVA that a significant number of hospitals were refusing to accept the repricing payments; and

    g. Failing to notify CVA that it had been sued by a number of hospitals; and

    h. Comingling funds of the Plan with unrelated plans or entities, thereby creating a MEWA, and using the earnings generated and the "float" on checks never cashed by health care providers for Defendants' own benefit.

126.    TBG further breached its fiduciary duty by misrepresenting to CVA that it had investigated the RBR pricing system, that the Plan would see "guaranteed cost savings," and that hospitals were happy to receive payment in the amount of 185% of Medicare.  All of these representations were made in order to induce CVA to choose the RBR pricing option from AMPS.  These misrepresentations were material because without them, and the trust that CVA had in Humpal and TBG, CVA would not have signed the RBR Agreement with AMPS, a relationship which directly benefited TBG and other Defendants.  As a result of CVA's reliance on TBG's misrepresentations, the Plan was damaged in the amount of claims payments that it has incurred as a result of provider's refusal to accept the repricing performed by AMPS and CDS and the amount of excessive fees paid by CVA and the Plan to TBG and AMPS. *Howe v. Varity Corp.,* 36 F.3d 746, 753-54 (8th Cir. 1994) (An ERISA fiduciary has a duty to avoid making material misrepresentations.)

127.    In taking these and other actions, TBG failed to act in a manner which was solely in the interest of participants and beneficiaries or to act with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

128.    TBG is liable under ERISA §409 to make good any losses incurred by the Plan as a result of TBG's breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

129.    As a result of TBG's breach of fiduciary duties, the Plan suffered damages in excess of $6 million.

**<u>Claim 2: Breach of Fiduciary Duty Under §502(a)(2) by AMPS</u>**

130.   All of the factual allegations set forth in paragraphs 1 through 129 above are incorporated by reference as though set forth herein.

131.   As to all time periods relevant to this litigation, AMPS is a fiduciary of the Plan within the meaning of ERISA §3(21)(A)(i) and (iii) as to AMPS' cost containment programs utilized by the Plan (including but not limited to reference based pricing and reference based reimbursement); what health care claims will be paid; and in what amount claims will be paid by the Plan.

132.   The following actions by AMPS breached its fiduciary duty to the Plan:

    a.   Failure to negotiate provider contracts prior to the participants incurring claims;

    b.   Engaging in a repricing scheme which caused payments to providers to be in amounts less than are reasonable and customary in this geographic region;

    c.   Failing to inform CVA and the Plan that hospitals were refusing payments;

    d.   Failing to disclose to Plan participants the nature, scope and amount of personal liability they would incur to their health care providers as a result of the RBR claims administration scheme of AMPS;

    e.   Failed to settle claims and caused CVA to settle claims on its own behalf;

    f.   Failing to act in the best interest of participants because the arbitrary repricing scheme exposed them to collections due to arbitrarily unpaid claims; and

    g.   Receiving assets of the Plan without rendering valuable services to earn them.

133.    In taking these, and other, actions, AMPS failed to act in a manner which was solely in the interest of participants and beneficiaries or with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

134.    AMPS is liable under ERISA §409 to make good any losses incurred by the Plan as a result of its breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

135.    As a result of AMPS's breach of fiduciary duties, the Plan suffered damages in excess of $6 million.

### Claim 3: Breach of Fiduciary Duty Under §502(a)(2) by CDS

136.    All of the factual allegations set forth in paragraphs 1 through 135 above are incorporated by reference as though set forth herein.

137.    CDS named fiduciary of the Plan. Doc. No. 19-9, p.3.

138.    CDS breached its fiduciary duty by:

a.    Engaging in the repricing scheme orchestrated by AMPS and TBG and exposing CVA to litigation from hospitals and plan participants;

b.    Failing to disclose to Plan participants the nature, scope and amount of personal liability they would incur to their health care providers as a result of the RBR claims administration scheme of CDS;

c.    Failing to act in the best interest of participants by exposing them to collection for arbitrarily unpaid claims; and,

d.    Failing to pay claims in accordance with the terms of the plan document.

139.    In taking these and other actions, CDS failed to act in a manner which was solely in the interest of participants and beneficiaries or with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity would use.

140.    CDS is liable under ERISA §409 to make good any losses incurred by the Plan as a result of CDS' breach, to restore any personal profits it received, and for such other equitable or remedial relief as the court may deem appropriate.

141.    As a result of CDS' breach of fiduciary duty, the Plan suffered damages in excess of $6 million.

### Claim 5: Breach of Fiduciary Duty Under §502(a)(3) by the Leonards

142.    All of the factual allegations set forth in paragraphs 1 through 141 above are incorporated by reference as though set forth herein.

143.    The Leonards are liable as non-fiduciary service providers to the Plan for the breach of fiduciary duty by TBG because they knowingly participated in the violations against the Plan. 29 U.S.C. §1105.

144.    The facts, as outlined above, show that the Leonards were aware of the partnership between TBG and AMPS.  The Leonards knew that TBG was a fiduciary of the Plan and that it owed special duties to the Plan as a result of this relationship.  They were aware of the excessive and double fees charged by TBG, the misrepresentations that TBG made to the Plan and CVA relating to purported savings, provider agreements, how the RBR pricing scheme worked, and whether it was lawful for the Plan to rely on RBR pricing. However, the Leonards never informed CVA or the Plan that these representations were false.  Instead, they permitted TBG to proceed with its scheme against the Plan and breaches of fiduciary duties because the

**THIRD AMENDED COMPLAINT**                                                      Page 44

relationships between the Plan, CVA, and TBG resulted in excess financial gain for the Leonards.

145.    As a result of the Leonards' knowing participation in TBG's breach of fiduciary duties, the Leonards are liable to the Plan for the damages it incurred as a result of these breaches.

**Prohibited Transactions**

146.    All of the factual allegations set forth in paragraphs 1 through 145 above are incorporated by reference as though set forth herein.

147.    In addition to the duties and obligations of fiduciaries, ERISA defines certain types of transactions in which fiduciaries may not engage or cause their plans to engage.  These prohibited transaction appear in §406 of ERISA and essentially prohibit certain transactions between a plan and a party in interest or between a plan and a fiduciary.  29 U.S.C. §1106. Defendants TGB and AMPS engaged in prohibited transactions with the Plan.

**Claim 6: Breach of Fiduciary Duty Under §502(a)(3) by TBG for Engaging in a Prohibited Transaction**

148.    All of the factual allegations set forth in paragraphs 1 through 147 above are incorporated by reference as though set forth herein.

149.    TBG further breached its responsibility, obligations, and duties as a fiduciary by engaging in transactions prohibited by 29 U.S.C. §1106, including: (a) providing services to the Plan for which it knowingly and fraudulently received excessive and unreasonable compensation; and (b) dealing with the assets of the Plan for its own interest and account.  None of the exemptions set forth in 29 U.S.C. §1108 are applicable to these transactions.

---

**THIRD AMENDED COMPLAINT**

150.     As a result of TBG's participation in a prohibited transaction, the Plan was damaged in excess of $6 million.

### Claim 7: GMS, as a Party in Interest with the Plan, Engaged in a Prohibited Transaction

151.     All of the factual allegations set forth in paragraphs 1 through 150 are incorporated by reference as though set forth herein.

152.     GMS is a party in interest with respect to the Plan because it provided insurance and plan consulting services to the Plan. 29 U.S.C. §1002(14)(B).

153.     As a party in interest, GMS is prohibited from engaging in certain transactions with the Plan, including, but not limited to, providing services to the Plan for which it knowingly and fraudulently received excess and unreasonable compensation, transferring any assets of the plan to a party in interest, or using plan assets for its own benefit. 29 U.S.C. §§1106(a)(1)(C), (D).

154.     Unbeknownst to Plaintiffs, GMS prepared fraudulent reports on behalf of TBG and/or AMPS, sent the fraudulent reports to CVA each month through the mail or e-mail, and received compensation that was in excess and unreasonable in exchange for procuring the fraudulent reports.  As a result of the fraudulent acts of GMS, none of the exemptions set forth in 29 U.S.C. §1108 are applicable.

155.     In addition, GMS engaged in a revenue sharing transaction with TBG in which it received an undisclosed amount of TBG's revenue in exchange for not attending certain meetings held by TBG and AMPS with CVA.  In effect, GMS received excess commissions and

"kickbacks" in exchange for performing certain acts on TBG's behalf, rather than reasonable compensation for actual services performed.  As a result, these payments were prohibited under 29 U.S.C. §§1106(a)(1)(C) and (D) and not exempted by §1108(b)(2).

156**.**    Because GMS engaged in a non-exempt prohibited transactions, it is liable for damages to the Plan in the amount of the excess compensation and/or plan assets received.

## Claim 8: The Leonards, as Parties in Interest with the Plan, Engaged in a Prohibited Transaction

157.    All of the factual allegations set forth in paragraphs 1 through 156 are incorporated herein by reference as though set forth herein.

158.    The Leonards are parties in interest with respect to the Plan because they provided insurance and plan consulting services to the Plan. 29 U.S.C. §1002(14)(B).

159.    As a party in interest, the Leonards are prohibited from engaging in certain transactions with the Plan, including, but not limited to, providing services to the Plan for which they knowingly and fraudulently received excess and unreasonable compensation, transferring any assets of the plan to a party in interest, or using plan assets for their own benefit. 29 U.S.C. §§1106(a)(1)(C), (D).

160.    Unbeknownst to Plaintiffs, the Leonards prepared fraudulent reports on behalf of TBG and/or AMPS, sent the fraudulent reports to CVA each month through the mail or e-mail, and received compensation that was in excess and unreasonable in exchange for procuring the fraudulent reports.  As a result of the fraudulent acts of the Leonards, none of the exemptions set forth in 29 U.S.C. §1108 are applicable.

161.   In addition, the Leonards engaged in a revenue sharing transaction with TBG in which they received an undisclosed amount of TBG's revenue in exchange for not attending certain meetings held by TBG and AMPS with CVA.   In effect, the Leonards received "kickbacks" or excess commissions in exchange for performing certain acts on TBG's behalf, rather than reasonable compensation for actual services performed.   As a result, these payments were prohibited under 29 U.S.C. §§1106(a)(1)(C) and (D) and not exempted by §1108(b)(2).

162.   Because the Leonards engaged in a non-exempt prohibited transaction, they are liable for damages to the Plan in the amount of the excess compensation received.

### Claim 9: Breach of Fiduciary Duty Under §502(a)(3) by AMPS for Engaging in a Prohibited Transaction

163.   All of the factual allegations set forth in paragraphs 1 through 162 above are incorporated by reference as though set forth herein.

164.   AMPS further breached its responsibility, obligations and duties as a fiduciary by engaging in transactions prohibited by 29 U.S.C. §1106, including: (a) providing services to the Plan for which it knowingly and fraudulently received excessive and unreasonable compensation; and (b) dealing with the assets of the Plan for its own interest and account.   None of the exemptions set forth in 29 U.S.C. §1108 are applicable to these transactions.

165.   As a result of AMPS' participation in the prohibited transaction, the Plan was damaged in excess of $6 million.

**THIRD AMENDED COMPLAINT**

## <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(A)     Permanently enjoining each Defendant from violating the provisions of Title 1 of ERISA;

(B)     Ordering TBG, AMPS, CDS to pay all reasonable costs and expenses of the Independent Fiduciary in re-adjudicating the claims set forth above and the reasonable costs and expenses associated with correcting all improperly adjudicated claims identified in this Complaint;

(C)     Requiring each Defendant to disgorge all unjust enrichment or profits received as a result of fiduciary breaches and diversion of plan assets committed by them or for which they are liable;

(D)     Attorney's fees and costs pursuant to ERISA §502(g); and

(I)     Such other and further relief as this Court may deem appropriate and just.

Dated this 7th day of May, 2018.

                                     **Respectfully Submitted,**

                                     JACKSON LEWIS, P.C.

By:    */s/ Kathleen R. Barrow*_____
           Michaelle L. Baumert, NE Bar #20948
           Kathleen R. Barrow, NE Bar #25152
           10050 Regency Circle, Suite 400
           Omaha, Nebraska 68114
           Phone: (402) 391-1991
           Fax:   (402) 391-7363
           Email: michaelle.baumert@jacksonlewis.com
           Email: barrowk@jacksonlewis.com

           ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification of said filing to all counsel of record.


*/s/ Kathleen R. Barrow*
Kathleen R. Barrow

4833-9844-8740, v. 4