IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CENTRAL VALLEY AG COOPERATIVE     )
and CENTRAL VALLEY AG             )
COOPERATIVE HEALTH CARE PLAN,     )
                                  ) CASE NO. 8:17CV379
        Plaintiffs,               )
                                  )
    vs.                           ) D E P O S I T I O N
                                  )
DANIEL K. LEONARD, SUSAN          )
LEONARD, THE BENEFIT GROUP,       )
INC., ANASAZI MEDICAL PAYMENT     )
SOLUTIONS, INC., d/b/a/           )
ADVANCED MEDICAL PRICING          )
SOLUTIONS, CLAIMS DELEGATE        )
SERVICES, L.L.C., and GMS         )
BENEFITS, INC.,                   )
                                  )
        Defendants.               )
                            *    *    *

        DEPOSITION OF JEAN REED taken before

Tina M. Nelson, Registered Merit Reporter and

General Notary Public in and for the State of

Nebraska, at 10:01 a.m. on February 22, 2019, at

10050 Regency Circle, Omaha, Nebraska, taken on

behalf of the defendant, TBG, pursuant to the

Federal Rules of Civil Procedure and the within

stipulations.

Tina M. Nelson, RMR, CSR, CRR
MTDS Reporters
7602 Pacific Street, #LL101
Omaha, NE  68114
402-397-9669
www.mtdsreporters.com

**EXHIBIT 2**

## APPEARANCES

```
FOR THE PLAINTIFFS:   MS. MICHAELLE L. BAUMERT
                      Attorney at Law
                      Jackson Lewis, P.C.
                      10050 Regency Circle
                      Suite 400
                      Omaha, Nebraska  68116

FOR THE DEFENDANT:    MR. TIMOTHY J. THALKEN
(TBG)                 Attorney at Law
                      Fraser Stryker, P.C., L.L.O.
                      409 South 17th Street
                      Suite 500
                      Omaha, Nebraska  68102

FOR THE DEFENDANTS:   MS. MEGAN P. MITCHELL
(AMPS and CDS)        Attorney at Law
(Appearing            Arnall, Golden, Gregory, L.L.P.
 telephonically)      171 17th Street, NW
                      Suite 2100
                      Atlanta, Georgia  30363

FOR THE DEFENDANTS:   MS. DIANA J. VOGT
(Leonards and GMS)    Attorney at Law
                      Sherrets, Bruno & Vogt, L.L.C.
                      260 Regency Parkway Drive
                      Suite 200
                      Omaha, Nebraska  68114


Also present:  Mr. Rick Smithpeter
```

## I N D E X

                                                      Page

Direct Examination by Mr. Thalken---------------    4

Recess from 11:34 a.m. to 11:44 a.m.------------   76

Recess from 12:32 p.m. to 12:45 p.m.------------  106

Direct Examination by Ms. Mitchell--------------  106

Direct Examination by Ms. Vogt------------------  136

Cross-Examination by Ms. Baumert----------------  150

1  Redirect Examination by Mr. Thalken-------------  154

2  End of Deposition at 2:00 p.m., 2-22-19---------  159

3  Errata Sheet------------------------------------  160

4  Certificate of Reporter-------------------------  161

5

6                     E X H I B I T S

7  No.                                       Identified

8  190. Expert witness report                        6

9  191. Jackson Lewis invoice through 2-19-19        7

10  192. Attachment A                                44

11  193. March 7 and 8, 2017, E-mails                70

12  194. Claim documents                             80

13  195. 12-8-17 E-mail with EOB attached            88

14

15

16

17                    *  *  *  *  *

18

19

20

21

22

23

24

25

1      (Deposition Exhibits 190 and 191 were marked.)

2                        JEAN REED,

3                having been first duly sworn,

4            was examined and testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. THALKEN:

7        Q.    Good morning, Ms. Reed; we met briefly

8    before the deposition.  My name is Tim Thalken, I

9    represent The Benefit Group in this lawsuit.

10   Would you please state your full name for the

11   record.

12       A.    Jean Marie Reed.

13       Q.    What is your date of birth?

14       A.    7-24, 1952.

15       Q.    Where do you live?

16       A.    Sioux Falls, South Dakota.

17       Q.    And where do you work?

18       A.    Self-employed, Impact Consulting.

19       Q.    Does Impact Consulting have any employees?

20       A.    Just myself.

21       Q.    How long has Impact Consulting been in

22   operation?

23       A.    It was established in 1990.

24       Q.    And what type of consulting do you do?

25       A.    The majority of my consulting work is in

1    health benefits, managed care.  And then in

2    addition to that, I do some consulting on

3    strategic planning, marketing, communications and

4    advertising.

5        Q.    Have you ever worked for a third-party

6    administrator before?

7        A.    Yes, I have.

8        Q.    Go ahead.  Who?

9        A.    Avera Health Plans; I was the president

10   of Avera Health Plans for four years.

11       Q.    And that's a third-party administrator?

12       A.    We functioned as a third-party

13   administrator.  They were licensed as a -- as an

14   HMO in South Dakota, Iowa and at one point in time

15   in Nebraska and in Minnesota.

16       Q.    And what did you do as president of Avera

17   Health Plans, what was your responsibility?

18       A.    Oversaw all of the operations

19   essentially, had responsibility for all of the

20   staff, all of the financials, claims processing.

21       Q.    Did you interact -- or have you

22   interacted at all with The Benefit Group before?

23       A.    I have not.

24       Q.    In this case did you ask for some

25   information through Kutak Rock to obtain from

1  The Benefit Group?

2      A.    Essentially they sent information to me.

3      Q.    Okay.  Are you aware of any situation

4  where The Benefit Group didn't cooperate in that

5  process?

6      A.    Not that I'm aware of.

7      Q.    Okay.  In front of you is Exhibit 190.

8  Is that a copy of your expert report in this case?

9      A.    Yes, it is.

10     Q.    And just, I guess, to clarify, Exhibit 190

11 also includes -- looks like there's a spreadsheet

12 on the back for a date of service report --

13     A.    Correct.

14     Q.    -- correct?

15     A.    Correct.

16     Q.    And did you prepare this report?

17     A.    I did.

18     Q.    Have you made any revisions to the report --

19     A.    Have not.

20     Q.    -- since -- since January 29 --

21     A.    Have not.

22     Q.    -- 2019?  Okay.  And January 29, 2019, is

23 the date of your report --

24     A.    Correct.

25     Q.    -- correct?  Okay.  When were you hired

1    to provide consulting services in this case?

2         A.    Actually those conversations started July

3    of 2017.  Contract was signed September of '17.

4         Q.    Okay.  And who is the contract with?

5         A.    I would have to actually look at the

6    contract itself to give -- to give you the exact

7    name because all of the work that I've done has

8    been predominantly with Kutak Rock.

9         Q.    Okay.  Do you know if your agreement was

10   with Kutak Rock or was it with Jackson Lewis or

11   CVA directly?

12        A.    It was with CVA directly, yeah.

13        Q.    Have you issued invoices --

14              (A discussion was held off the record.)

15        Q.    So I think where we left off was, you

16   think your engagement is with CVA --

17        A.    Yes, it is.

18        Q.    -- directly.

19        A.    Yep.

20        Q.    Okay.  And then you provided me an

21   example of -- or excuse me, with Exhibit 191?

22        A.    Correct.

23        Q.    What is that document?

24        A.    That actually is an invoice of the hours

25   through February 19th of 2019.

 1     Q.   Okay.  And at the top it says Jackson

 2  Lewis invoice?

 3     A.   The way that it had been set up was that

 4  I would submit the hours and any work that I did

 5  for those -- for those hours directly to Jackson

 6  Lewis, and then they would pass that on to the

 7  client.

 8     Q.   Okay.  And did you issue regular invoices

 9  throughout?

10     A.   Did not.  This is the first invoice.

11     Q.   Okay.  The first entry on Exhibit 191

12  says C-o-n call KB.  Do you --

13     A.   Yes.

14     Q.   -- know who KB is?

15     A.   Kathleen Barrow.

16     Q.   Okay.  August 9th, 2017, C-o-n call HP.

17     A.   That is with Heather --

18             MS. BAUMERT:  Panick.

19     A.   Panick.

20             THE WITNESS:  Thank you.

21     Q.   Do you know how to spell her last name?

22             MS. BAUMERT:  I do.  P-a-n-i-c-k.

23             THE WITNESS:  Thank you.

24     Q.   Is that a Jackson Lewis attorney?

25             MS. BAUMERT:  Yes.

1    A.    Yes.

2    Q.    Then there's one on December 18, 2017, conference call KR?

4    A.    Kutak Rock.

5    Q.    Okay.  January 15, 2019, meeting JL.

6    A.    Jackson Lewis.

7    Q.    Okay.  So in July -- there's an entry here July 8, 2017, for one nonbillable hour, conference call.  What's the -- why is it a nonbillable hour?

11    A.    It was essentially when we talked about the engagement.  And at that point Kathy and I talked about what would be involved, is it something that I'd be interested in doing.  She talked about me -- about my experience to see if it was something that she thought I could assist with.

18    Q.    And what was she asking you to assist with?

20    A.    She was asking me to assist with reviewing the claims, my experience in being able to go through the documents, validate the accuracy of the billing, being able to give recommendations on what payments should be within the marketplace, my knowledge of the marketplace and how that

1    knowledge had been gained.

2         Q.    Did you know Ms. Barrow before this

3    engagement?

4         A.    We had worked together on another -- in

5    another professional capacity for another client

6    that she was serving at that time, that she and I

7    both served at that time.

8         Q.    And what was that engagement?

9         A.    That engagement was Jackson Lewis has a

10   client that they were serving at that point in

11   time, State of South Dakota.

12                   MS. BAUMERT:  I'm probably going to

13              have to object on attorney-client

14              privilege with regard to that --

15                   THE WITNESS:  Okay.

16                   MS. BAUMERT:  -- relationship.

17                   MR. THALKEN:  Yeah.

18                   MS. BAUMERT:  I don't know anything

19              about it.

20        Q.    Yeah.  And I don't need to know --

21        A.    Okay.

22        Q.    -- who or --

23        A.    Okay.

24        Q.    I just kind of need big picture.

25        A.    Yeah.  We both had a professional

1  relationship with a client and became contacts in

2  that regard.

3       Q.   And did you serve as an expert in that

4  capacity?

5       A.   No.  I have an ongoing client relationship.

6       Q.   Consulting --

7       A.   Consulting relationship.

8       Q.   Doesn't have to do with litigation?

9       A.   No, not at all.

10      Q.   Have you ever testified before as an

11  expert in court?

12      A.   I have in one other situation.  That's

13  been ten-plus years ago.

14      Q.   What case was that?

15      A.   It was a case in Wisconsin where there

16  was a -- a transplant that had been denied.

17      Q.   And in what capacity did you serve as an

18  expert?

19      A.   I served as an expert as a former health

20  plan CEO, explaining the process that a health

21  plan would go through to review complicated

22  medical cases and why those kinds of cases could

23  legitimately be denied.

24      Q.   Have you ever been excluded as an expert

25  witness in any case?

1     A.    Have not.

2     Q.    Have you ever given a deposition before?

3     A.    I have.

4     Q.    How many times?

5     A.    I would say eight or more.

6     Q.    What type of cases?

7     A.    Types of cases involved wrongful

8  termination, work comp cases.  Most of these were

9  during my employment with my former employer.

10    Q.    With Avera?

11    A.    Yes.

12    Q.    Any depositions as an expert witness

13 prior to today?

14    A.    Just the one I previously mentioned.

15    Q.    The Wisconsin case?

16    A.    Yeah.

17    Q.    Okay.  Exhibit 190, your expert report,

18 are those all -- does that contain all of the

19 opinions you intend to offer in this case?

20    A.    It is.

21    Q.    Do you have any opinions regarding the

22 services that The Benefit Group provided to the

23 plan?

24    A.    I'm not sure I understand.

25    Q.    Do you have any criticisms of anything

1   that The Benefit Group did with respect to the

2   plan in this case?

3             MS. BAUMERT:  Objection to the

4          extent that exceeds the scope of the

5          report, I suppose.

6     A.   Yeah.  I don't -- yeah, I don't know how

7   that relates specifically to -- to the claim

8   reviews.

9     Q.   Well, and that's what I'm trying to

10   understand.  Are you going to offer any opinions

11   that The Benefit Group did anything wrong in this

12   case?

13             MS. BAUMERT:  Objection; same

14          objection.

15     A.   I don't know that I can speak to that.

16     Q.   So looking at, looks like, Page 2 of your

17   report, at the top you say, I have been asked to

18   opine concerning the accuracy of the claims

19   submitted --

20     A.   Uh-huh.

21     Q.   -- based on the information provided and

22   review charge amounts, to provide an opinion

23   regarding the appropriateness of the charge

24   amounts and to recommend a target settlement

25   amount for these outstanding claims.  For certain

1   claims I was also asked to review the claims and

2   other documents to reconcile the claim amount and

3   determine the exact amount the patient or the plan

4   owed on the claim.

5       A.   Uh-huh.

6       Q.   I have also been asked to opine regarding

7   the payment recommendations by AMPS/CDS for claims

8   of plan participants during plan years 2015 and

9   2016.  Did I read that correctly?

10      A.   Correct.

11      Q.   And is that the scope of what you did in

12  this case?

13      A.   Yes.

14      Q.   Page 3 of your report, fourth bullet

15  down -- and this, I believe, is -- is your

16  qualification -- under the heading, Qualifications?

17      A.   Correct.

18      Q.   Fourth bulletpoint down says, Implemented

19  a new hospital outpatient risk-based payment

20  methodology for one of South Dakota's largest

21  employers.

22      A.   Correct.

23      Q.   What is a risk-based payment methodology?

24      A.   A risk-based payment methodology is a

25  fixed payment for outpatient services, specifically

1  in this case it's an ambulatory payment

2  classification system, also known as a house --

3  hospital outpatient prospective payment system.

4  It's a Medicare-based payment.

5      Q.   Is that similar to reference-based

6  reimbursement?

7      A.   No --

8      Q.   How does it differ?

9      A.   -- absolutely not at all.  It's a

10  Medicare-based system where each of the providers

11  has a contract where they understand what it is

12  that they're going to be paid based on a

13  conversion factor.  They know based on the -- the

14  weight, again, a CMS weight for that specific case

15  how much they're going to be paid for that episode

16  of care.  And the reason that it's risk based is

17  that if the provider is able to process the

18  payment within the defined terms, the defined time

19  frame, then they're successful in reaching --

20  making -- if you will, making dollars on that

21  case.  If they exceed the expected time frame,

22  then they lose dollars on that case.  So that's

23  why it's risk based, and that's stated in their

24  contract.

25      Q.   Do you have experience with reference-based

1  reimbursement plans?

2      A.    In that I'm familiar with them, from that

3  stand- -- standpoint, yes, I do have experience

4  with them.

5      Q.    What is your familiarity with

6  reference-based reimbursement?

7      A.    When I was responsible for managed care

8  contracts within Avera, we had a couple of

9  different providers -- or payment organizations

10 that tried to put risk-based pricing in place

11 within our health system.  We rejected those and

12 immediately refused to cooperate with those

13 third-party administrators.

14     Q.    Now, you said tried to put together

15 risk-based pricing.

16     A.    I'm -- I'm sorry, not risk-based but

17 reference-based pricing.  Yeah.

18     Q.    So there were -- so there were a couple

19 of plans or what were they?

20     A.    TPAs.

21     Q.    Okay.  So there were a couple of TPAs,

22 third-party administrators --

23     A.    Uh-huh.

24     Q.    -- who tried to implement reference-based

25 reimbursement with Avera, and Avera rejected --

1    A.    Correct.

2    Q.    -- those.

3    A.    Yes.

4    Q.    Any other experience with reference-based

5    reimbursement?

6    A.    My other experience with it is knowledge

7    of reference-based pricing in the State of

8    Montana.

9    Q.    Okay.  What's your knowledge?

10    A.    The State of Montana, for the state

11    employees in Montana, uses a reference-based

12    pricing model where they're unable to obtain a

13    contract.

14    Q.    Your familiarity when you were at Avera

15    with those RBR -- I'll call it RBR --

16    A.    Uh-huh.  Okay.  Yes.

17    Q.    -- for short.  Do you understand --

18    A.    Yes.

19    Q.    -- what that means?

20    A.    Uh-huh, yes.

21    Q.    When was that experience?

22    A.    That -- that would have been -- that

23    would have been in the late '90s to early 2000.

24    We had -- we had experience then and then again

25    probably in mid 2000, so maybe 2003, 2004.

1    Q.   Do you know -- do you remember who the

2    TPAs were that were trying reference-based

3    reimbursement?

4    A.   I can't say specifically who they were.

5    I do remember one was from out of state, I don't

6    remember the name.  Both of them were from out of

7    state, I don't remember the names.

8    Q.   Did Avera operate in Nebraska at any

9    point?

10   A.   We -- yes.

11   Q.   When?

12   A.   Currently operate in Nebraska.  And

13   acquired -- acquired hospital and clinic -- I

14   don't remember the year, but did acquire both

15   hospitals and clinics in Nebraska.

16   Q.   Which ones, if you can remember?

17   A.   St. Anthony in O'Neill, Nebraska, and the

18   clinics associated in O'Neill.

19   Q.   Okay.  Any others?

20   A.   There were other hospitals that are part

21   of a -- a part of a hospital buying group in

22   Nebraska around the O'Neill area that we consulted

23   with but did not actually own or manage those.

24   And they were all independent hospitals.

25   Q.   So earlier you mentioned Avera was, I

1    thought, a health plan.

2        A.    Uh-huh.

3        Q.    But it also owns hospitals; right?

4        A.    Correct, hospitals, clinics, nursing homes.

5        Q.    So when you worked for Avera, were you

6    working for the hospitals?

7        A.    Both.  I -- I was at the health system

8    and then also for a period of time was at the

9    health plan.

10       Q.    Okay.  And looks like you're being paid

11   $350 per hour?

12       A.    Correct.

13       Q.    Okay.  And that's reflected on Exhibit 191.

14       A.    Yes.

15       Q.    And this is -- this shows $32,900 billed

16   to date?

17       A.    Through the 19th.

18       Q.    Through --

19       A.    Yeah.

20       Q.    -- February 19, 2019.

21       A.    Correct.

22       Q.    And none of this has actually been billed

23   though; correct?

24       A.    Correct.

25       Q.    All right.  Page 6 of your report,

1    Exhibit 190, first full paragraph --

2        A.    Okay.

3        Q.    -- second sentence, Generally when a

4    preferred provider organization is in a position

5    where they represent larger employer groups

6    collectively, they can obtain a minimum of a 20 to

7    25 percent discount and upwards of a 30 to 35

8    dis- -- excuse me, 30 to 35 percent --

9        A.    Uh-huh.

10       Q.    -- discount or possibly fixed

11   reimbursement on certain procedures such as

12   imaging or other high dollar cases if the TPA can

13   administer the payment methodology.

14       A.    Correct.

15       Q.    That's -- that's part of your opinion in

16   this case?

17       A.    Absolutely.

18       Q.    Okay.  What is the basis for the

19   discounts that you've listed?

20       A.    Two different -- two different places.

21   One would be during the time that I was

22   responsible for negotiating the contracts for

23   Avera, those were the types of discounts that --

24   that were normal, if you were, not only from --

25   from Avera but were representative of what payers

1   generally received within the marketplace, whether

2   it was a Wellmark or it was a Dakota Care, it was

3   Blues of Minnesota, it was United from the -- you

4   know, the Nebraska area.  Those were the types of

5   discounts that were given, whether it was Avera or

6   someone else.

7          And so -- and it depended upon the size

8   of the employer.  Obviously the larger the

9   employer, if you were doing a direct contract,

10  then those discounts were larger.  And then when I

11  started to do direct contracts with employers, and

12  Avera did some of those and I've also done those

13  on my own, you find that if there's a larger

14  employer, again, you'll see a willingness for

15  there to be an increase in the discount.

16      Q.   So is it fair to say then that

17  essentially a standard PPO agreement you would

18  expect a 20 to 25 percent discount off billed

19  charges; is that --

20      A.   Correct.  Yeah.

21      Q.   But in some cases if you're larger, you

22  might get 30 to 35 percent?

23      A.   Thirty to 35 if you're larger.  And then,

24  again, you'll see reference later in the report

25  that there is an opportunity for it to be even

1    higher than that, again, depending upon the size

2    of the group.

3         Q.    What do you consider to be a large

4    employer for purposes of getting that larger

5    discount?

6         A.    Typically it can be a larger group if

7    you're talking -- in our marketplace, in --

8         Q.    Right.

9         A.    -- this particular area?

10        Q.    In Nebraska.

11        A.    In Nebraska?  If you're looking to say if

12   you've got maybe 1500 to 2,000 employees that are

13   going to be accessing and, particularly, if you

14   can offer some sort of exclusivity or some kind of

15   steerage to a particular location.

16        Q.    Define steerage.

17        A.    Steerage meaning that there is some kind

18   of -- either it's an exclusive arrangement or

19   there's some type of incentive for a member to use

20   a particular facility.

21        Q.    So, for example, an employer could say to

22   its employees, hey, go to Bergan, you'll get a

23   better discount or --

24        A.    Correct.  You'll have less out-of-pocket

25   expenses.

1     Q.   Okay.  And that would be an example of

2     steerage.

3     A.   Correct.

4     Q.   Now, just to make -- I think you said a

5     larger group would be between 1500 and 2,000

6     employees accessing.  Do you make a distinction

7     between employees versus members of the plan?

8     A.   Not necessarily, because it's number of

9     people that are going to be using the services.

10    Q.   Okay.  So if you have 600 employees but

11    with their families you have 1500 members --

12    A.   Right.

13    Q.   -- you would consider that a large group?

14    A.   A larger group, yes.

15    Q.   You also mentioned, I think, in your

16    experience that there are direct contracts with

17    employers.

18    A.   Uh-huh, correct.

19    Q.   That's different than a PPO agreement;

20    correct?

21    A.   Yes, it is.  Yes.

22    Q.   What is a direct contract?

23    A.   Direct contract is a contract that exists

24    directly between the employer and the provider.

25    Q.   Okay.

1   A. So it essentially eliminates the

2 middleman.

3   Q. The next paragraph on Page 6, which is

4 the second full paragraph, you talk about

5 reference-based pricing.  And about --

6   A. Correct.

7   Q. -- four lines down you write, In no

8 situation was a reference-based price accepted

9 unless it was accompanied by a contract negotiated

10 in advance.

11   A. Correct.

12   Q. Okay.  Tell me about your experience with

13 that.

14   A. I mentioned that there was the situation

15 where a TPA came in and had put forward -- tried

16 to do reference-based pricing, and there was no

17 contract.  We essentially rejected all of those --

18 refused -- essentially refused any claim that was

19 presented at the hospital or a clinic.  And so

20 when that happened, obviously members were put at

21 risk because they were then billed for the entire

22 service.  The employer was contacted and explained

23 that they -- that because of that, they had been

24 sold a plan that had no network and that their

25 members were substantially at risk and the

1    employer was substantially at risk.

2              And until that employer was able to

3    move their employees to a plan that had a network,

4    we offered to provide -- to agree to do a

5    short-term contract.  We agreed upon a price so it

6    really wasn't a reference price.  But we agreed

7    upon a price with that TPA to accept a specific

8    payment.  And essentially what -- because what we

9    said to the employer is that no employer would do

10   that to their employees because you leave the

11   employee at such risk.

12        Q.   Do you remember who the TPA was?  I can't

13   remember if I asked you.

14        A.   Yeah, and I said I don't remember.  I

15   just know they were from out of state.

16        Q.   Do you know if the TPA was using a vendor

17   to assist them with their reference-based plan?

18        A.   That I don't know.

19        Q.   Do you have any experience with AMPS,

20   Advanced Medical Pricing Solutions?

21        A.   I don't.

22        Q.   How was the situation resolved that you

23   mentioned with Avera on these reference-based

24   claims?

25        A.   Again, we did a short-term agreement

1    until the -- until the employer could move their

2    employees to an insurance organization that had a

3    full network.

4        Q.   And do you know who -- so they went to a

5    PPO then?

6        A.   They went to a PPO, yeah.

7        Q.   Okay.  And so in the interim you had a

8    direct contract with the TPA or the employer?

9        A.   The employer.

10       Q.   Do you know what -- did that provide a

11   discount to the employer?

12       A.   Absolutely.

13       Q.   Do you remember what percent that was?

14       A.   I can't say specifically.  I can't say

15   specifically what it was.

16       Q.   What's your best estimate of what the

17   range --

18       A.   My best estimate --

19                MS. BAUMERT:  Objection, exceeds

20             the scope of the report but --

21       A.   Yeah, yeah.

22       Q.   You can answer.

23       A.   I don't want to guess so --

24       Q.   You don't have an estimate of what the

25   settlement was?

```
 1              MS. BAUMERT:  Objection; asked and

 2                  answered, speculation.

 3         A.   I'm not going to guess.

 4         Q.   Okay.  On the bottom of Page 6 you write,

 5    It is highly unusual for claims to be unresolved

 6    for two or three years after participants incurred

 7    them, as they were for the CVA plan for plan years

 8    2015 and 2016 because so many providers rejected

 9    payment on claims under the RBR program.  Did I

10    read that correctly?

11         A.   Correct.

12         Q.   How many providers rejected payment on

13    claims under the RBR program?

14         A.   Of the claims that I reviewed -- and I

15    believe what I sent in were the -- what did I

16    have, 14 -- 14 claims, that I reviewed, and I

17    viewed those as rejected claims because they were

18    unresolved.  And so that was my definition of a

19    rejected claim.

20         Q.   Okay.  So there are 14 instances that you

21    reviewed through your engagement?

22         A.   Correct.

23         Q.   And you've charged $32,900 to review

24    those 14 claims?

25         A.   That's not what all of that involves.
```

1    There were other things that I have done with

2    that, so there are other things that are included

3    in that.

4         Q.   And what else have you done?

5         A.   Some of it was some documents that I

6    reviewed, other is document preparation.

7         Q.   What documents did you review?

8         A.   I reviewed the AMPS document.

9         Q.   What do you mean by the AMPS document?

10        A.   The -- I believe that's what it's called.

11   Actually the -- this one (indicating), the --

12        Q.   The RBR program services agreement?

13        A.   Correct.

14        Q.   Okay.

15        A.   I reviewed the summary plan description,

16   the employee summary -- the plan document and

17   summary plan description.  I also -- and then

18   referred to that as I was going through the

19   individual claims.  And then as I was going

20   through each one of the claims, I would then -- I

21   pulled each of those claims and did a

22   reconciliation on each one of those claims.

23        Q.   Okay.  Looking at Exhibit 191, most of

24   your entries, is it fair to say, refers to claims

25   reviewed.

1    A.    Correct.

2    Q.    Okay.   There are some entries, for

3  example, on January 20, 2019, where you say claim

4  review, slash, prep, and you billed $6300 for that?

5    A.    Correct.

6    Q.    What prep did you do?

7    A.    What I did there was to go back and

8  essentially -- when I first -- the first time that

9  I did the claim review, I had not documented all

10  of the dates of service.  And so I went back

11  through each one of those and documented the date

12  of service and did that in preparation for this

13  meeting.

14    Q.    Okay.  So you did that to prepare for

15  this deposition?

16    A.    Correct.

17    Q.    And then January 24, 2019, you say

18  document prep and you billed $8,750 for that.

19    A.    That was a combination of doing the

20  write-up, the detail for each one of the

21  individual claims.  And part of doing that, to

22  make sure that it was completely accurate, I went

23  back through and essentially reworked each and

24  every one of those claims.

25    Q.    How did you rework each claim?

1    A.    I explain in here how I went through the
2  process.  And so essentially with each claim I
3  started by looking at that claim.  And when I did
4  so, I would start by making sure that the claim
5  was accurate by looking at the billing, comparing
6  the -- what was being billed, compared that to a
7  CPT manual to be sure that the right codes were
8  billed.
9           And then I would look to be sure that
10  when I looked at it -- here, let me get back to my
11  documents so I can do this a little more
12  succinctly.  So then after I took it through the
13  CPT code, then I would go through and make sure
14  that all of the hospital billing information was
15  right.  Oftentimes had to go back to the SPD.  And
16  then I would -- went through my individual notes
17  and the conversations that I had, most times with
18  Kutak Rock, relative to the recommendations that I
19  had made.  Determined the source of what generated
20  that, did the document come directly to Kutak
21  Rock, was it a delinquency notice that caused the
22  contact, was it something that came from a
23  collection agency, did it come directly from the
24  member?  So what was the source of that so that I
25  could detail all of that in the write-up.

1       Q.    So you have notes with your conversations

2    with Kutak Rock?

3       A.    And those I actually included here in the

4    summary information.

5       Q.    The actual notes are included or you just

6    mean you retyped them?

7       A.    I retyped them --

8       Q.    Okay.

9       A.    -- yeah.

10      Q.    Did you have handwritten notes or what do

11   you have?

12      A.    Mostly just something that I wrote on the

13   claim that said, you know, recommend 20 to 25

14   percent discount.  Yeah.

15      Q.    Did you prepare any -- other than this

16   report, when you were working with Kutak did you

17   prepare any recommendations in writing to them?

18      A.    I did not.

19      Q.    Okay.  It was all oral communications?

20      A.    Yes.

21      Q.    How about any E-mails with Kutak, did you

22   ever E-mail them?

23      A.    What I E-mailed -- information that I

24   E-mailed is included in the report.  Yeah.

25      Q.    But not the actual E-mails.  I guess what

1    I'm saying --

2        A.   Oh, no.  No.

3        Q.   Is it fair to say that the entry on

4    Exhibit 191 for January 20 and January 24, those

5    two entries are the time you spent preparing your

6    expert report?

7        A.   Yes.

8        Q.   Did you keep any records as to how long

9    you spent looking at any of the individual 14

10   claims that you looked at?

11       A.   Yes.

12       Q.   Okay.  How would you --

13       A.   Yeah.

14       Q.   -- would you record that time?

15       A.   On the -- how would I record it?

16       Q.   Yeah.

17       A.   Oh, I -- I keep track of the amount of

18   time that I spend for each of my clients.  Each

19   day that I do the work for that client I record it

20   on the specific day and the amount of -- on a

21   calendar and the amount of time that I worked for

22   that client.  And then I would indicate also which

23   of the claims I worked on.  So if I worked on,

24   say, a patient W.S., that first patient, I would

25   indicate the number of hours that patient took and

1    have that recorded on the calendar.

2         Q.   Okay.  Did you bring that information with

3    you?

4         A.   I did not.

5         Q.   Okay.  But you have it available if --

6         A.   I do.

7         Q.   Okay.  So there is a record somewhere of

8    how much time you spent on each of these 14

9    claims?

10        A.   Correct.

11                  MR. THALKEN:  And, Michaelle, we

12             would like to see that.

13                  MS. BAUMERT:  I don't have it so --

14                  MR. THALKEN:  Well, she just said

15             she has it.

16                  MS. BAUMERT:  But I don't think

17             it's proper to issue the notice with a

18             duces tecum aspect to it.  We'll look

19             into that, we can talk about it.

20                  MR. THALKEN:  Okay.  She's got a

21             record --

22                  MS. BAUMERT:  It's important to you

23             to know how much time she spent on

24             Willis Smith's claims, for instance?

25                  MR. THALKEN:  Yes.

1          MS. BAUMERT:  Okay.  We'll look

2               into that.  I -- I think we're going to

3               have probably an issue.

4               MR. THALKEN:  Okay.

5     Q.    Well, you understand that CVA is seeking

6     the fees that you -- that you charged the plan for

7     consulting on these claims --

8     A.    I --

9     Q.    -- as an element of damage in this

10    lawsuit; correct?

11    A.    I understand that.  I would also -- well,

12    I can talk to Michaelle about it, because that

13    information is included with all other information

14    for my other clients.  So it's not -- it's not

15    segregated from -- it's not something that is held

16    for this client and this client alone.

17    Q.    Right.  And I'm not interested in what

18    you're doing for other clients, but you're saying

19    there is a record of how much time you spent on

20    each of the individual 14 claims that you --

21    A.    Correct.

22    Q.    -- looked at.

23    A.    But I'm also saying that if you want to

24    see that, there will be a certain amount of work

25    incurred to go through and isolate that and block

1  all of that out with all of my other clients.  And

2  I would question whether or not that would be

3  worth it.

4      Q.   Okay.  Page 7 of your report, the top of

5  the page.  Are you there?

6      A.   I am.

7      Q.   All right.  In addition, and then I think

8  it's a typo, it just says B.  Should that say by?

9      A.   Yes, uh-huh.

10      Q.   In addition, by not having signed

11  provider contracts in place before the RBR program

12  was implemented, the plan costs increased at a

13  minimum of 20 percent, up to as much as 60 percent

14  of --

15      A.   Yeah.

16      Q.   -- total claim cost, for an average 45 to

17  50 percent of total claim cost.

18      A.   Yeah.

19      Q.   This figure is based on other savings

20  reports carriers in the market provide when

21  quoting large self-funded groups.

22      A.   Yep.

23      Q.   Okay.  Large third-party administrators

24  can yield over a 50 percent discount on inpatient

25  services and a 40 to 45 percent on professional

1  services.

2      A.   Uh-huh.

3      Q.   Outpatient services will be close to the

4  inpatient range or higher depending on the type of

5  reimbursement in place.

6      A.   Correct.

7      Q.   Have I read that correctly?

8      A.   Yes.

9      Q.   Tell me what your basis is for saying

10  that plan costs increased a minimum of 20 percent.

11      A.   What I -- what I did was, if you look at

12  the plan costs and it -- for years '15, '16 and

13  the run-out for '17 and you look at the provider

14  savings based on the billed charges, that reflects

15  a seven percent discount.  And --

16      Q.   Just to -- we're talking about the CVA

17  plan here.  This is --

18      A.   Correct.

19      Q.   -- actual --

20      A.   I looked at the actual claims.

21      Q.   Okay.

22      A.   And so that reflected a seven percent

23  discount.  So essentially the differential should

24  have been at least, I was thinking, somewhere in

25  that 25 percent range.  So that's where I came up

 1    with that minimum of 20.  And then up to as much

 2    as 60 percent, I calculated that based on -- if

 3    you look at a typical spend for health care in

 4    inpatient and outpatient and you split that 60/40

 5    with your inpatient claims these days being 40

 6    [sic] percent of your total spend, and that's a

 7    ballpark average, and then your outpatient being

 8    40 percent of your total spend.  And then I

 9    essentially -- and I couldn't do that specifically

10    with their claims to get what was their inpatient,

11    what was their outpatient spend.  I didn't take

12    the time to do that.  But I just ballparked that

13    based on the total claims figure.  And so then I

14    applied the percentages of the -- what I see for

15    discounts when groups are quoted.  And that's how

16    I came up with those numbers.

17         Q.   Did you draw any distinction between

18    hospital and facility claims versus nonhospital or

19    facility claims when doing that analysis?

20         A.   I did.  And that's the difference here

21    because the -- the discounts I used, the 50

22    percent on the inpatient and then I used 45

23    percent on the professions.

24         Q.   So your -- your assumption there is that

25    a typical plan will get a 50 percent discount on

1 inpatients?

2     A.    On inpatient.

3     Q.    And a 45 percent discount on --

4     A.    On the professional side, yeah.  And I

5 based that on what I see groups being quoted

6 today.

7     Q.    So how does that accord with your opinion

8 that if they had -- if there was a PPO in place

9 you'd get a 20 to 25 percent discount?

10     A.    Your -- if you have a group that's being

11 quoted, those quotes would be based on the network

12 that is supporting them.  And that would be a PPO

13 network that would be supporting that quote.  So

14 you have an insurance company that is giving a

15 quote to an employer.  That insurance company

16 bases those quotes on the PPO network that is

17 supporting it.

18     Q.    And that would be a 20 to 25 percent

19 discount typically?

20     A.    It -- the quotes I have seen of late, of

21 which there were -- when I wrote this I had just

22 seen three quotes that had these exact numbers.

23     Q.    Of 40 and --

24     A.    Of 50 and 40 to 45 percent on the hospital

25 and the professional side.

1    Q.    Who are those quotes from?

2    A.    The one -- I saw two from Wellmark and

3    one from Dakota Care.

4    Q.    How many employees does Walmart have?

5    A.    No, no, no, it wasn't from -- Wellmark

6    gave --

7    Q.    Oh, Wellmark.  I thought you said Walmart.

8    A.    No, no, no.  I'm sorry.  Wellmark, yeah.

9    It was from Wellmark.

10    Q.    All right.  My --

11    A.    Yeah.  No, no, no.

12    Q.    So Wellmark quoted -- you've seen two

13    quotes from Wellmark and one quote from Dakota Care?

14    A.    Correct.

15    Q.    To who are those quotes issued?

16    A.    I -- I don't feel comfortable saying who

17    they were issued to, but they were issued to

18    groups within this marketplace, because I think

19    who they were issued to is confidential.

20    Q.    Well, you're basing your opinion on these

21    percentages, but you won't tell me who the employer

22    was?

23    A.    I'm sorry, that is considered proprietary.

24    Q.    How many employees did they have?

25    A.    The -- one of them had 32- -- the

1   Wellmark, one was at 3200 employees.  Another was

2   at 1600 employees.  The Dakota Care one was --

3   that was around the 3200 mark as well.

4       Q.   So those employers were much larger than

5   CVA.

6       A.   Yes, yeah.

7       Q.   But you're assuming that CVA would have

8   got the same discount as those larger employers?

9       A.   I think that if, you know -- I think that

10   it's possible that they could have gotten that

11   same kind of discount.

12       Q.   Do you know?

13       A.   I can't say specifically, but I do think

14   it's possible.

15       Q.   It's possible they could have got less

16   than that discount.

17       A.   It is possible.

18       Q.   Do you know how many balance bills CVA

19   had to negotiate?

20              MS. BAUMERT:  Objection, exceeds

21         the scope of the report.

22       A.   I don't.

23       Q.   You looked at a total of 14 claims?

24       A.   I reviewed specifically 14 claims.

25       Q.   And how -- how many employees did the

1    plan have?

2        A.   I don't know the -- I don't know the

3    exact number.

4        Q.   More than 500?

5        A.   Yes, yep.

6        Q.   And you're looking over a period of two

7    years, 2015 and 2016?

8        A.   Correct.

9        Q.   And maybe it's not accurate to say

10   claims, it's 14 patients.

11       A.   14 patients, correct.

12       Q.   Is that --

13       A.   Yeah, because there were multiple claims

14   with -- yeah, there were multiple claims for these

15   patients.

16       Q.   Based on your review, did you determine

17   whether the claims were submitted accurately?

18               MS. BAUMERT:  Objection to form of

19                  the question.  If you understand the

20                  question, you can answer it.  If you

21                  don't understand it, you can tell him.

22       A.   Your question to me is, were the claims

23   submitted accurately from the providers?

24       Q.   Yes.

25       A.   In -- in most cases there -- there was --

1    there were a couple of situations where I suggested

2    that Kutak Rock go back and get additional

3    information.

4         Q.   And is that what you mean on Page 7 of

5    your report under C, Methodology, where it says, I

6    reviewed claim submissions for accuracy and plan

7    documents to determine if claims being filed were

8    for covered benefits and whether claims were

9    submitted accurately?

10        A.   Correct.

11        Q.   You're talking about the provider

12   submitting claims.

13        A.   Correct, yes.

14        Q.   And you found a couple situations where

15   you thought you needed some more information.

16        A.   Correct, yep.

17        Q.   Did you determine in those situations

18   whether the claims were submitted accurately?

19        A.   I did not always see the back-end process

20   so I don't know the answer to that.

21        Q.   Okay.  Was there ever any information

22   that you requested that you were not provided?

23        A.   Not to my knowledge.

24        Q.   Okay.  So let's look at Page 9 and we'll

25   kind of look at some individual patients.

1     A.    Okay.

2     Q.    The first one is patient W.S., is how you

3 have it listed?

4     A.    Uh-huh.

5     Q.    And then let's go to the second paragraph

6 under 1 there, four lines down says, I determined

7 the rates being charged were over market for the

8 services being provided.

9     A.    Yep.

10    Q.    So you determined that the hospital was

11 overbilling for the services it provided to W.S.;

12 correct?

13    A.    Right.

14              MS. BAUMERT:  Objection, form of

15          the question.

16    Q.    And you recommended that the Advanced

17 Imaging MRI be lowered by 60 percent.

18    A.    Uh-huh.

19    Q.    Is that yes?  You have to say yes or no

20 for --

21    A.    Yes --

22    Q.    -- the court reporter.

23    A.    -- I did, uh-huh.  Sorry.

24    Q.    No problem.  And then you recommended

25 that Saunders Medical Center be discounted at 50

1  to 55 percent; correct?

2      A.   Correct.

3      Q.   And you recommended negotiating a 60

4  percent discount and settling for 50 percent with

5  Bryan --

6      A.   Correct.

7      Q.   -- correct?

8      A.   Correct.

9      Q.   And do you know what the result of your

10  recommendations were, do you know if they were

11  accepted by the hospitals on patient W.S.?

12      A.   I -- I do not.

13      Q.   And then look -- well, looking back at

14  your report on the date of services report --

15      A.   Uh-huh.

16      Q.   -- that's attached to Exhibit 190, is

17  this a list of all the individual claims that you

18  looked at for each patient?

19      A.   Yes, it is.

20      Q.   Okay.

21           (Deposition Exhibit 192 was marked.)

22      Q.   Ms. Reed, I'm handing you what's been

23  marked as Exhibit 192.  And I'll represent to you

24  this is a document that was produced to us in

25  discovery by CVA.

1      A.   Okay.

2      Q.   I'm going to refer you to Page 4 of

3  Exhibit 192.  There's an entry for plan participant

4  for Willis Smith.  Do you see that?

5      A.   I do.

6      Q.   Is that W.S.?

7      A.   It is.

8      Q.   Okay.

9           MS. MITCHELL:  Tim, do you have a

10        Bates range for this document?

11           MR. THALKEN:  No.  This is -- this

12        is the attachment to an interrogatory

13        answer, I believe.

14           MS. BAUMERT:  Attachment A, yeah.

15           MR. THALKEN:  Yeah, Attachment A

16        and B and then -- I think I E-mailed it

17        to you earlier.

18           MS. MITCHELL:  Great.  Thanks.

19        Sorry.

20      Q.   So at least with respect to Exhibit --

21  excuse me, with respect to Patient 1, Willis

22  Smith, you don't know whether this is accurate as

23  to what the final settlement was with him?  You

24  weren't involved in the back-end, as you put it?

25      A.   I was not.

1     Q.    Okay.  But you would expect a settlement

2  of, for example, 60 percent on the Advanced

3  Imaging?

4     A.    Correct.

5     Q.    Okay.  And you would expect that Saunders

6  County would accept 50 to 55 percent?

7     A.    Correct.

8     Q.    And you would expect that Bryan would

9  accept a 60 percent discount.

10    A.    Yes, somewheres close to that for all of

11  them.

12    Q.    Patient Number 2, look at Page 10 of your

13  report.  This is patient R.G.?

14    A.    Uh-huh.

15    Q.    And then if you would refer back to your

16  date of service report under Patient 2 --

17    A.    Yes.

18    Q.    -- the billed charges on Patient R.G. are

19  $239.56?

20    A.    Yes.  Okay.

21    Q.    Okay.  And you recommended a 20 to 25

22  percent discount off that $239 bill?

23    A.    I did.

24    Q.    How much time did you spend reviewing

25  that bill?

1   A.   I would not have spent much time

2   reviewing that bill.

3   Q.   Do you think you spent more than 15

4   minutes reviewing it?

5   A.   I did -- I would have because of the

6   information -- because of how the information came

7   in.

8   Q.   Have you completed your answer or --

9   A.   Yes.

10  Q.   Okay.  So you're recommending a 25 percent

11  discount on a $239 bill.

12  A.   Uh-huh.

13          MS. BAUMERT:  I think you have to

14          answer yes.  Sorry.

15  A.   Yes.

16  Q.   So that would be a savings of about $60

17  off that bill?

18  A.   Yes.

19  Q.   You charged more than $60 to review this,

20  didn't you?

21  A.   Yes.

22  Q.   And then a law firm, Kutak Rock, also

23  assisted you with this?

24  A.   I would have given that recommendation to

25  them, yes.

1    Q.    So Kutak Rock billed some time to resolve

2    this -- to try to get a $60 discount?

3    A.    I would assume so.

4    Q.    Would you agree that the fees that you

5    charged and that Kutak charged exceeded the amount

6    of savings that you ultimately achieved on this

7    claim?

8                   MS. BAUMERT:  Objection to the form

9                of the question, calls for speculation,

10               exceeds the scope of the report.  You

11               can answer if you understand.

12   A.    Every time that something was done, it

13   was really done for the best interest of the

14   member and for -- for the employer.  That was our

15   intent.

16   Q.    So even -- so you could have spent

17   $10,000 consulting on this claim that saved $60

18   and that would have been in the best interest?

19                   MS. BAUMERT:  Objection to the form

20               of that question and also exceeds the

21               scope of the report, speculation.

22   A.    No, that was not the point.

23   Q.    Okay.  Well, you're saying whatever you

24   did was in the best interest of the member; right?

25   Is that -- whatever you did was in the best

1    interest of the member?

2        A.    That was always our intent was -- was to

3    do what was right for the member and for the

4    employer.

5        Q.    What about the plan, did you try to do

6    what's in the best interest of the plan?

7                MS. BAUMERT:  Objection to the form

8            of the question.

9        A.    We were --

10               MS. BAUMERT:  Exceeds the scope of

11           the report.

12       A.    Yeah.

13               MS. BAUMERT:  You're trying to make

14           distinctions between employer and plan.

15       A.    Yeah.

16       Q.    What's your answer?

17       A.    To me the employer and the plan are one

18   in the same.

19       Q.    Okay.  The work you did in reviewing

20   these -- these 14 patient claims -- again, I don't

21   want --

22       A.    Yeah.

23       Q.    -- I don't want to suggest that it's only

24   14 claims, but the claims of these 14 patients, is

25   that essentially the same work that AMPS was

1    supposed to be doing for the plan?

2                    MS. BAUMERT:  Objection; exceeds

3                the scope of the report, speculation,

4                form.

5        A.    I don't know.

6        Q.    Well, wasn't AMPS reviewing claims to

7    determine what amount should be paid on them?

8        A.    I don't know.

9                    MS. BAUMERT:  Objection; form,

10               speculation and exceeds the scope of the

11               report.

12       Q.    You don't know what AMPS was doing?

13                    MS. BAUMERT:  Same objections.

14       A.    Not specifically.

15       Q.    So then you have no criticisms of

16    anything that AMPS did in this case; correct?

17       A.    I -- yes, I do have criticisms of that

18    process.

19       Q.    But you don't know what they were doing,

20    so what's your criticism based on?

21       A.    My criticism is based on what I -- what I

22    read in the document, and that is that there was

23    balance billing to the member.

24       Q.    And how -- how is that a criticism of

25    AMPS?

1     A.   It's a criticism of the process in that

2    if there were contracts in place, there would be

3    no balance billing to the member.  So that is

4    really more related to the reference-based

5    pricing.

6     Q.   You don't like reference-based pricing.

7          MS. BAUMERT:  Objection; form,

8        exceeds the scope of the report.

9     A.   Reference-based pricing is an unfair

10   practice to a -- to an employer and to a member

11   because -- and to a provider.  All the way around,

12   it puts everyone at risk in that a provider

13   doesn't know what they're going to be paid, an

14   employer does not understand what their exposure

15   is for their health insurance expenses, and it

16   puts a member at risk to be balance billed.

17    Q.   So if an employer entered into a contract

18   for a reference-based reimbursement system that

19   authorized balance billing, would you say that's a

20   breach of its duty to -- to the plan?

21        MS. BAUMERT:  Exceeds the scope of

22      the report, speculation, form.

23    A.   It would strictly be an opinion, and it's

24   not -- it would be a judgment.

25    Q.   That's what I'm asking for.

1     A.   Yeah.  It would be a judgment --

2           MS. BAUMERT:  Same objections.

3     A.   -- and I'm not going there.

4     Q.   You're not going to answer?

5     A.   I'm not going to make that judgment.

6     Q.   Well, you reviewed the RBR program

7 services agreement, didn't you?  It's one of the

8 documents earlier you said you looked at?

9     A.   I did, I did review that.

10    Q.   Didn't CVA sign that document?

11          MS. BAUMERT:  Objection; form,

12      scope, exceeds the scope of the report.

13    A.   Yes, they did sign it.

14    Q.   Was that a mistake on CVA's part to sign

15 the RBR program services agreement?

16          MS. BAUMERT:  Same objections;

17      exceeds the scope of the report,

18      speculation, form.

19    A.   Yeah.

20          THE REPORTER:  Excuse me?  You said

21      yeah?

22          THE WITNESS:  Oh, I'm sorry.

23          MS. BAUMERT:  Were you saying yeah

24      to you agree with my objections --

25          THE WITNESS:  No.

1           MS. BAUMERT:  -- or, yeah, you --

2           THE WITNESS:  Yes, I agree with her

3       objection.

4           MR. THALKEN:  Well --

5           MS. BAUMERT:  Maybe you should read

6       back the question.

7           MR. THALKEN:  -- you're not a lawyer,

8       so I'd --

9           THE WITNESS:  Yeah, exactly.

10          MR. THALKEN:  -- like you to answer

11      my question and not -- and not agree

12      with her objection.

13          MS. BAUMERT:  I didn't think she

14      really intended --

15          THE WITNESS:  Yeah.

16          MS. BAUMERT:  -- to do that.

17          THE WITNESS:  No, I did not.

18          MS. BAUMERT:  We just want to

19      clarify the answer to the question, so

20      maybe she should read back the question.

21          MR. THALKEN:  Yes.

22          THE WITNESS:  So could you read

23      back the question for me?  Thank you.

24          MS. BAUMERT:  She's typing.

25      (The last question was read by the court

1          reporter.)

2                    MS. BAUMERT:  All the same

3                    objections.  You can go ahead and answer

4                    if you have an opinion.

5     A.    I don't know the answer to that.

6     Q.    But it would be a mistake for an employer

7     to offer any program -- or excuse me, to offer any

8     reference-based reimbursement program in your --

9                    MS. BAUMERT:  Same objections;

10                    exceeds the scope of the report,

11                    speculation, form.

12    A.    Again, I don't -- I'm not going to

13    speculate on that.

14    Q.    So you have no opinion as to whether an

15    employer should ever enter into a reference-based

16    reimbursement agreement.

17                    MS. BAUMERT:  Same objections,

18                    asked and answered.

19    A.    I don't believe it is a fair option for

20    employees.

21    Q.    And so if an employer entered into an

22    agreement, a reference-based reimbursement

23    agreement, that would not be a fair option to the

24    employees in your view.

25                    MS. BAUMERT:  Same objection;

1             exceeds the scope of the report, form,

2             foundation, speculation.

3      A.    I think I've answered that question.

4      Q.    I don't think you have.

5      A.    I -- I believe I have.  I think it's --

6  my opinion is it's -- it is -- it is -- it's not a

7  practice that is seen in this market.  And my

8  experience in working with employers, if they

9  understand that is what is going to happen to

10  their employees, it's not a plan they would choose.

11      Q.    Understand what is going to happen to the

12  employees?

13      A.    That they're going to be balance billed.

14      Q.    So if an employer was advised that

15  employees were going to be balance billed and

16  still entered into an RBR services agreement,

17  would that be a mistake by the employer?

18             MS. BAUMERT:  Exceeds the scope of

19         her report --

20             THE WITNESS:  Yeah.

21             MS. BAUMERT:  -- speculation,

22         foundation, form.

23             THE WITNESS:  Yeah.

24      A.    And, again, I -- I can't speak to that

25  because that employer in that situation needs to

1    make their own decisions.

2         Q.    And CVA made a decision here, didn't it?

3         A.    I don't know that.

4               MS. BAUMERT:  Objection; exceeds

5            the scope of the report, speculation.

6               MR. THALKEN:  Exceeding the scope

7            of the report is not an objection.

8               MS. BAUMERT:  It actually is; it

9            exceeds the scope of her report.

10        Q.    She has given opinions that RBR is not

11   appropriate in this market; is that correct?

12        A.    That's correct.

13        Q.    Okay.  But CVA entered into an RBR

14   program services agreement.

15               MS. BAUMERT:  Same objections.

16        Q.    Didn't it?

17        A.    They did.  And, again, I can't speak to

18   the specific circumstances of that.

19        Q.    Okay.  Page 11 of your report, Patient 3

20   which is patient J.K.

21        A.    Uh-huh.

22        Q.    And is that listed on your date of

23   service report as well under J.K.?

24        A.    Page 11.  Patient 3; right?

25        Q.    Correct.

1     A.    Oh, okay.  Yes.

2     Q.    So -- and then I want to refer you to

3   Exhibit 192 which is the --

4     A.    Okay.

5     Q.    -- interrogatory answer.  On Page 2 of

6   Exhibit 192 at the bottom, there's an entry for a

7   patient Jonathan King?

8     A.    Uh-huh.

9     Q.    Is that J.K.?

10    A.    It is.

11    Q.    Okay.  Tell me what you learned about

12  patient J.K.

13    A.    Jonathan King, in addition to the

14  information that is -- that is written there, he

15  had -- what was sent to us was that the entire

16  balance for the claims that we removed were a

17  number of lab tests that were due to a transplant.

18  It was a bone marrow transplant.  There was a

19  collection notice that was sent that reflected the

20  total amount that was due.

21          The -- one of the things that we did

22  not have was the transplant agreement.  And

23  without that transplant agreement, we were unable

24  to tell whether or not those lab tests should have

25  been included within the transplant period, which

1   is -- which is typical that lab tests would be

2   covered within a transplant period.  But without

3   that agreement, we weren't able to tell that.

4       Q.   And this dispute, as I look at Exhibit

5   192, is over $986?

6       A.   Uh-huh.

7       Q.   Is that a yes?

8       A.   Yeah.  Yes, it was.

9       Q.   Okay.  Do you know how much time you

10  spent reviewing this file?

11      A.   I can't say specifically how much time I

12  spent on it.  I do know that he had -- yeah,

13  again, I don't know the specific amount of time.

14  I do know that I went back through all of the

15  claims trying to determine whether or not we could

16  find the transplant, the original transplant claim

17  to match the transplant period with the billing on

18  the labs so that we could try to avoid having to

19  pay the billing at all.

20      Q.   And in looking at Mr. King's claim you

21  write, I determined the rates being charged were

22  over market for the services being provided?

23      A.   Uh-huh.

24      Q.   Is that a yes?

25      A.   That's a yes.  Yes.

1     Q.   So the hospital was overcharging the plan;

2  correct?

3     A.   For lab services, yes.

4     Q.   And you recommended a 35 percent discount?

5     A.   Correct.

6     Q.   But it looks like on Exhibit 192 that the

7  plan just paid the full amount, $986.

8            MS. BAUMERT:  Can you give us a

9          reference to what you're talking about?

10           MR. THALKEN:  Sure, Page 2 of

11         Exhibit 192, Jonathan King.

12           THE WITNESS:  Okay.

13     Q.   It says amount paid by CVA --

14     A.   Uh-huh, right.

15     Q.   -- 986?

16     A.   Right.

17     Q.   So they just paid the full bill.

18     A.   Yes.  If they were unable to get the

19  provider to agree to the requested amount, then,

20  yes, they would have to pay more.

21     Q.   I want to go back to Number 2 on your

22  report again, Page 10.  Sorry.  Patient R.G.

23     A.   Okay.

24     Q.   It says, The claim was sent to his

25  current health provider instead of TBG.

1    A.    Correct.

2    Q.    So the providers -- or the provider sent

3    the bill to -- didn't send the bill to TBG

4    originally; is that accurate?

5    A.    I can't say that for sure because that

6    information was provided -- that information was

7    provided by -- he sent that in -- yes, he sent

8    that in in a note that -- the note that he sent

9    requesting assistance.  So that was information

10   that came from the patient.

11   Q.    Because it says UMR denied the claim on

12   April 2, 2017 --

13   A.    Yep.

14   Q.    -- correct?  And UMR was not the TPA for --

15   A.    Correct.

16   Q.    -- 2016 claims --

17   A.    Yep.

18   Q.    -- right?

19   A.    Correct.  But, again, that's -- that was

20   the information he gave us so I can't say that

21   specifically.

22   Q.    Okay.  All right.  Back to Page 11,

23   Number 4, Patient L.M.  Is that Lucas Meyer?

24   A.    It is.

25   Q.    Tell me what was going on on this claim

1    or this patient.

2        A.    Lucas Meyer -- Lucas Meyer used a service

3    called Valley of Hope.  And with this particular

4    member there were -- it involved both covered and

5    noncovered services.  Valley of Hope has a -- a

6    residential, if you will, and a -- a continuing

7    care package.  So in this situation Lucas Meyer

8    had signed a -- a form indicating that if there

9    were noncovered services that he would be

10   responsible, so he signed a waiver.

11            Because specifically within the plan

12   document it outlines -- it outlines that room and

13   board is not a covered service.  And so went

14   through and identified letters that -- or the

15   waiver that he had signed.  Actually the facility

16   provided letters to -- to him that actually he

17   then -- I believe he sent it to Kutak Rock.  I'd

18   have to go back and check that specifically.  But

19   we were able to do a reconciliation to determine

20   what the patient liability was, what the plan

21   liability was and work through that and determine

22   what he was responsible for, what the plan was

23   responsible for.

24       Q.    And Valley Hope, is that a drug and

25   alcohol rehab center?

1    A.    I believe it is, yes.

2    Q.    And the total charges for the services

3    were $12,628.53?

4    A.    Correct.

5    Q.    And then you have on Page 12, you say

6    plan liability is $9,527.64.

7    A.    Correct, yep.

8    Q.    What -- how did you determine what the

9    plan liability was?

10    A.    Based on -- based on the covered charges,

11    based on what the plan document said that it would

12    cover, minus the member responsibility in terms of

13    his -- he had a deductible there that he needed to

14    cover and then also the patient liability -- yeah,

15    his deductible was the 627.88, 793.01 was the

16    coinsurance.  And then there had already been a

17    payment that had been made through TBG.

18    Q.    So TBG had paid --

19    A.    1850.35.

20    Q.    And do you know if that payment was made

21    at the recommendation of AMPS?

22    A.    I do not know that.

23    Q.    So you don't know if this went through an

24    RBR process --

25    A.    I don't --

1    Q.   -- review?

2    A.   -- no.  And then Lucas was responsible

3    for the balance above what was paid by the

4    insurance.

5    Q.   Do you know whether this claim ultimately

6    settled?

7    A.   I do not.

8    Q.   You had recommended a 20 to 25 percent

9    discount?

10    A.   Correct.

11         MS. BAUMERT:  Can we go off the

12          record for a second?

13         MR. THALKEN:  Uh-huh.

14         (A discussion was held off the record.)

15    Q.   Patient Number 5, is that Amy Eisenhauer?

16    A.   It is.

17         MR. THALKEN:  And that's

18          E-i-s-e-n-h-a-u-e-r, for the court

19          reporter.

20    Q.   All right.  So on Page 13, the middle --

21    or the second paragraph you say, The charge of

22    1350 was for an imaging service.

23    A.   Right.

24    Q.   Based on the prices published on the

25    provider's website, the service was overpriced.

1    The provider had published prices on their website

2    for similar imaging services for $499; correct?

3         A.   Correct.

4         Q.   So the provider was overcharging the plan.

5         A.   Correct.

6         Q.   For a service that they were advertising

7    on their website cost $499, the provider was

8    charging the plan 1350; correct?

9         A.   Correct.

10        Q.   And TBG you say had -- excuse me.  You

11   say that TBG had already paid $526.14; correct?

12        A.   Correct.

13        Q.   And that's a reasonable amount for that

14   service in your view; correct?

15        A.   Correct.

16        Q.   But the provider wanted more money.

17        A.   Correct.

18        Q.   And balance billed the patient for

19   $823.86; right?

20        A.   Correct.

21        Q.   And then you say, After some negotiating,

22   Northwest Nebraska Imaging accepted $475 to

23   resolve the outstanding balance.

24        A.   Correct.

25        Q.   So the total payments made on this $1,350

1    bill was $1,001.14?

2         A.    Fourteen cents, correct.

3         Q.    But that's more than the fair price.

4         A.    Correct.  The -- the -- the amount that

5    was shown on their website was something that I

6    had identified when I was reviewing the claim

7    because I wanted -- when I reviewed the claim, I

8    went in and looked at -- looked at their provider

9    site because I wanted to understand -- I was

10   looking for their place of service to determine

11   what type of provider they are, because that too

12   will affect the type of discount that they're

13   willing to give, which is how I found the $499

14   price reduction.

15        Q.    So at the end of the day, the plan saved

16   about, call it, $350 on this --

17        A.    Correct.

18        Q.    -- claim?  Did you spend more than an

19   hour working on this claim?

20        A.    Probably not.

21        Q.    And you were charging $350 an hour; right?

22        A.    Correct.

23        Q.    Kutak Rock was also working on this claim?

24              MS. BAUMERT:  Objection; exceeds

25            the scope of the report, foundation,

1          form.

2     Q.    Did Kutak Rock work on this claim?

3     A.    I provided them information.

4     Q.    Okay.  Do you think that between your

5   consulting fees and Kutak's fees, those fees

6   exceeded the amount of savings ultimately

7   achieved?

8                    MS. BAUMERT:  Same objections.

9     A.    I don't -- I don't know the answer to

10  that.

11    Q.    You don't -- you don't think more than

12  $350 in consulting and legal fees was spent on

13  resolving this claim?

14                   MS. BAUMERT:  Same objections.

15    A.    Yeah, I don't -- I don't know what that

16  arrangement is.

17    Q.    Well, you know what your arrangement is.

18    A.    I do, but I don't know what theirs is.

19    Q.    But you're charging $350 an hour.

20    A.    Correct.

21    Q.    And at the conclusion of all your work,

22  the plan saved $350.

23    A.    Correct.

24    Q.    But your notes will show us how much time

25  you actually spent on this claim.

1    A.    Correct.

2    Q.    Next one is 6, Patient J.L.

3    A.    Uh-huh.

4    Q.    Is that Jodi Lamprecht?

5    A.    Yes.

6    Q.    Tell me what you did with respect to her

7    claim.

8    A.    Jodi Lamprecht had -- she had multiple

9    claims from numerous providers, and all of

10   those -- all of the charges appeared to be for the

11   same types of services.  And in reviewing the

12   claims, the first -- first task, if you will, was

13   to sort out -- to attempt to sort out whether or

14   not those claims were duplicate bills.

15            In the -- in the end, my determination

16   was that there was potentially one duplicate

17   claim, which is what I passed on to Kutak Rock in

18   addition to the information relative to a

19   potential discount range.  However, I do know that

20   it took considerable time to determine whether or

21   not all of the claims that were submitted were for

22   individual providers that -- that did, in fact,

23   provide all of those services.

24   Q.    And your ultimate recommendation was to

25   seek a 40 percent discount?

1      A.    Correct.

2      Q.    Do you know how those claims -- or

3  whether they settled?

4      A.    I don't.

5      Q.    If you'd look at Exhibit 192 on Page 3,

6  there's two entries for Jodi Lamprecht.  Do you

7  see those?

8      A.    I do.

9      Q.    Are those the same claims referred to in

10  your report?

11            MS. BAUMERT:  Did you say two

12              entries?  There's three.

13      A.    There's actually three.

14      Q.    Well, one is Gary, isn't it?

15            MS. BAUMERT:  Oh, yeah, 104.  Sorry.

16      A.    Yeah.  The -- in terms of how these are

17  rolled up under the Mercy Medical Center, they're --

18  a number of the claims that I reviewed would have

19  rolled into Mercy Medical Center, which was part

20  of the confusion, because the billings were from

21  multiple providers, that while they had different

22  tax ID numbers, the thinking was that they

23  probably were employed by Mercy.  So I suspect

24  that the dollars all rolled into the Mercy Medical

25  Center, which is why you only see two.

1    Q.   Okay.  All right.  Next one on the bottom

2    of Page 13, Patient 7 is patient L.J.  Is that

3    Lilly Johnson?

4    A.   Yes.

5    Q.   Okay.  And Ms. Johnson had some care at

6    Bryan Medical Center; correct?

7    A.   Correct.

8    Q.   And you recommended a discount of 20 to

9    25 percent off those billed charges.

10   A.   Correct.

11   Q.   Why only a 20 to 25 percent discount

12   versus the 40 or 50 that you had mentioned

13   earlier?

14   A.   The -- the work that she had completed

15   there was predominantly lab work.  And there were

16   other payments in looking at the other claims --

17   predominantly because it was -- it was for labs

18   and it was consistent with other payments that

19   they had made.

20   Q.   And you stated then if you can't get a 25

21   percent discount, a 20 percent discount would be a

22   reasonable discount; correct?

23   A.   Correct, for the hospital outpatient.

24   Q.   Now, on your date of service report for

25   L.J. --

1    A.    Uh-huh.

2    Q.    -- are you there?

3    A.    No, but I can get there.

4    Q.    Okay.

5    A.    Okay.

6    Q.    There's four entries for Bryan Medical

7    Center under L.J.; correct?

8    A.    Correct.

9    Q.    And they're all dates of service in --

10   between September 2016 and November -- or excuse

11   me, December 2016?

12   A.    Correct.

13   Q.    Were you aware that CVA had entered into

14   a settlement agreement with Bryan Medical Center

15   in March of 2017?

16   A.    Was not.

17   Q.    Why would you be reviewing a claim that

18   fell -- well, let me strike that and we'll start

19   over.

20         (Deposition Exhibit 193 was marked.)

21   Q.    Ms. Reed, I'm handing you what's been

22   marked as Deposition Exhibit 193.  And this is an

23   E-mail from Rick Smithpeter to Natalie Skutt and

24   Julie Maschka and Hannah Inman at The Benefit

25   Group.

1     A.   Okay.

2     Q.   And it's dated March 8, 2017.  Do you see

3 that?

4     A.   Yes.

5     Q.   And Mr. Smithpeter writes, Please see

6 attached direct agreement CVA has made with Bryan.

7 We will want to do the same payment method as we

8 did for Faith Regional whereas TBG will reprocess

9 claims at 204 percent and send one check for all

10 claims, then reconcile the amount owed by CVA and

11 CVA will pay.  And then he attaches an E-mail

12 between Mr. Tim Meier, M-e-i-e-r, and

13 Mr. Smithpeter.  Do you see that on Page 2870?

14     A.   Correct.

15     Q.   And it says, Tim, please confirm.  E-mail

16 response is fine.  Bryan agreement for 2016

17 claims, 35 percent discount of billed charges.

18     A.   Yep.

19     Q.   And then Mr. Meier responds, Yes, we are

20 good with this.  The only other item I would add

21 is if we or you uncover another unpaid claim in

22 2016 that this same arrangement will apply.

23 Thanks.  Correct?

24     A.   Yep.  Correct.

25     Q.   So does it appear to you that CVA had

1    reached an agreement with Bryan in March of 2017

2    to get a 35 percent discount off billed charges?

3        A.    It does.

4                MS. BAUMERT:  Objection; exceeds

5            the scope of the report, speculation,

6            foundation.  You need to give me a

7            minute.

8                THE WITNESS:  Yep.

9        Q.    So if CVA had an agreement with Bryan for

10   2016 claims that provided for a 35 percent

11   discount and Lilly Johnson's claims were incurred

12   in 2016, why were you reviewing this?

13       A.    I reviewed it because Lilly Johnson's

14   father, I believe it was father, contacted Kutak

15   Rock on her behalf to request assistance in

16   resolving an outstanding claim when they received

17   an EOB and an invoice that they received from

18   Bryan.

19       Q.    Okay.  But CVA and Bryan had already

20   agreed to a 35 percent discount.

21               MS. BAUMERT:  Objection; speculation,

22           foundation, exceeds the scope of the

23           report.

24       A.    Bryan sent the invoice, and the explanation

25   of benefits indicated it was outstanding.

1    Q.    Well, you recommended a discount of 20 to

2    25 percent at a time that CVA already had a 35

3    percent contract.

4    A.    I was not aware of that.

5                  MS. BAUMERT:  Objection; form,

6              foundation, speculation, exceeds the

7              scope.

8    Q.    So CVA didn't tell you that it had an

9    agreement -- a settlement agreement or a direct

10   contract with Bryan for 2016 claims at a 35

11   percent discount?

12   A.    I did not know that.

13   Q.    Would you agree that CVA did better on

14   its direct contract than the amount you

15   recommended?

16                  MS. BAUMERT:  Objection; form,

17             foundation, speculation, exceeds the

18             scope.

19   A.    Yes, the 35 is better than the 20 to 25.

20   Q.    That you had recommended.

21   A.    Correct.

22   Q.    Now, look at Exhibit 192.  On Page 2

23   there is four entries for Lilly Johnson.  Do you

24   see those?

25   A.    I do.

1    Q.   Are those the same claims that you

2    reviewed?

3              MS. BAUMERT:  Objection; form,

4              foundation.

5    A.   Yes.

6    Q.   And according to Exhibit 192, for three

7    of them the negotiator was Alison Gutierrez at

8    Kutak Rock and for the fourth one it was Rick

9    Smithpeter at CVA; correct?

10   A.   Correct.

11   Q.   Now, as I did the math, it looks like the

12   settlement amount is a 34 percent discount.

13              MS. BAUMERT:  Objection; form,

14              foundation, speculation.

15   Q.   Which is a lower discount than the

16   settlement agreement that Mr. Smithpeter entered

17   into in March of 2017; correct?

18   A.   I would have to do the math but --

19              MS. BAUMERT:  And I think you'd

20              need to be --

21              THE WITNESS:  Yeah.

22              MS. BAUMERT:  -- able to read this.

23              Do you want her to do the math?

24   Q.   Well, we can -- we can do the math if you

25   want.  Let's do a hypothetical.  I want you to

1  assume that the Lilly Johnson entries listed on

2  Exhibit 192 add up to a 34 percent discount off

3  billed charges.

4          MS. BAUMERT:  Objection; form,

5          foundation, speculation.  You can't ask

6          her to --

7          MR. THALKEN:  I'm asking her --

8          MS. BAUMERT:  -- assume that it's

9          34 percent.

10          MR. THALKEN:  She's an expert, she

11          can assume facts.

12          MS. BAUMERT:  Assume about the math

13          that you have in front of her that

14          you're not allowing her to actually

15          calculate.

16  Q.    Do you need a calculator?  Do you -- do

17  you want to do the math, Ms. Reed?

18          MS. BAUMERT:  You want her to do

19          math in front of you?

20          MR. THALKEN:  You just asked [sic]

21          her that it's unfair if you don't.  If

22          you're not going to agree to my

23          hypothetical assumption --

24          MS. BAUMERT:  Why don't we take a

25          break, Tim --

1          MR. THALKEN:  Sure.

2          MS. BAUMERT:  -- and let her do some

3      calculations --

4          MR. THALKEN:  Okay.

5          MS. BAUMERT:  -- so that we're

6      talking about apples to apples.

7          MR. THALKEN:  Sure.

8      (A recess was taken from 11:34 a.m. to

9      11:44 a.m.)

10     Q.   All right.  Ms. Reed, have you had a

11 chance to do the math?

12     A.   I did.

13     Q.   All right.  What -- did you determine what

14 the percent discount was on --

15     A.   Thirty-five.

16     Q.   Thirty-five percent?

17     A.   Uh-huh.

18     Q.   So the same discount as what the

19 settlement agreement was in --

20     A.   Correct.

21     Q.   -- March of 2017?

22     A.   Correct.

23     Q.   So CVA paid you $350 an hour to review

24 these and they paid Kutak Rock whatever their rate

25 was to review these and they got the same discount

1    that was already in place.

2         A.   Okay.

3         Q.   Is that fair?  I mean --

4         A.   Yes.

5         Q.   I mean, if the contract was for a 35

6    percent discount on 2016 claims at Bryan, wouldn't

7    it have just been a matter of paying a 35 percent

8    discount rather than having a law firm and a

9    consultant involved?

10                   MS. BAUMERT:  Objection, form.

11        A.   I don't know the answer to that.

12        Q.   Number 8, Patient E.L., is that Long, the

13   last name?

14        A.   Yeah, Erica Long.

15        Q.   All right.  And this is a dispute with

16   Hutchinson Regional Medical Center; correct?

17        A.   Correct.

18        Q.   And ultimately Hutchinson agreed to

19   accept a settlement of 50 percent off the total

20   billed amount; correct?

21        A.   Correct.

22        Q.   And they agreed to accept that discount

23   even though there was no direct contract in place;

24   correct?

25        A.   Correct.  It was a single case agreement

1    that was put in place between -- yes, a single

2    case agreement was put in place.

3        Q.   Next one is Patient 9, Patient S.B.  is

4    that Mr. Bechard, B-e-c-h-a-r-d?

5        A.   Yes.

6        Q.   Steven Bechard?

7        A.   Yes.

8        Q.   All right.  And this was a dispute over a

9    $689 invoice for an X-ray; correct?

10       A.   Correct.

11       Q.   And you recommended a 25 percent discount.

12       A.   Correct.

13       Q.   And looking at Exhibit 192, the first

14    entry there for Steven Bechard -- first page of

15    Exhibit 192.

16       A.   Oh.

17       Q.   Sorry.  Is that first entry the -- the

18    bill that we're talking about?

19       A.   Correct.

20       Q.   And it looks like, according to this, CVA

21    paid -- just paid the $344.80.  Well, let me

22    restate.  It looks like the full amount of the

23    claim, $689.80, was paid.

24       A.   Correct.

25       Q.   So there was no discount earned on this

1    one.

2         A.   Correct.

3         Q.   And you consulted -- you put some time in

4    on this one?

5         A.   I did.

6         Q.   And Kutak Rock put some time on this one?

7                   MS. BAUMERT:   Objection; speculation,

8              form.

9         A.   I provided my recommendation to them.

10        Q.   Okay.   So presumably they billed some

11   time to this?

12        A.   I would assume so.

13        Q.   And the end result of all that work is

14   there was no discount.

15        A.   Well, the total amount was paid.   Well,

16   only the 344.80 was paid and the balance -- but

17   the member was balance billed.   So you could argue

18   that the member provided the discount.

19        Q.   Okay.   In your experience is $689 a --

20   usually a reasonable and customary fee for an

21   X-ray?

22        A.   That is a reasonable fee for an X-ray.

23        Q.   Next, Number 10.   Is this Debbie Nelsen?

24        A.   Yes.

25        Q.   Okay.   And looks like there -- on your

1  date of service report there are a number of

2  entries on here.  This one talks about an invoice

3  from Oncology Associates --

4      A.    Correct.

5      Q.    -- is what -- do you know which invoice

6  you're referring to in your date of service

7  report?

8      A.    I would have to look at it specifically.

9  It is -- it's the invoice that showed 480 units.

10     Q.    Do you know if this is a dispute over the

11 $779.24 charge?

12     A.    No.  I -- I can't say for sure, but I

13 believe it was much -- I believe it was higher

14 than that.  It was for 480 units of an oncology

15 drug.

16             (Deposition Exhibit 194 was marked.)

17     Q.    I'm going to hand you what's been marked

18 as Exhibit 194.  Can you tell from that document

19 which bills these are?  These talk about 480 units,

20 but I don't know which one we're talking about.

21     A.    This does show the 480 units.  To get the

22 actual dollars you have to take the 480 times the

23 873.60 --

24     Q.    Okay.

25     A.    -- to determine what they would actually

1    have to pay.

2              MS. BAUMERT:  Maybe we should

3         clarify what page you're on.

4              THE WITNESS:  Oh, I'm sorry.

5              MS. BAUMERT:  Down at the bottom,

6         302997.  Tim was talking about 303005.

7         So it's the second page of Exhibit 194.

8         A.   Actually it's on each one of them.  It's

9    on 303 -- 3005.  It's the first line to show you

10   there -- it shows you dates of service.  So she

11   got 480 units on the dates of service 2-22-16 to

12   2- -- so that was a date -- when she came in on

13   that date, she got 480 units.  And that -- so that

14   would have been the 873 times the 480.  And then

15   she came back in on 3-28, so these are weeklies

16   that she's coming in for oncology treatments.  So

17   she'd have gotten 480 units each week when she

18   came in.

19        Q.   Okay.  But to determine what the charge

20   was, you'd have to -- you'd multiply 873.60 times

21   480?

22        A.   Times 480.  That's the cost of that drug.

23        Q.   Okay.

24        A.   Yep.

25        Q.   And you wanted to verify whether she

1  actually got 480 units?

2      A.   Correct, yeah.  That was my question, was

3  to say, before you do anything with that, before

4  you pay it, make sure that she did, in fact, get

5  the 480 units.  So that would have been the cost

6  associated with it.

7      Q.   Did you -- did you actually verify that?

8      A.   I didn't, but that would have been part

9  of the negotiations.

10     Q.   Okay.  And the negotiations were handled

11 by Kutak Rock?

12     A.   Correct.

13     Q.   And you weren't privy to those

14 negotiations --

15     A.   No.

16     Q.   -- correct?  Well, if I multiply $873.60

17 times 480, I get $419,328.

18     A.   Right.  So evidently when I look at what

19 they did for this for the settlements based on

20 their billing --

21     Q.   What are you looking at right now?

22     A.   I'm sorry.  I'm looking at the -- Exhibit

23 192.

24     Q.   Okay.  Page 3 are you looking at --

25     A.   I'm looking at Page 3 --

1   Q.   -- Debbie Nelsen?

2   A.   -- Debbie Nelsen.

3   Q.   And this shows a claim amount of

4   $2,850.61.  Is that -- are we looking at the same

5   thing?

6   A.   We are.  So I don't see where the claim

7   payment is on this reconciliation.

8   Q.   Looking back at Exhibit -- I'm just --

9   I'm a little confused because, again, my math is

10   around $420,000.

11   A.   Uh-huh.

12   Q.   That would be a weekly charge?  I mean,

13   that seems --

14   A.   Not unusual for an oncology drug --

15   Q.   Really?  Okay.

16   A.   -- unfortunately.

17   Q.   Okay.  And that's what I'm trying to

18   understand.  Exhibit 194, when it says charges, is

19   that really a multiplier or is that the actual

20   total charge?

21   A.   When you're dealing with -- the CPT code,

22   when it says -- has a J in front of it, a J code

23   is a drug code.

24   Q.   Okay.

25   A.   And so -- and when it says quantity for

1    that 480, that's typically what that -- what that

2    means.  Now, that's why -- but not everyone bills

3    that in the same manner.  So I know that, for

4    example, some facilities will bill each unit

5    separately and they will list every single -- like

6    if you've got 480 units, you'll have 480 listed

7    separately.  So it -- you really have to go and

8    ask the question, which was why --

9         Q.   Uh-huh.

10        A.   -- I said verify.  Because it could be

11   that there is a very small charge attached to that

12   and it's only an admin fee that's being charged to

13   administer the drug.

14        Q.   Looking at the date of service report, I

15   mean, there's nothing close -- close on Patient

16   D.N. to a $400,000 charge; right?

17                  MS. BAUMERT:  I'm sorry.  The date

18            of service report --

19                  MR. THALKEN:  Yeah.

20                  MS. BAUMERT:  -- you mean 19- --

21            oh, that one --

22                  MR. THALKEN:  Yeah.

23                  MS. BAUMERT:  -- on her exhibit.

24                  MR. THALKEN:  On the back of her --

25                  MS. BAUMERT:  Yeah.

1          MR. THALKEN:  -- expert report.

2     Q.   I mean, as I look at this, the highest

3   charge here is $44,944.75.  I'm just trying to

4   understand what you're looking at and how you're

5   getting to the -- what the dispute was here.

6     A.   Because the -- the date of service

7   report --

8     Q.   Well, I don't think we need to recreate

9   this in this deposition but -- let's just, I

10   think, move on, might be the --

11     A.   I can't find what I'm looking for.

12     Q.   Well, as I read Exhibit 192, on Page 3

13   there's an entry for Debbie Nelsen for $2,850.61.

14   That's the claim amount.  And according to this,

15   TBG paid $2,071.37, leaving a balance-billed

16   amount of 779.24, of which then CVA paid $587.30

17   to resolve it, if I'm reading this correctly.  And

18   I guess my question for you is, is Exhibit 192 on

19   Page 3 when it talks about Debbie Nelsen, is that

20   the claim that you were reviewing?

21          MS. BAUMERT:  Objection; speculation,

22        form.

23     A.   I know the claim I reviewed had 840 [sic]

24   units on it and it was for multiple weeks.  I'd

25   have to go back and look at the --

1    Q.    Yeah.

2    A.    -- individual claim I pulled.

3    Q.    And I don't know that I've given you

4  every document, so I don't want to be unfair here.

5  I just -- I saw 480 on those and I didn't -- I

6  didn't know if that's what you were relying on.

7  But as I understand your testimony, we can't tell

8  from the stuff I've given you at this point.

9          But -- but to my question on Exhibit

10  192, do you know if on Page 3 where it says Debbie

11  Nelsen, $2,850.61, is that what you were reviewing

12  in your report?

13    A.    No, it's not, because --

14    Q.    Okay.

15    A.    Yeah.  No, it's not.

16    Q.    And how do you know it's not?

17    A.    Because -- I guess, no, what I should say

18  is I don't know for sure because I would have to

19  compare that to the actual claims that I reviewed.

20    Q.    Okay.

21    A.    Yeah.

22    Q.    Fair enough.

23    A.    Yeah.

24    Q.    At any rate, you recommended a discount

25  of 20 to 25 percent off of the -- well, what is

1    that off of?

2        A.    Average wholesale price, AWP.

3        Q.    Well, you said for the drugs I

4    recommended average wholesale pricing minus 25

5    percent.  Above that --

6        A.    Correct.

7        Q.    -- you said, I recommended a discount in

8    the range of 20 to 25 percent off billed charges.

9        A.    Right, for administering the drug.  Yep.

10       Q.    So administering the drug, 20 to 25

11   percent discount; the drug itself, average

12   wholesale price minus 25 percent.

13       A.    Minus 20 to 25 percent, correct.

14       Q.    Next entry, Number 11, K.D., is this Kim

15   Duerke, D-u-e-r-k-e [sic]?

16       A.    Correct.

17       Q.    Tell me what you did on this patient.

18       A.    On this one I actually did very little.

19   This patient sent in an EOB indicating that they

20   had a credit balance of this 1467.74.  I looked

21   through the outstanding claim files that -- that

22   we had and -- to see if I saw anything that was

23   owing.  I didn't see anything and so essentially

24   said the way it looks, there is a credit balance

25   of the 1467.74.  And unless a provider submits a

1  bill, it looks like there's a credit balance.

2      Q.   So this one had been processed correctly

3  in your view?

4      A.   I really couldn't tell.  I didn't have

5  enough information to know one way or the other.

6              (Deposition Exhibit 195 was marked.)

7                  MR. THALKEN:  Megan, this is CVA

8                  302477.

9      Q.   So I'm handing you, Ms. Reed, what's been

10 marked as Exhibit 195.  And is this the E-mail you

11 were referring to when it said K.D. sent Kutak

12 Rock an explanation of benefits indicating she had

13 a credit of 1,467.74?

14     A.   Yes.

15     Q.   Okay.  And then the second page --

16     A.   Yep.

17     Q.   -- of that is the EOB; correct?

18     A.   Correct.

19     Q.   And it shows employee's responsibility is

20 zero dollars.

21     A.   Correct, yep.

22     Q.   And the plan payment, it shows a credit

23 of $1,467.74.

24     A.   Correct.

25     Q.   And this member wanted to determine if

1    that credit amount to the plan was correct?

2         A.    Correct.

3         Q.    And so you -- Kutak Rock spent time

4    figuring out -- well, sending this to you;

5    correct?

6         A.    Correct.

7         Q.    And how much time did you spend reviewing

8    this?

9         A.    Half hour to an hour at the most.

10        Q.    Okay.  So -- and you're charging $350 an --

11        A.    Yes.

12        Q.    -- hour --

13        A.    Correct.

14        Q.    -- to tell the plan member that the plan

15    is owed a credit?

16        A.    Correct.

17        Q.    And Kutak Rock is billing legal fees to

18    confirm that the plan is owed a credit?

19                   MS. BAUMERT:  Objection; form,

20             foundation.

21        Q.    Do you think that's the best use of the

22    plan's funds, to spend money on a law firm and a

23    consultant to confirm that the plan is already

24    owed a refund which is what had been reported to

25    the plan?

1          MS. BAUMERT:  Objection; form,

2               foundation, exceeds the scope of her

3               report.

4      A.   There may have been a provider bill to

5  cover this.

6      Q.   But you don't know of one.

7      A.   No, but I was looking to answer the

8  question the member asked.

9      Q.   And you were charging for your time to do

10  that because -- I mean, usually if I get something

11  in the mail that says I'm owed a refund, I don't

12  hire a law firm and a consultant to verify that

13  the refund is owed.  I mean, is that normal?

14          MS. BAUMERT:  Objection; form,

15               foundation, exceeds the scope of her

16               report.

17     A.   We were simply trying to respond to the

18  member.

19     Q.   And this member, she was not balance

20  billed.

21     A.   Simply trying to respond to the member's

22  question.

23     Q.   And the member didn't say, hey, I've been

24  balance billed; right?

25     A.   The member's question was, can you tell

1    me what this is.  And we're trying to respond to

2    that.

3         Q.   Okay.  And so at $350 an hour, you tried

4    to respond to the member's question that, hey, I

5    got an EOB that says the plan is owed $1400.  Can

6    you verify that the plan is owed $1400?

7         A.   I believe --

8                   MS. BAUMERT:  Objection, form.

9         A.   -- I answered the question.

10        Q.   Is that what you did?

11                  MS. BAUMERT:  Form.

12        A.   I believe we did.

13        Q.   And you confirmed that, in fact, the plan

14   was owed $1400.

15                  MS. BAUMERT:  Form.

16        A.   Correct.

17        Q.   And how much money did it cost the plan

18   to determine that it was owed $1400?

19        A.   I don't know the specifics of that.

20        Q.   More than $1400?

21                  MS. BAUMERT:  Objection --

22        A.   I don't know.

23                  MS. BAUMERT:  -- form, foundation.

24        Q.   Number 12, looks like there's two

25   patients here.  G.S., is that Gary Sipe?

1     A.    It is.

2     Q.    And S.R., is that Shelby Rahe, R-a-h-e?

3     A.    Correct.

4     Q.    Okay.  And these are both claims with Via

5  Christi Health System?

6     A.    Correct.

7     Q.    You state in here, It was difficult to

8  find a person to work with at Via Christi.

9     A.    That's correct.

10    Q.    What did -- what do you mean by that?

11    A.    It was just -- it was difficult to get in

12  touch with an individual that would -- that you

13  could talk with that had the authority to do any

14  kind of negotiations.  As you went through their

15  billing office, the first response was, we don't

16  negotiate.  Then when you asked to speak with a

17  supervisor, if you got passed to a supervisor, the

18  supervisor wouldn't call back.

19         And so finally I was asked to try and

20  make contact with individuals I had worked with

21  there previously.  And so I actually ended up

22  making contact with a colleague of mine to try and

23  get some assistance to try and work through some

24  kind of a single case agreement.

25    Q.    Okay.  And looking at the bill, you

1  recommended a discount of 60 to 65 percent;

2  correct?

3      A.   Correct.

4      Q.   Did you think that the bill was -- that

5  the hospital was overcharging for the services?

6      A.   I did think the bill was high.  And I

7  also understood that from a health system

8  perspective and the size of the hospital that I

9  did not think that was an unreasonable discount.

10      Q.   Sixty to 65 percent was not unreasonable?

11      A.   Correct, due to the size of the facility.

12      Q.   How big is Via Christi?

13      A.   Via Christi is a -- I can't speak to

14  their -- to the total revenue.  I can tell you as

15  a health system, they are one of the larger health

16  systems within the region, in the Kansas City

17  region.

18      Q.   So this wouldn't be a rural hospital.

19      A.   No, it's not.

20      Q.   Okay.  If you want to flip over to

21  Exhibit 192, and let's look at this.  Are any of

22  these claims for Gary Sipe -- looks like there's

23  one maybe on Page 4, I'll direct your attention

24  to, for Via Christi.

25      A.   Yes.

```
 1      Q.    And is that -- is this the claim you were
 2   reviewing?
 3      A.    I don't have the specific dollar amounts
 4   written down, but I believe that it is, yes.
 5      Q.    If you look at your date of service
 6   report on the back of your expert report, there's
 7   an entry there for September 26, 2016, for date of
 8   service --
 9      A.    Yep.
10      Q.    -- for --
11      A.    Correct.
12      Q.    -- $33,089.34?  And does that match --
13   that doesn't match.
14      A.    It doesn't match.
15      Q.    Yeah.  That's the same date of service;
16   right?
17      A.    It is the same date of service; it is the
18   same claim.  I may have just recorded from a
19   different spot on the claim.  It is the same claim.
20      Q.    Okay.  And so of the amount billed, the
21   36,000, TBG had already paid 18,000?
22                MS. BAUMERT:  I'm sorry.  36,000?
23                MR. THALKEN:  I'm looking at the --
24           Exhibit 192.
25                MS. BAUMERT:  And what page are you
```

1          on?  I'm sorry.

2                MR. THALKEN:  Page 4.

3     A.   TBG had paid the 18,053.25?

4     Q.   Yes.  So that would be about a 50 percent

5  discount?

6     A.   Correct.

7     Q.   And your -- your opinion is that a

8  discount of 60 to 65 percent would be a good

9  discount.

10    A.   Correct.

11    Q.   And TBG had paid 50 percent.

12    A.   Uh-huh.

13    Q.   Is that a yes?

14    A.   Correct.

15    Q.   And then CVA on top of that paid another

16  $11,181.65 to settle the claim; correct?

17    A.   Correct.

18    Q.   It would be significantly less than 60 to

19  65 percent.

20    A.   Yes.

21    Q.   Would you assume for a moment that the

22  $18,000 payment made by TBG was done at the

23  recommendation of AMPS.  Okay?

24          You're calculating something here.

25  What's --

1     A.   I am.  Excuse me just a minute.

2         MS. BAUMERT:  You're asking for

3         percentages.

4     A.   Uh-huh.  Okay.

5     Q.   What did you just calculate there?

6     A.   What I -- what I was calculating was the

7 percentages in terms of the amount that was

8 balance -- balance billed in relationship to the --

9 to the amount of the discount that both TBG had

10 gotten for the amount of the claim that the -- the

11 discount that was given and the amount that the --

12 that -- essentially the member responsibility.

13     Q.   And what were those --

14     A.   And --

15     Q.   Well, okay.

16     A.   I didn't keep them.  But when I look at

17 the member responsibility and I look at -- yes,

18 TBG did calculate just over -- you know, close to

19 a 50 percent discount, but the member picked up a

20 large percentage as well.  So had we gotten closer

21 to that 60 percent percentage, the member would

22 have had a much smaller percentage that they would

23 have had responsibility for.

24     Q.   So what would a 60 percent discount on

25 billed charges be?

1    A.    That would have increased that by

2    another -- another $8,000.  Did I do that right?

3    Q.    Well, let me ask you another question.

4    A.    Yeah.

5    Q.    If CVA had gotten a 60 percent discount

6    off the billed charges, that would be a payment of

7    $22,013.60.

8    A.    Right.

9    Q.    And TBG had paid 18,053.20.

10    A.    Uh-huh.

11    Q.    And then CVA on top of that paid another

12    $11,181.65.

13    A.    Right.

14    Q.    So CVA didn't get a 60 percent discount

15    on this; isn't that true?  CVA didn't get a 60

16    percent discount?

17    A.    That's correct.

18    Q.    But the $18,000 payment that TBG did

19    make, was that reasonable for the charges?

20    A.    Yes, I mean, that's a good discount.  I

21    don't disagree with that.

22    Q.    Okay.  And then S.R. is the next one

23    within this group --

24    A.    Uh-huh.

25    Q.    -- Shelby Rahe?

1      A.   Yes.

2      Q.   And I'll refer you to Exhibit 192, Page 3.

3  Shelby Rahe, Via Christi, do you see that entry?

4      A.   Tell me again what page we're on.

5      Q.   Yeah.  Page 3, it's the second from the

6  bottom.  There's a Shelby Rahe.

7      A.   Right, yep.

8      Q.   Is that the claim you reviewed?

9      A.   It is.

10     Q.   Okay.  And it looks like the dispute on

11  this claim was over $474.13 out of total billed

12  charges of $13,868.98?

13     A.   Correct.

14     Q.   And ultimately it looks like CVA just

15  paid the full amount of the balance bill?

16     A.   Correct.  And the decision to do that was

17  because -- the thinking was that if that one were

18  paid, that there would have been a better outcome

19  on the -- on the Gary Sipe's case.

20     Q.   Kind of treat them as a package deal sort

21  of?

22     A.   Correct.

23     Q.   But on that one you still -- after paying

24  the additional 474, there was still a significant

25  discount off that --

1          A.    Correct.

2          Q.    -- bill.

3          A.    Yes.

4          Q.    Over 30 percent; right?

5          A.    Correct.

6          Q.    Next one, 13, Patient T.G., is that Terry

7     Granfield?

8          A.    Yes.

9          Q.    Okay.  And you say, T.G. is part of the

10    CHI claim negotiations.

11         A.    Uh-huh.

12         Q.    Kutak Rock asked that I validate the

13    negotiated rate being offered by CHI to ensure it

14    meets the intended 195 percent of Medicare.  The

15    rate being offered is in the form of a DRG payment.

16         A.    Uh-huh.

17         Q.    I expect to be able to make that

18    verification within the next week.

19         A.    Correct.

20         Q.    So a DRG payment, is that a

21    diagnosis-related group --

22         A.    It is.

23         Q.    -- payment?

24         A.    Correct.

25         Q.    And what's a DRG -- what does that mean

1   in laymen's terms?

2      A.   Essentially it's a case rate, so it's for

3   a specific period of time for an inpatient stay.

4   Remember when I talked earlier about the APC

5   payment for outpatient?  A DRG is the same type of

6   thing only for inpatient.  That case has since

7   been resolved.

8      Q.   Okay.  How was it resolved?

9      A.   I provided information back to Kutak Rock

10   indicating that the calculations were -- met

11   the -- met the -- met what they were looking for.

12      Q.   What calculations are you talking about?

13      A.   They were the intended 195 percent of

14   Nebraska Medicare.

15      Q.   Okay.  So at some point CVA entered into

16   a direct contract with CHI in which claims were

17   paid at 195 percent of Medicare?

18            MS. BAUMERT:  Objection, form and

19         foundation.

20      A.   I don't know the answer to that.

21      Q.   Okay.  Well, when you talked about the

22   negotiated rate being offered by CHI to ensure it

23   meets the intended 195 percent of Nebraska

24   Medicare --

25      A.   That was an agreement of some form

1    between CHI -- with CHI.  I can't speak to the

2    specifics of that.

3         Q.   Okay.  You don't know if it was finalized

4    or not --

5         A.   Exactly.

6         Q.   -- but you were --

7         A.   Right.

8         Q.   It was your understanding though that

9    there was a deal in the works, if you will, at 195

10   percent --

11        A.   Correct --

12        Q.   -- of Medicare.

13        A.   -- yep.

14        Q.   All right.  And this one will be

15   difficult.  Might need your help, Michaelle.  So

16   same exhibit, Exhibit 192, there's an Attachment C.

17   And about nine pages from the back of Exhibit

18   192 -- it looks like that (indicating).

19        A.   So it's after these --

20        Q.   It's nine from the back.  So start at the

21   back and go nine.

22        A.   Okay.

23                  MS. BAUMERT:  So this one there are

24             four yellow --

25                  MR. THALKEN:  Yeah.

1          MS. BAUMERT:  -- highlighted

2          entries, Terry Granfield, Randy Kelly,

3          Terry Granfield, Randy Kelly.  You can

4          just look at mine if you want.

5          THE WITNESS:  Okay.  All right.

6          I'll look at yours.  All right.  I'll

7          stop sorting.

8          MR. THALKEN:  That's fair enough.

9     Q.    So there's an entry on the page for Terry

10   Granfield.  Do you see that?

11        A.    I do.

12        Q.    Is that the claim you were reviewing for

13   him?

14        A.    41,000, yes.

15        Q.    Okay.  And then if you'd look at the next

16   page, it looks like it goes on, if you want to

17   flip the page.  There's some notes in there, 195

18   percent of Medicare per TBG.  Do you see that?

19   $7,855.32?

20        A.    Uh-huh.

21        Q.    Is that a yes?

22        A.    Yes.

23        Q.    Then there's CHI notes, DRG 236.  What

24   does that mean?

25        A.    Every -- every case, if you will, based

1    on the severity of the case is assigned a number

2    by Medicare.  And that tells you the -- the

3    weight, if you will, attached to that inpatient

4    stay.

5        Q.    Okay.  So did you do this spreadsheet?

6        A.    I did not.

7        Q.    Okay.  Do you think the $7,855.32 is the

8    accurate number for 195 percent of Medicare?

9        A.    I'd have to calculate it to check that.

10       Q.    So how does the DRG work versus 195

11   percent of Medicare?

12       A.    The way that works is that Medicare

13   assigns a -- Medicare assigns a weight.  Are we

14   talking this specific claim?

15       Q.    In general, I think.  I just -- I don't

16   fully understand --

17       A.    All right.

18       Q.    -- the DRG process versus 195.

19       A.    Every -- every case starts at a weight of

20   one, and so -- and then from there the DRG

21   severity works up.  So then the DRG is based on

22   its weight, so your conversion factor is then

23   multiplied times the weight assigned to that case.

24   So -- and your Medicare rate -- so it's your

25   Medicare rate times the weight.

1          So let's say I have a DRG at a weight

2     of one at $10,000 for an inpatient hospital stay.

3     And then there's a weight attached to -- in this

4     case it was DRG 303, all right, which is a cardiac

5     surgery.  So that weight is something greater than

6     one so then you're going to take my $10,000 times

7     195 percent.  So it's 95 times greater than one.

8     And that's how you're going to get 195 percent of

9     Medicare.

10         Q.    Okay.  You never saw the settlement

11    agreement or the direct contract with CHI though.

12         A.    Did not.

13         Q.    So you don't know if there's a DRG

14    provision in it or not.

15         A.    I don't.

16         Q.    Fourteen.  Yeah, go ahead.

17         A.    To be accurate though, I want to make

18    sure that what I'm stating is accurate.  On the

19    last claim that I did review, that is what I was

20    looking for, was the 195 percent of Medicare for

21    that claim.

22         Q.    And that's the Granfield claim that we're

23    talking about?

24         A.    Correct.

25         Q.    Fourteen on your report.

1    A.    Yes.

2    Q.    You talked about Kutak Rock negotiating

3    with CHI?

4    A.    Correct.

5    Q.    You weren't actively involved in the

6    direct negotiations; correct?

7    A.    I was not.  Typically what would happen

8    is if there was a case they were negotiating on, I

9    would be consulted on occasions that says we have

10   lab cases that we're reviewing and here's the

11   approach we are planning to take.  Does that seem

12   reasonable?  And -- so that was really the extent

13   of it.

14   Q.    Okay.  Let me go back to 13 before -- you

15   said, I expect to be able to make that verification

16   in the next week.  You did --

17   A.    I did complete that.  That is complete

18   now.

19   Q.    Okay.  And then is that --

20   A.    Yes.

21   Q.    -- did you just talk to Kutak Rock about

22   it or what did you do?

23   A.    Correct, yes.

24   Q.    Is there any document about it or --

25   A.    I passed back the same form that they

1    gave me and explained the numbers that were on the

2    form.

3        Q.   Okay.  Did you create any spreadsheets

4    regarding the CHI 195 percent --

5        A.   Did not --

6        Q.   -- figures?

7        A.   -- no.

8                    MR. THALKEN:  I believe those are

9               all the questions I have.  Thank you.

10                   THE WITNESS:  Okay.  You're welcome.

11                   MS. BAUMERT:  Let's take a quick

12              break.

13                   (A discussion was held off the record.)

14                   (A recess was taken from 12:32 p.m. to

15              12:45 p.m.)

16                        DIRECT EXAMINATION

17   BY MS. MITCHELL:

18       Q.   Ms. Reed, my name is Megan Mitchell; I

19   represent AMPS and CDS in this matter.  I want to

20   go back to some of your prior testimony about

21   experience with RBR plans.  And when I say RBR,

22   you understand that to mean reference-based

23   reimbursement; correct?

24       A.   Correct.

25       Q.   Have you worked with an RBR plan since

1   2004, or was that the last experience that you had

2   with -- with an RBR plan?

3       A.   That is my last experience in terms of

4   working with one.

5       Q.   Okay.  Are you aware of the differences

6   in various types of RBR products?

7       A.   Yes, I am.

8       Q.   Can you explain what you mean?

9       A.   I understand -- my understanding with an

10  RBR product is that contracts -- contracts do not

11  exist with providers, that what is paid to a

12  provider is considered usual and customary for

13  services that are rendered to a member, and that

14  if the provider does not accept that as full

15  payment, then the members are balance billed.

16      Q.   And is it your understanding that it

17  would be the hospital's decision whether to

18  balance bill a member; correct?

19              MS. BAUMERT:  Objection; form,

20          foundation.

21      A.   I do understand it's the hospital's

22  decision; however, there is not a hospital that

23  won't balance bill.

24      Q.   On all of the claims that you've reviewed

25  then for these 14 patients, you understood that

1  they had all received a balance bill; correct?

2      A.    I can't -- I can't speak to that because

3  I didn't review the entire -- the entire

4  situation.  All I reviewed were individual claims.

5      Q.    So some of these patients may not have

6  received a balance bill then?

7      A.    I don't -- I don't know that specifically.

8      Q.    Okay.  And I believe you said that as

9  your understanding of RBR works, a contract with a

10  hospital does not exist.  Is that your testimony?

11      A.    Yes, it is.

12                  MS. BAUMERT:  Objection; form,

13              foundation, exceeds the scope.

14      Q.    So is it your understanding that if a

15  plan adopts an RBR program, there would not be

16  direct contracts with hospitals prior to adoption

17  of an RBR program; correct?

18      A.    (Witness nodded head.)

19                  MS. BAUMERT:  Objection; form,

20              foundation, exceeds the scope of her

21              report.  You're going to have to answer.

22              She definitely can't hear you when

23              you're nodding.

24      A.    That -- that's my understanding.

25      Q.    That no direct contracts are in place

1 prior to implementing an RBR plan; right?

2             MS. BAUMERT:  Same objection.

3     A.   Correct.

4     Q.   And do you have any familiarity with RBR

5 products in Nebraska as of 2015 or 2016?

6     A.   I do not.

7     Q.   Are you aware that there are at least

8 eight groups that are using RBR programs in

9 Nebraska working with AMPS and TBG currently?

10    A.   I'm not aware of that.

11    Q.   So you didn't talk to any of those groups

12 about their experiences with RBR as part of the

13 scope of your expert report in this case?

14    A.   I did not.

15    Q.   Are you aware that some claims that AMPS

16 handled for CVA were done in the 2015 plan year?

17             MS. BAUMERT:  Objection to the form.

18    A.   The claims I reviewed were 2015, 2016 and

19 then run-out for 2017.

20    Q.   Okay.  Did you understand that CVA was a

21 participant in a traditional PPO network for the

22 2015 plan year?

23    A.   Yes, I did.

24    Q.   And did you understand that CVA

25 contracted with AMPS to provide medical bill

1  review services for the 2015 plan year?

2      A.   Yes, I did.

3      Q.   Did you review the MBR agreement as part

4  of your expert report?

5      A.   Yes.  Yes, I did.

6      Q.   And did you review the MBR -- the MBR

7  agreement while you were looking at claims that

8  had a 2015 date of service?

9            MS. BAUMERT:  She's saying MBR.

10     A.   By MBR, do you mean medical bill review?

11     Q.   I do, yes.

12     A.   Okay.  I did not review that while

13  looking at claims.

14     Q.   Okay.

15            MS. MITCHELL:  And if someone has a

16            copy of the exhibits that have previously

17            been marked in this case, the MBR

18            agreement has previously been marked as

19            Exhibit 16.  Is someone able to show

20            that exhibit to Ms. Reed?

21            MR. THALKEN:  Yes, we have it.  Okay.

22            It's in front of her.

23     Q.   So, Ms. Reed, is this -- is this a copy

24  of the MBR agreement that you looked at in

25  connection with your expert report?

1    A.    Yes, it is.

2    Q.    Okay.  So if you look at Section 2.4 of

3    the MBR agreement, do you see that?

4    A.    I do.

5    Q.    And it says, Client shall give AMPS full

6    authority to act on its behalf during the various

7    stages of an appeal of a claim payment reduced

8    based on a recommendation by AMPS and continuing

9    through the finalization of such appeal.  Do you

10   see that?

11   A.    I do.

12   Q.    Did you ever review that language in

13   connection with your recommendations made to the

14   plan in connection with this case?

15             MS. BAUMERT:  Objection; asked and

16             answered, form.

17   A.    I did review that prior to reviewing

18   claims and indicated that I thought it was

19   problematic and language that should cause great

20   concern to the employer and to the plan.

21   Q.    And why is that?

22   A.    Because it abdicates the plan's

23   responsibility to an outside third party.  And the

24   employer is -- and the plan, excuse me, as a

25   self-funded plan are ultimately responsible for

1    the dollars that get spent.

2        Q.   So is it your opinion that the plan

3    violated a duty by engaging AMPS to perform

4    medical bill review?

5                  MS. BAUMERT:  Objection; form,

6              foundation, exceeds the scope of the

7              report.

8        A.   I'm not talking about abdicating

9    responsibility.  I'm talking about the best

10   interest of the plan.

11       Q.   I'm not sure I understand your answer.

12   You said -- I believe you testified earlier that

13   the plan abdicated its responsibility by giving

14   responsibility to a third party.

15       A.   No, I don't believe --

16       Q.   I'm trying to understand your answer.

17       A.   I don't believe I said that they

18   abdicated responsibility.  I said I didn't believe

19   it was in their best interest to allow someone

20   else to have full authority.

21       Q.   And did you read Section 2.5 of the MBR

22   agreement which says that if for any reason client

23   does not allow AMPS to conduct and control an

24   appeal that contests a recommended reduction by

25   AMPS, there will be no adjustment to the fees paid

1    to AMPS for its review of the claim, and it goes

2    on.  Do you see that language?

3        A.    I do.

4        Q.    So is it your understanding that the

5    client could make its own decision on an

6    additional payment amount?

7                    MS. BAUMERT:  Objection; form,

8              foundation.

9        A.    I do see that.

10       Q.    And did you take a look at Attachment A

11   to the MBR agreement?  Are you familiar with this

12   Attachment A?

13       A.    Yes.  I'm looking at it right now.

14       Q.    Did you look at Attachment A when you

15   were making recommendations on any of the claims

16   for the 14 patients that we've talked about today?

17       A.    I did not.

18       Q.    When did you look at Attachment A?

19       A.    I looked at Attachment A when I reviewed

20   the medical bill review document in the very

21   beginning of my engagement.

22       Q.    Was that prior to the lawsuit being filed

23   in this case?

24                   MS. BAUMERT:  Objection; form,

25              foundation.

1     A.    I can't speak to that specifically.  It

2  would have been in sometime mid to late September.

3     Q.    Of what year?

4     A.    Actually it would have been early

5  October -- October 9th of '17.

6     Q.    Okay.  So you first looked at this

7  document in October 9th of -- on or around October

8  9th of 2017.

9     A.    Correct.

10     Q.    And do you see Paragraph A that discusses

11  percentage of savings, fees and compensation?

12     A.    I do.

13     Q.    So did you understand that CVA was

14  retaining 70 percent of the savings on any claims

15  that AMPS reviewed?

16              MS. BAUMERT:  Objection; form,

17          foundation, exceeds the scope of her

18          report.

19     A.    I do understand that.

20     Q.    And that if -- if a claim is subsequently

21  successfully challenged in the appeals process by

22  the provider and a higher adjusted charge is

23  recommended by AMPS and paid by client, then upon

24  receipt by AMPS of verification of such payment

25  and a copy of the applicable revised or

1  supplemental explanation of payment, AMPS shall

2  credit or reimburse TPA for the account of client

3  for such proportionate amount of percentage of

4  savings fees previously paid or currently due to

5  AMPS.  Do you see that in Section B?

6      A.    I do.

7      Q.    So did you understand that CVA would

8  receive a refund on AMPS's savings if it complied

9  with Paragraph D?

10              MS. BAUMERT:  Form, foundation,

11          exceeds the scope of the report.

12      A.    I -- I do see these provisions.  My

13  review of this document was -- was not for the

14  purpose of making an evaluation about the specific

15  terms that the two organizations had set forth

16  but, rather, to look at a type of arrangement that

17  an employer typically has in place, the type of

18  partnership an employer typically has in place

19  with a third-party administrator for a self-funded

20  plan.

21      Q.    Okay.  So when you were looking at a

22  claim with a date of service of 2015 later on

23  after October of 2017, did you discuss with Kutak

24  Rock or anyone else the provisions on Attachment A

25  to the MBR agreement?

1          MS. BAUMERT:  Objection; form,

2              foundation, scope of the report.

3      A.    I did not.

4      Q.    And then for the vast majority of the

5  claims that you looked at, they had dates of

6  service in 2016; correct?

7      A.    Correct.

8      Q.    As you were reviewing these claims, did

9  you look at the plan document for 2016?

10     A.    Yes, I did.

11     Q.    When did you look at the plan document?

12     A.    I looked at the plan document as I was

13  reviewing specific claims to determine whether or

14  not there was a -- something was a covered

15  service.

16     Q.    Did you look at the permitted payment

17  levels adopted in the plan document?

18     A.    I did.  Specifically there was a case

19  that dealt with maximum payment amounts for

20  prescription drugs, and that is noted in my -- in

21  my report.  It's for -- I'll have to -- let me

22  check here to see which member.  It's actually on

23  Page 10 of my report for the -- for the first

24  patient where it talks about the pharmaceutical

25  payments and there being restrictions relative to

1    what the calculations need to be limited to.

2         Q.   Okay.

3                   MS. MITCHELL:  And if I could have

4              someone show Ms. Reed Exhibit 8 that has

5              previously been marked in this case.

6         A.   Yes.

7         Q.   Ms. Reed, is this Exhibit 8 a copy of the

8    plan document and summary plan description that

9    you reviewed as discussed on Page 10 of your

10   report?

11                  MS. BAUMERT:  I think she's going

12             to have to look at it to see.

13                  MS. MITCHELL:  Sure.

14        Q.   And if it helps, on the very last page of

15   this exhibit, it appears to have been signed by

16   Tim Esser on January 19th, 2016.

17                  MS. BAUMERT:  I will say, Megan,

18             that she identifies in her report a

19             Bates number, CVA 1, as where her --

20             where the plan document began in her

21             report.  So, as you know, there are

22             sometimes several iterations of the same

23             document, and the document is produced

24             by each party.  And the one that you're

25             pointing to is a TBG marked document.

1          MS. MITCHELL:  Sure.

2     A.    And I -- I don't have with me the

3     complete document sum- -- summary plan document

4     that I reviewed.  I do have a portion of it with

5     me.  The cover page is the same, but beyond that I

6     can't say specifically it's the exact document.

7     So I guess I would refer you to the reference in

8     my report.

9     Q.    Okay.  Thank you.

10           In the portion of the report that you

11    have with you of the plan -- I'm sorry.  Do you

12    have Page 42 and 43 of the plan document?

13    A.    I do not.  I go to Page 30.

14    Q.    So you don't have anything after Page 30?

15    A.    Not with me.

16    Q.    Okay.  Do you have Page 4 of the plan

17    document?

18    A.    I do.

19    Q.    Do you see a provision that says balance

20    billing?

21    A.    I do.

22    Q.    Do you see that that provision says,

23    Again, the plan has no control over any network

24    provider that engages in balance-billing

25    practices, except to the extent that such

1   practices are contrary to the contract governing

2   the relationship between the plan and the network

3   provider.  Do you see that?

4        A.    I do.

5        Q.    Did you review that provision of the plan

6   document in connection with your work on this

7   case?

8        A.    I did.

9        Q.    When did you review this provision?

10       A.    I can't say specifically when I reviewed

11  it.  I do know I reviewed it because I have it

12  circled.

13       Q.    Okay.  And does that provision of the

14  plan document -- is it reflected in any of your

15  expert opinions in this case?

16       A.    It -- it is not because it -- it's not.

17       Q.    So you didn't rely upon this provision in

18  forming any of your expert opinions in this case?

19                 MS. BAUMERT:  Objection; asked and

20              answered, form.

21       A.    In my -- in my expert opinion I do speak

22  to balance billing, and I speak to that -- I

23  reference it in the -- the sixth from the bottom

24  sentence on Page 6.  And I also referenced it on

25  Page 7 under Letter B.

1    Q.   Was it -- is it your opinion that any

2    hospital that balance billed a patient was acting

3    in violation of the plan document?

4              MS. BAUMERT:  Objection; form,

5              foundation, exceeds the scope of her

6              report.

7    A.   I was not connecting the two.

8    Q.   Do you have an opinion on that sitting

9    here today?

10             MS. BAUMERT:  Objection; form,

11             foundation, exceeds the scope.

12   A.   Can you ask that question again?

13             MS. MITCHELL:  Would the court

14             reporter mind reading that back, please?

15             (The last question was read by the court

16             reporter.)

17   A.   The provider has no tie to the plan

18   document or to the plan because they have no

19   contract.  So there would be nothing to be in

20   violation of.  I mean, they have no relationship

21   with you.

22   Q.   So is it your opinion that any of the

23   terms of the plan document don't govern payment

24   made by the plan to providers?

25             MS. BAUMERT:  Objection; form,

1               foundation, exceeds the scope.

2     A.   They have no relationship with you, they

3 have no contract.

4     Q.   I would like for you to turn to Page 42

5 of Exhibit 8.

6            MS. MITCHELL:  And, Michaelle, also

7           the CVA 0001 document that I have is not

8           a copy of the plan document.  So unless

9           you have that in the room, I'll use

10          Exhibit 8.

11          MS. BAUMERT:  Okay.

12    A.   Okay.  I'm on Page 42.

13    Q.   Do you see the permitted payment level

14 provision at the bottom of the document?

15    A.   Yes, the last -- yep.  The last sentence

16 there?

17    Q.   Right.  And if you flip to Page 43, the

18 plan document shows that the permitted payment

19 level for inpatient covered services shall be

20 based upon 160 percent of the Medicare allowable

21 IPPS amount for the covered services or, if

22 greater, 135 percent of the cost of the covered

23 services.  Do you see that language?

24    A.   I do.

25    Q.   Did you review this language in

1  connection with any of the 14 patient claims that

2  you reviewed in this case?

3      A.   I did not.

4      Q.   Did you review this language at any time?

5      A.   I -- I can't say specifically.  Yeah, I

6  can't say specifically that I did.

7      Q.   So you don't have any recollection of

8  reviewing this language on Page 43 of the plan

9  document then.

10     A.   I don't.

11     Q.   Okay.  And then if you turn to Page 70

12  of -- of Exhibit 8, the plan document.

13     A.   (Witness complies.)  Okay.

14     Q.   There's a provision called basis for

15  benefit adjustment at the bottom of the page.  Do

16  you see that?

17     A.   I do.

18     Q.   There's language there that says, The

19  claims delegate may, in its sole discretion,

20  increase reimbursement for allowable expenses

21  included in such hospital or facility claim by up

22  to 30 percent of the amount of the permitted

23  payment levels set forth above.  Do you see that?

24     A.   I do.

25     Q.   Did you review this language at any time

1    when you were making recommendations on claims for

2    the 14 patients discussed in your expert report?

3         A.   I did not.

4         Q.   Have you reviewed this language at any

5    time?

6         A.   I -- I cannot -- I can't recall if I did

7    or not.

8         Q.   So you don't have any recollection of

9    reviewing the language in this basis for benefit

10   adjustment provision --

11        A.   I don't.

12        Q.   -- in the plan.

13        A.   I don't.

14        Q.   So if you read this language now, I

15   understand that you may not have seen this before,

16   but looking at the basis for benefit adjustment

17   language and turning back to the permitted payment

18   level provision on Page 43 of the plan document,

19   this appears to allow payment at up to 208 percent

20   of Medicare on a hospital or facility inpatient

21   claim.  Would you agree with that?

22             MS. BAUMERT:  Objection; form,

23           foundation, exceeds the scope.

24        A.   So you're saying the 180, plus at the

25   discretion an additional 30.

1    Q.   The 160 plus the --

2    A.   Or I'm sorry.

3    Q.   -- additional 30.

4    A.   That's a 60?

5          MS. BAUMERT:  Yeah, that's 160.

6          THE WITNESS:  Okay.

7          MS. BAUMERT:  And she's asking you

8        whether 160 plus 30 --

9    A.   160 and 30 is 190; right?

10   Q.   Thirty percent of 160.

11   A.   Ah, okay.

12   Q.   And add that on to the 160.

13   A.   Okay.

14   Q.   Does that equal 208 percent?

15        MS. BAUMERT:  Objection; form,

16       foundation, scope.

17   A.   It would.

18   Q.   That's just a math question.

19   A.   Yeah, yeah.  Yes.

20   Q.   Okay.  So in connection with any of your

21 work on this case, did you ever evaluate whether a

22 payment was made below or above 208 percent of

23 Medicare?

24   A.   I -- I did not.  But I can tell you that

25 in looking at the 195 percent, most of my

1    recommendations were above that because a number

2    of the facilities that -- where care was delivered

3    are rural facilities.  And most of them, even for

4    Medicare, are recognized as -- as facilities that

5    cannot take -- that are entitled to additional

6    payments.

7         Q.    Okay.  And 204 -- 208 percent is higher

8    than 195 percent of Medicare; correct?

9         A.    Correct.

10        Q.    And that's -- that is the amount that CVA

11   agreed to pay the CHI hospitals.  Is that your

12   understanding?

13        A.    Correct.

14        Q.    Okay.  Can you turn to Page 75 of Exhibit

15   8, please.

16        A.    (Witness complies.)  Okay.

17        Q.    Do you see the section entitled Assignment?

18        A.    I do.

19        Q.    Okay.  And if you look at the third

20   paragraph under Assignment, do you see the

21   language that says, Any provider who has accepted

22   assignment of benefits and/or payment of benefits

23   from the plan and then pursues recovery from the

24   claimant, on any legal or equitable theory, shall

25   be acting in violation of this plan and shall be

1    required to immediately refund in full any and all

2    amounts paid to such provider by or on behalf of

3    the plan in connection with the claim in question.

4    Do you see that?

5        A.   I do.

6        Q.   Did you review this language in

7    connection with any of the recommendations that

8    you made on claims involving the 14 patients that

9    are discussed in your expert report?

10        A.   I did not.

11        Q.   Did you review this language at any other

12    time?

13        A.   Not that I recall.

14        Q.   Are you aware of whether anyone advised

15    the plan to seek a refund of any and all amounts

16    paid to any provider that balance billed a patient?

17        A.   Not -- I don't know.

18        Q.   Okay.  Did you ever recommend to Kutak

19    Rock or to the plan that it should enter into any

20    direct contract?

21        A.   Yes.

22        Q.   Can you tell me about that recommendation?

23        A.   There were two situations where direct

24    contracts were considered.  One of them was with

25    the -- for Patient Number 8, Erica Long, at

1    Hutchison [sic] Regional Medical Center.  We also

2    then for Via Christi, however, that one did not

3    come to fruition.

4        Q.    So for patient E.L. -- when you say a

5    direct contract, do you mean a single case

6    agreement?

7        A.    A single case agreement, yes.

8        Q.    Okay.  So you're not referring to a

9    direct contract between the CVA plan and the

10   provider that would govern claims other than that

11   single claim.

12       A.    Correct.  We -- yes.  In each situation

13   that I referenced, they were single case

14   agreements, they were not ongoing direct employer

15   and -- employer and plan contracts.

16       Q.    Did you have any involvement at all in

17   recommending that the plan enter into any direct

18   contracts between the employer group and the

19   provider?

20       A.    I did not.

21       Q.    I want to understand who you spoke with

22   about the recommendations that you made on the

23   claims in your expert report.  Other than Kutak

24   Rock, did you speak with anyone at CVA about your

25   recommendations?

1     A.    I did not.

2     Q.    Okay.  So you only spoke with Kutak Rock.

3     A.    That's right.

4     Q.    And I know we've talked about this a

5  little bit, but you didn't have any understanding

6  of whether a patient -- one of the 14 patients in

7  your report had received an invoice or a balance

8  bill as opposed to a collection notice as opposed

9  to a lawsuit; is that right?

10    A.    Only if the patient referenced it in the

11  material that they sent.

12    Q.    So otherwise you had no idea of the

13  status of the claim in terms of whether it was an

14  invoice all the way up to a lawsuit.

15    A.    Correct.

16    Q.    Would that information change the way you

17  would evaluate the claim?

18    A.    I -- I don't -- I don't think so.

19    Q.    So for purposes of the recommendations

20  that you made, it didn't matter whether the

21  patient had just received an invoice from the

22  hospital as opposed to whether the patient had

23  received -- had been named in a balance billing

24  lawsuit.  Those cases should be treated equally.

25  Is that -- is that what I understand you to be

1    saying?

2        A.    Not necessarily, because there were times

3    when a patient received -- their bill had been

4    turned over to the -- to a collection agency.  And

5    so the -- the recommendation would be to -- rather

6    than go to the collection agency, to still contact

7    the hospital to do those negotiations and attempt

8    to negotiate with the hospital rather than the

9    collection agency.

10       Q.    So is it your understanding that there

11   were times that a collection agency notice was not

12   responded to?

13       A.    When you say not responded to, are you

14   talking about not responded to by the patient

15   or -- I'm not sure I understand.

16       Q.    Well, I'm only asking you what you know.

17   So you said that you were aware of an -- of

18   instances where a patient would receive a

19   collection notice, but you or others acting on

20   behalf of CVA would contact the hospital, not the

21   collection agency; is that right?

22       A.    That would be my recommendation.  I can't

23   tell you if that was the way that it went.

24       Q.    And why would that be your recommendation?

25       A.    Because if -- in my experience if you're

1    able to negotiate still directly with the

2    hospital, you can avoid the fees that a collection

3    agency would pay if you can get the hospital to

4    pull that account back from the collection agency.

5        Q.   Was -- it would be possible for the

6    collection agency to pursue a lawsuit if no one

7    responded to the collection agency though; right?

8        A.   Well, I -- I suspect.  I mean, it's pure

9    speculation, but I -- I doubt that they were ever

10   left totally hanging.

11       Q.   And what makes you say that?

12       A.   Because the -- the member did not come

13   back with a follow-up situation asking for

14   assistance.

15       Q.   And did you ever try to evaluate in the

16   situation where a collection notice was received

17   whether the collection agency had actually

18   purchased the debt from the hospital as opposed to

19   just collecting a debt on the hospital's behalf?

20       A.   Did not.

21       Q.   Okay.  Are you aware that there's -- that

22   that difference exists?

23       A.   Yes, I am.

24       Q.   Did you ever -- have you ever spoken to

25   anyone at AMPS in connection with your

1  recommendations made on claims in this case?

2      A.   Have not.

3      Q.   Have you ever spoken with anyone at AMPS

4  ever?

5      A.   No, not that I'm aware of.

6      Q.   Have you ever spoken with anyone from CDS

7  in connection with your work on this case?

8      A.   Again, no, not that I'm aware of.

9      Q.   Have you ever spoken with anyone from CDS

10  ever?

11      A.   No.

12      Q.   Did anyone ever give you any instruction

13  about whether to contact AMPS or CDS about any of

14  the claims that you reviewed in this case?

15      A.   No, they did not.

16      Q.   Did it ever occur to you to contact AMPS

17  or CDS about these claims?

18      A.   No.  I mean, I didn't have a reason to.

19      Q.   Are you offering any opinion on whether

20  AMPS or CDS handled a claim incorrectly?

21      A.   I'm not.

22      Q.   So you -- you do not have an opinion that

23  AMPS handled any claims incorrectly in this

24  matter.

25      A.   That really was not the scope of my

1    engagement.

2        Q.    Okay.  So -- and it is -- so you are not

3    expressing the opinion that AMPS handled any

4    claims incorrectly in this case.

5        A.    I -- yeah, I did not review for that.

6        Q.    And so you're also not expressing an

7    opinion that CDS handled any claims incorrectly in

8    this case.

9        A.    Again, I didn't review for that.

10       Q.    And the scope of your review was to

11   determine what additional amounts should be paid

12   on the claims that you reviewed?

13       A.    That and to validate that the claims

14   submitted were accurate.

15       Q.    As submitted by the hospital; correct?

16       A.    Right, the hospitals or other providers.

17       Q.    Okay.  And so it wasn't the scope of your

18   review to determine whether a claim was paid in a

19   manner inconsistent with the plan document then.

20                    MS. BAUMERT:  Objection, form.

21       A.    Occasionally, yes.  If there was a

22   noncovered service that was being billed for, I

23   would identify that so that those charges were

24   not -- were not paid for if they were member

25   liability.

1    Q.   I see.  So you looked at the plan

2  document to determine whether a hospital was

3  attempting to recover on an inappropriate charge.

4    A.   Correct.  And if you look at patient --

5  Valley of Hope.

6              MS. BAUMERT:  L.M.?

7              THE WITNESS:  Yes.

8    A.   If you look at Patient L.M., I think he's

9  like Number 4.

10             MS. BAUMERT:  He is.

11   A.   Yeah, he's Number -- Patient Number 4,

12  Lucas Meyers [sic].  You'll note that that's a

13  combination of both covered and noncovered charges

14  in that claim review.

15   Q.   Right, I see that.  But you were not

16  reviewing claims to determine whether they were --

17  they had been previously paid in a manner that was

18  inconsistent with the terms of the plan document;

19  right?

20             MS. BAUMERT:  Objection, form.

21   A.   I mean, it was -- it was kind of all

22  simultaneous.

23   Q.   Right.  And I'm just trying to figure out

24  whether you were looking at the amount that had

25  been previously paid on these claims to determine

1   whether those amounts were paid in accordance with

2   the terms of the plan document.

3       A.   So -- so, yes, I did look at amounts that

4   had been previously paid, depending upon when the

5   billing came in.  So it was that total episode of

6   care that I reviewed.

7       Q.   Did you ever question the amount that had

8   previously been paid on the claim?  That's what

9   I'm trying to get at.  I understand that that was

10  part of determining what additional amount, if

11  any, should be paid.  But did you ever reach the

12  conclusion that the amount that had previously

13  been paid was incorrect for any reason?

14      A.   I did not.

15              MS. BAUMERT:  Objection, form.

16      Q.   Okay.  Do you have any understanding of

17  how a percentage of Medicare would relate to the

18  prevailing PPO rate for plans in Nebraska?

19              MS. BAUMERT:  Objection; form,

20          foundation, scope of the report.

21      A.   Yeah, it's difficult to -- it's difficult

22  to say as a percent of Medicare because it's --

23  very few contracts that I'm familiar with in

24  Nebraska are written as a percent of Medicare.

25      Q.   And so if -- if a general discount for a

1   PPO contract is 25 percent off of billed charges,

2   for example, do you have any way of determining

3   how a 25 percent discount off of billed charges

4   might relate to a percentage of Medicare?

5              MS. BAUMERT:  Form, foundation,

6           scope of the report.

7       A.   Yes, with some -- you know, with some

8   time you can back into that.  I mean, it's -- but,

9   I mean, you need to have some other numbers to be

10  able to do that.  It's just -- you need volumes

11  and --

12      Q.   So when that --

13      A.   You need volumes and --

14      Q.   I'm sorry.  Go ahead.

15      A.   You need volumes and you need -- you need

16  weights and you need to know whether it's

17  inpatient or outpatient.  It's not -- it's not a

18  simple calculation, 20 percent discount equals X

19  percent of Medicare.

20      Q.   Sure.  So, for example, with the CHI

21  agreement that was done at 195 percent of Medicare --

22      A.   Uh-huh.

23      Q.   -- do you have any understanding of what

24  the PPO rate might be with CHI, for example, to

25  use as a comparison?

1     A.    I do not.

2               MS. MITCHELL:  I think that's all I

3          have.  Thank you.

4               THE WITNESS:  Okay.  Thank you,

5          Megan.

6               MS. VOGT:  I have just a few, and

7          mine are kind of from the macro level.

8               THE WITNESS:  Okay.

9                    DIRECT EXAMINATION

10    BY MS. VOGT:

11    Q.    When you were working with Kutak Rock,

12    would they contact you about a specific claim and

13    then you give them a recommendation and then they

14    deal with the hospital to try and get that result?

15    A.    Uh-huh.  Typically they would send me a

16    list of claims that needed to be reviewed or a

17    list of individuals that needed to be reviewed,

18    and then I would start to review the correspondence

19    and the claim files and then provide updates on

20    those as I finished my reviews.  And then they

21    would have the communication back with the

22    respective providers.

23    Q.    Did you review claims other than the ones

24    that are addressed in your report?

25    A.    Did not.

1    Q.   Were you ever provided with the results

2  that Kutak actually achieved?

3    A.   I did not.

4    Q.   Do you do the same kind of consulting for

5  other plans, examining claims and making a

6  recommendation?

7    A.   I do on -- on occasion, not -- not in the

8  exact same manner.  I do it -- I've done it more

9  for audit purposes where employers have asked me

10  to come in and audit claims to be sure that

11  they're being paid according to contracts and

12  being paid appropriately.

13    Q.   So more of a reconciliation?

14    A.   More of a reconciliation.  And then --

15  yeah, I would say it's probably more of a

16  reconciliation.

17    Q.   When you do that, is it in conjunction

18  with an attorney or just administrators?

19    A.   Can be both.  Depends on the reason why

20  the employer is asking for it.

21    Q.   What things did you take into consideration

22  when you looked at each one of these claims?

23    A.   I took -- I took into consideration the

24  place of service, so where -- where it was billed,

25  because that -- there are specific billing

1  requirements as a -- if you're a hospital, a

2  clinic, an outpatient center, if you're a

3  stand-alone outpatient center.  So there's a

4  specific code, place of service 11, place of

5  service 21, 22.  So I took that into

6  consideration.

7          Then I looked at the CPT codes so -- to

8  be sure that the service that was provided matched

9  the CPT code that was billed.  If there were

10  pharmaceuticals that were provided, then I looked

11  at the J codes and I -- I actually looked up the

12  drugs that were provided to make sure that the --

13  essentially the -- the charges that were being

14  provided were reasonable given the cost of drugs

15  these days.  Then made sure that those billings

16  for those were appropriate.

17          Oftentimes, if there were multiple

18  providers that were involved, I looked to be sure

19  that -- that there weren't duplicate charges

20  similar to the one that I mentioned in the Sioux

21  City market.  Then from there I essentially

22  reconciled to be sure that they -- the billing was

23  accurate.  From there, then depending upon what

24  each particular member was looking for,

25  investigated that particular claim to try to get

1    to the resolution.  So, you know, were they

2    looking to see is this something that I owe?  I

3    would sometimes do the reconciliation on what had

4    already been paid, what's the member's deductible,

5    had that been satisfied?

6              So it would be a matter of going back

7    and reconstructing what had been billed, what had

8    been paid and what the remaining balance was.  And

9    then based on that, depending upon the service

10   that was -- it was outstanding on, would make a

11   recommendation back to Kutak Rock how they

12   would -- or what they could try and obtain for a

13   discount.

14   Q.    And I -- it appeared to me from your

15   report that the majority of your recommendations

16   fell somewhere between 20 percent and 60 percent.

17   A.    That's correct.

18   Q.    What were the main factors that would

19   make a difference between a 20 percent

20   recommendation --

21   A.    Uh-huh.

22   Q.    -- and a 60 percent?

23   A.    It would -- it would fall into a couple

24   of different categories.  One of that would be

25   place of service.  Another would be type of

1    provider.  And the -- the last one would be then

2    the -- type of service, the provider type, and

3    then the other would be the service -- the service

4    itself.  So if it's -- for example, on the

5    oncology drugs, I happen to know -- or when you're

6    dealing with drugs in particular, I happen to know

7    that there's a large markup.  If you're dealing

8    with imaging services, imaging services are a very

9    profitable -- imaging and lab are very profitable

10   services within a hospital setting, as are

11   outpatient services.  Those are very profitable

12   areas so typically you can have a larger discount

13   there.

14          If you're dealing with physician

15   services, in physician services you'll typically

16   see around a 40 to a 45 percent discount.  In a

17   hospital setting, a lot of times you'll see

18   somewhere around that 50 percent mark.  Again, it

19   depends upon the size of the group and it depends

20   upon whether or not that's a direct contract, size

21   of the group.  And so all of those things get

22   taken into consideration.

23       Q.   Towards the beginning of your testimony

24   you said that the health care group that you used

25   to work for --

1     A.    Uh-huh.

2     Q.    -- refused any claim from TPAs trying to

3  use reference-based reimbursement.

4     A.    Correct.

5     Q.    Do you recall if those programs were

6  based on a percentage of Medicare?

7     A.    No, they were -- they were based on usual

8  and customary.

9     Q.    And do you know how they were determining

10  usual and customary?

11     A.    I -- that was part of the issue, was that

12  you couldn't really tell.  What you were told is

13  that it's based on usual and customary, but it was

14  difficult to really understand what usual and

15  customary meant because that meant something

16  different to really just about every third-party

17  administrator.

18     Q.    You also had mentioned that an RBR

19  program puts an employer at risk.

20     A.    Yes.

21     Q.    Tell me how it puts an employer at risk.

22     A.    I believe it puts an employer at risk

23  because in today's market -- and, again, this is

24  my opinion, in today's market when you have a

25  difficult time hiring employees, I think that one

1   of the things we have to sell are our benefits.

2   And the -- an RBR program, because it puts members

3   and their families in a position where there is

4   balance billing and oftentimes that can create

5   financial strain for a family, I believe that that

6   disadvantages an employer when they're trying to

7   hire.

8            I also think that while it can create

9   savings for an employer on the short-term, I do

10  believe that over the long haul that there will

11  be -- that there will be costs that they will

12  incur through -- whether those will be costs on

13  the -- on the pharmacy side, on the medical

14  management side because they are not as involved

15  in managing their plan.

16       Q.   Were you aware that in -- in the case of

17  the CVA plan that CVA had the ultimate authority

18  to accept or reject the recommendations for

19  payments?

20            MS. BAUMERT:  Objection; form and

21            foundation, exceeds the scope of the

22            report.

23       A.   I was not.

24       Q.   You mentioned that you worked with some

25  employers and you had rejected reference-based

1  reimbursement and worked with the employers to get

2  like on a short-term plan?

3      A.   Correct.

4      Q.   Do you know if any of those employers

5  sued their TPAs?

6      A.   I don't know that.

7              MS. BAUMERT:  Objection, form and

8          foundation.

9      Q.   Did you do any review to see if -- if the

10  claims you were looking at were a duplicate of

11  claims that had already been reviewed by somebody

12  else?

13     A.   Did not.

14     Q.   And in your review -- in the claims that

15  you looked at, did you see any that the materials

16  in the file you had showed that the claim had

17  already been paid?

18             MS. BAUMERT:  Objection, form.

19     A.   Are you saying that there was a

20  delinquency notice?

21     Q.   No.  I'm saying in any of the claims that

22  you reviewed, did it appear that that claim had

23  been submitted more than once?

24             MS. BAUMERT:  Objection.

25     Q.   In other words, that it had a duplicate.

1          MS. BAUMERT:  Form, foundation.

2     A.    Oh, only the one that I mentioned in the

3  Sioux City situation.

4     Q.    You said something about even Medicare

5  recognizes there are facilities that are entitled

6  to additional payments.

7     A.    Uh-huh.

8     Q.    Would you explain to me?

9     A.    Yes.  There are facilities that are

10  classified as critical access facilities, such as

11  your smaller facilities.  And so they put in place

12  what's called cost-based reimbursement.  So if you

13  are classified as a critical access facility,

14  you're paid at 105 percent, is typically the

15  minimum payment that you receive.

16          Also, if you are a rural facility and

17  you're classified as such, there is a rural --

18  there's a rural factor that is applied.  For

19  example, on the fixed outpatient reimbursement

20  that I was describing early on, your conversion

21  factor is increased by 1.5 percent.  So if your --

22  you know, if your rate's a hundred dollars, you're

23  going to get an additional 1.5 percent on every

24  procedure that is performed.

25     Q.    And early on you were talking about -- I

1    can't remember exactly how you phrased it, but

2    basically that if you didn't have a contract with

3    a hospital it would be hard to get them to

4    discount a bill --

5        A.    Uh-huh.

6        Q.    -- is that correct?

7        A.    That's correct.

8        Q.    In this case there were, in fact, many

9    instances of the claims that you worked on where a

10   discount was received.

11       A.    Uh-huh, that's true.  There are -- there

12   are some facilities that will accept something

13   other than what they've billed.  I can -- I can

14   say that that is not a sustainable practice for

15   those facilities, particularly facilities that

16   are -- that are small in nature.  And I -- that's

17   one of the reasons that I believe that contracts

18   are important, and over the long term I think it's

19   important, again, that you have that kind of a

20   relationship and that facilities understand what

21   it is that they're going to get paid and that it

22   does become more of a partnership arrangement

23   between employers and providers relative to how

24   health care is delivered.  Because if we are ever

25   going to get our arms around what health care

1  costs, we need to figure out how to do it together

2  as opposed to creating what, I believe, is some

3  kind of an adversary relationship where we simply

4  decide what we're going to pay each other and not

5  sit down and have that conversation.  So we need

6  to create opportunities where we bring one another

7  together to figure out how we make the system

8  better as opposed to just exchanging dollars at

9  whatever rate I decide I'm going to exchange those

10  dollars.

11      Q.    And before you started your consulting

12  business, you worked for a provider --

13      A.    I did.

14      Q.    -- is that correct?

15      A.    I did.  I actually worked on both sides

16  of the house, as we said.  I worked on the

17  provider side where I negotiated all the contracts

18  to determine what it was that the hospitals and

19  the physicians were going to get paid.  And then I

20  ran the health plan where I worked with the

21  employers.  And so did I, yes, try to make sure

22  that when I was negotiating with the insurance

23  companies that I kept those discounts as low as I

24  possibly could, I did that for a number of years.

25          And then I changed that practice so

1   that instead of trying to work to get just a

2   better reimbursement, I worked to put risk-based

3   contracts in place so that I could create a

4   situation where the payer, the ultimate payer, the

5   member, the employer, and the provider came

6   together through direct contracts and you treated

7   the TPA like they should be treated, and that is

8   someone who pays a claim.

9        Q.   And I -- I'm not sure I understood what

10   you said the first time about risk based.  Was

11   what you were saying is if the hospital is very

12   prompt in getting their billings out --

13        A.   Right.

14        Q.   -- they are rewarded by being paid the

15   full amount, whereas if they hold something for a

16   long time that might be reduced?  And if that's

17   not right, just explain it to me.

18                 MS. BAUMERT:  Form.  I'm going to

19              make an objection as to form, and I

20              didn't hear that at all so --

21        A.   I don't remember that.

22                 THE WITNESS:  Can you --

23                 MS. BAUMERT:  She would have to go

24              back --

25                 THE WITNESS:  Yeah.

1          MS. BAUMERT:  -- to the beginning

2              of the transcript to look.

3      A.    Is there something you can reference in

4   the report that might help?

5      Q.    Well, you said -- it was on Page 3, the

6   fourth dot down from the time -- or from the top.

7   And --

8      A.    Oh, okay.

9      Q.    -- Mr. Thalken asked you --

10     A.    Right.

11     Q.    -- about risk-based and what you said at

12  least --

13     A.    Yes.  Okay.

14     Q.    -- in part in my scribble --

15     A.    Uh-huh.

16     Q.    -- was if provider met a standard for

17  promptness, they got full dollar amount; if longer,

18  maybe not.

19     A.    Okay.  So this is in relation to a

20  risk-based payment methodology.  Okay.  So in that

21  instance, there is a set dollar amount that you're

22  going to get paid for a particular procedure.  And

23  in that case there's -- there are assumptions made

24  about what resources you're going to use, say, how

25  long I'm going to be in the -- in the operating

1  room, how many supplies are going to be used,

2  okay, so what the total resource consumption is

3  going to be.  And so if I stay within those

4  parameters, then I'm going to either -- I'm going

5  to make money on that payment or maybe even come

6  out a little bit ahead.  But if I use more

7  resources than what it is assumed when my payment

8  was put together, then I'll lose money on that

9  transaction.

10      Q.   Okay.  So just so I understand --

11      A.   Uh-huh.

12      Q.   -- the hospital sets a per procedure cost.

13      A.   Correct.

14      Q.   But if it takes much longer or they need

15  to use many more supplies than --

16      A.   Correct.

17      Q.   -- a normal one, they're not going to get

18  paid for the extra.

19      A.   No -- correct.  They're going to get paid

20  whatever that agreed-upon amount is.  And if it

21  costs more than that, they're not going to get

22  paid for it.

23      Q.   Okay.  I understand now.

24      A.   Okay.

25                  MS. VOGT:  I think that's all of my

1      questions.

2           MS. BAUMERT:  I just have a few

3           just to clear things up.

4                CROSS-EXAMINATION

5  BY MS. BAUMERT:

6      Q.   So when you were talking about dealing

7  with the RBR pricing systems in the late '90s and

8  the 2000s, that was when you were with Avera.

9      A.   Correct.

10     Q.   And none of those RBR pricing structure

11  type arrangements that you were dealing with were

12  in Nebraska; right?

13     A.   Correct.

14     Q.   And then we've been talking about RBR

15  programs and your opinions with regard to RBR

16  programs.  And when you were speaking about them

17  not being in the interest of the employee or the

18  plan or the employer, you were contemplating RBR

19  means no advance direct contracting; correct?

20     A.   That's correct.

21     Q.   And so if there is an RBR arrangement --

22  and I think some of this is semantics about RBR

23  and what we all think of RBR in this case --

24     A.   Uh-huh.

25     Q.   -- and what you think --

1    A.    Right.

2    Q.    -- of RBR.  If there is an advance direct

3   contracting element to an RBR program, you

4   wouldn't necessarily call it an RBR program --

5    A.    That's correct.

6    Q.    -- right?  But we would here --

7    A.    All right.

8    Q.    -- in this case, this life.  So if there

9   is direct contracting relationships as an element

10   of that and if there's an understanding on behalf

11   of the plan and the employer that those are going

12   to be put into place, then that would be sort of a

13   different opinion.

14    A.    That would be a different opinion.

15              MS. MITCHELL:  Object to the form.

16          This is Megan Mitchell.

17              MS. BAUMERT:  We know.

18              MS. MITCHELL:  I'm the only one on

19          the phone.

20    A.    Yeah, if -- if there are, in fact,

21   contracts, then you're right, that is different.

22   But as you noted, I mean, that to me -- when you

23   say RBR, to me that -- that means there are no

24   contracts.  But I understand in your context if

25   there's a contract in place, yes, that does change

1     the -- the outcome.

2          Q.    Right.  So if an employer is contemplating

3     an RBR arrangement with a third party like AMPS or

4     CDS, for instance, and understands that there will

5     be direct contracting as part of it, you would

6     consider that to be exercising their due diligence

7     on behalf of their plan.

8          A.    Correct.

9                    MS. MITCHELL:  Object to the form.

10         Q.    And then we talked a little bit as well

11    about Exhibit 192 and we were talking about Gary

12    Sipe.  He's on Page 3.  And you had been doing

13    some clickety-click calculating?

14         A.    Uh-huh, yes.

15         Q.    And we kind of started talking about

16    things with the plan, what the member obligation

17    was to pay and then we stopped talking about that.

18    I just wanted to make sure that that testimony was

19    complete --

20         A.    Okay.

21         Q.    -- because you had said that the member

22    paid more.  What -- what would the member -- what

23    would Gary Sipe have paid?  That's what we mean;

24    right?

25         A.    Correct.

1     Q.   Okay.  So what would Gary Sipe have paid

2     on this -- this claim here that we have at the top

3     of that page, Page 4?

4                    MS. VOGT:  Object to the form.

5                    MR. THALKEN:  Foundation.

6     A.   The calculations that I were doing is

7     that I took a look at the charge of the 36,689.

8     Yes, TBG did obtain a discount and took that and

9     paid the 18,053.  And -- however, the member was

10    balance billed 18,636.  So, in essence, the member

11    paid almost the same amount as what was -- the

12    discount amount that TBG obtained.

13                    So if you look at what CVA paid, in --

14    in a typical arrangement -- and, again, I'm making

15    some assumptions.  In a typical arrangement, that

16    18,636 would have been split between the amount

17    that TBG would have -- would have had on the

18    negotiated side for the provider and what CVA,

19    what the employer would have done.  So in -- in my

20    world with a contract, Gary Sipes [sic] would have

21    paid -- overpaid by 20 percent because those

22    additional dollars would have been covered by the

23    employer and the provider.

24    Q.   Okay.

25                    MS. BAUMERT:  I don't think I have

1          any further questions.

2              MR. THALKEN:  Couple follow-ups on

3          that, Ms. Reed.

4                    REDIRECT EXAMINATION

5    BY MR. THALKEN:

6        Q.   So with respect to Gary Sipe when you're

7    looking at Exhibit 192 --

8        A.   Uh-huh.

9        Q.   -- you don't know whether Mr. Sipe made

10   any payments on this.

11       A.   Correct.  He may have ignored the amount

12   that was balance billed.

13       Q.   Right, right.  It's a balance-billed

14   amount but it's not a paid --

15       A.   Correct.

16       Q.   -- amount; correct?  And CVA paid

17   11,186.65 [sic] to resolve the claim out of the

18   18,000 balance bill.  Is that your understanding?

19       A.   That's correct.

20       Q.   Okay.  You testified about critical

21   access facilities, and I think you said cost-based

22   reimbursements were paid at 105 percent?

23       A.   Correct.

24       Q.   105 percent of what?

25       A.   105 percent of their cost.

1     Q.   Okay.  Is that different than 105 percent

2  of Medicare?

3     A.   It is.  There's a separate reimbursement

4  system for critical access facilities.

5     Q.   Okay.  You asked about -- or I think you

6  testified about long-term -- there are long-term

7  costs --

8     A.   Uh-huh.

9     Q.   -- because the employer is not as involved

10  in managing the plan --

11     A.   Right.

12     Q.   -- something to that effect?  I didn't

13  quite understand what you mean by that.

14     A.   What I mean by that is if you look at --

15  if you look at pharmacy spend today, which will --

16  pharmacy costs for a health plan today or for a --

17  for an employer today, it's not uncommon for that

18  to represent 40 percent of an employer's spend

19  today.  And that continues to rise because of

20  specialty drugs.  So if an employer -- and, again,

21  it's about attracting and retaining high quality

22  employees.  If you're not a part of how those --

23  how your plan is offering those kinds of benefits,

24  then from a financial perspective you'll find

25  yourself in a position where you may not be able

1  to continue to offer that kind of benefit or be as

2  competitive.

3          Now, you may not be offering a -- a

4  pharmacy benefit, in this situation they are, but

5  you might have to find that you have to

6  drastically reduce that.  I believe that an

7  employer who offers a health plan benefit to their

8  employees needs to be involved with that, needs to

9  understand what their employees are getting for

10 that benefit and then needs to be able to use that

11 as a tool to recruit and retain.

12     Q.   Did the RBR program apply to prescription

13 drug costs?

14               MS. BAUMERT:  Are we --

15     A.   No, it's more really about kind of the

16 overall benefits that it can offer.

17     Q.   And I'm asking about in this situation --

18 I mean, you mentioned prescription drugs.  Is it

19 your understanding that the RBR program applied to

20 prescription drug costs?

21               MS. BAUMERT:  I think -- haven't

22          you kind of finished your questioning?

23          Aren't we kind of jumping on a new line

24          of questions here?

25               MR. THALKEN:  No, I'm following up

1          what she said.

2              MS. BAUMERT: Following up what she

3          said to their questions, not --

4              MR. THALKEN: Right.

5              MS. BAUMERT: -- to my questions.

6          So I don't understand where we're going

7          with the scope of this. Now we're like

8          reopening it and everybody is getting

9          another turn again?

10              MR. THALKEN: It's my deposition,

11         direct examination, cross-examination.

12             MS. BAUMERT: And redirect which --

13             MR. THALKEN: And now I'm

14         redirecting.

15             MS. BAUMERT: -- is supposed to be

16         based off of my cross.

17            MR. THALKEN: And their cross.

18            MS. BAUMERT: No, not their cross.

19         You're all on the same side.

20            MR. THALKEN: Well --

21            MS. BAUMERT: That's not the same

22         thing.

23            MR. THALKEN: -- we're here.

24   Q.   Can you answer my question?

25            MS. BAUMERT: Well, I'm objecting

1          to this entire line of questioning so --

2     A.   And I may have used an inappropriate

3     example.

4     Q.   So -- but you don't know whether

5     prescription drug costs in this --

6     A.   I don't.

7     Q.   -- case were subject to RBR.

8     A.   Correct.  I don't know.

9          MR. THALKEN:  That's all I have.

10         MS. BAUMERT:  All right.  You have

11         the right to read and sign the

12         deposition --

13         THE WITNESS:  Okay.

14         MS. BAUMERT:  -- if you would like

15         to do so to make sure your testimony is

16         recorded accurately.

17         THE WITNESS:  Okay.

18         MS. BAUMERT:  You have to in our

19         jurisdiction say on the record whether

20         you would like to read and sign it or

21         whether you waive that right.  We've

22         been recommending that people read and

23         sign in this case because it's --

24         THE WITNESS:  Okay.  I will read

25         and sign.

1          MS. BAUMERT:  -- so complicated and

2      there are lots of acronyms.

3          THE WITNESS:  I will read and sign.

4      (The foregoing deposition was concluded

5      at 2:00 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF NEBRASKA )
                    :ss          <u>ERRATA SHEET</u>
COUNTY OF DOUGLAS )


         I, JEAN REED, do hereby attest that I have
read the foregoing deposition and find it to be true
and correct, with the exception of any changes that I
have noted below:


<u>PAGE</u>      <u>LINE</u>      <u>CHANGE/REASON FOR CHANGE</u>

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

_____     _____     _____

     If you make no changes, please indicate <u>NO CHANGES</u>.

                         _____
                              JEAN REED


     Subscribed and sworn to before me this _____day
of _____, 2019.


                         _____
                         GENERAL NOTARY PUBLIC

1                    CERTIFICATE

2  STATE OF NEBRASKA     )
                          :ss
3  COUNTY OF DOUGLAS      )

4

5           I, Tina M. Nelson, Registered Merit

6  Reporter, and General Notary Public in and for the

7  State of Nebraska, do hereby certify that JEAN REED

8  was by me duly sworn to testify to the truth, the

9  whole truth, and nothing but the truth; and that the

10  deposition as hereinbefore set forth was reduced to

11  writing by me and is a true and accurate

12  transcription of the testimony given by said witness;

13           That the within and foregoing deposition

14  was taken by me at the time and place herein

15  specified and in accordance with the within

16  stipulations, the reading and signing of the witness

17  to the deposition having not been waived;

18           That I am not counsel, attorney or

19  relative of any of the parties or otherwise

20  interested in the event of this suit;

21           IN TESTIMONY WHEREOF, I have placed my

22  hand and notarial seal this 7th day of March, 2019.

23

24                        _____
                          Tina M. Nelson, RMR
25                        General Notary Public

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

CENTRAL VALLEY AG COOPERATIVE )
and CENTRAL VALLEY AG )
COOPERATIVE HEALTH CARE PLAN, )
) CASE NO. 8:17CV379
     Plaintiffs, )
)
   vs. ) COST CERTIFICATE
)
DANIEL K. LEONARD, SUSAN )
LEONARD, THE BENEFIT GROUP, )
INC., ANASAZI MEDICAL PAYMENT )
SOLUTIONS, INC., d/b/a/ )
ADVANCED MEDICAL PRICING )
SOLUTIONS, CLAIMS DELEGATE )
SERVICES, L.L.C., and GMS )
BENEFITS, INC., )
)
     Defendants. )
               * * *

     I, Tina M. Nelson, RMR, do hereby certify

that on February 22, 2019, I took the deposition of

JEAN REED on behalf of the defendants in the

above-captioned case, that said deposition was

transcribed and delivered to Mr. Timothy Thalken,

defendant TBG counsel; that the total costs of the

deposition to be assessed to the defendants are in

the total amount of $_____.


     Dated this 7th day of March, 2019.


                  _____
                  Tina M. Nelson, RMR
                  General Notary Public

# #

#LL101 [1] - 1:23

# $

$1,001.14 [1] - 65:1
$1,350 [1] - 64:25
$1,467.74 [1] - 88:23
$10,000 [3] - 48:17, 104:2, 104:6
$11,181.65 [2] - 95:16, 97:12
$12,628.53 [1] - 62:3
$13,868.98 [1] - 98:12
$1400 [5] - 91:5, 91:6, 91:14, 91:18, 91:20
$18,000 [2] - 95:22, 97:18
$2,071.37 [1] - 85:15
$2,850.61 [3] - 83:4, 85:13, 86:11
$22,013.60 [1] - 97:7
$239 [2] - 46:22, 47:11
$239.56 [1] - 46:19
$32,900 [2] - 19:15, 27:23
$33,089.34 [1] - 94:12
$344.80 [1] - 78:21
$350 [9] - 19:11, 65:16, 65:21, 66:12, 66:19, 66:22, 76:23, 89:10, 91:3
$400,000 [1] - 84:16
$419,328 [1] - 82:17
$420,000 [1] - 83:10
$44,944.75 [1] - 85:3
$474.13 [1] - 98:1
$475 [1] - 64:22
$499 [3] - 64:2, 64:7, 65:13
$526.14 [1] - 64:11
$587.30 [1] - 85:16
$60 [4] - 47:16, 47:19, 48:2, 48:17
$6300 [1] - 29:4
$689 [2] - 78:9, 79:19
$689.80 [1] - 78:23
$7,855.32 [2] - 102:19, 103:7
$779.24 [1] - 80:11
$8,000 [1] - 97:2
$8,750 [1] - 29:18
$823.86 [1] - 64:19
$873.60 [1] - 82:16
$9,527.64 [1] - 62:6
$986 [2] - 58:5, 59:7

# '

'15 [1] - 36:12

# '16 [1] - 36:12

'17 [3] - 7:3, 36:13, 114:5
'90s [2] - 17:23, 150:7

# 0

0001 [1] - 121:7

# 1

1 [3] - 43:6, 45:21, 117:19
1,467.74 [1] - 88:13
1.5 [2] - 144:21, 144:23
10 [5] - 46:12, 59:22, 79:23, 116:23, 117:9
10050 [2] - 1:17, 2:3
104 [1] - 68:15
105 [5] - 144:14, 154:22, 154:24, 154:25, 155:1
106 [2] - 2:22, 2:23
10:01 [1] - 1:16
11 [5] - 56:19, 56:24, 60:22, 87:14, 138:4
11,186.65 [1] - 154:17
11:34 [2] - 2:21, 76:8
11:44 [2] - 2:21, 76:9
12 [2] - 62:5, 91:24
12-8-17 [1] - 3:13
12:32 [2] - 2:22, 106:14
12:45 [2] - 2:22, 106:15
13 [4] - 63:20, 69:2, 99:6, 105:14
135 [1] - 121:22
1350 [2] - 63:22, 64:8
136 [1] - 2:24
14 [20] - 27:16, 27:20, 27:24, 32:9, 33:8, 34:20, 40:23, 40:24, 41:10, 41:11, 49:20, 49:24, 107:25, 113:16, 122:1, 123:2, 126:8, 128:6
1467.74 [2] - 87:20, 87:25
15 [2] - 9:5, 47:3
150 [1] - 2:25
1500 [3] - 22:12, 23:5, 23:11
154 [1] - 3:1
159 [1] - 3:2
16 [1] - 110:19
160 [8] - 3:3, 121:20, 124:1, 124:5, 124:8, 124:9, 124:10, 124:12

# 1600 [1] - 40:2

161 [1] - 3:4
171 [1] - 2:10
17th [2] - 2:7, 2:10
18 [1] - 9:2
18,000 [2] - 94:21, 154:18
18,053 [1] - 153:9
18,053.20 [1] - 97:9
18,053.25 [1] - 95:3
18,636 [2] - 153:10, 153:16
180 [1] - 123:24
1850.35 [1] - 62:19
19 [2] - 19:20, 84:20
190 [8] - 3:8, 4:1, 6:7, 6:10, 12:17, 20:1, 44:16, 124:9
191 [7] - 3:9, 4:1, 7:21, 8:11, 19:13, 28:23, 32:4
192 [26] - 3:10, 44:21, 44:23, 45:3, 57:3, 57:6, 58:5, 59:6, 59:11, 68:5, 73:22, 74:6, 75:2, 78:13, 78:15, 82:23, 85:12, 85:18, 86:10, 93:21, 94:24, 98:2, 101:16, 101:18, 152:11, 154:7
193 [3] - 3:11, 70:20, 70:22
194 [5] - 3:12, 80:16, 80:18, 81:7, 83:18
195 [19] - 3:13, 88:6, 88:10, 99:14, 100:13, 100:17, 100:23, 101:9, 102:17, 103:8, 103:10, 103:18, 104:7, 104:8, 104:20, 106:4, 124:25, 125:8, 135:21
1952 [1] - 4:14
1990 [1] - 4:23
19th [3] - 7:25, 19:17, 117:16

# 2

2 [9] - 13:16, 46:12, 46:16, 57:5, 59:10, 59:21, 60:12, 73:22, 81:12
2,000 [2] - 22:12, 23:5
2-19-19 [1] - 3:9
2-22-16 [1] - 81:11
2-22-19 [1] - 3:2

# 2.4 [1] - 111:2

2.5 [1] - 112:21
20 [25] - 20:6, 21:18, 29:3, 31:13, 32:4, 35:13, 36:10, 37:1, 38:9, 38:18, 46:21, 63:8, 69:8, 69:11, 69:21, 73:1, 73:19, 86:25, 87:8, 87:10, 87:13, 135:18, 139:16, 139:19, 153:21
200 [1] - 2:14
2000 [2] - 17:23, 17:25
2000s [1] - 150:8
2003 [1] - 17:25
2004 [2] - 17:25, 107:1
2015 [10] - 14:8, 27:8, 41:7, 109:5, 109:16, 109:18, 109:22, 110:1, 110:8, 115:22
2016 [18] - 14:9, 27:8, 41:7, 60:16, 70:10, 70:11, 71:16, 71:22, 72:10, 72:12, 73:10, 77:6, 94:7, 109:5, 109:18, 116:6, 116:9, 117:16
2017 [14] - 3:11, 7:3, 8:16, 9:2, 9:8, 60:12, 70:15, 71:2, 72:1, 74:17, 76:21, 109:19, 114:8, 115:23
2019 [12] - 1:16, 6:22, 7:25, 9:5, 19:20, 29:3, 29:17, 160:23, 161:22, 162:14, 162:22
204 [2] - 71:9, 125:7
208 [4] - 123:19, 124:14, 124:22, 125:7
21 [1] - 138:5
2100 [1] - 2:11
22 [3] - 1:16, 138:5, 162:14
236 [1] - 102:23
24 [2] - 29:17, 32:4
25 [23] - 20:7, 21:18, 31:13, 36:25, 38:9, 38:18, 46:21, 47:10, 63:8, 69:9, 69:11, 69:20, 73:2, 73:19, 78:11, 86:25, 87:4, 87:8, 87:10, 87:12, 87:13, 135:1, 135:3
26 [1] - 94:7
260 [2] - 2:14
2870 [1] - 71:13

# 29 [2] - 6:20, 6:22

2:00 [2] - 3:2, 159:5

# 3

3 [13] - 14:14, 56:19, 56:24, 68:5, 82:24, 82:25, 85:12, 85:19, 86:10, 98:2, 98:5, 148:5, 152:12
3-28 [1] - 81:15
30 [11] - 20:7, 20:8, 21:22, 99:4, 118:13, 118:14, 122:22, 123:25, 124:3, 124:8, 124:9
3005 [1] - 81:9
302477 [1] - 88:8
302997 [1] - 81:6
303 [2] - 81:9, 104:4
303005 [1] - 81:6
30363 [1] - 2:11
32 [1] - 39:25
3200 [2] - 40:1, 40:3
34 [3] - 74:12, 75:2, 75:9
344.80 [1] - 79:16
35 [14] - 20:7, 20:8, 21:22, 21:23, 59:4, 71:17, 72:2, 72:10, 72:20, 73:2, 73:10, 73:19, 77:5, 77:7
36,000 [2] - 94:21, 94:22
36,689 [1] - 153:7

# 4

4 [9] - 2:20, 45:2, 60:23, 93:23, 95:2, 118:16, 133:9, 133:11, 153:3
40 [9] - 35:25, 37:5, 37:8, 38:23, 38:24, 67:25, 69:12, 140:16, 155:18
400 [1] - 2:4
402-397-9669 [1] - 1:24
409 [1] - 2:7
41,000 [1] - 102:14
42 [3] - 118:12, 121:4, 121:12
43 [4] - 118:12, 121:17, 122:8, 123:18
44 [1] - 3:10
45 [6] - 35:16, 35:25, 37:22, 38:3, 38:24, 140:16
474 [1] - 98:24

**480** [18] - 80:9, 80:14, 80:19, 80:21, 80:22, 81:11, 81:13, 81:14, 81:17, 81:21, 81:22, 82:1, 82:5, 82:17, 84:1, 84:6, 86:5

**5**

**5** [1] - 63:15
**50** [14] - 35:17, 35:24, 37:21, 37:25, 38:24, 43:25, 44:4, 46:6, 69:12, 77:19, 95:4, 95:11, 96:19, 140:18
**500** [2] - 2:7, 41:4
**55** [2] - 44:1, 46:6

**6**

**6** [6] - 3:8, 19:25, 24:3, 27:4, 67:2, 119:24
**60** [17] - 35:13, 37:2, 43:17, 44:3, 46:2, 46:9, 93:1, 95:8, 95:18, 96:21, 96:24, 97:5, 97:14, 97:15, 124:4, 139:16, 139:22
**60/40** [1] - 37:4
**600** [1] - 23:10
**627.88** [1] - 62:15
**65** [4] - 93:1, 93:10, 95:8, 95:19
**68102** [1] - 2:8
**68114** [2] - 1:24, 2:15
**68116** [1] - 2:4

**7**

**7** [6] - 3:9, 3:11, 35:4, 42:4, 69:2, 119:25
**7-24** [1] - 4:14
**70** [3] - 3:11, 114:14, 122:11
**75** [1] - 125:14
**76** [1] - 2:21
**7602** [1] - 1:23
**779.24** [1] - 85:16
**793.01** [1] - 62:15
**7th** [2] - 161:22, 162:22

**8**

**8** [11] - 3:11, 9:8, 71:2, 77:12, 117:4, 117:7, 121:5, 121:10, 122:12, 125:15, 126:25
**80** [1] - 3:12
**840** [1] - 85:23

**873** [1] - 81:14
**873.60** [2] - 80:23, 81:20
**88** [1] - 3:13
**8:17CV379** [2] - 1:4, 162:4

**9**

**9** [2] - 42:24, 78:3
**95** [1] - 104:7
**986** [1] - 59:15
**9th** [4] - 8:16, 114:5, 114:7, 114:8

**A**

**a.m** [5] - 1:16, 2:21, 76:8, 76:9
**abdicated** [2] - 112:13, 112:18
**abdicates** [1] - 111:22
**abdicating** [1] - 112:8
**able** [14] - 9:21, 9:23, 15:17, 25:2, 58:3, 61:19, 74:22, 99:17, 105:15, 110:19, 130:1, 135:10, 155:25, 156:10
**above-captioned** [1] - 162:16
**absolutely** [3] - 15:9, 20:17, 26:12
**accept** [8] - 25:7, 46:6, 46:9, 77:19, 77:22, 107:14, 142:18, 145:12
**accepted** [4] - 24:8, 44:11, 64:22, 125:21
**access** [4] - 144:10, 144:13, 154:21, 155:4
**accessing** [2] - 22:13, 23:6
**accompanied** [1] - 24:9
**accord** [1] - 38:7
**accordance** [2] - 134:1, 161:15
**according** [4] - 74:6, 78:20, 85:14, 137:11
**account** [2] - 115:2, 130:4
**accuracy** [3] - 9:22, 13:18, 42:6
**accurate** [11] - 29:22, 30:5, 41:9, 45:22, 60:4, 103:8, 104:17, 104:18, 132:14, 138:23, 161:11
**accurately** [5] - 41:17,

41:23, 42:9, 42:18, 158:16
**achieved** [3] - 48:6, 66:7, 137:2
**acquire** [1] - 18:14
**acquired** [2] - 18:13
**acronyms** [1] - 159:2
**act** [1] - 111:6
**acting** [3] - 120:2, 125:25, 129:19
**actively** [1] - 105:5
**actual** [7] - 31:5, 31:25, 36:19, 36:20, 80:22, 83:19, 86:19
**add** [3] - 71:20, 75:2, 124:12
**addition** [5] - 5:2, 35:7, 35:10, 57:13, 67:18
**additional** [11] - 42:2, 98:24, 113:6, 123:25, 124:3, 125:5, 132:11, 134:10, 144:6, 144:23, 153:22
**addressed** [1] - 136:24
**adjusted** [1] - 114:22
**adjustment** [4] - 112:25, 122:15, 123:10, 123:16
**admin** [1] - 84:12
**administer** [2] - 20:13, 84:13
**administering** [2] - 87:9, 87:10
**administrator** [5] - 5:6, 5:11, 5:13, 115:19, 141:17
**administrators** [4] - 16:13, 16:22, 35:23, 137:18
**adopted** [1] - 116:17
**adoption** [1] - 108:16
**adopts** [1] - 108:15
**advance** [3] - 24:10, 150:19, 151:2
**ADVANCED** [2] - 1:8, 162:8
**Advanced** [3] - 25:20, 43:16, 46:2
**adversary** [1] - 146:3
**advertising** [2] - 5:4, 64:6
**advised** [2] - 55:14, 126:14
**affect** [1] - 65:12
**AG** [4] - 1:2, 1:3, 162:2, 162:3
**agency** [11] - 30:23,

129:4, 129:6, 129:9, 129:11, 129:21, 130:3, 130:4, 130:6, 130:7, 130:17
**ago** [1] - 11:13
**agree** [9] - 25:4, 48:4, 52:24, 53:2, 53:11, 59:19, 73:13, 75:22, 123:21
**agreed** [7] - 25:5, 25:6, 72:20, 77:18, 77:22, 125:11, 149:20
**agreed-upon** [1] - 149:20
**agreement** [40] - 7:9, 21:17, 23:19, 25:25, 28:12, 52:7, 52:15, 54:16, 54:22, 54:23, 55:16, 56:14, 57:22, 57:23, 58:3, 70:14, 71:6, 71:16, 72:1, 72:9, 73:9, 74:16, 76:19, 77:25, 78:2, 92:24, 100:25, 104:11, 110:3, 110:7, 110:18, 110:24, 111:3, 112:22, 113:11, 115:25, 127:6, 127:7, 135:21
**agreements** [1] - 127:14
**ahead** [5] - 5:8, 54:3, 104:16, 135:14, 149:6
**alcohol** [1] - 61:25
**Alison** [1] - 74:7
**allow** [3] - 112:19, 112:23, 123:19
**allowable** [2] - 121:20, 122:20
**allowing** [1] - 75:14
**almost** [1] - 153:11
**alone** [2] - 34:16, 138:3
**ambulatory** [1] - 15:1
**amount** [53] - 13:25, 14:2, 14:3, 32:17, 32:20, 32:21, 34:24, 48:5, 50:7, 57:20, 58:13, 59:7, 59:13, 59:19, 64:13, 65:4, 66:6, 71:10, 73:14, 74:12, 77:20, 78:22, 79:15, 83:3, 85:14, 85:16, 89:1, 94:20, 96:7, 96:9, 96:10, 96:11, 98:15, 113:6, 115:3, 121:21,

122:22, 125:10, 133:24, 134:7, 134:10, 134:12, 147:15, 148:17, 148:21, 149:20, 153:11, 153:12, 153:16, 154:11, 154:14, 154:16, 162:20
**amounts** [9] - 13:22, 13:24, 94:3, 116:19, 126:2, 126:15, 132:11, 134:1, 134:3
**AMPS** [34] - 2:9, 25:19, 28:8, 28:9, 49:25, 50:6, 50:12, 50:16, 50:25, 62:21, 95:23, 106:19, 109:9, 109:15, 109:25, 111:5, 111:8, 112:3, 112:23, 112:25, 113:1, 114:15, 114:23, 114:24, 115:1, 115:5, 130:25, 131:3, 131:13, 131:16, 131:20, 131:23, 132:3, 152:3
**AMPS's** [1] - 115:8
**AMPS/CDS** [1] - 14:7
**Amy** [1] - 63:15
**analysis** [1] - 37:19
**ANASAZI** [1] - 1:7, 162:7
**answer** [22] - 26:22, 41:20, 42:20, 45:13, 47:8, 47:14, 48:11, 49:16, 52:4, 53:10, 53:19, 54:3, 54:5, 57:5, 66:9, 77:11, 90:7, 100:20, 108:21, 112:11, 112:16, 157:24
**answered** [6] - 27:2, 54:18, 55:3, 91:9, 111:16, 119:20
**Anthony** [1] - 18:17
**APC** [1] - 100:4
**appeal** [3] - 111:7, 111:9, 112:24
**appeals** [1] - 114:21
**appear** [2] - 71:25, 143:22
**APPEARANCES** [1] - 2:1
**appeared** [2] - 67:10, 139:14
**Appearing** [1] - 2:10
**apples** [2] - 76:6

applicable [1] - 114:25
applied [3] - 37:14, 144:18, 156:19
apply [2] - 71:22, 156:12
approach [1] - 105:11
appropriate [2] - 56:11, 138:16
appropriately [1] - 137:12
appropriateness [1] - 13:23
April [1] - 60:12
area [3] - 18:22, 21:4, 22:9
areas [1] - 140:12
argue [1] - 79:17
arms [1] - 145:25
Arnall [1] - 2:10
arrangement [10] - 22:18, 66:16, 66:17, 71:22, 115:16, 145:22, 150:21, 152:3, 153:14, 153:15
arrangements [1] - 150:11
aspect [1] - 33:18
assessed [1] - 162:19
assigned [2] - 103:1, 103:23
Assignment [2] - 125:17, 125:20
assignment [1] - 125:22
assigns [2] - 103:13
assist [4] - 9:16, 9:18, 9:20, 25:17
assistance [4] - 60:9, 72:15, 92:23, 130:14
assisted [1] - 47:23
associated [2] - 18:18, 82:6
Associates [1] - 80:3
assume [7] - 48:3, 75:1, 75:8, 75:11, 75:12, 79:12, 95:21
assumed [1] - 149:7
assuming [1] - 40:7
assumption [2] - 37:24, 75:23
assumptions [2] - 148:23, 153:15
Atlanta [1] - 2:11
attached [6] - 3:13, 44:16, 71:6, 84:11, 103:3, 104:3
attaches [1] - 71:11
Attachment [9] - 3:10,

45:15, 101:16, 113:10, 113:12, 113:14, 113:18, 113:19, 115:24
attachment [2] - 45:12, 45:14
attempt [2] - 67:13, 129:7
attempting [1] - 133:3
attention [1] - 93:23
attest [1] - 160:4
Attorney [4] - 2:2, 2:6, 2:9, 2:13
attorney [4] - 8:24, 10:13, 137:18, 161:18
attorney-client [1] - 10:13
attracting [1] - 155:21
audit [1] - 137:9, 137:10
August [1] - 8:16
authority [4] - 92:13, 111:6, 112:20, 142:17
authorized [1] - 51:19
available [1] - 33:5
Avera [1] - 5:9, 5:10, 5:16, 12:10, 16:8, 16:25, 17:14, 18:8, 18:25, 19:5, 20:23, 20:25, 21:5, 21:12, 25:23, 150:8
average [5] - 35:16, 37:7, 87:2, 87:4, 87:11
avoid [2] - 58:18, 130:2
aware [14] - 6:3, 6:6, 70:13, 73:4, 107:5, 109:7, 109:10, 109:15, 126:14, 129:17, 130:21, 131:5, 131:8, 142:16
AWP [1] - 87:2

## B

back-end [2] - 42:19, 45:24
balance [40] - 40:18, 50:23, 51:3, 51:16, 51:19, 55:13, 55:15, 57:16, 63:3, 64:18, 64:23, 79:16, 79:17, 85:15, 87:20, 87:24, 88:1, 90:19, 90:24, 96:8, 98:15, 107:15, 107:18, 107:23, 108:1, 108:6, 118:19, 118:24,

119:22, 120:2, 126:16, 128:7, 128:23, 139:8, 142:4, 153:10, 154:12, 154:13, 154:18
balance-billed [2] - 85:15, 154:13
balance-billing [1] - 118:24
ballpark [1] - 37:7
ballparked [1] - 37:12
Barrow [2] - 8:15, 10:2
based [66] - 13:21, 14:19, 14:23, 14:24, 15:4, 15:5, 15:10, 15:12, 15:13, 15:16, 15:23, 15:25, 16:6, 16:10, 16:15, 16:16, 16:17, 16:24, 17:4, 17:7, 17:11, 18:2, 24:5, 24:8, 24:16, 25:17, 25:23, 35:19, 36:14, 37:2, 37:13, 38:5, 38:11, 41:16, 50:20, 50:21, 51:4, 51:6, 51:9, 51:18, 54:8, 54:15, 54:22, 62:10, 62:11, 63:24, 82:19, 102:25, 103:21, 106:22, 111:8, 121:20, 139:9, 141:3, 141:6, 141:7, 141:13, 142:25, 144:12, 147:2, 147:10, 148:11, 148:20, 154:21, 157:16
bases [1] - 38:16
basing [1] - 39:20
basis [5] - 20:18, 36:9, 122:14, 123:9, 123:16
Bates [2] - 45:10, 117:19
BAUMERT [151] - 2:2, 8:18, 8:22, 8:25, 10:12, 10:16, 10:18, 13:3, 13:13, 26:19, 27:1, 33:13, 33:16, 33:22, 34:1, 40:20, 41:18, 43:14, 45:14, 47:13, 48:8, 48:19, 49:7, 49:10, 49:13, 50:2, 50:9, 50:13, 51:7, 51:21, 52:2, 52:11, 52:16, 52:23, 53:1, 53:5, 53:13, 53:16, 53:18, 53:24, 54:2, 54:9, 54:17,

54:25, 55:18, 55:21, 56:4, 56:8, 56:15, 59:8, 63:11, 65:24, 66:8, 66:14, 68:11, 68:15, 72:4, 72:21, 73:5, 73:16, 74:3, 74:13, 74:19, 74:22, 75:4, 75:8, 75:12, 75:18, 75:24, 76:2, 76:5, 77:10, 79:7, 81:2, 81:5, 84:17, 84:20, 84:23, 84:25, 85:21, 89:19, 90:1, 90:14, 91:8, 91:11, 91:15, 91:21, 91:23, 94:22, 94:25, 96:2, 100:18, 101:23, 102:1, 106:11, 107:19, 108:12, 108:19, 109:2, 109:17, 110:9, 111:15, 112:5, 113:7, 113:24, 114:16, 115:10, 116:1, 117:11, 117:17, 119:19, 120:4, 120:10, 120:25, 121:11, 123:22, 124:5, 124:7, 124:15, 132:20, 133:6, 133:10, 133:20, 134:15, 134:19, 135:5, 142:20, 143:7, 143:18, 143:24, 144:1, 147:18, 147:23, 148:1, 150:2, 150:5, 151:17, 153:25, 156:14, 156:21, 157:2, 157:5, 157:12, 157:15, 157:18, 157:21, 157:25, 158:10, 158:14, 158:18, 159:1
Baumert [1] - 2:25
became [1] - 11:1
Bechard [3] - 78:4, 78:6, 78:14
BECHARD [1] - 78:4
become [1] - 145:22
began [1] - 117:20
beginning [3] - 113:21, 140:23, 148:1
behalf [9] - 1:18, 72:15, 111:6, 126:2, 129:20, 130:19, 151:10, 152:7,

162:15
below [2] - 124:22, 160:5
benefit [7] - 122:15, 123:9, 123:16, 156:1, 156:4, 156:7, 156:10
BENEFIT [2] - 1:7, 162:7
Benefit [8] - 4:9, 5:22, 6:1, 6:4, 12:22, 13:1, 13:11, 70:24
BENEFITS [2] - 1:10, 162:10
benefits [9] - 5:1, 42:8, 72:25, 88:12, 125:22, 142:1, 155:23, 156:16
Bergan [1] - 22:22
best [10] - 26:16, 26:18, 48:13, 48:18, 48:24, 48:25, 49:6, 89:21, 112:9, 112:19
better [6] - 22:23, 73:13, 73:19, 98:18, 146:8, 147:2
between [17] - 23:5, 23:7, 23:24, 37:17, 49:14, 66:4, 70:10, 71:12, 78:1, 101:1, 119:2, 127:9, 127:18, 139:16, 139:19, 145:23, 153:16
beyond [1] - 118:5
big [2] - 10:24, 93:12
bill [30] - 46:22, 46:25, 47:2, 47:11, 47:17, 59:17, 60:3, 65:1, 78:18, 84:4, 88:1, 90:4, 92:25, 93:4, 93:6, 98:15, 99:2, 107:18, 107:23, 108:1, 108:6, 109:25, 110:10, 112:4, 113:20, 128:8, 129:3, 145:4, 154:18
billed [44] - 19:15, 19:22, 21:18, 24:21, 29:4, 29:18, 30:6, 30:8, 36:14, 46:18, 48:1, 51:16, 55:13, 55:15, 64:18, 69:9, 71:17, 72:2, 75:3, 77:20, 79:10, 79:17, 85:15, 87:8, 90:20, 90:24, 94:20, 96:8, 96:25, 97:6, 98:11, 107:15, 120:2,

126:16, 132:22, 135:1, 135:3, 137:24, 138:9, 139:7, 145:13, 153:10, 154:12, 154:13
**billing** [19] - 9:23, 30:5, 30:14, 50:23, 51:3, 51:19, 58:17, 58:19, 82:20, 89:17, 92:15, 118:20, 118:24, 119:22, 128:23, 134:5, 137:25, 138:22, 142:4
**billings** [3] - 68:20, 138:15, 147:12
**bills** [4] - 40:18, 67:14, 80:19, 84:2
**birth** [1] - 4:13
**bit** [3] - 128:5, 149:6, 152:10
**block** [1] - 34:25
**Blues** [1] - 21:3
**board** [1] - 61:13
**bone** [1] - 57:18
**bottom** [8] - 27:4, 57:6, 69:1, 81:5, 98:6, 119:23, 121:14, 122:15
**breach** [1] - 51:20
**break** [2] - 75:25, 106:12
**briefly** [1] - 4:7
**bring** [2] - 33:2, 146:6
**Bruno** [1] - 2:13
**Bryan** [14] - 44:5, 46:8, 69:6, 70:6, 70:14, 71:6, 71:16, 72:1, 72:9, 72:18, 72:19, 72:24, 73:10, 77:6
**bullet** [1] - 14:14
**bulletpoint** [1] - 14:18
**business** [1] - 146:12
**buying** [1] - 18:21
**BY** [5] - 4:6, 106:17, 136:10, 150:5, 154:5

## C

**calculate** [4] - 75:15, 96:5, 96:18, 103:9
**calculated** [1] - 37:2
**calculating** [3] - 95:24, 96:6, 152:13
**calculation** [1] - 135:18
**calculations** [5] - 76:3, 100:10, 100:12, 117:1, 153:6

**calculator** [1] - 75:16
**calendar** [2] - 32:21, 33:1
**cannot** [2] - 123:6, 125:5
**capacity** [3] - 10:5, 11:4, 11:17
**captioned** [1] - 162:16
**cardiac** [1] - 104:4
**care** [11] - 5:1, 15:16, 16:7, 37:3, 61:7, 69:5, 125:2, 134:6, 140:24, 145:24, 145:25
**CARE** [2] - 1:3, 162:3
**Care** [4] - 21:2, 39:3, 39:13, 40:2
**carriers** [1] - 35:20
**case** [56] - 5:24, 6:8, 7:1, 11:14, 11:15, 11:25, 12:15, 12:19, 13:2, 13:12, 14:12, 15:1, 15:14, 15:21, 15:22, 20:16, 50:16, 77:25, 78:2, 92:24, 98:19, 100:2, 100:6, 102:25, 103:1, 103:19, 103:23, 104:4, 105:8, 109:13, 110:17, 111:14, 113:23, 116:18, 117:5, 119:7, 119:15, 119:18, 122:2, 124:21, 127:5, 127:7, 127:13, 131:1, 131:7, 131:14, 132:4, 132:8, 142:16, 145:8, 148:23, 150:23, 151:8, 158:7, 158:23, 162:16
**CASE** [2] - 1:4, 162:4
**cases** [11] - 11:22, 12:6, 12:7, 12:8, 20:12, 21:21, 41:25, 105:10, 128:24
**categories** [1] - 139:24
**caused** [1] - 30:21
**CDS** [9] - 2:9, 106:19, 131:6, 131:9, 131:13, 131:17, 131:20, 132:7, 152:4
**Center** [9] - 43:25, 68:17, 68:19, 68:25, 69:6, 70:7, 70:14, 77:16, 127:1
**center** [3] - 61:25,

138:2, 138:3
**CENTRAL** [4] - 1:2, 1:3, 162:2, 162:3
**cents** [1] - 65:2
**CEO** [1] - 11:20
**certain** [3] - 13:25, 20:11, 34:24
**CERTIFICATE** [2] - 161:1, 162:5
**Certificate** [1] - 3:4
**certify** [1] - 161:7, 162:13
**challenged** [1] - 114:21
**chance** [1] - 76:11
**change** [2] - 128:16, 151:25
**CHANGE** [1] - 160:7
**CHANGE/REASON** [1] - 160:7
**changed** [1] - 146:25
**changes** [2] - 160:5, 160:20
**CHANGES** [1] - 160:20
**charge** [13] - 13:22, 13:23, 63:21, 80:11, 81:19, 83:12, 83:20, 84:11, 84:16, 85:3, 114:22, 133:3, 153:7
**charged** [8] - 27:23, 34:6, 43:7, 47:19, 48:5, 58:21, 84:12
**charges** [22] - 21:19, 36:14, 46:18, 62:2, 62:10, 67:10, 69:9, 71:17, 72:2, 75:3, 83:18, 87:8, 96:25, 97:6, 97:19, 98:12, 132:23, 133:13, 135:1, 135:3, 138:13, 138:19
**charging** [2] - 64:8, 65:21, 66:19, 89:10, 90:9
**check** [4] - 61:18, 71:9, 103:9, 116:22
**CHI** [13] - 99:10, 99:13, 100:16, 100:22, 101:1, 102:23, 104:11, 105:3, 106:4, 125:11, 135:20, 135:24
**choose** [1] - 55:10
**Christi** [7] - 92:5, 92:8, 93:12, 93:13, 93:24, 98:3, 127:2
**Circle** [2] - 1:17, 2:3
**circled** [1] - 119:12

**circumstances** [1] - 56:18
**City** [3] - 93:16, 138:21, 144:3
**Civil** [1] - 1:19
**Claim** [1] - 3:12
**claim** [81] - 13:7, 14:2, 14:4, 24:18, 27:19, 29:3, 29:9, 29:25, 30:2, 30:3, 30:4, 31:13, 35:16, 35:17, 42:6, 48:7, 48:17, 58:16, 58:20, 59:24, 60:11, 60:25, 63:5, 65:6, 65:7, 65:18, 65:19, 65:23, 66:2, 66:13, 66:25, 66:7, 67:17, 70:17, 71:21, 72:16, 78:23, 83:3, 83:6, 85:14, 85:20, 85:23, 86:2, 87:21, 94:1, 94:18, 94:19, 95:16, 96:10, 98:8, 98:11, 99:10, 102:12, 103:14, 104:19, 104:21, 104:22, 111:7, 113:1, 114:20, 115:22, 122:21, 123:21, 126:3, 127:11, 128:13, 128:17, 131:20, 132:18, 133:14, 134:8, 136:12, 136:19, 138:25, 141:2, 143:16, 143:22, 147:8, 153:2, 154:17
**claimant** [1] - 125:24
**CLAIMS** [2] - 1:9, 162:9
**claims** [111] - 5:20, 9:21, 13:18, 13:25, 14:1, 14:7, 25:24, 27:5, 27:9, 27:13, 27:14, 27:16, 27:17, 27:24, 28:19, 28:20, 28:21, 28:22, 28:24, 29:21, 29:24, 32:10, 32:23, 33:9, 33:24, 34:7, 34:20, 36:20, 37:5, 37:10, 37:13, 37:18, 37:19, 40:23, 40:24, 41:10, 41:13, 41:14, 41:17, 41:22, 42:7, 42:8, 42:12, 42:18, 44:17, 49:20, 49:24, 50:6, 57:16, 58:15, 60:16, 67:9, 67:12, 67:14, 67:21,

68:2, 68:9, 68:18, 69:16, 71:9, 71:10, 71:17, 72:10, 72:11, 73:10, 74:1, 77:6, 86:19, 92:4, 93:22, 100:16, 107:24, 108:4, 109:15, 109:18, 110:7, 110:13, 111:18, 113:15, 114:14, 116:5, 116:8, 116:13, 122:1, 122:19, 123:1, 126:8, 127:10, 127:23, 131:1, 131:14, 131:17, 131:23, 132:4, 132:7, 132:12, 132:13, 133:16, 133:25, 136:16, 136:23, 137:5, 137:10, 137:22, 143:10, 143:11, 143:14, 143:21, 145:9
**clarify** [1] - 6:10, 53:19, 81:3
**classification** [1] - 15:2
**classified** [3] - 144:10, 144:13, 144:17
**clear** [1] - 150:3
**click** [1] - 152:13
**clickety** [1] - 152:13
**clickety-click** [1] - 152:13
**client** [14] - 8:7, 10:5, 10:10, 10:13, 11:1, 11:5, 32:19, 32:22, 34:16, 112:22, 113:5, 114:23, 115:2
**Client** [1] - 111:5
**clients** [4] - 32:18, 34:14, 34:18, 35:1
**clinic** [3] - 18:13, 24:19, 138:2
**clinics** [3] - 18:15, 18:18, 19:4
**close** [5] - 36:3, 46:10, 84:15, 96:18
**closer** [1] - 96:20
**CMS** [1] - 15:14
**code** [6] - 30:13, 83:21, 83:22, 83:23, 138:4, 138:9
**codes** [3] - 30:7, 138:7, 138:11
**coinsurance** [1] - 62:16
**colleague** [1] - 92:22

**collecting** [1] - 130:19
**collection** [15] - 30:23, 57:19, 128:8, 129:4, 129:6, 129:9, 129:11, 129:19, 129:21, 130:2, 130:4, 130:6, 130:7, 130:16, 130:17
**collectively** [1] - 20:6
**combination** [2] - 29:19, 133:13
**comfortable** [1] - 39:16
**coming** [1] - 81:16
**communication** [1] - 136:21
**communications** [2] - 5:3, 31:19
**comp** [1] - 12:8
**companies** [1] - 146:23
**company** [2] - 38:14, 38:15
**compare** [1] - 86:19
**compared** [1] - 30:6
**comparing** [1] - 30:5
**comparison** [1] - 135:25
**compensation** [1] - 114:11
**competitive** [1] - 156:2
**complete** [4] - 105:17, 118:3, 152:19
**completed** [2] - 47:8, 69:14
**completely** [1] - 29:22
**complicated** [2] - 11:21, 159:1
**complied** [1] - 115:8
**complies** [2] - 122:13, 125:16
**CON** [2] - 8:12, 8:16
**concern** [1] - 111:20
**concerning** [1] - 13:18
**concluded** [1] - 159:4
**conclusion** [2] - 66:21, 134:12
**conduct** [1] - 112:23
**conference** [2] - 9:3, 9:9
**confidential** [1] - 39:19
**confirm** [3] - 71:15, 89:18, 89:23
**confirmed** [1] - 91:13
**confused** [1] - 83:9
**confusion** [1] - 68:20
**conjunction** [1] - 137:17

**connecting** [1] - 120:7
**connection** [10] - 110:25, 111:13, 111:14, 119:6, 122:1, 124:20, 126:3, 126:7, 130:25, 131:7
**consider** [3] - 22:3, 23:13, 152:6
**considerable** [1] - 67:20
**consideration** [4] - 137:21, 137:23, 138:6, 140:22
**considered** [3] - 39:23, 107:12, 126:24
**consistent** [1] - 69:18
**consultant** [3] - 77:9, 89:23, 90:12
**Consulting** [3] - 4:18, 4:19, 4:21
**consulting** [12] - 4:24, 4:25, 5:2, 7:1, 11:6, 11:7, 34:7, 48:17, 66:5, 66:12, 137:4, 146:11
**consumption** [1] - 149:2
**contact** [8] - 30:22, 92:20, 92:22, 129:6, 129:20, 131:13, 131:16, 136:12
**contacted** [2] - 24:22, 72:14
**contacts** [1] - 11:1
**contain** [1] - 12:18
**contemplating** [2] - 150:18, 152:2
**contests** [1] - 112:24
**context** [1] - 151:24
**continue** [1] - 156:1
**continues** [1] - 155:19
**continuing** [2] - 61:6, 111:8
**contract** [34] - 7:3, 7:4, 7:6, 15:11, 15:24, 17:13, 21:9, 23:22, 23:23, 24:9, 24:17, 25:5, 26:8, 51:17, 73:3, 73:10, 73:14, 77:5, 77:23, 100:16, 104:11, 108:9, 119:1, 120:19, 121:3, 126:20, 127:5, 127:9, 135:1, 140:20, 145:2,

151:25, 153:20
**contracted** [1] - 109:25
**contracting** [4] - 150:19, 151:3, 151:9, 152:5
**contracts** [21] - 16:8, 20:22, 21:11, 23:16, 35:11, 51:2, 107:10, 108:16, 108:25, 126:24, 127:15, 127:18, 134:23, 137:11, 145:17, 146:17, 147:3, 147:6, 151:21, 151:24
**contrary** [1] - 119:1
**control** [2] - 112:23, 118:23
**conversation** [1] - 146:5
**conversations** [3] - 7:2, 30:17, 31:1
**conversion** [3] - 15:13, 103:22, 144:20
**cooperate** [2] - 6:4, 6:12
**COOPERATIVE** [4] - 1:2, 1:3, 162:2, 162:3
**copy** [6] - 6:8, 110:16, 110:23, 114:25, 117:7, 121:8
**correct** [192] - 6:13, 6:14, 6:15, 6:24, 6:25, 7:22, 14:10, 14:17, 14:22, 17:1, 19:4, 19:12, 19:21, 19:23, 19:24, 20:14, 21:20, 22:24, 23:3, 23:18, 23:20, 24:6, 24:11, 27:11, 27:22, 28:13, 29:1, 29:5, 29:16, 33:10, 34:10, 34:21, 36:6, 36:18, 39:14, 41:8, 41:11, 42:10, 42:13, 42:16, 43:12, 44:1, 44:2, 44:6, 44:7, 44:8, 46:4, 46:7, 50:16, 56:11, 56:12, 56:25, 59:2, 59:5, 60:1, 60:14, 60:15, 60:19, 62:4, 62:7, 63:10, 64:2, 64:3, 64:5, 64:8, 64:9, 64:11, 64:12, 64:14, 64:15, 64:17, 64:20, 64:24, 65:2, 65:4, 65:17,

65:22, 66:20, 66:23, 67:1, 68:1, 69:6, 69:7, 69:10, 69:22, 69:23, 70:7, 70:8, 70:12, 71:14, 71:23, 71:24, 73:21, 74:9, 74:10, 74:17, 76:20, 76:22, 77:16, 77:17, 77:20, 77:21, 77:24, 77:25, 78:9, 78:10, 78:12, 78:19, 78:24, 79:2, 80:4, 82:2, 82:12, 82:16, 87:6, 87:13, 87:16, 88:17, 88:18, 88:21, 88:24, 89:1, 89:2, 89:5, 89:6, 89:13, 89:16, 91:16, 92:3, 92:6, 92:9, 93:2, 93:3, 93:11, 94:11, 95:6, 95:10, 95:14, 95:16, 95:17, 97:17, 98:13, 98:16, 98:22, 99:1, 99:5, 99:19, 99:24, 101:11, 104:24, 105:4, 105:6, 105:23, 106:23, 106:24, 107:18, 108:1, 108:17, 109:3, 114:9, 116:6, 116:7, 125:8, 125:9, 125:13, 127:12, 128:15, 132:15, 133:4, 139:17, 141:4, 143:3, 145:6, 145:7, 146:14, 149:13, 149:16, 149:19, 150:9, 150:13, 150:19, 150:20, 151:5, 152:8, 152:25, 154:11, 154:15, 154:16, 154:19, 154:23, 158:8, 160:5
**correctly** [5] - 14:9, 27:10, 36:7, 85:17, 88:2
**correspondence** [1] - 136:18
**COST** [1] - 162:5
**cost** [12] - 35:16, 35:17, 64:7, 81:22, 82:5, 91:17, 121:22, 138:14, 144:12, 149:12, 154:21, 154:25
**cost-based** [2] - 144:12, 154:21
**costs** [13] - 35:12, 36:10, 36:12,

142:11, 142:12, 146:1, 149:21, 155:7, 155:16, 156:13, 156:20, 158:5, 162:18
**counsel** [2] - 161:18, 162:18
**County** [1] - 46:6
**COUNTY** [2] - 160:2, 161:3
**couple** [7] - 16:8, 16:18, 16:21, 42:1, 42:14, 139:23, 154:2
**court** [6] - 11:11, 43:22, 53:25, 63:18, 120:13, 120:15
**COURT** [2] - 1:1, 162:1
**cover** [4] - 62:12, 62:14, 90:5, 118:5
**covered** [11] - 42:8, 58:2, 61:4, 61:13, 62:10, 116:14, 121:19, 121:21, 121:22, 133:13, 152:22
**CPT** [5] - 30:7, 30:13, 83:21, 138:7, 138:9
**create** [5] - 106:3, 142:4, 142:8, 146:6, 147:3
**creating** [1] - 146:2
**credit** [9] - 87:20, 87:24, 88:1, 88:13, 88:22, 89:1, 89:15, 89:18, 115:2
**critical** [4] - 144:10, 144:13, 154:20, 155:4
**criticism** [4] - 50:20, 50:21, 50:24, 51:1
**criticisms** [3] - 12:25, 50:15, 50:17
**cross** [4] - 157:11, 157:16, 157:17, 157:18
**CROSS** [1] - 150:4
**Cross** [1] - 2:25
**cross-examination** [1] - 157:11
**Cross-Examination** [1] - 2:25
**CROSS-EXAMINATION** [1] - 150:4
**CRR** [1] - 1:22
**CSR** [1] - 1:22
**current** [1] - 59:25
**customary** [6] - 79:20, 107:12, 141:8,

141:10, 141:13, 141:15
**CVA** [52] - 7:11, 7:12, 7:16, 27:7, 34:5, 36:16, 40:5, 40:7, 40:18, 44:25, 52:10, 56:2, 56:13, 59:13, 70:13, 71:6, 71:10, 71:11, 71:25, 72:9, 72:19, 73:2, 73:8, 73:13, 74:9, 76:23, 78:20, 85:16, 88:7, 95:15, 97:5, 97:11, 97:14, 97:15, 98:14, 100:15, 109:16, 109:20, 109:24, 114:13, 115:7, 117:19, 121:7, 125:10, 127:9, 127:24, 129:20, 142:17, 153:13, 153:18, 154:16
**CVA's** [1] - 52:14

**D**

**D.N** [1] - 84:16
**d/b/a** [2] - 1:8, 162:8
**Dakota** [7] - 4:16, 5:14, 10:11, 21:2, 39:3, 39:13, 40:2
**Dakota's** [1] - 14:20
**damage** [1] - 34:9
**DANIEL** [2] - 1:6, 162:6
**date** [22] - 4:13, 6:12, 6:23, 19:16, 29:11, 44:14, 46:16, 56:22, 69:24, 80:1, 80:6, 81:12, 81:13, 84:14, 84:17, 85:6, 94:5, 94:7, 94:15, 94:17, 110:8, 115:22
**dated** [1] - 71:2
**Dated** [1] - 162:22
**dates** [5] - 29:10, 70:9, 81:10, 81:11, 116:5
**days** [2] - 37:5, 138:15
**deal** [3] - 98:20, 101:9, 136:14
**dealing** [6] - 83:21, 140:6, 140:7, 140:14, 150:6, 150:11
**dealt** [1] - 116:19
**Debbie** [6] - 79:23, 83:1, 83:2, 85:13, 85:19, 86:10
**debt** [2] - 130:18, 130:19
**December** [2] - 9:2,

70:11
**decide** [2] - 146:4, 146:9
**decision** [5] - 56:2, 98:16, 107:17, 107:22, 113:5
**decisions** [1] - 56:1
**deductible** [3] - 62:13, 62:15, 139:4
**defendant** [2] - 1:18, 162:18
**DEFENDANT** [1] - 2:5
**defendants** [2] - 162:15, 162:19
**Defendants** [2] - 1:11, 162:11
**DEFENDANTS** [2] - 2:9, 2:12
**define** [1] - 22:16
**defined** [2] - 15:18
**definitely** [1] - 108:22
**definition** [1] - 27:18
**delegate** [1] - 122:19
**DELEGATE** [2] - 1:9, 162:9
**delinquency** [2] - 30:21, 143:20
**delivered** [3] - 125:2, 145:24, 162:17
**denied** [3] - 11:16, 11:23, 60:11
**depended** [1] - 21:7
**DEPOSITION** [1] - 1:13
**Deposition** [7] - 3:2, 4:1, 44:21, 70:20, 70:22, 80:16, 88:6
**deposition** [14] - 4:8, 12:2, 29:15, 85:9, 157:10, 158:12, 159:4, 160:4, 161:10, 161:13, 161:17, 162:14, 162:16, 162:19
**depositions** [1] - 12:12
**describing** [1] - 144:20
**description** [3] - 28:15, 28:17, 117:8
**detail** [2] - 29:20, 30:25
**determination** [1] - 67:15
**determine** [23] - 14:3, 41:16, 42:7, 42:17, 50:7, 58:15, 61:19, 61:21, 62:8, 65:10, 67:20, 76:13, 80:25, 81:19, 88:25, 91:18,

116:13, 132:11, 132:18, 133:2, 133:16, 133:25, 146:18
**determined** [4] - 30:19, 43:6, 43:10, 58:21
**determining** [3] - 134:10, 135:2, 141:9
**diagnosis** [1] - 99:21
**diagnosis-related** [1] - 99:21
**DIANA** [1] - 2:12
**differ** [1] - 15:8
**difference** [3] - 37:20, 130:22, 139:19
**differences** [1] - 107:5
**different** [12] - 16:9, 20:20, 23:19, 68:21, 94:19, 139:24, 141:16, 151:13, 151:14, 151:21, 155:1
**differential** [1] - 36:23
**difficult** [7] - 92:7, 92:11, 101:15, 134:21, 141:14, 141:25
**diligence** [1] - 152:6
**direct** [29] - 21:9, 21:11, 23:16, 23:22, 23:23, 26:8, 71:6, 73:9, 73:14, 77:23, 93:23, 100:16, 104:11, 105:6, 108:16, 108:25, 126:20, 126:23, 127:5, 127:9, 127:14, 127:17, 140:20, 147:6, 150:19, 151:2, 151:9, 152:5, 157:11
**DIRECT** [3] - 4:5, 106:16, 136:9
**Direct** [3] - 2:20, 2:23, 2:24
**directly** [8] - 7:11, 7:12, 7:18, 8:5, 23:24, 30:20, 30:23, 130:1
**dis** [1] - 20:8
**disadvantages** [1] - 142:6
**disagree** [1] - 97:21
**discount** [79] - 20:7, 20:10, 21:15, 21:18, 22:5, 22:23, 26:11, 31:14, 35:24, 36:15, 36:23, 37:25, 38:3, 38:9, 38:19, 40:8,

40:11, 40:16, 44:4, 46:9, 46:22, 47:11, 48:2, 59:4, 63:9, 65:12, 67:19, 67:25, 69:8, 69:11, 69:21, 69:22, 71:17, 72:2, 72:11, 72:20, 73:1, 73:11, 74:12, 74:15, 75:2, 76:14, 76:18, 76:25, 77:6, 77:8, 77:22, 78:11, 78:25, 79:14, 79:18, 86:24, 87:7, 87:11, 93:1, 93:9, 95:5, 95:8, 95:9, 96:9, 96:11, 96:19, 96:24, 97:5, 97:14, 97:16, 97:20, 98:25, 134:25, 135:3, 135:18, 139:13, 140:12, 140:16, 145:4, 145:10, 153:8, 153:12
**discounted** [1] - 43:25
**discounts** [7] - 20:19, 20:23, 21:5, 21:10, 37:15, 37:21, 146:23
**discovery** [1] - 44:25
**discretion** [2] - 122:19, 123:25
**discuss** [1] - 115:23
**discussed** [3] - 117:9, 123:2, 126:9
**discusses** [1] - 114:10
**discussion** [5] - 7:14, 63:14, 106:13
**dispute** [6] - 58:4, 77:15, 78:8, 80:10, 85:5, 98:10
**distinction** [2] - 23:6, 37:17
**distinctions** [1] - 49:14
**DISTRICT** [4] - 1:1, 1:1, 162:1, 162:1
**document** [49] - 7:23, 28:6, 28:8, 28:9, 28:16, 29:18, 30:20, 44:24, 45:10, 50:22, 52:10, 61:12, 62:11, 80:18, 86:4, 105:24, 113:20, 114:7, 115:13, 116:9, 116:11, 116:12, 116:17, 117:8, 117:20, 117:23, 117:25, 118:3, 118:6, 118:12, 118:17, 119:6, 119:14, 120:3,

120:18, 120:23, 121:7, 121:8, 121:14, 121:18, 122:9, 122:12, 123:18, 132:19, 133:2, 133:18, 134:2
**documented** [2] - 29:9, 29:11
**documents** [8] - 3:12, 9:22, 14:2, 28:5, 28:7, 30:11, 42:7, 52:8
**dollar** [4] - 20:12, 94:3, 148:17, 148:21
**dollars** [10] - 15:20, 15:22, 68:24, 80:22, 88:20, 112:1, 144:22, 146:8, 146:10, 153:22
**done** [11] - 7:7, 21:12, 28:1, 28:4, 48:12, 48:13, 95:22, 109:16, 135:21, 137:8, 153:19
**dot** [1] - 148:6
**doubt** [1] - 130:9
**DOUGLAS** [2] - 160:2, 161:3
**down** [8] - 14:15, 14:18, 24:7, 43:6, 81:5, 94:4, 146:5, 148:6
**drastically** [1] - 156:6
**draw** [1] - 37:17
**DRG** [12] - 99:15, 99:20, 99:25, 100:5, 102:23, 103:10, 103:18, 103:20, 103:21, 104:1, 104:4, 104:13
**Drive** [1] - 2:14
**drug** [12] - 61:24, 80:15, 81:22, 83:14, 83:23, 84:13, 87:9, 87:10, 87:11, 156:13, 156:20, 158:5
**drugs** [8] - 87:3, 116:20, 138:12, 138:14, 140:5, 140:6, 155:20, 156:18
**duces** [1] - 33:18
**due** [5] - 57:17, 57:20, 93:11, 115:4, 152:6
**Duerke** [1] - 87:15
**DUERKE** [1] - 87:15
**duly** [2] - 4:3, 161:8
**duplicate** [5] - 67:14, 67:16, 138:19,

143:10, 143:25
**during** [4] - 12:9, 14:8, 20:21, 111:6
**duty** [2] - 51:20, 112:3

## E

**E-mail** [6] - 3:13, 31:22, 70:23, 71:11, 71:15, 88:10
**E-mailed** [3] - 31:23, 31:24, 45:16
**E-mails** [3] - 3:11, 31:21, 31:25
**E.L** [2] - 77:12, 127:4
**early** [4] - 17:23, 114:4, 144:20, 144:25
**earned** [1] - 78:25
**effect** [1] - 155:12
**eight** [2] - 12:5, 109:8
**Eisenhauer** [1] - 63:15
**EISENHAUER** [1] - 63:18
**either** [2] - 22:18, 149:4
**element** [3] - 34:9, 151:3, 151:9
**eliminates** [1] - 24:1
**employed** [2] - 4:18, 68:23
**employee** [3] - 25:11, 28:16, 150:17
**employee's** [1] - 88:19
**employees** [24] - 4:19, 17:11, 22:12, 22:22, 23:6, 23:7, 23:10, 25:3, 25:10, 26:2, 39:4, 39:24, 40:1, 40:2, 40:25, 54:20, 54:24, 55:10, 55:12, 55:15, 141:25, 155:22, 156:8, 156:9
**employer** [55] - 12:9, 20:5, 21:8, 21:9, 21:14, 22:4, 22:21, 23:24, 24:22, 25:1, 25:2, 25:9, 26:1, 26:8, 26:9, 26:11, 38:15, 39:21, 48:14, 49:4, 49:14, 49:17, 51:10, 51:14, 51:17, 54:6, 54:15, 54:21, 55:14, 55:17, 55:25, 111:20, 111:24, 115:17, 115:18, 127:14, 127:15, 127:18, 137:20, 141:19, 141:21, 141:22, 142:6, 142:9, 147:5,

**employer's** [1] - 155:18
**employers** [12] - 14:21, 21:11, 23:17, 40:4, 40:8, 55:8, 137:9, 142:25, 143:1, 143:4, 145:23, 146:21
**employment** [1] - 12:9
**End** [1] - 3:2
**end** [6] - 42:19, 45:24, 65:15, 67:15, 79:13
**ended** [1] - 92:21
**engagement** [8] - 7:16, 9:12, 10:3, 10:8, 10:9, 27:21, 113:21, 132:1
**engages** [1] - 118:24
**engaging** [1] - 112:3
**ensure** [2] - 99:13, 100:22
**enter** [3] - 54:15, 126:19, 127:17
**entered** [7] - 51:17, 54:21, 55:16, 56:13, 70:13, 74:16, 100:15
**entire** [5] - 24:21, 57:15, 108:3, 158:1
**entitled** [3] - 125:5, 125:17, 144:5
**entries** [10] - 28:24, 29:2, 32:5, 68:6, 68:12, 70:6, 73:23, 75:1, 80:2, 102:2
**entry** [12] - 8:11, 9:7, 32:3, 45:3, 57:6, 78:14, 78:17, 85:13, 87:14, 94:7, 98:3, 102:9
**EOB** [5] - 3:13, 72:17, 87:19, 88:17, 91:5
**episode** [2] - 15:15, 134:5
**equal** [1] - 124:14
**equally** [1] - 128:24
**equals** [1] - 135:18
**equitable** [1] - 125:24
**Erica** [2] - 77:14, 126:25
**Errata** [1] - 3:3
**ERRATA** [1] - 160:1
**essence** [1] - 153:10
**essentially** [19] - 5:19, 6:2, 9:11, 21:17, 24:1, 24:17, 24:18,

25:8, 29:8, 29:23, 30:2, 36:23, 37:9, 49:25, 87:23, 96:12, 100:2, 138:13, 138:21
**Esser** [1] - 117:16
**established** [1] - 4:23
**estimate** [3] - 26:16, 26:18, 26:24
**evaluate** [3] - 124:21, 128:17, 130:15
**evaluation** [1] - 115:14
**event** [1] - 161:20
**evidently** [1] - 82:18
**exact** [6] - 7:6, 14:3, 38:22, 41:3, 118:6, 137:8
**exactly** [3] - 53:9, 101:5, 145:1
**examination** [2] - 157:11
**EXAMINATION** [5] - 4:5, 106:16, 136:9, 150:4, 154:4
**Examination** [5] - 2:20, 2:23, 2:24, 2:25, 3:1
**examined** [1] - 4:4
**examining** [1] - 137:5
**example** [12] - 7:21, 22:21, 23:1, 29:3, 46:2, 84:4, 135:2, 135:20, 135:24, 140:4, 144:19, 158:3
**exceed** [1] - 15:21
**exceeded** [2] - 48:5, 66:6
**exceeding** [1] - 56:6
**exceeds** [34] - 13:4, 26:19, 40:20, 48:10, 48:20, 49:10, 50:2, 50:10, 51:8, 51:21, 52:12, 52:17, 54:10, 55:1, 55:18, 56:4, 56:9, 65:24, 72:4, 72:22, 73:6, 73:17, 90:2, 90:15, 108:13, 108:20, 112:6, 114:17, 115:11, 120:5, 120:11, 121:1, 123:23, 142:21
**except** [1] - 118:25
**exception** [1] - 160:5
**exchange** [1] - 146:9
**exchanging** [1] - 146:8
**excluded** [1] - 11:24
**exclusive** [1] - 22:18

**exclusivity** [1] - 22:14
**excuse** [9] - 7:21, 20:8, 45:21, 52:20, 54:7, 64:10, 70:10, 96:1, 111:24
**exercising** [1] - 152:6
**Exhibit** [52] - 6:7, 6:10, 7:21, 8:11, 12:17, 19:13, 20:1, 28:23, 32:4, 44:16, 44:21, 44:23, 45:3, 45:20, 57:3, 57:6, 58:4, 59:6, 59:11, 68:5, 70:20, 70:22, 73:22, 74:6, 75:2, 78:13, 78:15, 80:16, 80:18, 81:7, 82:22, 83:8, 83:18, 85:12, 85:18, 86:9, 88:6, 88:10, 93:21, 94:24, 98:2, 101:16, 101:17, 110:19, 117:4, 117:7, 121:5, 121:10, 122:12, 125:14, 152:11, 154:7
**exhibit** [4] - 84:23, 101:16, 110:20, 117:15
**Exhibits** [1] - 4:1
**exhibits** [1] - 110:16
**exist** [2] - 107:11, 108:10
**exists** [2] - 23:23, 130:22
**expect** [6] - 21:18, 46:1, 46:5, 46:8, 99:17, 105:15
**expected** [1] - 15:21
**expenses** [2] - 22:25, 51:15, 122:20
**experience** [17] - 9:15, 9:21, 15:25, 16:3, 17:4, 17:6, 17:21, 17:24, 23:16, 24:12, 25:19, 55:8, 79:19, 106:21, 107:1, 107:3, 129:25
**experiences** [1] - 109:12
**expert** [22] - 3:8, 6:8, 11:3, 11:11, 11:18, 11:19, 11:24, 12:12, 12:17, 32:6, 75:10, 85:1, 94:6, 109:13, 110:4, 110:25, 119:15, 119:18, 119:21, 123:2, 126:9, 127:23
**explain** [4] - 30:1,

107:8, 144:8, 147:17
**explained** [2] - 24:22, 106:1
**explaining** [1] - 11:20
**explanation** [3] - 72:24, 88:12, 115:1
**exposure** [1] - 51:14
**expressing** [2] - 132:3, 132:6
**extent** [3] - 13:4, 105:12, 118:25
**extra** [1] - 149:18

## F

**facilities** [14] - 84:4, 125:2, 125:3, 125:4, 144:5, 144:9, 144:10, 144:11, 145:12, 145:15, 145:20, 154:21, 155:4
**facility** [9] - 22:20, 37:18, 37:19, 61:15, 93:11, 122:21, 123:20, 144:13, 144:16
**fact** [5] - 67:22, 82:4, 91:13, 145:8, 151:20
**factor** [4] - 15:13, 103:22, 144:18, 144:21
**factors** [1] - 139:18
**facts** [1] - 75:11
**fair** [9] - 21:16, 28:24, 32:3, 54:19, 54:23, 65:3, 77:3, 86:22, 102:8
**Faith** [1] - 71:8
**fall** [1] - 139:23
**Falls** [1] - 4:16
**familiar** [3] - 16:2, 113:11, 134:23
**familiarity** [3] - 16:5, 17:14, 109:4
**families** [2] - 23:11, 142:3
**family** [1] - 142:5
**father** [2] - 72:14
**February** [4] - 1:16, 7:25, 19:20, 162:14
**Federal** [1] - 1:19
**fee** [3] - 79:20, 79:22, 84:12
**fees** [11] - 34:6, 48:4, 66:5, 66:12, 89:17, 112:25, 114:11, 115:4, 130:2
**fell** [2] - 70:18, 139:16
**few** [3] - 134:23,

136:6, 150:2
**figure** [5] - 35:19, 37:13, 133:23, 146:1, 146:7
**figures** [1] - 106:6
**figuring** [1] - 89:4
**file** [2] - 58:10, 143:16
**filed** [2] - 42:7, 113:22
**files** [2] - 87:21, 136:19
**final** [1] - 45:23
**finalization** [1] - 111:9
**finalized** [1] - 101:3
**finally** [1] - 92:19
**financial** [2] - 142:5, 155:24
**financials** [1] - 5:20
**fine** [1] - 71:16
**finished** [2] - 136:20, 156:22
**firm** [4] - 47:22, 77:8, 89:22, 90:12
**first** [18] - 4:3, 8:10, 8:11, 20:1, 29:8, 32:24, 43:2, 67:12, 78:13, 78:14, 78:17, 81:9, 92:15, 114:6, 116:23, 147:10
**five** [2] - 76:15, 76:16
**fixed** [3] - 14:25, 20:10, 144:19
**flip** [3] - 93:20, 102:17, 121:17
**follow** [2] - 130:13, 154:2
**follow-up** [1] - 130:13
**follow-ups** [1] - 154:2
**following** [2] - 156:25, 157:2
**follows** [1] - 4:4
**FOR** [7] - 1:1, 2:2, 2:5, 2:9, 2:12, 160:7, 162:1
**foregoing** [3] - 159:4, 160:4, 161:13
**form** [67] - 41:18, 43:14, 48:8, 48:19, 49:7, 50:4, 50:9, 51:7, 51:22, 52:11, 52:18, 54:11, 55:1, 55:22, 61:8, 66:1, 73:5, 73:16, 74:3, 74:13, 75:4, 77:10, 79:8, 85:22, 89:19, 90:1, 90:14, 91:8, 91:11, 91:15, 91:23, 99:15, 100:18, 100:25, 105:25, 106:2, 107:19, 108:12, 108:19,

109:17, 111:16, 112:5, 113:7, 113:24, 114:16, 115:10, 116:1, 119:20, 120:4, 120:10, 120:25, 123:22, 124:15, 132:20, 133:20, 134:15, 134:19, 135:5, 142:20, 143:7, 143:18, 144:1, 147:18, 147:19, 151:15, 152:9, 153:4
**former** [2] - 11:19, 12:9
**forming** [1] - 119:18
**forth** [3] - 115:15, 122:23, 161:10
**forward** [1] - 24:15
**foundation** [35] - 55:2, 55:22, 65:25, 72:6, 72:22, 73:6, 73:17, 74:4, 74:14, 75:5, 89:20, 90:2, 90:15, 91:23, 100:19, 107:20, 108:13, 108:20, 112:6, 113:8, 113:25, 114:17, 115:10, 116:2, 120:5, 120:11, 121:1, 123:23, 124:16, 134:20, 135:5, 142:21, 143:8, 144:1, 153:5
**four** [6] - 5:10, 24:7, 43:6, 70:6, 73:23, 101:24
**fourteen** [2] - 65:2, 104:16, 104:25
**fourth** [4] - 14:14, 14:18, 74:8, 148:6
**frame** [2] - 15:19, 15:21
**Fraser** [1] - 2:6
**front** [5] - 6:7, 75:13, 75:19, 83:22, 110:22
**fruition** [1] - 127:3
**full** [14] - 4:10, 20:1, 24:4, 26:3, 59:7, 59:17, 78:22, 98:15, 107:14, 111:5, 112:20, 126:1, 147:15, 148:17
**fully** [1] - 103:16
**functioned** [1] - 5:12
**funded** [3] - 35:21, 111:25, 115:19
**funds** [1] - 89:22

## G

**G.S** [1] - 91:25
**gained** [1] - 10:1
**Gary** [9] - 68:14, 91:25, 93:22, 98:19, 152:11, 152:23, 153:1, 153:20, 154:6
**general** [2] - 103:15, 134:25
**GENERAL** [1] - 160:25
**General** [4] - 1:15, 161:6, 161:25, 162:25
**generally** [1] - 21:1
**Generally** [1] - 20:3
**generated** [1] - 30:19
**Georgia** [1] - 2:11
**given** [9] - 12:2, 21:5, 47:24, 56:10, 86:3, 86:8, 96:11, 138:14, 161:12
**GMS** [3] - 1:9, 2:13, 162:9
**Golden** [1] - 2:10
**govern** [2] - 120:23, 127:10
**governing** [1] - 119:1
**Granfield** [5] - 99:7, 102:2, 102:3, 102:10, 104:22
**great** [2] - 45:18, 111:19
**greater** [3] - 104:5, 104:7, 121:22
**Gregory** [1] - 2:10
**Group** [8] - 4:9, 5:22, 6:1, 6:4, 12:22, 13:1, 13:11, 70:25
**group** [13] - 18:21, 22:2, 22:6, 23:5, 23:13, 23:14, 38:10, 97:23, 99:21, 127:18, 140:19, 140:21, 140:24
**GROUP** [2] - 1:7, 162:7
**groups** [7] - 20:5, 35:21, 37:15, 38:5, 39:18, 109:8, 109:11
**guess** [7] - 6:10, 26:23, 27:3, 31:25, 85:18, 86:17, 118:7
**Gutierrez** [1] - 74:7

## H

**half** [1] - 89:9
**hand** [2] - 80:17, 161:22
**handing** [3] - 44:22,

70:21, 88:9
**handled** [6] - 82:10, 109:16, 131:20, 131:23, 132:3, 132:7
**handwritten** [1] - 31:10
**hanging** [1] - 130:10
**Hannah** [1] - 70:24
**hard** [1] - 145:3
**haul** [1] - 142:10
**head** [1] - 108:18
**heading** [1] - 14:16
**health** [19] - 5:1, 11:19, 11:20, 16:11, 19:1, 19:7, 19:9, 37:3, 51:15, 59:25, 93:7, 93:15, 140:24, 145:24, 145:25, 146:20, 155:16, 156:7
**Health** [4] - 5:9, 5:10, 5:17, 92:5
**HEALTH** [1] - 1:3, 162:3
**hear** [2] - 108:22, 147:20
**Heather** [1] - 8:17
**held** [4] - 7:14, 34:15, 63:14, 106:13
**help** [2] - 101:15, 148:4
**helps** [1] - 117:14
**hereby** [3] - 160:4, 161:7, 162:13
**herein** [1] - 161:14
**hereinbefore** [1] - 161:10
**high** [3] - 20:12, 93:6, 155:21
**higher** [5] - 22:1, 36:4, 80:13, 114:22, 125:7
**highest** [1] - 85:2
**highlighted** [1] - 102:1
**highly** [1] - 27:5
**hire** [2] - 90:12, 142:7
**hired** [1] - 6:25
**hiring** [1] - 141:25
**HMO** [1] - 5:14
**hold** [1] - 147:15
**homes** [1] - 19:4
**Hope** [3] - 61:5, 61:24, 133:5
**hospital** [36] - 14:19, 15:3, 18:13, 18:21, 24:19, 30:14, 37:18, 38:24, 43:10, 59:1, 69:23, 93:5, 93:8, 93:18, 104:2, 107:22, 108:10, 120:2, 122:21,

123:20, 128:22, 129:7, 129:8, 129:20, 130:2, 130:3, 130:18, 132:15, 133:2, 136:14, 138:1, 140:10, 140:17, 145:3, 147:11, 149:12
**hospital's** [3] - 107:17, 107:21, 130:19
**hospitals** [11] - 18:15, 18:20, 18:24, 19:3, 19:4, 19:6, 44:11, 108:16, 125:11, 132:16, 146:18
**hour** [1] - 9:8, 9:10, 19:11, 65:19, 65:21, 66:19, 76:23, 89:9, 89:12, 91:3
**hours** [4] - 7:24, 8:4, 8:5, 32:25
**house** [2] - 15:2, 146:16
**HP** [1] - 8:16
**hundred** [1] - 144:22
**Hutchinson** [2] - 77:16, 77:18
**Hutchison** [1] - 127:1
**hypothetical** [2] - 74:25, 75:23

## I

**ID** [1] - 68:22
**idea** [1] - 128:12
**identified** [3] - 3:7, 61:14, 65:6
**identifies** [1] - 117:18
**identify** [1] - 132:23
**ignored** [1] - 154:11
**imaging** [6] - 20:12, 63:22, 64:2, 140:8, 140:9
**Imaging** [3] - 43:17, 46:3, 64:22
**immediately** [2] - 16:12, 126:1
**Impact** [2] - 4:18, 4:19, 4:21
**implement** [1] - 16:24
**implemented** [1] - 35:12
**Implemented** [1] - 14:18
**implementing** [1] - 109:1
**important** [3] - 33:22, 145:18, 145:19
**IN** [3] - 1:1, 161:21,

162:1
**inappropriate** [2] - 133:3, 158:2
**INC** [6] - 1:7, 1:8, 1:10, 162:7, 162:8, 162:10
**incentive** [1] - 22:19
**included** [7] - 28:2, 31:3, 31:5, 31:24, 34:13, 57:25, 122:21
**includes** [1] - 6:11
**inconsistent** [2] - 132:19, 133:18
**incorrect** [1] - 134:13
**incorrectly** [4] - 131:20, 131:23, 132:4, 132:7
**increase** [2] - 21:15, 122:20
**increased** [4] - 35:12, 36:10, 97:1, 144:21
**incur** [1] - 142:12
**incurred** [3] - 27:6, 34:25, 72:11
**independent** [1] - 18:24
**indicate** [3] - 32:22, 32:25, 160:20
**indicated** [2] - 72:25, 111:18
**indicating** [5] - 28:11, 61:8, 87:19, 88:12, 100:10
**indicating)** [1] - 101:18
**individual** [11] - 28:19, 29:21, 30:16, 32:9, 34:20, 42:25, 44:17, 67:22, 86:2, 92:12, 108:4
**individuals** [2] - 92:20, 136:17
**information** [24] - 5:25, 6:2, 13:21, 30:14, 31:4, 31:23, 33:2, 34:13, 42:3, 42:15, 42:21, 47:6, 57:14, 60:6, 60:9, 60:20, 66:3, 67:18, 88:5, 100:9, 128:16
**Inman** [1] - 70:24
**inpatient** [14] - 35:24, 36:4, 37:4, 37:5, 37:10, 37:22, 38:2, 100:3, 100:6, 103:3, 104:2, 121:19, 123:20, 135:17
**inpatients** [1] - 38:1
**instance** [3] - 33:24, 148:21, 152:4
**instances** [3] - 27:20,

129:18, 145:9
**instead** [2] - 59:25, 147:1
**instruction** [1] - 131:12
**insurance** [6] - 26:2, 38:14, 38:15, 51:15, 63:4, 146:22
**intend** [1] - 12:19
**intended** [4] - 53:14, 99:14, 100:13, 100:23
**intent** [2] - 48:15, 49:2
**interact** [1] - 5:21
**interacted** [1] - 5:22
**interest** [8] - 48:13, 48:18, 48:24, 49:1, 49:6, 112:10, 112:19, 150:17
**interested** [3] - 9:14, 34:17, 161:20
**interim** [1] - 26:7
**interrogatory** [2] - 45:12, 57:5
**investigated** [1] - 138:25
**invoice** [13] - 3:9, 7:24, 8:2, 8:10, 72:17, 72:24, 78:9, 80:2, 80:5, 80:9, 128:7, 128:14, 128:21
**invoices** [2] - 7:13, 8:8
**involved** [10] - 9:13, 12:7, 45:24, 61:4, 77:9, 105:5, 138:18, 142:14, 155:9, 156:8
**involvement** [1] - 127:16
**involves** [1] - 27:25
**involving** [1] - 126:8
**Iowa** [1] - 5:14
**IPPS** [1] - 121:21
**isolate** [1] - 34:25
**issue** [4] - 8:8, 33:17, 34:3, 141:11
**issued** [5] - 7:13, 39:15, 39:17, 39:19
**item** [1] - 71:20
**iterations** [1] - 117:22
**itself** [3] - 7:6, 87:11, 140:4

---

## J

**J.K** [4] - 56:20, 56:23, 57:9, 57:12
**J.L** [1] - 67:2
**jackson** [1] - 3:9
**Jackson** [7] - 2:3,

7:10, 8:1, 8:5, 8:24, 9:6, 10:9
**January** [8] - 6:20, 6:22, 9:5, 29:3, 29:17, 32:4, 117:16
**JEAN** [6] - 1:13, 4:2, 160:4, 160:21, 161:7, 162:15
**Jean** [1] - 4:12
**JL** [1] - 9:5
**Jodi** [3] - 67:4, 67:8, 68:6
**Johnson** [4] - 69:3, 69:5, 73:23, 75:1
**Johnson's** [2] - 72:11, 72:13
**Jonathan** [3] - 57:7, 57:13, 59:11
**judgment** [3] - 51:24, 52:1, 52:5
**Julie** [1] - 70:24
**July** [3] - 7:2, 9:7, 9:8
**jumping** [1] - 156:23
**jurisdiction** [1] - 158:19

---

## K

**K.D** [2] - 87:14, 88:11
**Kansas** [1] - 93:16
**Kathleen** [1] - 8:15
**Kathy** [1] - 9:12
**KB** [2] - 8:12, 8:14
**keep** [3] - 32:8, 32:17, 96:16
**Kelly** [2] - 102:2, 102:3
**kept** [1] - 146:23
**Kim** [1] - 87:14
**kind** [18] - 10:24, 22:14, 22:17, 40:11, 42:25, 92:14, 92:24, 98:20, 133:21, 136:7, 137:4, 145:19, 146:3, 152:15, 156:1, 156:15, 156:22, 156:23
**kinds** [2] - 11:22, 155:23
**King** [3] - 57:7, 57:13, 59:11
**king's** [1] - 58:20
**knowledge** [5] - 9:25, 10:1, 17:6, 17:9, 42:23
**known** [1] - 15:2
**KR** [1] - 9:3
**Kutak** [36] - 5:25, 7:8, 7:10, 9:4, 30:18, 30:20, 31:2, 31:16,

31:21, 42:2, 47:22, 48:1, 48:5, 61:17, 65:23, 66:2, 67:17, 72:14, 74:8, 76:24, 79:6, 82:11, 88:11, 89:3, 89:17, 99:12, 100:9, 105:2, 105:21, 115:23, 126:18, 127:23, 128:2, 136:11, 137:2, 139:11
**Kutak's** [1] - 66:5

---

## L

**L.J** [3] - 69:2, 69:25, 70:7
**L.L.C** [3] - 1:9, 2:13, 162:9
**L.L.O** [1] - 2:6
**L.L.P** [1] - 2:10
**L.M** [3] - 60:23, 133:6, 133:8
**lab** [7] - 57:17, 57:24, 58:1, 59:3, 69:15, 105:10, 140:9
**labs** [2] - 58:18, 69:17
**Lamprecht** [3] - 67:4, 67:8, 68:6
**language** [16] - 111:12, 111:19, 113:2, 121:23, 121:25, 122:4, 122:8, 122:18, 122:25, 123:4, 123:9, 123:14, 123:17, 125:21, 126:6, 126:11
**large** [6] - 22:3, 23:13, 35:21, 35:23, 96:20, 140:7
**larger** [14] - 20:5, 21:8, 21:10, 21:13, 21:21, 21:23, 22:4, 22:6, 23:5, 23:14, 40:4, 40:8, 93:15, 140:12
**largest** [1] - 14:20
**last** [11] - 8:21, 53:25, 77:13, 104:19, 107:1, 107:3, 117:14, 120:15, 121:15, 140:1
**late** [4] - 17:23, 38:20, 114:2, 150:7
**law** [4] - 47:22, 77:8, 89:22, 90:12
**Law** [4] - 2:2, 2:6, 2:9, 2:13
**lawsuit** [4] - 4:9, 34:10, 113:22, 128:9, 128:14,

128:24, 130:6
**lawyer** [1] - 53:7
**laymen's** [1] - 100:1
**learned** [1] - 57:11
**least** [4] - 36:24, 45:20, 109:7, 148:12
**leave** [1] - 25:10
**leaving** [1] - 85:15
**left** [2] - 7:15, 130:10
**legal** [3] - 66:12, 89:17, 125:24
**legitimately** [1] - 11:23
**LEONARD** [4] - 1:6, 1:7, 162:6, 162:7
**Leonards** [1] - 2:13
**less** [3] - 22:24, 40:15, 95:18
**Letter** [1] - 119:25
**letters** [2] - 61:14, 61:16
**level** [4] - 121:13, 121:19, 123:18, 136:7
**levels** [2] - 116:17, 122:23
**Lewis** [8] - 2:3, 3:9, 7:10, 8:2, 8:6, 8:24, 9:6, 10:9
**liability** [6] - 61:20, 61:21, 62:6, 62:9, 62:14, 132:25
**licensed** [1] - 5:13
**life** [1] - 151:8
**Lilly** [5] - 69:3, 72:11, 72:13, 73:23, 75:1
**limited** [1] - 117:1
**LINE** [1] - 160:7
**line** [3] - 81:9, 156:23, 158:1
**lines** [2] - 24:7, 43:6
**list** [4] - 44:17, 84:5, 136:16, 136:17
**listed** [5] - 20:19, 43:3, 56:22, 75:1, 84:6
**litigation** [1] - 11:8
**live** [1] - 4:15
**location** [1] - 22:15
**long-term** [1] - 155:6
**look** [43] - 7:5, 30:9, 33:18, 34:1, 36:11, 36:13, 37:3, 42:24, 42:25, 44:13, 46:12, 58:4, 68:5, 73:22, 80:8, 82:18, 85:2, 85:25, 93:21, 94:5, 96:16, 96:17, 102:4, 102:6, 102:15, 111:2, 113:10, 113:14, 113:18,

115:16, 116:9, 116:11, 116:16, 117:12, 125:19, 133:4, 133:8, 134:3, 148:2, 153:7, 153:13, 155:14, 155:15

**looked** [22] - 30:10, 32:10, 34:22, 36:20, 40:23, 44:18, 52:8, 65:8, 87:20, 110:24, 113:19, 114:6, 116:5, 116:12, 133:1, 137:22, 138:7, 138:10, 138:11, 138:18, 143:15

**looking** [37] - 13:16, 22:11, 28:23, 30:3, 30:5, 32:9, 41:6, 44:13, 58:20, 65:10, 69:16, 78:13, 82:21, 82:22, 82:24, 82:25, 83:4, 83:8, 84:14, 85:4, 85:11, 90:7, 92:25, 94:23, 100:11, 104:20, 110:7, 110:13, 113:13, 115:21, 123:16, 124:25, 133:24, 138:24, 139:2, 143:10, 154:7

**looks** [16] - 6:11, 13:16, 19:10, 59:6, 74:11, 78:20, 78:22, 79:25, 87:24, 88:1, 91:24, 93:22, 98:10, 98:14, 101:18, 102:16

**lose** [2] - 15:22, 149:8

**low** [1] - 146:23

**lower** [1] - 74:15

**lowered** [1] - 43:17

**Lucas** [5] - 60:23, 61:2, 61:7, 63:2, 133:12

---

**M**

**macro** [1] - 136:7

**mail** [7] - 3:13, 31:22, 70:23, 71:11, 71:15, 88:10, 90:11

**mailed** [3] - 31:23, 31:24, 45:16

**mails** [3] - 3:11, 31:21, 31:25

**main** [1] - 139:18

**majority** [3] - 4:25, 116:4, 139:15

**manage** [1] - 18:23

---

**managed** [2] - 5:1, 16:7

**management** [1] - 142:14

**managing** [2] - 142:15, 155:10

**manner** [4] - 84:3, 132:19, 133:17, 137:8

**manual** [1] - 30:7

**March** [8] - 3:11, 70:15, 71:2, 72:1, 74:17, 76:21, 161:22, 162:22

**Marie** [1] - 4:12

**mark** [2] - 40:3, 140:18

**marked** [13] - 4:1, 44:21, 44:23, 70:20, 70:22, 80:16, 80:17, 88:6, 88:10, 110:17, 110:18, 117:5, 117:25

**market** [8] - 35:20, 43:7, 55:7, 56:11, 58:22, 138:21, 141:23, 141:24

**marketing** [1] - 5:3

**marketplace** [5] - 9:24, 9:25, 21:1, 22:7, 39:18

**markup** [1] - 140:7

**marrow** [1] - 57:18

**Maschka** [1] - 70:24

**match** [4] - 58:17, 94:12, 94:13, 94:14

**matched** [1] - 138:8

**material** [1] - 128:11

**materials** [1] - 143:15

**math** [10] - 74:11, 74:18, 74:23, 74:24, 75:12, 75:17, 75:19, 76:11, 83:9, 124:18

**matter** [5] - 77:7, 106:19, 128:20, 131:24, 139:6

**maximum** [1] - 116:19

**MBR** [11] - 110:3, 110:6, 110:9, 110:10, 110:17, 110:24, 111:3, 112:21, 113:11, 115:25

**mean** [30] - 28:9, 31:6, 42:4, 77:3, 77:5, 83:12, 84:15, 84:20, 85:2, 90:10, 90:13, 92:10, 97:20, 99:25, 102:24, 106:22, 107:8, 110:10, 120:20, 127:5,

---

130:8, 131:18, 133:21, 135:8, 135:9, 151:22, 152:23, 155:13, 155:14, 156:18

**meaning** [1] - 22:17

**means** [4] - 17:19, 84:2, 150:19, 151:23

**meant** [2] - 141:15

**MEDICAL** [4] - 1:7, 1:8, 162:7, 162:8

**medical** [6] - 11:22, 109:25, 110:10, 112:4, 113:20, 142:13

**Medical** [10] - 25:20, 43:25, 68:17, 68:19, 68:24, 69:6, 70:6, 70:14, 77:16, 127:1

**Medicare** [31] - 15:4, 15:10, 99:14, 100:14, 100:17, 100:24, 101:12, 102:18, 103:2, 103:8, 103:11, 103:12, 103:13, 103:24, 103:25, 104:9, 104:20, 121:20, 123:20, 124:23, 125:4, 125:8, 134:17, 134:22, 134:24, 135:4, 135:19, 135:21, 141:6, 144:4, 155:2

**Medicare-based** [2] - 15:4, 15:10

**meeting** [2] - 9:5, 29:13

**meets** [2] - 99:14, 100:23

**MEGAN** [1] - 2:9

**Megan** [5] - 88:7, 106:18, 117:17, 136:5, 151:16

**Meier** [2] - 71:12, 71:19

**MEIER** [1] - 71:12

**member** [36] - 22:19, 30:24, 48:14, 48:24, 49:1, 49:3, 50:23, 51:3, 51:10, 51:16, 61:4, 62:12, 79:17, 79:18, 88:25, 89:14, 90:8, 90:18, 90:19, 90:23, 96:12, 96:17, 96:19, 96:21, 107:13, 107:18, 116:22, 130:12, 132:24, 138:24,

---

147:5, 152:16, 152:21, 152:22, 153:9, 153:10

**member's** [4] - 90:21, 90:25, 91:4, 139:4

**members** [6] - 23:7, 23:11, 24:20, 24:25, 107:15, 142:2

**mentioned** [11] - 12:14, 18:25, 23:15, 24:14, 25:23, 69:12, 138:20, 141:18, 142:24, 144:2, 156:18

**Mercy** [4] - 68:17, 68:19, 68:23, 68:24

**Merit** [2] - 1:14, 161:5

**met** [5] - 4:7, 100:10, 100:11, 148:16

**method** [1] - 71:7

**Methodology** [1] - 42:5

**methodology** [5] - 14:20, 14:23, 14:24, 20:13, 148:20

**Meyer** [4] - 60:23, 61:2, 61:7

**Meyers** [1] - 133:12

**Michaelle** [4] - 33:11, 34:12, 101:15, 121:6

**MICHAELLE** [1] - 2:2

**mid** [2] - 17:25, 114:2

**middle** [1] - 63:20

**middleman** [1] - 24:2

**might** [8] - 21:22, 85:10, 101:15, 135:4, 135:24, 147:16, 148:4, 156:5

**mind** [1] - 120:14

**mine** [3] - 92:22, 102:4, 136:7

**minimum** [5] - 20:6, 35:13, 36:10, 37:1, 144:15

**Minnesota** [2] - 5:15, 21:3

**minus** [4] - 62:12, 87:4, 87:12, 87:13

**minute** [2] - 72:7, 96:1

**minutes** [1] - 47:4

**mistake** [5] - 52:14, 54:6, 55:17

**Mitchell** [3] - 2:23, 106:18, 151:16

**MITCHELL** [14] - 2:9, 45:9, 45:18, 106:17, 110:15, 117:3, 117:13, 118:1, 120:13, 121:6, 136:2, 151:15,

---

151:18, 152:9

**model** [1] - 17:12

**moment** [1] - 95:21

**money** [5] - 64:16, 89:22, 91:17, 149:5, 149:8

**Montana** [3] - 17:8, 17:10, 17:11

**morning** [1] - 4:7

**most** [7] - 12:8, 28:23, 30:17, 41:25, 89:9, 124:25, 125:3

**mostly** [1] - 31:12

**move** [3] - 25:3, 26:1, 85:10

**MR** [46] - 2:5, 4:6, 10:17, 33:11, 33:14, 33:20, 33:25, 34:4, 45:11, 45:15, 53:4, 53:7, 53:10, 53:21, 56:6, 59:10, 63:13, 63:17, 75:7, 75:10, 75:20, 76:1, 76:4, 76:7, 84:19, 84:22, 84:24, 85:1, 88:7, 94:23, 95:2, 101:25, 102:8, 106:8, 110:21, 153:5, 154:2, 154:5, 156:25, 157:4, 157:10, 157:13, 157:17, 157:20, 157:23, 158:9

**MRI** [1] - 43:17

**MS** [170] - 2:2, 2:9, 2:12, 8:18, 8:22, 8:25, 10:12, 10:16, 10:18, 13:3, 13:13, 26:19, 27:1, 33:13, 33:16, 33:22, 34:1, 40:20, 41:18, 43:14, 45:9, 45:14, 45:18, 47:13, 48:8, 48:19, 49:7, 49:10, 49:13, 50:2, 50:9, 50:13, 51:7, 51:21, 52:2, 52:11, 52:16, 52:23, 53:1, 53:5, 53:13, 53:16, 53:18, 53:24, 54:2, 54:9, 54:17, 54:25, 55:18, 55:21, 56:4, 56:8, 56:15, 59:8, 63:11, 65:24, 66:8, 66:14, 68:11, 68:15, 72:4, 72:21, 73:5, 73:16, 74:3, 74:13, 74:19, 74:22, 75:4, 75:8, 75:12, 75:18, 75:24, 76:2, 76:5, 77:10, 79:7,

81:2, 81:5, 84:17, 84:20, 84:23, 84:25, 85:21, 89:19, 90:1, 90:14, 91:8, 91:11, 91:15, 91:21, 91:23, 94:22, 94:25, 96:2, 100:18, 101:23, 102:1, 106:11, 106:17, 107:19, 108:12, 108:19, 109:2, 109:17, 110:9, 110:15, 111:15, 112:5, 113:7, 113:24, 114:16, 115:10, 116:1, 117:3, 117:11, 117:13, 117:17, 118:1, 119:19, 120:4, 120:10, 120:13, 120:25, 121:6, 121:11, 123:22, 124:5, 124:7, 124:15, 132:20, 133:6, 133:10, 133:20, 134:15, 134:19, 135:5, 136:2, 136:6, 136:10, 142:20, 143:7, 143:18, 143:24, 144:1, 147:18, 147:23, 148:1, 149:25, 150:2, 150:5, 151:15, 151:17, 151:18, 152:9, 153:4, 153:25, 156:14, 156:21, 157:2, 157:5, 157:12, 157:15, 157:18, 157:21, 157:25, 158:10, 158:14, 158:18, 159:1
**MTDS** [1] - 1:23
**multiple** [6] - 41:13, 41:14, 67:8, 68:21, 85:24, 138:17
**multiplied** [1] - 103:23
**multiplier** [1] - 83:19
**multiply** [2] - 81:20, 82:16

**N**

**name** [7] - 4:8, 4:10, 7:7, 8:21, 18:6, 77:13, 106:18
**named** [1] - 128:23
**names** [1] - 18:7
**Natalie** [1] - 70:23

**nature** [1] - 145:16
**NE** [1] - 1:24
**NEBRASKA** [4] - 1:1, 160:1, 161:2, 162:1
**Nebraska** [23] - 1:16, 1:17, 2:4, 2:8, 2:15, 5:15, 18:8, 18:12, 18:15, 18:17, 18:22, 21:4, 22:10, 22:11, 64:22, 100:14, 100:23, 109:5, 109:9, 134:18, 134:24, 150:12, 161:7
**necessarily** [3] - 23:8, 129:2, 151:4
**need** [18] - 10:20, 10:24, 72:6, 74:20, 75:16, 85:8, 101:15, 117:1, 135:9, 135:10, 135:13, 135:15, 135:16, 146:1, 146:5, 149:14
**needed** [4] - 42:15, 62:13, 136:16, 136:17
**needs** [4] - 55:25, 156:8, 156:10
**negotiate** [4] - 40:19, 92:16, 129:8, 130:1
**negotiated** [5] - 24:9, 99:13, 100:22, 146:17, 153:18
**negotiating** [6] - 20:22, 44:3, 64:21, 105:2, 105:8, 146:22
**negotiations** [7] - 82:9, 82:10, 82:14, 92:14, 99:10, 105:6, 129:7
**negotiator** [1] - 74:7
**Nelsen** [6] - 79:23, 83:1, 83:2, 85:13, 85:19, 86:11
**Nelson** [5] - 1:14, 1:22, 161:5, 161:24, 162:13
**nelson** [1] - 162:24
**network** [9] - 24:24, 25:3, 26:3, 38:11, 38:13, 38:16, 109:21, 118:23, 119:2
**never** [1] - 104:10
**new** [2] - 14:19, 156:23
**next** [11] - 24:3, 67:2, 69:1, 78:3, 79:23, 87:14, 97:22, 99:6, 99:18, 102:15,

105:16
**nine** [3] - 101:17, 101:20, 101:21
**NO** [3] - 1:4, 160:20, 162:4
**nonbillable** [2] - 9:8, 9:10
**noncovered** [4] - 61:5, 61:9, 132:22, 133:13
**none** [2] - 19:22, 150:10
**nonhospital** [1] - 37:18
**normal** [3] - 20:24, 90:13, 149:17
**Northwest** [1] - 64:22
**notarial** [1] - 161:22
**Notary** [4] - 1:15, 161:6, 161:25, 162:25
**NOTARY** [1] - 160:25
**note** [3] - 60:8, 133:12
**noted** [3] - 116:20, 151:22, 160:5
**notes** [7] - 30:16, 31:1, 31:5, 31:10, 66:24, 102:17, 102:23
**nothing** [3] - 84:15, 120:19, 161:9
**notice** [8] - 30:21, 33:17, 57:19, 128:8, 129:11, 129:19, 130:16, 143:20
**November** [1] - 70:10
**Number** [12] - 46:12, 59:21, 60:23, 63:15, 77:12, 79:23, 87:14, 91:24, 126:25, 133:9, 133:11
**number** [11] - 23:8, 32:25, 41:3, 57:17, 68:18, 80:1, 103:1, 103:8, 117:19, 125:1, 146:24
**numbers** [5] - 37:16, 38:22, 68:22, 106:1, 135:9
**numerous** [1] - 67:9
**nursing** [1] - 19:4
**NW** [1] - 2:10

**O**

**O'Neill** [3] - 18:17, 18:18, 18:22
**object** [4] - 10:13, 151:15, 152:9, 153:4
**objecting** [1] - 157:25
**objection** [63] - 13:3,

13:13, 13:14, 26:19, 27:1, 40:20, 41:18, 43:14, 48:8, 48:9, 48:19, 49:7, 50:2, 50:9, 51:7, 52:11, 53:3, 53:12, 54:25, 56:4, 56:7, 65:24, 72:4, 72:21, 73:5, 73:16, 74:3, 74:13, 75:4, 77:10, 79:7, 85:21, 89:19, 90:1, 90:14, 91:8, 91:21, 100:18, 107:19, 108:12, 108:19, 109:2, 109:17, 111:15, 112:5, 113:7, 113:24, 114:16, 116:1, 119:19, 120:4, 120:10, 120:25, 123:22, 124:15, 132:20, 133:20, 134:15, 134:19, 142:20, 143:7, 143:18, 143:24, 147:19
**objections** [10] - 50:13, 52:2, 52:16, 52:24, 54:3, 54:9, 54:17, 56:15, 66:8, 66:14
**obligation** [1] - 152:16
**obtain** [5] - 5:25, 17:12, 20:6, 139:12, 153:8
**obtained** [1] - 153:12
**obviously** [2] - 21:8, 24:20
**occasion** [1] - 137:7
**occasionally** [1] - 132:21
**occasions** [1] - 105:9
**occur** [1] - 131:16
**October** [5] - 114:5, 114:7, 115:23
**OF** [7] - 1:1, 1:13, 160:1, 160:2, 161:2, 161:3, 162:1
**offer** [7] - 12:19, 13:10, 22:14, 54:7, 156:1, 156:16
**offered** [4] - 25:4, 99:13, 99:15, 100:22
**offering** [3] - 131:19, 155:23, 156:3
**offers** [1] - 156:7
**office** [1] - 92:15
**oftentimes** [3] - 30:15, 138:17, 142:4
**Omaha** [5] - 1:17, 1:24, 2:4, 2:8, 2:15

**once** [1] - 143:23
**Oncology** [1] - 80:3
**oncology** [4] - 80:14, 81:16, 83:14, 140:5
**one** [70] - 5:14, 9:2, 9:8, 11:12, 12:14, 14:20, 18:5, 20:21, 28:11, 28:20, 28:22, 29:11, 29:20, 29:24, 39:2, 39:3, 39:13, 39:25, 40:1, 40:2, 43:2, 49:17, 52:7, 57:21, 67:2, 67:16, 68:14, 69:1, 71:9, 74:8, 78:3, 79:1, 79:4, 79:6, 80:2, 80:20, 81:8, 84:21, 87:18, 88:2, 88:5, 90:6, 93:15, 93:23, 97:22, 98:17, 98:23, 99:6, 101:14, 101:23, 103:20, 104:2, 104:6, 104:7, 107:4, 117:24, 126:24, 127:2, 128:6, 130:6, 137:22, 138:20, 139:24, 140:1, 141:25, 144:2, 145:17, 146:6, 149:17, 151:18
**ones** [2] - 18:16, 136:23
**ongoing** [2] - 11:5, 127:14
**operate** [2] - 18:8, 18:12
**operating** [1] - 148:25
**operation** [1] - 4:22
**operations** [1] - 5:18
**opine** [2] - 13:18, 14:6
**opinion** [21] - 13:22, 20:15, 38:7, 39:20, 51:23, 54:4, 54:14, 55:6, 95:7, 112:2, 119:21, 120:1, 120:8, 120:22, 131:19, 131:22, 132:3, 132:7, 141:24, 151:13, 151:14
**opinions** [7] - 12:19, 12:21, 13:10, 56:10, 119:15, 119:18, 150:15
**opportunities** [1] - 146:6
**opportunity** [1] - 21:25
**opposed** [6] - 128:8,

128:22, 130:18, 146:2, 146:8
**option** [1] - 54:19, 54:23
**oral** [1] - 31:19
**organization** [2] - 20:4, 26:2
**organizations** [2] - 16:9, 115:15
**original** [1] - 58:16
**originally** [1] - 60:4
**otherwise** [2] - 128:12, 161:19
**out-of-pocket** [1] - 22:24
**outcome** [2] - 98:18, 152:1
**outlines** [2] - 61:12
**outpatient** [14] - 14:19, 14:25, 15:3, 36:3, 37:4, 37:7, 37:11, 69:23, 100:5, 135:17, 138:2, 138:3, 140:11, 144:19
**outside** [1] - 111:23
**outstanding** [6] - 13:25, 64:23, 72:16, 72:25, 87:21, 139:10
**overall** [1] - 156:16
**overbilling** [1] - 43:11
**overcharging** [3] - 59:1, 64:4, 93:5
**overpaid** [1] - 153:21
**overpriced** [1] - 63:25
**oversaw** [1] - 5:18
**owe** [1] - 139:2
**owed** [11] - 14:4, 71:10, 89:15, 89:18, 89:24, 90:11, 90:13, 91:5, 91:6, 91:14, 91:18
**owing** [1] - 87:23
**own** [4] - 18:23, 21:13, 56:1, 113:5
**owns** [1] - 19:3

**P**

**P-a-n-i-c-k** [1] - 8:22
**P.C** [2] - 2:3, 2:6
**p.m** [6] - 2:22, 3:2, 106:14, 106:15, 159:5
**Pacific** [1] - 1:23
**package** [2] - 61:7, 98:20
**page** [14] - 35:5, 78:14, 81:3, 81:7, 88:15, 94:25, 98:4,

102:9, 102:16, 102:17, 117:14, 118:5, 122:15, 153:3
**Page** [50] - 2:19, 13:16, 14:14, 19:25, 24:3, 27:4, 35:4, 42:4, 42:24, 45:2, 46:12, 56:19, 56:24, 57:5, 59:10, 59:22, 60:22, 62:5, 63:20, 68:5, 69:2, 71:13, 73:22, 82:24, 82:25, 85:12, 85:19, 86:10, 93:23, 95:2, 98:2, 98:5, 116:23, 117:9, 118:12, 118:13, 118:14, 118:16, 119:24, 119:25, 121:4, 121:12, 121:17, 122:8, 122:11, 123:18, 125:14, 148:5, 152:12, 153:3
**PAGE** [1] - 160:7
**pages** [1] - 101:17
**paid** [68] - 15:12, 15:15, 19:10, 50:7, 51:13, 59:7, 59:13, 59:17, 62:18, 63:3, 64:11, 76:23, 76:24, 78:21, 78:23, 79:15, 79:16, 85:15, 85:16, 94:21, 95:3, 95:11, 95:15, 97:9, 97:11, 98:15, 98:18, 100:17, 107:11, 112:25, 114:23, 115:4, 126:2, 126:16, 132:11, 132:18, 132:24, 133:17, 133:25, 134:1, 134:4, 134:8, 134:11, 134:13, 137:11, 137:12, 139:4, 139:8, 143:17, 144:14, 145:21, 146:19, 147:14, 148:22, 149:18, 149:19, 149:22, 152:22, 152:23, 153:1, 153:9, 153:11, 153:13, 153:21, 154:14, 154:16, 154:22
**panick** [2] - 8:18, 8:19
**Paragraph** [2] - 114:10, 115:9
**paragraph** [6] - 20:1, 24:3, 24:4, 43:5,

63:21, 125:20
**parameters** [1] - 149:4
**Parkway** [1] - 2:14
**part** [15] - 18:20, 18:21, 20:15, 29:21, 52:14, 68:19, 82:8, 99:9, 109:12, 110:3, 134:10, 141:11, 148:14, 152:5, 155:22
**participant** [2] - 45:3, 109:21
**participants** [2] - 14:8, 27:6
**particular** [8] - 22:9, 22:15, 22:20, 61:3, 138:24, 138:25, 140:6, 148:22
**particularly** [2] - 22:13, 145:15
**parties** [1] - 161:19
**partnership** [1] - 15:18, 145:22
**party** [12] - 5:5, 5:11, 5:12, 16:13, 16:22, 35:23, 111:23, 112:14, 115:19, 117:24, 141:16, 152:3
**pass** [1] - 8:6
**passed** [3] - 67:17, 92:17, 105:25
**Patient** [15] - 45:21, 46:16, 46:18, 56:19, 60:23, 67:2, 69:2, 77:12, 78:3, 84:15, 99:6, 126:25, 133:8, 133:11
**patient** [37] - 14:3, 32:24, 32:25, 43:2, 44:11, 44:18, 46:12, 46:13, 49:20, 56:20, 56:24, 57:7, 57:12, 59:22, 60:10, 61:1, 61:20, 62:14, 63:15, 64:18, 69:2, 87:17, 87:19, 116:24, 120:2, 122:1, 126:16, 127:4, 128:6, 128:10, 128:21, 128:22, 129:3, 129:14, 129:18, 133:4
**patients** [12] - 41:10, 41:11, 41:15, 42:25, 49:24, 91:25, 107:25, 108:5, 113:16, 123:2, 126:8, 128:6
**pay** [9] - 58:19, 59:20,

71:11, 81:1, 82:4, 125:11, 130:3, 146:4, 152:17
**payer** [2] - 147:4
**payers** [1] - 20:25
**paying** [2] - 77:7, 98:23
**payment** [45] - 14:7, 14:19, 14:23, 14:24, 14:25, 15:1, 15:3, 15:4, 15:18, 16:9, 20:13, 25:8, 27:9, 27:12, 62:17, 62:20, 71:7, 83:7, 88:22, 95:22, 97:6, 97:18, 99:15, 99:20, 99:23, 100:5, 107:15, 111:7, 113:6, 114:24, 115:1, 116:16, 116:19, 120:23, 121:13, 121:18, 122:23, 123:17, 123:19, 124:22, 125:22, 144:15, 148:20, 149:5, 149:7
**PAYMENT** [2] - 1:7, 162:7
**payments** [9] - 9:24, 64:25, 69:16, 69:18, 116:25, 125:6, 142:19, 146:6, 154:10
**pays** [1] - 147:8
**people** [2] - 23:9, 158:22
**per** [3] - 19:11, 102:18, 149:12
**percent** [122] - 20:7, 20:8, 21:18, 21:22, 26:13, 31:14, 35:13, 35:17, 35:24, 35:25, 36:10, 36:15, 36:22, 36:25, 37:2, 37:6, 37:8, 37:22, 37:23, 37:25, 38:3, 38:9, 38:18, 38:24, 43:17, 44:1, 44:4, 46:2, 46:6, 46:9, 46:22, 47:10, 59:4, 63:8, 67:25, 69:9, 69:11, 69:21, 71:9, 71:17, 72:2, 72:10, 72:20, 73:2, 73:3, 73:11, 74:12, 75:2, 75:9, 76:14, 76:16, 77:6, 77:7, 77:19, 78:11, 86:25, 87:5, 87:8, 87:11, 87:12, 87:13, 93:1, 93:10, 95:4,

95:8, 95:11, 95:19, 96:19, 96:21, 96:24, 97:5, 97:14, 97:16, 99:4, 99:14, 100:13, 100:17, 100:23, 101:10, 102:18, 103:8, 103:11, 104:7, 104:8, 104:20, 106:4, 114:14, 121:20, 121:22, 122:22, 123:19, 124:10, 124:14, 124:22, 124:25, 125:7, 125:8, 134:22, 134:24, 135:1, 135:3, 135:18, 135:19, 135:21, 139:16, 139:19, 139:22, 140:16, 140:18, 144:14, 144:21, 144:23, 153:21, 154:2, 154:24, 154:25, 155:1, 155:18
**percentage** [8] - 96:20, 96:21, 96:22, 114:11, 115:3, 134:17, 135:4, 141:6
**percentages** [6] - 37:14, 39:21, 96:3, 96:7
**perform** [1] - 112:3
**performed** [1] - 144:24
**period** [6] - 19:8, 41:6, 57:25, 58:2, 58:17, 100:3
**permitted** [5] - 116:16, 121:13, 121:18, 122:22, 123:17
**person** [1] - 92:8
**perspective** [2] - 93:8, 155:24
**pharmaceutical** [1] - 116:24
**pharmaceuticals** [1] - 138:10
**pharmacy** [4] - 142:13, 155:15, 155:16, 156:4
**phone** [1] - 151:19
**phrased** [1] - 145:1
**physician** [2] - 140:14, 140:15
**physicians** [1] - 146:19
**picked** [1] - 96:19
**picture** [1] - 10:24
**place** [22] - 16:10,

35:11, 36:5, 38:8, 51:2, 65:10, 77:1, 77:23, 78:1, 78:2, 108:25, 115:17, 115:18, 137:24, 138:4, 139:25, 144:11, 147:3, 151:12, 151:25, 161:14
**placed** [1] - 161:21
**places** [1] - 20:20
**Plaintiffs** [2] - 1:4, 162:4
**PLAINTIFFS** [1] - 2:2
**plan** [122] - 11:20, 11:21, 12:23, 13:2, 14:3, 14:8, 19:1, 19:9, 23:7, 24:24, 25:3, 25:17, 27:7, 28:15, 28:16, 28:17, 34:6, 35:12, 36:10, 36:12, 36:17, 37:25, 41:1, 42:6, 45:3, 49:5, 49:6, 49:14, 49:17, 50:1, 51:20, 55:10, 59:1, 59:7, 61:11, 61:20, 61:22, 62:6, 62:9, 62:11, 64:4, 64:8, 65:15, 66:22, 88:22, 89:1, 89:14, 89:18, 89:23, 89:25, 91:5, 91:6, 91:13, 91:17, 106:25, 107:2, 108:15, 109:1, 109:16, 109:22, 110:1, 111:14, 111:20, 111:24, 111:25, 112:2, 112:10, 112:13, 115:20, 116:9, 116:11, 116:12, 116:17, 117:8, 117:20, 118:3, 118:11, 118:12, 118:16, 118:23, 119:2, 119:5, 119:14, 120:3, 120:17, 120:18, 120:23, 120:24, 121:8, 121:18, 122:8, 122:12, 123:12, 123:18, 125:23, 125:25, 126:3, 126:15, 126:19, 127:9, 127:15, 127:17, 132:19, 133:1, 133:18, 134:2, 142:15, 142:17,

143:2, 146:20, 150:18, 151:11, 152:7, 152:16, 155:10, 155:16, 155:23, 156:7
**PLAN** [2] - 1:3, 162:3
**plan's** [2] - 89:22, 111:22
**planning** [2] - 5:3, 105:11
**plans** [5] - 16:1, 16:19, 106:21, 134:18, 137:5
**Plans** [3] - 5:9, 5:10, 5:17
**plus** [4] - 11:13, 123:24, 124:1, 124:8
**pocket** [1] - 22:24
**point** [7] - 5:14, 9:12, 10:10, 18:9, 48:22, 86:8, 100:15
**pointing** [1] - 117:25
**portion** [2] - 118:4, 118:10
**position** [3] - 20:4, 142:3, 155:25
**possible** [5] - 40:10, 40:14, 40:15, 40:17, 130:5
**possibly** [2] - 20:10, 146:24
**potential** [1] - 67:19
**potentially** [1] - 67:16
**PPO** [11] - 21:17, 23:19, 26:5, 26:6, 38:8, 38:12, 38:16, 109:21, 134:18, 135:1, 135:24
**practice** [4] - 51:10, 55:7, 145:14, 146:25
**practices** [2] - 118:25, 119:1
**predominantly** [3] - 7:8, 69:15, 69:17
**preferred** [1] - 20:4
**prep** [2] - 29:4, 29:6, 29:18
**preparation** [2] - 28:6, 29:12
**prepare** [4] - 6:16, 29:14, 31:15, 31:17
**preparing** [1] - 32:5
**prescription** [5] - 116:20, 156:12, 156:18, 156:20, 158:5
**present** [1] - 2:16
**presented** [1] - 24:19
**president** [2] - 5:9, 5:16

**presumably** [1] - 79:10
**prevailing** [1] - 134:18
**previously** [11] - 12:14, 92:21, 110:16, 110:18, 115:4, 117:5, 133:17, 133:25, 134:4, 134:8, 134:12
**price** [8] - 24:8, 25:5, 25:6, 25:7, 65:3, 65:14, 87:2, 87:12
**prices** [2] - 63:24, 64:1
**PRICING** [2] - 1:8, 162:8
**pricing** [13] - 16:10, 16:15, 16:17, 17:7, 17:12, 24:5, 24:16, 51:5, 51:6, 51:9, 87:4, 150:7, 150:10
**Pricing** [1] - 25:20
**privilege** [1] - 10:14
**privy** [1] - 82:13
**problem** [1] - 43:24
**problematic** [1] - 111:19
**procedure** [3] - 144:24, 148:22, 149:12
**Procedure** [1] - 1:19
**procedures** [1] - 20:11
**process** [10] - 6:5, 11:20, 15:17, 30:2, 42:19, 50:18, 51:1, 62:24, 103:18, 114:21
**processed** [1] - 88:2
**processing** [1] - 5:20
**produced** [2] - 44:24, 117:23
**product** [1] - 107:10
**products** [2] - 107:6, 109:5
**professional** [5] - 10:5, 10:25, 35:25, 38:4, 38:25
**professions** [1] - 37:23
**profitable** [3] - 140:9, 140:11
**program** [17] - 27:9, 27:13, 28:12, 35:11, 52:6, 52:15, 54:7, 54:8, 56:14, 108:15, 108:17, 141:19, 142:2, 151:3, 151:4, 156:12, 156:19
**programs** [4] - 109:8, 141:5, 150:15,

150:16
**prompt** [1] - 147:12
**promptness** [1] - 148:17
**proper** [1] - 33:17
**proportionate** [1] - 115:3
**proprietary** [1] - 39:23
**prospective** [1] - 15:3
**provide** [8] - 7:1, 13:22, 25:4, 26:10, 35:20, 67:23, 109:25, 136:19
**provided** [20] - 7:20, 12:22, 13:21, 42:22, 43:8, 43:11, 58:22, 60:6, 60:7, 61:16, 66:3, 72:10, 79:9, 79:18, 100:9, 137:1, 138:8, 138:10, 138:12, 138:14
**provider** [38] - 15:17, 20:4, 23:24, 35:11, 36:13, 42:11, 51:11, 51:12, 59:19, 59:25, 60:2, 64:1, 64:4, 64:7, 64:16, 65:8, 65:11, 87:25, 90:4, 107:12, 107:14, 114:22, 118:24, 119:3, 120:17, 125:21, 126:2, 126:16, 127:10, 127:19, 140:1, 140:2, 146:12, 146:17, 147:5, 148:16, 153:18, 153:23
**provider's** [1] - 63:25
**providers** [15] - 15:10, 16:9, 27:8, 27:12, 41:23, 60:2, 67:9, 67:22, 68:21, 107:11, 120:24, 132:16, 136:22, 138:18, 145:23
**provision** [11] - 104:14, 118:19, 118:22, 119:5, 119:9, 119:13, 119:17, 121:14, 122:14, 123:10, 123:18
**provisions** [2] - 115:12, 115:24
**PUBLIC** [1] - 160:25
**Public** [4] - 1:15, 161:6, 161:25, 162:25
**published** [2] - 63:24,

64:1
**pull** [1] - 130:4
**pulled** [2] - 28:21, 86:2
**purchased** [1] - 130:18
**pure** [1] - 130:8
**purpose** [1] - 115:14
**purposes** [3] - 22:4, 128:19, 137:9
**pursuant** [1] - 1:18
**pursue** [1] - 130:6
**pursues** [1] - 125:23
**put** [13] - 16:10, 16:14, 24:15, 24:20, 45:24, 78:1, 78:2, 79:3, 79:6, 144:11, 147:2, 149:8, 151:12
**puts** [6] - 51:12, 51:16, 141:19, 141:21, 141:22, 142:2

## Q

**qualification** [1] - 14:16
**Qualifications** [1] - 14:16
**quality** [1] - 155:21
**quantity** [1] - 83:25
**questioning** [2] - 156:22, 158:1
**questions** [6] - 106:9, 150:1, 154:1, 156:24, 157:3, 157:5
**quick** [1] - 106:11
**quite** [1] - 155:13
**quote** [3] - 38:13, 38:15, 39:13
**quoted** [4] - 37:15, 38:5, 38:11, 39:12
**quotes** [7] - 38:11, 38:16, 38:20, 38:22, 39:1, 39:13, 39:15
**quoting** [1] - 35:21

## R

**R.G** [3] - 46:13, 46:18, 59:22
**Rahe** [4] - 92:2, 97:25, 98:3, 98:6
**RAHE** [1] - 92:2
**ran** [1] - 146:20
**Randy** [2] - 102:2, 102:3
**range** [6] - 26:17, 36:4, 36:25, 45:10, 67:19, 87:8
**rate** [11] - 76:24,

86:24, 99:13, 99:15, 100:2, 100:22, 103:24, 103:25, 134:18, 135:24, 146:9
**rate's** [1] - 144:22
**rates** [2] - 43:7, 58:21
**rather** [4] - 77:8, 115:16, 129:5, 129:8
**ray** [3] - 78:9, 79:21, 79:22
**RBR** [43] - 17:15, 27:9, 27:13, 28:12, 35:11, 52:6, 52:15, 55:16, 56:10, 56:13, 62:24, 106:21, 106:25, 107:2, 107:6, 107:10, 108:9, 108:15, 108:17, 109:1, 109:4, 109:8, 109:12, 141:18, 142:2, 150:7, 150:10, 150:14, 150:15, 150:18, 150:21, 150:22, 150:23, 151:2, 151:3, 151:4, 151:23, 152:3, 156:12, 156:19, 158:7
**reach** [1] - 134:11
**reached** [1] - 72:1
**reaching** [1] - 15:19
**read** [19] - 14:9, 27:10, 36:7, 50:22, 53:5, 53:20, 53:22, 53:25, 74:22, 85:12, 112:21, 120:15, 123:14, 158:11, 158:20, 158:22, 158:24, 159:3, 160:4
**reading** [3] - 85:17, 120:14, 161:16
**really** [14] - 25:6, 48:13, 51:4, 53:14, 83:15, 83:19, 84:7, 88:4, 105:12, 131:25, 141:12, 141:14, 141:16, 156:15
**reason** [5] - 15:16, 112:22, 131:18, 134:13, 137:19
**reasonable** [7] - 64:13, 69:22, 79:20, 79:22, 97:19, 105:12, 138:14
**reasons** [1] - 145:17
**receipt** [1] - 114:24
**receive** [3] - 115:8,

129:18, 144:15
**received** [11] - 21:1, 72:16, 72:17, 108:1, 108:6, 128:7, 128:21, 128:23, 129:3, 130:16, 145:10
**Recess** [2] - 2:21, 2:22
**recess** [2] - 76:8, 106:14
**recognized** [1] - 125:4
**recognizes** [1] - 144:5
**recollection** [2] - 122:7, 123:8
**recommend** [3] - 13:24, 31:13, 126:18
**recommendation** [14] - 47:24, 62:21, 67:24, 79:9, 95:23, 111:8, 126:22, 129:5, 129:22, 129:24, 136:13, 137:6, 139:11, 139:20
**recommendations** [16] - 9:23, 14:7, 30:18, 31:17, 44:10, 111:13, 113:15, 123:1, 125:1, 126:7, 127:22, 127:25, 128:19, 131:1, 139:15, 142:18
**recommended** [17] - 43:16, 43:24, 44:3, 46:21, 59:4, 63:8, 69:8, 73:1, 73:15, 73:20, 78:11, 86:24, 87:4, 87:7, 93:1, 112:24, 114:23
**recommending** [3] - 47:10, 127:17, 158:22
**reconcile** [2] - 14:2, 71:10
**reconciled** [1] - 138:22
**reconciliation** [7] - 28:22, 61:19, 83:7, 137:13, 137:14, 137:16, 139:3
**reconstructing** [1] - 139:7
**record** [12] - 4:11, 7:14, 32:14, 32:15, 32:19, 33:7, 33:21, 34:19, 63:12, 63:14, 106:13, 158:19
**recorded** [2] - 33:1, 94:18, 158:16
**records** [1] - 32:8

**recover** [1] - 133:3
**recovery** [1] - 125:23
**recreate** [1] - 85:8
**recruit** [1] - 156:11
**Redirect** [1] - 3:1
**REDIRECT** [1] - 154:4
**redirect** [1] - 157:12
**redirecting** [1] - 157:14
**reduce** [1] - 156:6
**reduced** [3] - 111:7, 147:16, 161:10
**reduction** [2] - 65:14, 112:24
**REED** [6] - 1:13, 4:2, 160:4, 160:21, 161:7, 162:15
**reed** [1] - 4:7
**Reed** [12] - 4:12, 44:22, 70:21, 75:17, 76:10, 88:9, 106:18, 110:20, 110:23, 117:4, 117:7, 154:3
**refer** [5] - 45:2, 46:15, 57:2, 98:2, 118:7
**reference** [30] - 15:5, 15:25, 16:6, 16:17, 16:24, 17:4, 17:7, 17:11, 18:2, 21:24, 24:5, 24:8, 24:16, 25:6, 25:17, 25:23, 51:4, 51:6, 51:9, 51:18, 54:8, 54:15, 54:22, 59:9, 106:22, 118:7, 119:23, 141:3, 142:25, 148:3
**reference-based** [24] - 15:5, 15:25, 16:6, 16:17, 16:24, 17:4, 17:7, 17:11, 18:2, 24:5, 24:8, 24:16, 25:17, 25:23, 51:4, 51:6, 51:9, 51:18, 54:8, 54:15, 54:22, 106:22, 141:3, 142:25
**referenced** [3] - 119:24, 127:13, 128:10
**referred** [2] - 28:18, 68:9
**referring** [3] - 80:6, 88:11, 127:8
**refers** [1] - 28:24
**reflected** [4] - 19:13, 36:22, 57:19, 119:14
**reflects** [1] - 36:14
**refund** [6] - 89:24, 90:11, 90:13, 115:8, 126:1, 126:15

**refused** [4] - 16:12, 24:18, 141:2
**regard** [3] - 10:14, 11:2, 150:15
**regarding** [4] - 12:21, 13:23, 14:6, 106:4
**Regency** [1] - 1:17, 2:3, 2:14
**region** [2] - 93:16, 93:17
**Regional** [3] - 71:8, 77:16, 127:1
**Registered** [2] - 1:14, 161:5
**regular** [1] - 8:8
**rehab** [1] - 61:25
**reimburse** [1] - 115:2
**reimbursement** [20] - 15:6, 16:1, 16:6, 16:25, 17:5, 18:3, 20:11, 36:5, 51:18, 54:8, 54:16, 54:22, 106:23, 122:20, 141:3, 143:1, 144:12, 144:19, 147:2, 155:3
**reimbursements** [1] - 154:22
**reject** [1] - 142:18
**rejected** [8] - 16:11, 16:25, 24:17, 27:8, 27:12, 27:17, 27:19, 142:25
**relate** [1] - 134:17, 135:4
**related** [2] - 51:4, 99:21
**relates** [1] - 13:7
**relation** [1] - 148:19
**relationship** [10] - 10:16, 11:1, 11:5, 11:7, 96:8, 119:2, 120:20, 121:2, 145:20, 146:3
**relationships** [1] - 151:9
**relative** [5] - 30:18, 67:18, 116:25, 145:23, 161:19
**rely** [1] - 119:17
**relying** [1] - 86:6
**remaining** [1] - 139:8
**remember** [13] - 18:1, 18:5, 18:6, 18:7, 18:14, 18:16, 25:12, 25:13, 25:14, 26:13, 100:4, 145:1, 147:21
**removed** [1] - 57:16
**rendered** [1] - 107:13
**reopening** [1] - 157:8

**report** [84] - 3:8, 6:8, 6:12, 6:16, 6:18, 6:23, 12:17, 13:5, 13:17, 14:14, 19:25, 21:24, 26:20, 31:16, 31:24, 32:6, 35:4, 40:21, 42:5, 44:14, 46:13, 46:16, 48:10, 48:21, 49:11, 50:3, 50:11, 51:8, 51:22, 52:12, 52:17, 54:10, 55:1, 55:19, 56:5, 56:7, 56:9, 56:19, 56:23, 59:22, 65:25, 68:10, 69:24, 72:5, 72:23, 80:1, 80:7, 84:14, 84:18, 85:1, 85:7, 86:12, 90:3, 90:16, 94:6, 104:25, 108:21, 109:13, 110:4, 110:25, 112:7, 114:18, 115:11, 116:2, 116:21, 116:23, 117:10, 117:18, 117:21, 118:8, 118:10, 120:6, 123:2, 126:9, 127:23, 128:7, 134:20, 135:6, 136:24, 139:15, 142:22, 148:4
**reported** [1] - 89:24
**Reporter** [3] - 1:14, 3:4, 161:6
**REPORTER** [1] - 52:20
**reporter** [5] - 43:22, 54:1, 63:19, 120:14, 120:16
**Reporters** [1] - 1:23
**reports** [1] - 35:20
**represent** [5] - 4:9, 20:5, 44:23, 106:19, 155:18
**representative** [1] - 20:25
**reprocess** [1] - 71:8
**request** [1] - 72:15
**requested** [2] - 42:22, 59:19
**requesting** [1] - 60:9
**required** [1] - 126:1
**requirements** [1] - 138:1
**residential** [1] - 61:6
**resolution** [1] - 139:1
**resolve** [4] - 48:1, 64:23, 85:17, 154:17
**resolved** [3] - 25:22,

100:7, 100:8
**resolving** [2] - 66:13, 72:16
**resource** [1] - 149:2
**resources** [2] - 148:24, 149:7
**respect** [5] - 13:1, 45:20, 45:21, 67:6, 154:6
**respective** [1] - 136:22
**respond** [4] - 90:17, 90:21, 91:1, 91:4
**responded** [4] - 129:12, 129:13, 129:14, 130:7
**responds** [1] - 71:19
**response** [2] - 71:16, 92:15
**responsibility** [12] - 5:17, 5:19, 62:12, 88:19, 96:12, 96:17, 96:23, 111:23, 112:9, 112:13, 112:14, 112:18
**responsible** [7] - 16:7, 20:22, 61:10, 61:22, 61:23, 63:2, 111:25
**restate** [1] - 78:22
**restrictions** [1] - 116:25
**result** [3] - 44:9, 79:13, 136:14
**results** [1] - 137:1
**retain** [1] - 156:11
**retaining** [2] - 114:14, 155:21
**retyped** [2] - 31:6, 31:7
**revenue** [1] - 93:14
**review** [42] - 11:21, 13:22, 14:1, 27:23, 28:7, 29:4, 29:9, 41:16, 47:19, 52:9, 63:1, 76:23, 76:25, 104:19, 108:3, 110:1, 110:3, 110:6, 110:10, 110:12, 111:12, 111:17, 112:4, 113:1, 113:20, 115:13, 119:5, 119:9, 121:25, 122:4, 122:25, 126:6, 126:11, 132:5, 132:9, 132:10, 132:18, 133:14, 136:18, 136:23, 143:9, 143:14
**reviewed** [35] - 27:14,

27:16, 27:21, 28:6, 28:8, 28:15, 28:25, 40:24, 42:6, 52:6, 65:7, 68:18, 72:13, 74:2, 85:23, 86:19, 98:8, 107:24, 108:4, 109:18, 113:19, 114:15, 117:9, 118:4, 119:10, 119:11, 122:2, 123:4, 131:14, 132:12, 134:6, 136:16, 136:17, 143:11, 143:22
**reviewing** [23] - 9:21, 46:24, 47:2, 47:4, 49:19, 50:6, 58:10, 65:6, 67:11, 70:17, 72:12, 85:20, 86:11, 89:7, 94:2, 102:12, 105:10, 111:17, 116:8, 116:13, 122:8, 123:9, 133:16
**reviews** [2] - 13:8, 136:20
**revised** [1] - 114:25
**revisions** [1] - 6:18
**rewarded** [1] - 147:14
**rework** [1] - 29:25
**reworked** [1] - 29:23
**Rick** [3] - 2:16, 70:23, 74:8
**rise** [1] - 155:19
**risk** [21] - 14:19, 14:23, 14:24, 15:16, 15:23, 16:10, 16:15, 16:16, 24:21, 24:25, 25:1, 25:11, 51:12, 51:16, 141:19, 141:21, 141:22, 147:2, 147:10, 148:11, 148:20
**risk-based** [9] - 14:19, 14:23, 14:24, 16:10, 16:15, 16:16, 147:2, 148:11, 148:20
**RMR** [4] - 1:22, 161:24, 162:13, 162:24
**Rock** [32] - 5:25, 7:8, 7:10, 9:4, 30:18, 30:21, 31:2, 42:2, 47:22, 48:1, 61:17, 65:23, 66:2, 67:17, 72:15, 74:8, 76:24, 79:6, 82:11, 88:12, 89:3, 89:17, 99:12, 100:9, 105:2, 105:21, 115:24, 126:19, 127:24,

128:2, 136:11, 139:11
**rolled** [3] - 68:17, 68:19, 68:24
**room** [3] - 61:12, 121:9, 149:1
**Rules** [1] - 1:19
**run** [2] - 36:13, 109:19
**run-out** [2] - 36:13, 109:19
**rural** [5] - 93:18, 125:3, 144:16, 144:17, 144:18

**S**

**S.B** [1] - 78:3
**S.R** [2] - 92:2, 97:22
**satisfied** [1] - 139:5
**Saunders** [2] - 43:25, 46:5
**saved** [3] - 48:17, 65:15, 66:22
**savings** [10] - 35:19, 36:14, 47:16, 48:6, 66:6, 114:11, 114:14, 115:4, 115:8, 142:9
**saw** [4] - 39:2, 86:5, 87:22, 104:10
**scope** [46] - 13:4, 14:11, 26:20, 40:21, 48:10, 48:21, 49:10, 50:3, 50:10, 51:8, 51:21, 52:12, 52:17, 54:10, 55:1, 55:18, 56:5, 56:6, 56:9, 65:25, 72:5, 72:22, 73:7, 73:18, 90:2, 90:15, 108:13, 108:20, 109:13, 112:6, 114:17, 115:11, 116:2, 120:5, 120:11, 121:1, 123:23, 124:16, 131:25, 132:10, 132:17, 134:20, 135:6, 142:21, 157:7
**scribble** [1] - 148:14
**seal** [1] - 161:22
**second** [8] - 20:3, 24:4, 43:5, 63:12, 63:21, 81:7, 88:15, 98:5
**section** [1] - 125:17
**Section** [3] - 111:2, 112:21, 115:5
**see** [47] - 9:15, 21:14, 21:24, 33:12, 34:24, 37:14, 38:5, 42:19,

45:4, 68:7, 68:25, 71:2, 71:5, 71:13, 73:24, 83:6, 87:22, 87:23, 98:3, 102:10, 102:18, 111:3, 111:10, 113:2, 113:9, 114:10, 115:5, 115:12, 116:22, 117:12, 118:19, 118:22, 119:3, 121:13, 121:23, 122:16, 122:23, 125:17, 125:20, 126:4, 133:1, 133:15, 139:2, 140:16, 140:17, 143:9, 143:15
**seek** [2] - 67:25, 126:15
**seeking** [1] - 34:5
**seem** [1] - 105:11
**segregated** [1] - 34:15
**self** [4] - 4:18, 35:21, 111:25, 115:19
**self-employed** [1] - 4:18
**self-funded** [3] - 35:21, 111:25, 115:19
**sell** [1] - 142:1
**semantics** [1] - 150:22
**send** [3] - 60:3, 71:9, 136:15
**sending** [1] - 89:4
**sent** [14] - 6:2, 27:15, 57:15, 57:19, 59:24, 60:2, 60:7, 60:8, 61:17, 72:24, 87:19, 88:11, 128:11
**sentence** [3] - 20:3, 119:24, 121:15
**separate** [1] - 155:3
**separately** [2] - 84:5, 84:7
**September** [4] - 7:3, 70:10, 94:7, 114:2
**serve** [2] - 11:3, 11:17
**served** [2] - 10:7, 11:19
**service** [40] - 6:12, 24:22, 29:10, 29:12, 46:16, 56:23, 61:2, 61:13, 63:22, 63:25, 64:6, 64:14, 65:10, 69:24, 70:9, 80:1, 80:6, 81:10, 81:11, 84:14, 84:18, 85:6, 94:5, 94:8, 94:15, 94:17, 110:8,

115:22, 116:6, 116:15, 132:22, 137:24, 138:4, 138:5, 138:8, 139:9, 139:25, 140:2, 140:3
**SERVICES** [2] - 1:9, 162:9
**services** [35] - 7:1, 12:22, 14:25, 23:9, 28:12, 35:25, 36:1, 36:3, 43:8, 43:11, 44:14, 52:7, 52:15, 55:16, 56:14, 58:22, 59:3, 61:5, 61:9, 62:2, 64:2, 67:11, 67:23, 93:5, 107:13, 110:1, 121:19, 121:21, 121:23, 140:8, 140:10, 140:11, 140:15
**serving** [2] - 10:6, 10:10
**set** [5] - 8:3, 115:15, 122:23, 148:21, 161:10
**sets** [1] - 149:12
**setting** [2] - 140:10, 140:17
**settle** [1] - 95:16
**settled** [2] - 63:6, 68:3
**settlement** [1] - 13:24, 26:25, 45:23, 46:1, 70:14, 73:9, 74:12, 74:16, 76:19, 77:19, 104:10
**settlements** [1] - 82:19
**settling** [1] - 44:4
**seven** [2] - 36:15, 36:22
**several** [1] - 117:22
**severity** [2] - 103:1, 103:21
**shall** [2] - 111:5, 115:1, 121:19, 125:24, 125:25
**Sheet** [1] - 3:3
**SHEET** [1] - 160:1
**Shelby** [4] - 92:2, 97:25, 98:3, 98:6
**Sherrets** [1] - 2:13
**short** [5] - 17:17, 25:5, 25:25, 142:9, 143:2
**short-term** [4] - 25:5, 25:25, 142:9, 143:2
**show** [5] - 66:24, 80:21, 81:9, 110:19, 117:4
**showed** [2] - 80:9, 143:16

shown [1] - 65:5
shows [6] - 19:15, 81:10, 83:3, 88:19, 88:22, 121:18
sic [7] - 37:6, 75:20, 85:23, 87:15, 127:1, 153:20, 154:17
sic] [1] - 133:12
side [7] - 38:4, 38:25, 142:13, 142:14, 146:17, 153:18, 157:19
sides [1] - 146:15
sign [8] - 52:10, 52:13, 52:14, 158:11, 158:20, 158:23, 158:25, 159:3
signed [6] - 7:3, 35:10, 61:8, 61:10, 61:15, 117:15
significant [1] - 98:24
significantly [1] - 95:18
signing [1] - 161:16
similar [3] - 15:5, 64:2, 138:20
simple [1] - 135:18
simply [3] - 90:17, 90:21, 146:3
simultaneous [1] - 133:22
single [8] - 77:25, 78:1, 84:5, 92:24, 127:5, 127:7, 127:11, 127:13
Sioux [3] - 4:16, 138:20, 144:3
Sipe [7] - 91:25, 93:22, 152:12, 152:23, 153:1, 154:6, 154:9
Sipe's [1] - 98:19
Sipes [1] - 153:20
sit [1] - 146:5
site [1] - 65:9
sitting [1] - 120:8
situation [15] - 6:3, 11:12, 24:8, 24:14, 25:22, 55:25, 61:7, 108:4, 127:12, 130:13, 130:16, 144:3, 147:4, 156:4, 156:17
situations [4] - 42:1, 42:14, 42:17, 126:23
sixth [1] - 119:23
sixty [1] - 93:10
size [6] - 21:7, 22:1, 93:8, 93:11, 140:19, 140:20

Skutt [1] - 70:23
slash [1] - 29:4
small [2] - 84:11, 145:16
smaller [2] - 96:22, 144:11
Smith [2] - 45:4, 45:22
Smith's [1] - 33:24
Smithpeter [6] - 2:16, 70:23, 71:5, 71:13, 74:9, 74:16
sold [1] - 24:24
sole [1] - 122:19
Solutions [1] - 25:20
SOLUTIONS [4] - 1:8, 1:9, 162:8, 162:9
someone [6] - 21:6, 110:15, 110:19, 112:19, 117:4, 147:8
sometime [1] - 114:2
sometimes [2] - 117:22, 139:3
somewhere [4] - 33:7, 36:24, 139:16, 140:18
somewheres [1] - 46:10
sorry [18] - 16:16, 39:8, 39:23, 43:23, 45:19, 47:14, 52:22, 59:22, 68:15, 78:17, 81:4, 82:22, 84:17, 94:22, 95:1, 118:11, 124:2, 135:14
sort [5] - 22:14, 67:13, 98:20, 151:12
sorting [1] - 102:7
source [2] - 30:19, 30:24
South [5] - 2:7, 4:16, 5:14, 10:11, 14:20
SPD [1] - 30:15
speaking [1] - 150:16
specialty [1] - 155:20
specific [13] - 15:14, 25:7, 32:20, 56:18, 58:13, 94:3, 100:3, 103:14, 115:14, 116:13, 136:12, 137:25, 138:4
specifically [21] - 13:7, 14:25, 18:4, 26:14, 26:15, 37:9, 40:13, 40:24, 50:14, 58:11, 60:21, 61:11, 61:18, 80:8, 108:7, 114:1, 116:18, 118:6, 119:10, 122:5, 122:6
specifics [2] - 91:19,

101:2
specified [1] - 161:15
speculate [1] - 54:13
speculation [20] - 27:2, 48:9, 48:21, 50:3, 50:10, 51:22, 52:18, 54:11, 55:2, 55:21, 56:5, 72:5, 72:21, 73:6, 73:17, 74:14, 75:5, 79:7, 85:21, 130:9
spell [1] - 8:21
spend [11] - 32:18, 37:3, 37:6, 37:8, 37:11, 46:24, 65:18, 89:7, 89:22, 155:15, 155:18
spent [14] - 32:5, 32:9, 33:8, 33:23, 34:19, 47:1, 47:3, 48:16, 58:10, 58:12, 66:12, 66:25, 89:3, 112:1
split [2] - 37:4, 153:16
spoken [4] - 130:24, 131:3, 131:6, 131:9
spot [1] - 94:19
spreadsheet [2] - 6:11, 103:5
spreadsheets [1] - 106:3
ss [2] - 160:1, 161:2
St [1] - 18:17
staff [1] - 5:20
stages [1] - 111:7
stand [2] - 16:3, 138:3
stand-alone [1] - 138:3
standard [2] - 21:17, 148:16
standpoint [1] - 16:3
start [4] - 30:4, 70:18, 101:20, 136:18
started [5] - 7:2, 21:11, 30:3, 146:11, 152:15
starts [1] - 103:19
state [6] - 4:10, 17:10, 18:5, 18:7, 25:15, 92:7
STATE [2] - 160:1, 161:2
State [5] - 1:15, 10:11, 17:7, 17:10, 161:7
STATES [2] - 1:1, 162:1
stating [1] - 104:18
status [1] - 128:13
stay [4] - 100:3, 103:4, 104:2, 149:3
steerage [4] - 22:15,

22:16, 22:17, 23:2
Steven [2] - 78:6, 78:14
still [5] - 55:16, 98:23, 98:24, 129:6, 130:1
stipulations [2] - 1:20, 161:16
stop [1] - 102:7
stopped [1] - 152:17
strain [1] - 142:5
strategic [1] - 5:3
Street [3] - 1:23, 2:7, 2:10
strictly [1] - 51:23
strike [1] - 70:18
structure [1] - 150:10
Stryker [1] - 2:6
stuff [1] - 86:8
subject [1] - 158:7
submissions [1] - 42:6
submit [1] - 8:4
submits [1] - 87:25
submitted [9] - 13:19, 41:17, 41:23, 42:9, 42:18, 67:21, 132:14, 132:15, 143:23
submitting [1] - 42:12
Subscribed [1] - 160:23
subsequently [1] - 114:20
substantially [2] - 24:25, 25:1
successful [1] - 15:19
successfully [1] - 114:21
succinctly [1] - 30:12
sued [1] - 143:5
suggest [1] - 49:23
suggested [1] - 42:1
suit [1] - 161:20
Suite [4] - 2:4, 2:7, 2:11, 2:14
sum [1] - 118:3
summary [6] - 28:15, 28:16, 28:17, 31:4, 117:8, 118:3
supervisor [3] - 92:17, 92:18
supplemental [1] - 115:1
supplies [2] - 149:1, 149:15
supporting [3] - 38:12, 38:13, 38:17
suppose [1] - 13:5
supposed [2] - 50:1, 157:15

surgery [1] - 104:5
SUSAN [2] - 1:6, 162:6
suspect [2] - 68:23, 130:8
sustainable [1] - 145:14
sworn [3] - 4:3, 160:23, 161:8
system [10] - 15:2, 15:3, 15:10, 16:11, 19:7, 51:18, 93:7, 93:15, 146:7, 155:4
System [1] - 92:5
systems [2] - 93:16, 150:7

**T**

T.G [2] - 99:6, 99:9
talks [3] - 80:2, 85:19, 116:24
target [1] - 13:24
task [1] - 67:12
tax [1] - 68:22
TBG [25] - 1:18, 2:6, 59:25, 60:3, 62:17, 62:18, 64:10, 64:11, 71:8, 85:15, 94:21, 95:3, 95:11, 95:22, 96:9, 96:18, 97:9, 97:18, 102:18, 109:9, 117:25, 153:8, 153:12, 153:17, 162:18
tecum [1] - 33:18
telephonically [1] - 2:10
ten [1] - 11:13
ten-plus [1] - 11:13
term [7] - 25:5, 25:25, 142:9, 143:2, 145:18, 155:6
termination [1] - 12:8
terms [11] - 15:18, 62:12, 68:16, 96:7, 100:1, 107:3, 115:15, 120:23, 128:13, 133:18, 134:2
Terry [4] - 99:6, 102:2, 102:3, 102:9
testified [5] - 4:4, 11:10, 112:12, 154:20, 155:6
testify [1] - 161:8
testimony [7] - 86:7, 106:20, 108:10, 140:23, 152:18, 158:15, 161:12
TESTIMONY [1] - 161:21

**tests** [3] - 57:17, 57:24, 58:1
**thalken** [1] - 148:9
**THALKEN** [46] - 2:5, 4:6, 10:17, 33:11, 33:14, 33:20, 33:25, 34:4, 45:11, 45:15, 53:4, 53:7, 53:10, 53:21, 56:6, 59:10, 63:13, 63:17, 75:7, 75:10, 75:20, 76:1, 76:4, 76:7, 84:19, 84:22, 84:24, 85:1, 88:7, 94:23, 95:2, 101:25, 102:8, 106:8, 110:21, 153:5, 154:2, 154:5, 156:25, 157:4, 157:10, 157:13, 157:17, 157:20, 157:23, 158:9
**Thalken** [4] - 2:20, 3:1, 4:8, 162:17
**THE** [39] - 1:1, 1:1, 1:7, 2:2, 2:5, 2:9, 2:12, 8:20, 8:23, 10:15, 52:20, 52:22, 52:25, 53:2, 53:9, 53:15, 53:17, 53:22, 55:20, 55:23, 59:12, 72:8, 74:21, 81:4, 102:5, 106:10, 124:6, 133:7, 136:4, 136:8, 147:22, 147:25, 158:13, 158:17, 158:24, 159:3, 162:1, 162:1, 162:7
**theirs** [1] - 66:18
**theory** [1] - 125:24
**they've** [1] - 145:13
**thinking** [3] - 36:24, 68:22, 98:17
**third** [12] - 5:5, 5:11, 5:12, 16:13, 16:22, 35:23, 111:23, 112:14, 115:19, 125:19, 141:16, 152:3
**third-party** [8] - 5:5, 5:11, 5:12, 16:13, 16:22, 35:23, 115:19, 141:16
**thirty** [4] - 21:23, 76:15, 76:16, 124:10
**thirty-five** [2] - 76:15, 76:16
**three** [5] - 27:6, 38:22, 68:12, 68:13, 74:6
**throughout** [1] - 8:9

**tie** [1] - 120:17
**Tim** [7] - 4:8, 45:9, 71:12, 71:15, 75:25, 81:6, 117:16
**TIMOTHY** [1] - 2:5
**Timothy** [1] - 162:17
**Tina** [6] - 1:14, 1:22, 161:5, 161:24, 162:13, 162:24
**today** [8] - 12:13, 38:6, 113:16, 120:9, 155:15, 155:16, 155:17, 155:19
**today's** [2] - 141:23, 141:24
**together** [6] - 10:4, 16:14, 146:1, 146:7, 147:6, 149:8
**took** [9] - 30:12, 32:25, 67:20, 137:23, 138:5, 153:7, 153:8, 162:14
**tool** [1] - 156:11
**top** [7] - 8:1, 13:17, 35:4, 95:15, 97:11, 148:6, 153:2
**total** [18] - 35:16, 35:17, 37:6, 37:8, 37:13, 40:23, 57:20, 62:2, 64:25, 77:19, 79:15, 83:20, 93:14, 98:11, 134:5, 149:2, 162:18, 162:20
**totally** [1] - 130:10
**touch** [1] - 92:12
**towards** [1] - 140:23
**TPA** [7] - 20:12, 24:15, 25:7, 25:12, 25:16, 26:8, 60:14, 115:2, 147:7
**TPAs** [5] - 16:20, 16:21, 18:2, 141:2, 143:5
**track** [1] - 32:17
**traditional** [1] - 109:21
**transaction** [1] - 149:9
**transcribed** [1] - 162:17
**transcript** [1] - 148:2
**transcription** [1] - 161:12
**transplant** [10] - 11:16, 57:17, 57:18, 57:22, 57:23, 57:25, 58:2, 58:16, 58:17
**treat** [1] - 98:20
**treated** [3] - 128:24, 147:6, 147:7
**treatments** [1] - 81:16
**tried** [5] - 16:10,

16:14, 16:24, 24:15, 91:3
**true** [4] - 97:15, 145:11, 160:4, 161:11
**truth** [3] - 161:8, 161:9
**try** [11] - 48:2, 49:5, 58:18, 92:19, 92:22, 92:23, 130:15, 136:14, 138:25, 139:12, 146:21
**trying** [15] - 13:9, 18:2, 49:13, 58:15, 83:17, 85:3, 90:17, 90:21, 91:1, 112:16, 133:23, 134:9, 141:2, 142:6, 147:1
**turn** [4] - 121:4, 122:11, 125:14, 157:9
**turned** [1] - 129:4
**turning** [1] - 123:17
**two** [14] - 20:20, 27:6, 32:5, 39:2, 39:12, 41:6, 68:6, 68:11, 68:25, 91:24, 115:15, 120:7, 126:23
**type** [13] - 4:24, 12:6, 22:19, 36:4, 65:11, 65:12, 100:5, 115:16, 115:17, 139:25, 140:2, 150:11
**types** [5] - 12:7, 20:23, 21:4, 67:11, 107:6
**typical** [5] - 37:3, 37:25, 58:1, 153:14, 153:15
**typically** [11] - 22:6, 38:19, 84:1, 105:7, 115:17, 115:18, 136:15, 140:12, 140:15, 144:14
**typing** [1] - 53:24
**typo** [1] - 35:8

## U

**ultimate** [3] - 67:24, 142:17, 147:4
**ultimately** [6] - 48:6, 63:5, 66:6, 77:18, 98:14, 111:25
**UMR** [2] - 60:11, 60:14
**unable** [3] - 17:12, 57:23, 59:18
**uncommon** [1] - 155:17
**uncover** [1] - 71:21
**under** [11] - 14:16,

27:9, 27:13, 42:5, 43:6, 46:16, 56:23, 68:17, 70:7, 119:25, 125:20
**understood** [3] - 93:7, 107:25, 147:9
**unfair** [2] - 51:9, 75:21, 86:4
**unfortunately** [1] - 83:16
**unit** [1] - 84:4
**UNITED** [2] - 1:1, 162:1
**United** [1] - 21:3
**units** [11] - 80:9, 80:14, 80:19, 80:21, 81:11, 81:13, 81:17, 82:1, 82:5, 84:6, 85:24
**unless** [3] - 24:9, 87:25, 121:8
**unpaid** [1] - 71:21
**unreasonable** [2] - 93:9, 93:10
**unresolved** [2] - 27:5, 27:18
**unusual** [2] - 27:5, 83:14
**up** [20] - 8:3, 29:20, 30:25, 35:13, 36:25, 37:1, 37:16, 68:17, 75:2, 92:21, 96:19, 103:21, 122:21, 123:19, 128:14, 130:13, 138:11, 150:3, 156:25, 157:2
**updates** [1] - 136:19
**ups** [1] - 154:2
**upwards** [1] - 20:7
**uses** [1] - 17:11
**usual** [2] - 107:12, 141:7, 141:10, 141:13, 141:14

## V

**validate** [3] - 9:22, 99:12, 132:13
**Valley** [4] - 61:3, 61:5, 61:24, 133:5
**VALLEY** [4] - 1:2, 1:3, 162:2, 162:3
**various** [2] - 107:6, 111:6
**vast** [1] - 116:4
**vendor** [1] - 25:16
**verification** [2] - 99:18, 105:15, 114:24
**verify** [5] - 81:25, 82:7, 84:10, 90:12, 91:6

**versus** [5] - 23:7, 37:18, 69:12, 103:10, 103:18
**Via** [6] - 92:4, 92:8, 93:12, 93:24, 98:3, 127:2
**via** [1] - 93:13
**view** [3] - 54:24, 64:14, 88:3
**viewed** [1] - 27:17
**violated** [1] - 112:3
**violation** [3] - 120:3, 120:20, 125:25
**VOGT** [3] - 2:12, 136:6, 136:10, 149:25, 153:4
**Vogt** [2] - 2:13, 2:24
**volumes** [3] - 135:10, 135:13, 135:15
**vs** [1] - 1:5, 162:5

## W

**W.S** [5] - 32:24, 43:2, 43:11, 44:11, 45:6
**waive** [1] - 158:21
**waived** [1] - 161:17
**waiver** [2] - 61:10, 61:15
**Walmart** [2] - 39:4, 39:7
**website** [4] - 63:25, 64:1, 64:7, 65:5
**week** [3] - 81:17, 99:18, 105:16
**weeklies** [1] - 81:15
**weekly** [1] - 83:12
**weeks** [1] - 85:24
**weight** [11] - 15:14, 103:3, 103:13, 103:19, 103:22, 103:23, 103:25, 104:1, 104:3, 104:5
**weights** [1] - 135:16
**welcome** [1] - 106:10
**Wellmark** [9] - 21:2, 39:2, 39:5, 39:7, 39:8, 39:9, 39:12, 39:13, 40:1
**whereas** [2] - 71:8, 147:15
**WHEREOF** [1] - 161:21
**whole** [1] - 161:9
**wholesale** [3] - 87:2, 87:4, 87:12
**willing** [1] - 65:13
**willingness** [1] - 21:14
**Willis** [3] - 33:24, 45:4, 45:21

**Wisconsin** [2] - 11:15, 12:15

**witness** [5] - 3:8, 11:25, 12:12, 161:12, 161:16

**WITNESS** [28] - 8:20, 8:23, 10:15, 52:22, 52:25, 53:2, 53:9, 53:15, 53:17, 53:22, 55:20, 55:23, 59:12, 72:8, 74:21, 81:4, 102:5, 106:10, 124:6, 133:7, 136:4, 136:8, 147:22, 147:25, 158:13, 158:17, 158:24, 159:3

**Witness** [3] - 108:18, 122:13, 125:16

**words** [1] - 143:25

**works** [4] - 101:9, 103:12, 103:21, 108:9

**world** [1] - 153:20

**worth** [1] - 35:3

**write** [5] - 24:7, 27:4, 29:20, 30:25, 58:21

**write-up** [2] - 29:20, 30:25

**writes** [1] - 71:5

**writing** [2] - 31:17, 161:11

**written** [3] - 57:14, 94:4, 134:24

**wrongful** [1] - 12:7

**wrote** [2] - 31:12, 38:21

**www.mtdsreporters. com** [1] - 1:25

# X

**X-ray** [3] - 78:9, 79:21, 79:22

# Y

**year** [5] - 18:14, 109:16, 109:22, 110:1, 114:3

**years** [8] - 5:10, 11:13, 14:8, 27:6, 27:7, 36:12, 41:7, 146:24

**yellow** [1] - 101:24

**yield** [1] - 35:24

**yourself** [1] - 155:25

# Z

**zero** [1] - 88:20