DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

# RBR PROGRAM SERVICES AGREEMENT

This RBR PROGRAM SERVICES AGREEMENT (the "Agreement") is made and entered into effective as of the 1st day of January, 2016 (the "Contract Date"), by and among ANASAZI MEDICAL PAYMENT SOLUTIONS, INC. d/b/a Advanced Medical Pricing Solutions, an Arizona corporation with its principal place of business at 420 Technology Parkway, Suite 200, Norcross, GA 30092 ("AMPS"), and its subsidiary, CLAIMS DELEGATE SERVICES, LLC, a Florida limited liability company with its principal place of business at 420 Technology Parkway, Suite 200, Norcross, GA 30092 ("CDS" or the "Delegate"), the CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN (the "Plan"), CENTRAL VALLEY AG COOPERATIVE, a Nebraska corporation with its principal place of business at 2803 N. Nebraska Avenue, York, NE 68467 ("Company"), on its own behalf and as the Plan Sponsor and Plan Administrator, and THE BENEFIT GROUP, INC., a Nebraska corporation with its principal place of business at 11906 Arbor Street, Suite 100, Omaha, NE 68144, the Plan's third party administrator (the "TPA"). When the Company is acting as the Plan Sponsor, it is acting in its capacity as the settlor of the Plan and will be referred to as the "Plan Sponsor." When the Company is acting as the named administrator of the Plan, it is acting in its fiduciary capacity and will be referred to as the "Plan Administrator." The Company, Plan, Plan Sponsor and Plan Administrator are hereinafter sometimes referred to collectively as the "Plan Parties" and each individually as a "Plan Party." CDS and AMPS are hereinafter sometimes referred to collectively as the "Program Parties" and each individually as a "Program Party." The Program Parties, the Plan Parties and the TPA are hereinafter sometimes referred to collectively as the "Parties" and each individually as a "Party."

WHEREAS, the Plan Sponsor, which established the Plan to provide medical benefits to eligible participants, wants to engage the Program Parties, to help implement and administer a Reference Based Reimbursement plan design and wants the TPA to modify its services to support that effort, and the Program Parties and TPA are willing to undertake such engagement and provide such services on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, the Parties agree as follows:

## Article I.    CAPITALIZED TERMS & DEFINITIONS

**Section 1.01**    Capitalized Terms Not Otherwise Defined. Any capitalized term used and not otherwise defined in the body of this Agreement will have the meaning set forth in the "Plan Modification Exhibit" (defined below), if such term is defined therein, and if not, it will have such meaning as may be set forth in another Exhibit or Schedule attached hereto. Any capitalized term used and not otherwise defined in this Agreement or an Exhibit or Schedule hereto will have the meaning established for such term under ERISA.

**Section 1.02**    Certain Definitions. For purposes of this Agreement, the terms below will have the following meanings:

"*Adjusted Charges*" means the amount of all billed charges on a Hospital or Facility Claim adjusted to the Specified Fee Levels (as hereinafter defined).

"*Advocacy*" means the assistance, support and negotiation services offered to Participants faced with Balance Billing through the Advocacy Program maintained by CDS, as described in Section 2.04 of this Agreement.

"*Advocacy Authorization*" means the valid consent of a Billed Participant (or a custodial parent or legal guardian of a Billed Participant who is a minor) authorizing CDS to provide Protective Efforts for their benefit, submitted in a written form acceptable to CDS, consent of a Billed Participant.

"*Advocacy Program*" means the program maintained by CDS to provide Advocacy, as described in Section 2.04 of this Agreement.

"*Applicable Law(s)*" means, as to any particular party or subject matter, applicable statutes and laws, regulations and rules promulgated thereunder, judicial orders, and the rules and requirements of governmental authorities having jurisdiction over such party or subject matter.

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

Page 1 of 29



TBG00002385

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

*"Balance Bill"* or *"Balance Billing"* means a bill for or attempt to collect an Improper Balance (as hereinafter defined)

*"Balance Billing Defense"* or *"Balance Billing Defense"* means commercially reasonable efforts to defend or provide for the defense of Billed Participants against legal actions to collect an Improper Balance in violation of the terms in the Plan Document, or to settle or provide for the settlement of such actions.

*"Billed Participant"* means a Participant who is subject to actions or attempts to collect an Improper Balance.

*"Billed Rates"* means, as to any Hospital Claim (as hereinafter defined), the rates or pricing levels reflected in the itemized bill from the Hospital (as hereinafter defined).

*"Billing Review"* means a review of billing documentation and related medical records undertaken to uncover any identifiable Invalid Charges (as hereinafter defined), as necessary and sufficient to allow the Claims Delegate to reasonably assess the accuracy and validity of billed charges submitted in connection with a Claim and to make determinations as to whether any such charge exceeds the Maximum Allowable Charge or whether such Claim exceeds Permitted Payment Levels.

*"Billing Review Specialist"* means any organization(s) or individual(s) engaged to provide Billing Review services, advice and recommendations regarding Hospital Claims.

*"Claim Review"* means Billing Review and/or Medical Record Review of Hospital Claims.

*"Covered Employees"* means, at any particular time, all employees of the Company that are Participants in the Plan (individually referred to each as a *"Covered Employee"*).

*"Demand for Payment"* means a Balance Bill or any assertion, statement, notice, claim, demand for payment, collection effort or other action regarding an Improper Balance.

*"Directly Contracted Hospital"* or *"Directly Contracted Facility"* or *"Directly Contracted Hospital or Facility"* means any Hospital or Facility that has contracted directly with or for the benefit of the Plan to offer Services to Participants at negotiated rates.

*"Engagement Letter"* means documentation whereby a Billed Participant formally engages or authorizes and accepts representation by legal counsel for purposes of Balance Billing Defense, in form and substance acceptable to CDS and such legal counsel.

*"EOBs"* means explanations of benefits and explanations of payment.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

*"Excessive Charges"* means such portions of an Improper Balance that are directly attributable to Billed Rates charged by a Hospital in excess of the Specified Fee Levels.

*"Facility"* means an ambulatory surgical center or other facility, whether independent or hospital-affiliated, that provides medical services on an outpatient basis.

*"Final HFC Appeals"* means final administrative appeals of HFC Benefit Determinations (as hereinafter defined).

*"Gross Charges"* means the full amount of all gross billed charges on a Hospital Claim.

*"HFC Benefit Determinations"* means benefit determinations on Hospital Claims.

*"Hospital"* means a Hospital or Facility.

*"Hospital Claim"* means a post-service claim for charges by a Hospital.

TBG00002386

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

"*Improper Balance*" means charges on Hospital Claims for medical treatment, services and goods in amounts that exceed Permitted Payment Levels, including such amounts as are not considered appropriately billable to or the responsibility of the Billed Participant under the terms of the Plan, such as charges billed in error, duplicate charges, impermissible charges, unreasonably excessive charges, etc.

"*Legal Plan*" and "*Legal Plan Membership*" means the Legal Club of America program provided by Legal Club Financial Corporation, and membership in such program that entitles the member and his or her spouse and children to certain benefits and services described on <u>Schedule I</u> attached hereto.

"*Medical Care*" means, as to any Improper Balance, the medical treatment, services and goods to which the Improper Balance relates.

"*Medical Record Review*" means the review and audit of medical records to determine if a different treatment or different quantity of a drug or supply was provided which is not supported in the billing or that treatment, drugs or other services or supplies, or fees therefore, were provided that were not clinically appropriate, were not necessary or were only necessary for the care and treatment of Illness or Injury that was caused by the treating Provider.

"*Medical Review Specialist*" means any organization(s) or individual(s) engaged to undertake or assist with Medical Record Review.

"*New Direct Contract*" means any direct contract between the Plan and a Hospital executed after the Contract Date or with the involvement or assistance of CDS, which contract provides that the Hospital will accept reimbursement from the Plan for Covered Services in amounts that are lower than the standard rates charged by the Hospital, and that the Hospital will not Balance Bill the Participant for medical treatment, services and goods included in the Hospital Claim in question.

"*New Plan Document*" means an amended and restated version the Plan Document or SPD that incorporates the Required Modifications.

"*Notice of Disputed Charges*" means a letter to a Provider or a collection agency that is attempting to collect an Improper Balance notifying such party that a Billed Participant is formally disputing charges, exercising legal rights and demanding investigation and correction of billing errors, validation of indebtedness and the suspension of collection efforts and negative credit reporting in accordance with Applicable Laws.

"*Participant*" means an Employee, a Dependent, a COBRA Qualified Beneficiary or a COBRA Qualified Beneficiary's Dependent meeting the eligibility requirements for coverage as specified in the Plan, and who is properly enrolled in the Plan.

"*Plan Document*" means the Company's most recent Plan Document and/or Summary Plan Description, together with all modifications and amendments made thereto since the original adoption of the Plan Document.

"*Pre-Existing Direct Contract*" means a direct contract between the Plan and a Hospital that was negotiated, structured and documented without the involvement or assistance of CDS and was executed before the Contract Date, which contract provides that the Hospital will accept reimbursement from the Plan for Covered Services in amounts that are lower than the standard rates charged by the Hospital, and that the Hospital will not Balance Bill the Participant for medical treatment, services and goods included in the Hospital Claim in question.

"*Properly Balance Billed Amounts*" means any portion of the charges on Hospital Claims that are not covered or paid by the Plan and under its terms are considered appropriately billable to and the responsibility of the Participant, such as deductibles, coinsurance amounts, charges for procedures not covered as a benefit of the Plan, etc.

"*Protective Efforts*" means Advocacy and Balance Billing Defense.

"*Reference Based Reimbursement*" or "*RBR*" means a health plan design that defines and establishes the amount of benefits payable for Hospital services and supplies, based on the consistent application of various formulas to

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

Page 3 of 29

TBG00002387

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

reasonably objective and reliable data reference points that are indicative of fair and reasonable values and rational pricing for such services and supplies.

"*Required Modifications*" means the health plan benefits structure, design, concepts, definitions, terms and provisions set forth in Exhibit A, attached hereto and incorporated herein by this reference (the "Plan Modification Exhibit").

"*SPD*" means a Summary Plan Description, serving as is the main vehicle for communicating Plan rights and obligations to Participants, which provides a summary of the material provisions of the plan document and is intended to be understandable to the average Participant of the Plan.

"*Specified Fee Level(s)*" means payment for medical treatment and supplies at levels equal to or greater than the following: (i) for Hospitals and Hospital-Affiliated Facilities, 175% of the greater of the Medicare allowable reimbursement amount for the Services or the Hospital's costs reflected in the Hospital's most recent departmental cost ratio report to the Centers for Medicare and Medicaid Services ("CMS") and published as the "Medicare Cost Report" in the American Hospital Directory (the "CMS Cost Ratio"); (ii) for ambulatory health care centers and other Independent Facilities, including Ambulatory Surgery Centers that are not Hospital-Affiliated Facilities and/or for which no Medicare based reimbursement is available, 175% of the greater of Medicare Outpatient Prospective Payment System (OPPS) allowed fees or the Medicare allowed reimbursement amount for comparable services from other facilities in the same geographic region; (iii) for any general medical and/or surgical services not covered under (i) or (ii) above, the cost to the Provider for providing the Services plus an additional 75%, calculated based upon industry-standard resources, published and publicly available fee and cost lists and comparisons, or a combination thereof, and taking into consideration Usual and Customary rates, CMS Cost Ratios, Medicare allowed fees (by geographic region), Medicare OPPS allowed fees; (iv) for pharmacy charges, 150% of the average acquisition cost ("AAC") for the pharmaceuticals, calculated using one or more industry-standard resources such as National Average Drug Acquisition Cost (NADAC) pricing, applicable State AAC pricing standards, Predictive Acquisition Cost determined by Glass Box Analytics, or another comparable and widely recognized data source; (v) for medical and surgical supplies, implants and devices, 130% of the cost to the Provider, which cost may be established by a provider supplied invoice or, in the absence of a provider supplied invoice, calculated based on other documentation such as comparable invoices or receipts, or industry-standard resources, such as published and publicly available price and cost lists and comparisons, or a combination thereof; (vi) for clinical care and procedures or other services for which fees, for technical reasons, cannot be determined as set forth above, 300% of the Resource-based relative value scale ("RBRVS") rates in the same geographic area; (vii) for physician medical and surgical care, freestanding laboratory, x-ray and other diagnostic or therapeutic radiology services may be determined based upon the greater of the fees for comparable services in the geographic region at the ninety-fifth (95th) percentile of the Physician Fee Reference, or 175% of RBRVS rates or other Medicare allowed amount for comparable services in the same geographic region.

"*Unreasonable Fees*" means any amount or portion of the charges included in a Hospital bill that constitutes an Improper Balance.

## Article II.   DELEGATE OBLIGATIONS & SERVICES

**Section 2.01**   Document Review and Recommendations.   The Plan Parties will provide or cause the TPA to provide the Program Parties with currents copies and all prior amendments to the Plan Document and the following: (a) the Plan's administrative services agreement with the TPA (the "ASA Contract") and any other similar agreement(s); (b) any stop-loss policy issued to or for the benefit of the Plan; (c) any PPO or network access agreement(s) and direct provider, facility or health system contract(s) that were entered into, agreed to or used by or for the benefit of the Plan that are in place or were in place at any time during the current or past calendar year; and (d) forms, templates or representative examples of the EOBs, notices of initial adverse benefit determinations and notices of adverse determinations on appeal used by the Plan the current or past calendar year. The Program Parties will review and comment on such documents to help with the incorporation and integration of the Required Modifications into a New Plan Document and otherwise facilitate the adoption, set-up, implementation and administration of a Reference Based Reimbursement plan design.

**Section 2.02**   New Plan Document.   CDS developed the Required Modifications sample Plan language for the Plan Sponsor to adopt and distribute to Participants prior to the Effective Date and the provision of "Services" (as defined below) by the Program Parties. The Plan Parties and TPA understand and acknowledge that the sample

TBG00002388

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

Required Modifications language may need to be revised and adapted to properly conform to and integrate with the form and style of the language in the current Plan Document, including, but not limited to, modification of certain defined terms. If the New Plan Document is not finalized sufficiently in advance of the Effective Date, CDS will either (i) utilize the summary of Plan benefits and exclusions that has been created based on the Delegate's understanding of the Reference Based Reimbursement plan design which the Plan Administrator has reviewed and approved or (ii) create, at Delegate's discretion, an operational SPD which will be based upon the summary of Plan benefits that the Plan Administrator has reviewed and approved, CDS will administer Hospital Claims and otherwise provide services in accordance with this summary of Plan benefits and exclusions or operational SPD, as the case may be, and it will govern and remain in full force and effect until a final SPD provided to and accepted by us.

**Section 2.03**    Description of Services. CDS and AMPS, respectively, assume the obligations and will provide the services described below (the "Services"), subject to and in accordance with the Required Modifications and, once approved and adopted, the New Plan Document. CDS and/or AMPS, as indicated, agree to provide the Services as follows:

(a)    CDS will manage and oversee the Claim Review and Validation Program and cause Hospital Claims to be subject to the level of Claim Review that CDS determines to be appropriate and desirable under the facts and circumstances relating to such Claims. The Parties acknowledge and agreed that CDS shall have the right to elect not to subject Claims of various types or amounts to Billing Review and/or Medical Record Review based on a reasonable determination that the potential value of reviewing such Claims would not outweigh the expenses and non-monetary costs likely to arise in connection with or as a result of undertaking such reviews (e.g., Hospital Claims for single tests, Hospital Claims for a single type of imaging, or Hospital Claims under $750).

(b)    AMPS shall be responsible for the performance of Claim Reviews, and will be the primary source of Claim Review services, barring a determination by CDS that there is a material reason to use another source or sources. In addition, the Parties acknowledge and agree that, at AMPS expense: (i) AMPS may engage other Billing Review Specialists and/or Medical Review Specialists acceptable to CDS as needed to provide specific Claim Review services that AMPS is not prepared to provide; (ii) CDS may engage or cause to be engaged other Billing Review Specialists and/or Medical Review Specialists acceptable to CDS to provide any Claim Review services for which it is determined that AMPS does not possess the specific expertise or resources to provide; and (ii) CDS may engage or cause to be engaged such additional or alternate Billing Review Specialists, Medical Review Specialists or other expert or professional advisors to undertake or supplement any Claim Review(s), as CDS reasonably deems necessary or appropriate in light of the facts and circumstances related to the Claim(s) at issue.

(c)    CDS will handle HFC Benefit Determinations and Final HFC Appeals in accordance with the New Plan Document, and advise the Plan Administrator and TPA as to decisions regarding the same. CDS will make Delegated Claims Decisions as it deems appropriate, based on any information obtained through Claim Reviews and in light of the relevant facts and circumstances relating to the Claims in question.

(d)    CDS will maintain the Advocacy Program and offer Advocacy and, when necessary and appropriate, Balance Billing Defense for those Participants who need and desire it;

(e)    The Program Parties will provide explanatory video and written materials, as they deem necessary, to educate Company employees about the Claim Review and Validation Program, the nature of Reference Based Reimbursement, the Permitted Payment Levels for Hospital benefits, and the Advocacy Program; and

(f)    The Program Parties will maintain all necessary records pertaining to the Services.

**Section 2.04**    Advocacy Program. Subject to all exceptions and limitations set forth below, CDS will maintain the Advocacy Program and offer Advocacy, as follows:

(a)    Program Components. The Advocacy Program will provide assistance and support for Participants with regard to Balance Billing by Hospitals.

(i)    CDS will maintain a toll free support line staffed by personnel trained to assist callers with Balance Billing issues ("Billing Advocates") for Participants to call if they are Balance-Billed or subject to efforts to collect for Invalid Charges on a Hospital Claim, and the work of the Billing Advocates will be periodically reviewed by and subject to the general supervision of CDS in-house or outside legal counsel;

(ii)    CDS will maintain and/or cause AMPS to maintain a database of Participants created from eligibility files and claims data provided by the Plan Administrator and/or the TPA that will allow Billing Advocates to confirm the identity of Participants and access Hospital Claim records and related documentation with regard to which Participants may have questions or need assistance;

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, inc. (Effective as of 01/01/2016)

TBG00002389

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

    (iii)    Billing Advocates will attempt to contact any Participant for whom a Hospital Claim over $1,500 is submitted with an Improper Balance of more than $500, and will take incoming calls from any Participants to explain and answer questions about Permitted Payment Levels, Unreasonable Fees, Improper Balances, Properly Balance Billed Amounts, and the ways that the Advocacy Program can assist Billed Participants;

    (iv)    Billed Participants will have the option to authorize CDS to contact medical providers on their behalf with regard to disputing an Improper Balance or arranging terms for the payment of Properly Balance Billed Amounts; and

    (v)    For Billed Participants requesting assistance, the Billing Advocates will provide Advocacy Authorization forms, appropriate Notice of Disputed Charges letters, and suggestions and instructions on how to handle subsequent contact concerning a Balance Bill.

(b)    <u>Protective Efforts and Notice of Demands for Payment</u>.  Except as otherwise specifically set forth in this Agreement, for those Billed Participants seeking assistance, CDS will (1) provide for Protective Efforts as to any Balance Bill or Improper Balance, and (2) protect the Billed Participant from being forced to pay such portion of an Improper Balance that, if taken together with the Benefits and Properly Balance Billed Amounts actually paid for the Hospital Claim at issue, would exceed the Specified Fee Levels for the Covered Services and Covered Medical Expenses in question.  To facilitate the provision of Protective Efforts, CDS will enroll all Covered Employees in the Legal Plan and, with the consent of and at no cost to a Billed Participant, CDS will have the right to use the Legal Plan Membership to engage legal counsel to provide Balance Billing Defense for Billed Participants or otherwise assist with the provision of Protective Efforts for their benefit.  The Parties understand and acknowledge that the effectiveness of Protective Efforts is highly dependent on CDS receiving timely notice of all Demands for Payment.  The Plan Parties and TPA agree to ensure that every Participant is given clear notice and periodic reminders that effective Advocacy and the availability of Balance Billing Defense requires that the Participant must notify CDS of any Demand for Payment (and, for any demand made in writing, by facsimile, email or other digital or electronic means, provide a copy to CDS) within fifteen (15) days of the date of the Demand for Payment.

(c)    <u>Exclusions and Limitations Regarding Protective Efforts</u>.  Notwithstanding anything in this Agreement to the contrary:

(i) CDS may, but shall not be required to offer, provide or continue Advocacy for a Billed Participant with regard to any particular Balance Bill or Improper Balance, if:

1)    The Billed Participant does not provide Advocacy Authorization for CDS, or provides but subsequently revokes such Advocacy Authorization;

2)    The Balance Bill relates to a Hospital Claim under $1,500 or any Improper Balance of $500 or less;

3)    The Billed Participant does not cooperate as reasonably requested with the Advocacy efforts;

4)    All or part of the Improper Balance is paid without the prior written approval of CDS;

5)    The Billed Participant does not either pay or make payment arrangements for all Properly Balance Billed Amounts when due and payable or, prior to such due date, agree to payment terms accepted in writing by the Hospital, provide evidence of the same to CDS, and thereafter timely make all payments in accordance with such terms;

6)    Before receiving the Medical Care, having been given a reasonably accurate estimate of the amount or the specific rates to be charged, the Billed Participant agrees to pay for the Medical Care in such amount or at such rates;

7)    After receiving the Medical Care, the Billed Participant agrees to pay for the Medical Care at the Billed Rates, or agrees to pay all Balance Billed Amounts or any Improper Balance, or confirms or ratifies an alleged prior agreement to pay at the Billed Rates or to pay all charges billed for the Medical Care;

8)    A Plan Party, the TPA or the Billed Participant is party to a contract that requires payment for the Medical Care at the Billed Rates or other rates in excess of the Specified Fee Levels, or that specifically prohibits bill review or adjustments based on Unreasonable Fees;

9)    The Billed Participant, a Plan Party or the TPA is party to a contract that requires payment for the Medical Care at the Billed Rates or in amounts in excess of the Specified Fee Levels, or that effectively prohibits bill review or adjustments; or

10)    Any monies owed to CDS under this Agreement have not been paid in full when due, or a Plan Party or the TPA have otherwise failed to satisfy their obligations under or strictly adhere to the terms and conditions of this Agreement or the Plan Document.

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

TBG00002390

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

(ii) CDS may, but shall not be obligated to provide or continue to provide for Balance Billing Defense for a Billed Participant, with regard to any particular Balance Bill or Improper Balance, or indemnify any party in connection with such Balance Bill or Improper Balance, if:

1) CDS is not given documented notice of a Demand for Payment (and a copy where applicable), within fifteen (15) days of the date of the Demand for Payment;

2) The Balance Bill relates to a Hospital Claim under $1,500 or any Improper Balance of $750 or less;

3) The Billed Participant, when requested, does not execute an Engagement Letter, or executes but thereafter revokes or terminates an Engagement Letter;

4) The Billed Participant does not fully cooperate with the Balance Billing Defense efforts, including cooperating with CDS, with any attorney or other party CDS may designate, and in the investigation and defense of any claim, suit or proceeding over an Improper Balance, which investigation and defense CDS and any attorney(s) designated by CDS shall have the right to control and direct;

5) The Billed Participant has not paid all Properly Balance Billed Amounts;

6) Before receiving the Medical Care, having been given a reasonably accurate estimate of the amount or the specific rates to be charged, the Billed Participant agrees to pay for the Medical Care in such amount or at such rates;

7) After receiving the Medical Care, the Billed Participant agrees to pay for the Medical Care at the Billed Rates, or agrees to pay all Balance Billed Amounts or any Improper Balance, or confirms or ratifies an alleged prior agreement to pay at the Billed Rates or to pay all charges billed for the Medical Care;

8) The Hospital has not been paid or formally offered and refused payment in an aggregate amount equal to or greater than the Specified Fee Levels for the Medical Care to which the Balance Bill relates;

9) The Billed Participant, a Plan Party or the TPA is party to a contract that requires payment for the Medical Care at the Billed Rates or in amounts in excess of the Specified Fee Levels, or that effectively prohibits bill review or adjustments;

10) The Plan Parties and the TPA have not used EOB messaging, restrictive check endorsement and notice of adverse benefit determination language that was recommended or specifically approved by CDS in writing; or

11) Any monies owed to CDS under this Agreement have not been paid in full when due, or a Plan Party or the TPA have otherwise failed to satisfy their obligations under or strictly adhere to the terms and conditions of this Agreement or the Plan Document.

**Section 2.05**    Settlement Authority. CDS will have the authority to negotiate settlements of Hospital Claims and Final HFC Appeals on terms that it deems reasonable under the circumstances and permissible under the Plan ("Settlement Terms"). CDS will give the Plan Administrator written notice of any proposed Settlement Terms that exceed the independent authority of CDS under the Plan. If the Plan Parties do not agree with such Settlement Terms and elect not to settle on such terms, then with respect to the Hospital Claim in question, the Plan Parties will be responsible for the outcome of any litigation regarding the Hospital Claim and any related costs and damages that are in excess of the settlement amount proposed by CDS, including the costs of litigation and any judgment.

**Section 2.06**    General Limitations. The Parties understand and agree that CDS will have no authority, responsibility or liability under this Agreement or the Plan Document other than as specifically referenced above and in the Plan Document with respect to Delegated Claims Decisions, Claim Review and Protective Efforts. In the event that the Plan Administrator and/or the TPA for any reason disregards or acts contrary to any determination or decision of CDS regarding any Delegated Claims Decision, then CDS will automatically be relieved of obligations, responsibilities and liability under this Agreement with respect to such determination or decision and will have no obligation to indemnify or hold the Plan Parties or any other party harmless with respect to such determination or decision. If CDS determines that any exclusion of a benefit or coverage in the New Plan Document is not enforceable, it will have the authority to direct the payment of any related Hospital Claim benefit at the appropriate Specified Fee Level.

**Section 2.07**    Standard of Care. CDS will exercise its authority and carry out its duties and responsibilities as the Claims Delegate in accordance with the specific terms of the New Plan Document, as a fiduciary of the Plan, and will adhere to the "prudent man standard of care" set forth in 29 U.S.C. §1104(a)(1)(A), (B) and (D). Otherwise, CDS agrees to provide the Services in a professional, workmanlike, commercially reasonable manner.

TBG00002391

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

**Article III.    PLAN RESPONSIBILITIES**

**Section 3.01**    The Plan Parties and/or the TPA, respectively as indicated below, assume the following obligations, duties and responsibilities under this Agreement and agree to perform as follows:

(a)  Appointment of Claims Delegate. The Plan Sponsor will appoint CDS as the Claims Delegate for the Plan and delegate and grant to CDS the responsibility and discretionary authority described in the Required Modifications.

(b)  New Plan Document. The Plan Parties will cause the New Plan Document to be prepared and to include the Recommended Modifications in a manner and form satisfactory to CDS (the "New Plan Document"), and will ensure that the New Plan Document is formally adopted with proper notice to all Participants and Employees and otherwise in accordance with all Applicable Laws. The Parties acknowledge and agree that regardless of the effective date stated on the face of the New Plan Document (the "Effective Date"), CDS will not be responsible for any inability or failure to perform any Services occurring prior to such actual date as the New Plan Document has been formally adopted and signed and has become fully effective. The Parties will use their best efforts to cause the New Plan Document to be finalized, formally adopted and fully executed within twenty (20) days of the Contract Date, and in any event no later than the Effective Date. Upon its adoption, an executed copy of the New Plan Document will be attached hereto as Exhibit B. Any subsequent modification or amendment of the New Plan Document during the Term of this Agreement must: (i) appoint and authorize CDS as the Claims Delegate; (ii) allocate, delegate and grant to CDS primary responsibility and maximum discretionary authority with respect to all Delegated Claims Decisions; (iii) be furnished to CDS for review and comment reasonably in advance of the intended effective date of such modification or amendment; and (iv) be acceptable in form and substance to CDS as to all such modifications or amendments that relate to, have or would have any material effect on the responsibilities and authority of the Claims Delegate.

(c)  Participant Eligibility Data. The TPA shall deliver to the Program Parties an initial full Participant eligibility file and data, followed by monthly Participant eligibility add and delete files and data.

(d)  Processing and Payment. The TPA will process all Hospital Claims in accordance with the New Plan Document and Applicable Law, and the Plan Administrator will fund and cause the TPA to promptly issue benefit payments for such Hospital Claims according to the Delegated Claims Decisions made by CDS, using checks or electronic payment advice bearing restrictive endorsement language approved in writing by CDS. The TPA will also process all Hospital Claim Appeals, and will be responsible for making benefit determinations on first Appeals and sending out required notices regarding such determinations in accordance with the Plan Document and at the direction of the Plan Administrator. The Plan Administrator will fund and cause the TPA to promptly pay any additional benefits approved by CDS, in full or in part, on Final HFC Appeals. In processing claims and appeals, the Plan Administrator and the TPA will comply with all requirements of the New Plan Document and Applicable Law. At the reasonable request of CDS, the Plan Administrator and the TPA will provide CDS with a written description of the administrative processes and safeguards which are in place to ensure adherence to and consistent application of all provisions and terms of the New Plan Document.

(e)  Delivery of Hospital Claims. The Plan Administrator will, within seven (7) days of receipt, forward or cause the TPA to forward to the Program Parties all Hospital Claims and related materials and information.

(f)  Delivery of EOBs and EOPs; Proof of Payment. The Plan Administrator will cause the TPA to deliver or provide CDS with access to EOBs for each Hospital Claim within seven (7) days of the payment of such Claim. As soon as practicably possible after a request by CDS, the Plan Administrator will provide or cause to be provided to CDS a copy or digital image of the front and back of the cancelled check with which payment was made for any Hospital Claim.

(g)  Delivery of Final HFC Appeals. The Plan Administrator will, within five (5) days of receipt, forward or cause the Third Party Administrator to forward to CDS or its designee all Final HFC Appeals and related materials and information, even if there is reason to believe that a Final HFC Appeal may have been delivered directly to CDS by or on behalf of a Claimant or any other party.

(h)  General Compliance, Cooperation, Support and Facilitation. In addition to satisfying the responsibilities and obligations specifically set forth in this Agreement, the Plan Parties and the TPA agree to act strictly in accordance with the terms of the New Plan Document and to use their best efforts to cooperate with and support and facilitate the efforts of CDS to maintain the Claim Review and Validation Program, make Delegated Claims Decisions and provide Billing Advocacy, Protective Efforts and other Services as contemplated in the New Plan Document and this Agreement.

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc. (Effective as of 01/01/2016)

TBG00002392

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB6

## Article IV.    FEES & PAYMENT TERMS

**Section 4.01**    Set-Up and Implementation Fee. An initial one time set-up and implementation fee of $750.00 for document review and recommendations, help with the incorporation and integration of the Required Modifications into a New Plan Document, and other preparation and implementation services shall be payable to CDS prior to the commencement of services under this Agreement (the "Implementation Fee"). The Parties understand and agree that some portion of the Implementation Fee may be paid by CDS to an outside law firm ("Outside Counsel") for legal services provided for the benefit of the Plan in connection with the Required Modifications and drafting, revising or rendering advice with regard to a New Plan Document. The Plan Parties agree to enter into such engagement agreement or consent to representation as Outside Counsel may reasonably request or require.

**Section 4.02**    Delegate Service Fees. As consideration for the Services provided by the Program Parties, the Plan Parties agree to pay and shall be jointly and severally responsible for paying to or causing to be paid to the Program Parties fees (the "Service Fees") equal to 10% of the gross billed charges on all Hospital Claims ("Gross Charges"); provided, however, that (i) Service Fees payable on any individual Claim shall not exceed $15,000.00; and (ii) Service Fee for dialysis and home infusion claims submitted for review will be a flat $450.00 per Claim. The Implementation Fee and Service Fees are collectively referred to in this Agreement as "Fees."

**Section 4.03**    Payment. The Implementation Fee shall be paid within ten (10) days of the execution of this Agreement by the Plan Parties. Thereafter, CDS will invoice the Plan Parties for Service Fees on a regular basis and all outstanding Service Fees shall be due and payable in full within twenty (20) days of invoicing. Any Fees not paid within such twenty (20) days will be considered delinquent ("Delinquent Fees"), and the Plan Parties shall pay interest at the rate of one and one-half percent (1.5%) per month on the outstanding balance of all Delinquent Fees from the date they were originally due until all such amounts are paid in full. Payment of interest on Delinquent Fees shall not affect or limit any other rights or remedies of the Program Parties with respect to such Delinquent Fees or any obligations of the Plan Parties or TPA. The Parties acknowledge and agree that CDS, in its sole discretion, may elect to have a parent, subsidiary or affiliate company generate and deliver invoices and collect Fees on behalf of CDS. Notwithstanding anything in this Agreement or the Plan Document to the contrary, in the event that any Delinquent Fees and accrued interest are not paid within ten (10) days of written demand, CDS will have the right to suspend performance of the Services with advance written notice of not less than five (5) days.

**Section 4.04**    Direct Contract Claim Fee Modification. Fees shall be reduced with regard to Claims for services from Directly Contracted Providers, as follows: (i) for Claims submitted or paid under any Pre-existing Direct Contract, Service Fees shall be reduced to an amount equal to 2.5% of the Gross Charges on such Claims; and (ii) for Claims submitted or paid under any New Direct Contract, Service Fees shall be reduced to an amount equal to 4% of the Gross Charges on such Claims ("Review and Re-pricing Fees").

## Article V.    INDEMNIFICATION & LIMITATION OF LIABILITY

**Section 5.01**    Indemnification by Delegate. Subject to all other terms and conditions of this Agreement, Delegate agrees to be responsible for and indemnify the Plan Parties and the TPA against damages, losses, liabilities, fees, costs, and expenses, including reasonable attorneys' fees, that any of them incur for or which arise out of: (i) attorneys' fees incurred by Delegate as the result of an Adverse Benefit Determination on Appeal made by Delegate on an HFC Level II Appeal (a "Delegated Appeal Decision") or its defense thereof (a "Delegated Appeal Defense" and together with the related Delegated Appeal Decision, a "Delegated Appeals Dispute"); (ii) attorneys' fees incurred by the Plan Sponsor, the Plan Administrator and/or the Plan or the TPA as a result of any Delegated Appeals Dispute, if such attorneys were engaged or designated by Delegate; (iii) other fees, costs and expenses incurred by the Delegate, or by any of the Plan Parties or the TPA with the prior written approval of Delegate, as a result of any Delegated Appeals Dispute; (iv) any damages finally awarded by a court of competent jurisdiction as restitution to a Participant as a result of a Delegated Appeal Decision, excluding awards for payment or reimbursement of charges for Covered Services or Covered Medical Expenses; and (v) any attorneys' fees and costs incurred by a Plan Participant as a result of a Delegated Appeal Decision if, based on such Delegated Appeal Decision, a court of competent jurisdiction finally determines that such fees and costs are to be paid by the Plan Sponsor, the Plan Administrator, the Plan, the TPA and/or the Delegate. Furthermore, Delegate agrees to be responsible for and indemnify the Plan Parties and any Participant against damages, losses, liabilities, fees, costs, and expenses, including reasonable attorneys' fees that any

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

TBG00002393

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

of them incur which arise out of any uncured breach of a representation of warranty made by Delegate in this Agreement, as finally determined by a court of competent jurisdiction or other tribunal having jurisdiction of the matter, except for sanctions, fines, penalties, taxes, multiple damages or damages that are exemplary or punitive in nature. The damages, losses, liabilities, fees, costs, and expenses (i)-(v) above are referred to collectively as "Covered Costs". Notwithstanding anything in this Agreement to the contrary, Covered Costs shall not include the amount of any charges included in any Hospital Claim for Covered Services or Covered Medical Expenses or Benefits determined to be payable by the Plan for any Hospital Claim, or any sanctions, fines, penalties, taxes, multiple damages or damages that are exemplary or punitive in nature. The obligation of Delegate to indemnify the Plan shall be limited to the amount payable by the Plan with respect to a Hospital Claim, which amount is in excess of the amount that the Plan would have been responsible to pay on such Hospital Claim but for Delegated Claims Decisions made by Delegate regarding such Hospital Claim in violation of the terms of the Plan Document.  Notwithstanding anything herein to the contrary, the obligation of Delegate to indemnify for any Covered Costs is subject to the following conditions and limitations:

(a)  The Plan Administrator and/or the TPA must give prompt written notice to Delegate of any HFC Level II Appeal or reconsideration request of which the Plan Administrator and/or the TPA has knowledge (within five days after the notice of appeal is received or the Plan Administrator and/or the TPA otherwise becomes aware of the appeal, or such shorter period as is required to avoid any prejudice in the appeal or other proceeding involving the Delegated Appeal Decision in question);

(b)  Delegate shall have the exclusive right to control and direct the investigation, preparation, defense and settlement of each HFC Level II Appeal or other proceeding concerning a Delegated Appeals Dispute, provided, however, that the Plan Administrator shall have the right to participate in any appeal or proceeding involving the Delegated Appeals Dispute and to be represented by its own attorneys, which additional participation and representation shall be at the Plan Administrator's or Plan's cost and expense;

(c)  The Plan Sponsor, the Plan Administrator, Participants and the TPA must fully cooperate with Delegate in the investigation and defense of the Delegated Appeal Decision;

(d)  Any claim for indemnification under this Section 5.01 must be made prior to one (1) year from the date that payment with respect to the Hospital Claim subject to the HFC Level II Appeal at issue was received by the provider from the TPA or the Plan Administrator, or the date the provider was notified that no payment would be made on the Hospital Claim; and

(e)  Delegate shall have no responsibility to pay or contribute to any settlement or compromise of a Hospital Claim or HFC Appeal made without its consent.

**Section 5.02**    <u>Indemnification by AMPS</u>.  AMPS agrees to be responsible for and indemnify each of the other Parties against damages, losses, liabilities, fees, costs, and expenses, including reasonable attorneys' fees, that any of them incur for or which arise out of: (i) AMPS' negligence or willful misconduct in the performance of AMPS or its vendors', contractors' or authorized agents' obligations under this Agreement or (ii) AMPS' material breach of this Agreement, all as determined by a court or other tribunal having jurisdiction of the matter.  This Section shall survive the termination of this Agreement.

**Section 5.03**    <u>Indemnification by the Plan Parties and TPA</u>.  Each of the Plan Parties and the TPA (the "Responsible Party") agrees to reimburse, indemnify, defend and hold harmless each of the other Parties from and against any liability, damages, losses, costs and expenses (including reasonable attorneys' fees) incurred by any of them, or any claim, demand, charge, action, cause of action or other proceeding asserted by a third party against any of them, as a result of, arising out of, or based upon an uncured material breach of any covenant, agreement, representation or warranty made in this Agreement by the Responsible Party.

**Section 5.04**    <u>Exclusions</u>.  In no event will any Party be required to pay damages, reimburse, indemnify, defend or hold harmless any other Party against, for, resulting from or arising out of:  (a) any liability, damages, losses, costs and expenses of any kind that result from the negligence or intentional misconduct of such other Party or from a failure to act in accordance with this Agreement or the Plan Document on the part of such other Party; (b) any lost profits or other consequential or incidental damages incurred or likely to be incurred by such other Party (irrespective of whether the responsible Party has been advised of the possibility or likelihood of any such damages), and any sanctions, fines, penalties, taxes, multiple damages or damages that are exemplary or punitive in nature; (c) any demands, actions, suits, claims or counterclaims based any contract, other than this Agreement, to which any Party or their agent or representative is a party or is subject or bound; (d) any Benefits or charges included in any Hospital Claim determined to be payable by the Plan in accordance with the terms of the Plan Document; and (e) any liability, damages, costs or

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
[Effective as of 01/01/2016]

TBG00002394

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

losses resulting or arising from any provision or portion of the Plan Document determined not to be enforceable or to conflict with Applicable Law. Furthermore, in no event will CDS or AMPS be required to pay damages, reimburse, indemnify, defend or hold harmless any other Party against, for, resulting from or arising out of: (1) any amount which the Plan would have been responsible to pay on such Hospital Claim regardless of any CDS breach or failure to adhere to the terms of the Plan Document or this Agreement; or (II) any failure to timely pay or fund the payment of any benefits approved by Delegate; or (2) any Hospital charges or other amounts related to a Hospital Claim not actually paid pursuant to a binding final legal judgment or award.

**Section 5.05**    <u>Limitation of Liability</u>.  Notwithstanding anything in this Agreement to the contrary, in no event will CDS and AMPS, in the aggregate, be liable for or required to reimburse, indemnify, defend or hold harmless the other Parties from or against any liability, damages, losses, costs and expenses incurred by them, or any claim, demand, charge, action, cause of action or other proceeding asserted by a third party against any of them (a) as to any individual Hospital Claim or any group of Hospital Claims relating to the same incident of care, any amount exceeding One Million and No/100 Dollars ($1,000,000.00), and (b) as to all Hospital Claims paid during any year of the Term, taken together, any amount exceeding Two Million and No/100 Dollars ($2,000,000.00) in the aggregate; <u>provided, however,</u> that in no event shall the total amount of all indemnification and reimbursement by CDS for or as a result of any single breach or failure of a representation or warranty exceed Two Hundred and Fifty Thousand and No/100 Dollars ($250,000.00).

## Article VI.    CONFIDENTIALITY & PROPRIETARY INTERESTS

**Section 6.01**    <u>Confidentiality of Claim Records and Information</u>.  Each Program Party will exercise all commercially reasonable efforts to maintain the confidentiality of the claims records and information created or received by them in the performance of the Services.  A Program Party will only disclose the information in such records to the Plan Administrator or its authorized agents, if permitted by Applicable Law to do so, or to any other party, including governmental and other regulatory agencies to the extent such disclosure is required by legal process or pursuant to any applicable statute, rule or regulation.  The obligations of each Program Party contained in this <u>Section 6.01</u> will not be construed to restrict or prevent the Program Party from disclosing information in such records to the extent such disclosure is authorized or necessary in order for the Program Party to perform the Services under this Agreement and as contemplated under the Plan Document.

**Section 6.02**    <u>Protected Health Information</u>.  In addition, to the extent information obtained or received by a Program Party in connection with the performance of the Services constitutes "protected health information," as defined under 45 CFR 164.501 ("Protected Information"), the Program Party agrees that such Protected Information will be used or disclosed by the Program Party only for the purposes of performing the Services and for such other purposes as expressly provided in 45 CFR 164.504(e)(4), and the Parties will execute a Business Associate Agreement ("BAA") meeting the requirements of 45 CFR 164.504(e)(2), a sample form of which BAA is attached hereto as <u>Exhibit C</u>.

**Section 6.03**    <u>Rights in Service Delivery Model and Materials</u>.  The Parties acknowledge and agree that the systems, processes, procedures, designs, plans, methods, work flows, know-how, pricing data, scripts, flow charts, forms, documentation, instructions, letters, notices, memoranda, position statements, and other materials (the "Delegate Program Materials") used in connection with the design, administration and provision of the Services under the Claims Delegate service delivery model described in or implemented in connection with this Agreement (the "Delegate Service Model"), including, without limitation, the design and administration of the Review Program, the explanation and defense of Delegated Claims Decisions and provision of the Advocacy Program, are and will at all times remain the property of CDS and/or its parent, affiliates, partners, joint-venturers or licensors ("Affiliates" and each an "Affiliate").  CDS reserves all right, title and interest in and to any intellectual property, proprietary or other rights in the Delegate Service Model and the Delegate Program Materials (but not the Plan, Employee, Claimant or Claim data reflected therein), as well as any improvements, adaptations, modifications or derivative works based thereon or conceived, created or made thereto by any Party.

**Section 6.04**    <u>Limited License</u>.  The Program Parties grant to the other Parties the limited, non-exclusive, non-transferable right and license to use the Delegate Program Materials during the Term of this Agreement, only as necessary in connection with the provision of Services to the Plan and for the sole purpose of satisfying obligations or requirements under this Agreement.  No ownership or other rights in the Delegate Service Model or the Delegate

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

TBG00002395

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

Program Materials are granted to the Plan Parties or the TPA unless and except as may be expressly set forth herein, and all rights not expressly granted to the Plan Parties in this Agreement are reserved by CDS and its Affiliates. Except for the foregoing permitted use, the Plan Parties will not, and will ensure that the TPA and their respective employees, contractors agents and representatives do not, modify, publish, transmit, participate in the transfer of, make available to third parties, reproduce, create derivative works of, distribute, publicly display, or in any way exploit the Delegate Service Model or the Delegate Program Materials in whole or in part, including (without limitation) for the purpose of obtaining, creating, building or providing a materially similar or competitive service. This limited license does not apply to any material or work product that is generally used or available in the industry, or in the public domain.

## Article VII.    CHANGE OF THIRD PARTY ADMINISTRATOR

**Section 7.01**    Removal by the Plan Parties. With advance written notice of not less than thirty (30) days, or such shorter period as may be permitted for termination under the ASA Contract between the Plan and the originally named or then serving TPA (the "Existing TPA"), the Plan Administrator shall have the right to remove the Existing TPA ("Removal"), which Removal shall take effect per the notice (the "Removal Date"), and to replace that Existing TPA with another third party administrator (the "New TPA"), and such Removal shall not itself cause a termination of this Agreement. In the event of a Removal: (i) the Plan Parties will pay the Existing TPA any monies due to it for services rendered through the Removal Date within thirty (30) days after such amounts become due; (ii) CDS will have the right to terminate this Agreement if it does not approve of the New TPA, which approval may be withheld in the sole discretion of CDS for any reason; (iii) the New TPA approved by the Plan Parties to become the TPA, if approved by CDS, will be required to become a party to an amended and restated version of this Agreement in form and substance satisfactory to CDS; and (iii) CDS will have the right to terminate this Agreement if such New TPA does not become a party to an Amended Agreement within ten (10) days of approval by CDS. With regard to Hospital Claims submitted to the Existing TPA prior to Removal, the Existing TPA will continue to provide services as may be reasonably required in connection therewith, in accordance with the terms of this Agreement, for twelve (12) months following the Removal Date, so long as all amounts due to the Existing TPA under this Agreement prior to the Removal Date have been paid in full.

**Section 7.02**    Withdrawal by TPA. With advance written notice of not less than thirty (30) days, or such longer period as may be required under the ASA Contract between the Existing TPA and the Plan, the Existing TPA may withdraw as the third party administrator for the Plan ("Withdrawal"). If Withdrawal occurs, the Existing TPA shall automatically be removed as the TPA under this Agreement as of the effective date of the Withdrawal (the "Withdrawal Date"), but the Withdrawal shall not itself cause a termination of this Agreement. In the event of a Withdrawal: (i) the Plan Parties will pay the Existing TPA any monies due to it for services rendered through the Withdrawal Date within thirty (30) days after such amounts become due; (i) the Plan Parties shall immediately engage a New TPA acceptable to CDS to be the TPA, and CDS will have the right to terminate this Agreement if it does not approve of the New TPA selected by the Plan; (ii) any New TPA approved by CDS must become a party to an amended and restated version of this Agreement in form and substance satisfactory to CDS (an "Amended Agreement"); and (iii) CDS will have the right to terminate this Agreement if such New TPA does not become a party to an Amended Agreement within ten (10) days of the Withdrawal Date. With regard to Hospital Claims submitted to the Existing TPA prior to Withdrawal, the Existing TPA will continue to provide services as may be reasonably required in connection therewith, in accordance with the terms of this Agreement, for twelve 12) months following the Withdrawal Date, so long as all amounts due to the Existing TPA under this Agreement prior to the Withdrawal Date have been paid in full.

## Article VIII.    TERM & TERMINATION

**Section 8.01**    Term. The term of this Agreement (the "Term") will begin as of the Contract Date and will initially continue for a period ending one (1) year from the Effective Date, unless earlier terminated by either the Plan Parties or CDS in accordance with the terms of this Agreement or extended as provided in Section 8.04, below. Upon each yearly anniversary of the Effective Date, the Term will automatically extend for an additional one (1) year period unless, at least thirty (30) days prior to such anniversary of the Effective Date, the Plan Administrator or CDS has given the other Parties written notice of the intention not to extend the Term.

**Section 8.02**    Termination. Either CDS or the Plan Parties may terminate this Agreement for any reason with at least ninety (90) days prior written notice the other Parties. In addition, either CDS or the Plan Parties may terminate

TBG00002396

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

this Agreement at any time if the other has defaulted in the performance of any of its material obligations as set forth in this Agreement. In such event, the Party declaring the default will provide the other Party (the "Recipient") with written notice setting forth in detail the nature of the default. The Recipient will have seven (7) days to cure a monetary default, or thirty (30) days to cure a non-monetary default; provided, however, that if the nature of a non-monetary default is such that it is not reasonably subject to being cured within a thirty (30) day period, the Recipient may cure such default by commencing to cure in good faith and continuing to completion with diligence and continuity within a reasonable time thereafter. If any Fees are not paid within ten (10) days of the due date, CDS will have the right to resign at any time with seven (7) days advance written notice, and this Agreement will immediately terminate upon the effective date of CDS's resignation. In addition to such right of CDS, if there is a default on any payment due CDS under this Agreement that is not cured within seven (7) days, CDS will be entitled to bring an action against one or more of the Plan Parties for any balance due, plus interest on such amount from the date the payment became delinquent until paid at the rate of 1.5% per month, and all costs and expenses (including reasonable attorneys' fees) related to efforts to collect payment.

**Section 8.03**    <u>Rights and Duties Upon Termination.</u>  As of the effective date of termination, all rights and obligations of the Parties under this Agreement will terminate, except as specifically provided herein.

  (a)   The Plan Parties shall pay all amounts owed under this Agreement through the date of termination within ten (10) days of invoicing, and shall pay any amounts determined to be owed thereafter within ten (10) days of the earlier of such determination or invoicing.

  (b)   With regard to Hospital Claims submitted to the TPA during the Term of this Agreement and Hospital Claims for dates of service occurring during the Term of this Agreement which are submitted to the TPA after a termination ("Included Claims"), the TPA shall continue to provide services as may be reasonably required in connection therewith, in accordance with the terms of this Agreement, for twelve (12) months following a termination, so long as all amounts due to the TPA under this Agreement have been paid in full (the "Runout Period").

  (c)   With regard to Included Claims, the Program Parties shall continue to provide Services as may be reasonably required in connection therewith, in accordance with the terms of this Agreement, during the Runout Period, so long as all amounts due to the Program Parties under this Agreement have been paid in full. With regard to claims made against Billed Participants for Improper Balances under Hospital Claims adjudicated by CDS during the Term of this Agreement, CDS will continue to make or provide for such Protective Efforts as may be reasonably required in connection therewith ("Post-Termination Protection"), subject to all conditions, requirements, limitations and exclusions set forth in this Agreement, but only if and for so long as: (1) all Fees and other amounts due to CDS have been paid in full; (2) the Plan Document continues to authorize CDS to act as the Claims Delegate with all of the authority and discretion provided in the Recommended Modifications with regard to Claims adjudicated by CDS and Hospital Claims for dates of service occurring during the Term of this Agreement; and (3) the Plan Parties, the TPA, any new third party administrator and all Billed Participants continue to fulfill and satisfy all requirements and obligations set forth in this Agreement (the "Post-Termination Defense Period"). The Post-Termination Defense Period and the obligation to provide Post-Termination Protection will end if any of the conditions set forth in (1)-(3) above are not satisfied, or the Plan Parties notify CDS that Post-Termination Protection is no longer required.

  (d)   After the termination of this Agreement, if the Plan Parties have paid CDS all amounts due under this Agreement in full when due, then if they notify CDS that Post-Termination Protection is no longer required and sign a written agreement satisfactory to CDS waiving and releasing the Program Parties from any further obligations or liability pursuant to or in connection with this Agreement (with regard to Billing Advocacy, Protective Efforts or otherwise), then CDS will pay to the Plan within ninety (90) days an amount equal to the amount of any Restricted Fees not used or then owed for Authorized Purposes.

**Section 8.04**    <u>Term Extension.</u>  The Plan Parties understand and agree that, notwithstanding anything in this Article VIII to the contrary, if any New Direct Contract is put in place, then the Term of the Agreement shall automatically extend for a period beginning on the date of such Direct Contract and ending thirty-six (36) months from the next yearly anniversary of the Effective Date (the "Term Extension"), and the Agreement shall not terminate prior to the end of the Term Extension unless: (a) CDS thereafter defaults in the performance of its material obligations under the Agreement, the Plan Parties declare the default and provide CDS with written notice setting forth in detail the nature of the default, and CDS thereafter fails to cure such default within thirty (30) calendar days of such notice or, if the nature of the default is such that it is not reasonably subject to being cured within a thirty (30) day period, CDS fails to commencing to cure in good faith within a thirty (30) day period and thereafter continue to completion

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

Page 13 of 29

TBG00002397

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

with diligence and continuity within a reasonable time thereafter; or (b) the Plan is amended to become or is replaced by a fully insured plan. The Parties agree that if efforts of CDS substantially contributed to a New Direct Contract with a hospital or group of Hospitals with the potential to service 50% or more of the Covered Employees population, then the Term Extension shall apply without any modification of the scope of the Agreement, but that if the Hospital(s) covered under any such New Direct Contract(s) do not have the potential to service 50% or more of the Covered Employees population then, at the election of the Plan Parties or the Program Parties by written notice to the other Parties, the Agreement may be limited during the Extended Term so as to only apply to claims from Hospitals under Direct Contract and thereafter the Plan Parties shall be required to submit only those claims to the Program Parties, and the Program Parties shall be required to provide Claim Review for those Claims, and not other Services, and shall be entitled to Fees only for those Claims.

## Article IX.    MISCELLANEOUS PROVISIONS

**Section 9.01**    General Representations & Warranties. Each Party, as a material inducement to the other Parties to enter into this Agreement, makes the following representations and warranties:

(a)    The Party is an entity duly formed, validly existing and in good standing under the laws of its state of organization and maintains its principal place of business at the address indicated in this Agreement.

(b)    The execution, delivery and performance by the Party of this Agreement: (1) is within its power and legal capacity; (2) has been duly authorized by all necessary corporate or organizational action; (3) does not contravene any provision of its organizational documents; (4) does not violate any law or regulation, or any order or decree of any court or governmental authority applicable to it; and (5) does not (and will not with notice and/or the passage of time) violate, breach, conflict with or constitute a default under any other agreement to which it is a party or by which it is bound.

(c)    The Party has read this Agreement in its entirety, is aware of and understands all of its terms and conditions, and has had the opportunity to seek the advice of an attorney of its choosing regarding this Agreement and all of its terms and conditions.

(d)    This Agreement shall be duly executed and delivered by the Party and shall constitute a legal, valid and binding obligation of the Party enforceable against it in accordance with its terms.

In addition to the general representations and warranties set forth above, the Plan Parties represent and warrant that the Plan has operated and been administered in accordance with its terms and provisions and in compliance with all applicable statutes, laws, regulations, judicial orders and requirements of governmental authorities having jurisdiction over any of the Plan Parties, and that the New Plan Document and any subsequent modifications or amendments thereto will fully comply and be adopted in accordance with the requirements of Applicable Law.

**Section 9.02**    Acknowledgement of Affiliate Relationship and Ownership Interest. Each of the Plan Parties and the TPA understand and acknowledge that Anasazi Medical Payment Solutions, Inc. acquired one hundred percent of the ownership interests of CDS effective August 1, 2014 (the "Acquisition").

**Section 9.03**    Conflict Between Applicable Law and Intent of Agreement. In the event it becomes clear that under Applicable Law, whether currently existing or later adopted, as interpreted or applied by any court or government authority, payment at the Specified Fee Levels will not constitute fair and reasonable consideration for covered services in the absence of specifically agreed upon price terms, then upon written notice of such legal determination to the Plan, the Program Parties shall thereafter have no liability for any representation or warranty to the contrary and CDS will not be responsible for making Protective Efforts with regard to subsequently Balance Billed amounts below such fee levels as have been legally determined to constitute fair and reasonable consideration for the covered services in question.

**Section 9.04**    Notices. All notices pursuant to this Agreement must be in writing and will be deemed given: (a) upon delivery (which may be by facsimile transmission with confirmation of receipt by the transmitting machine); (b) on the designated date for delivery if sent by recognized overnight courier (such as Federal Express); or (c) on the fifth (5th) day following the date of deposit in the United States mail, certified mail postage prepaid with return receipt requested, if addressed to the addresses set forth below the respective signatures of the Parties to this Agreement: Any Party may change its address designated for receiving notice by informing the other Parties of such change in accordance with this Section 9.04.

TBG00002398

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

**Section 9.05**     Confidentiality of Agreement.  Each Party will maintain this Agreement and the terms hereof in strict confidence and will not disclose or provide a copy of this Agreement or the terms hereof in any form whatsoever to any entity or person except, on a strictly need-to-know basis, to a director, officer, executive employee, attorney or accounting professional of such Party who has agreed in writing to maintain this Agreement and the terms hereof in strict confidence.

**Section 9.06**     Cooperation, Amendment and Waiver.  The Parties will use their best efforts to cooperate with each other and to provide any further assurances, including the execution of any additional agreements, reasonably necessary or desirable to implement the intentions of the Parties evidenced herein.  However, no amendment or waiver of any provision of this Agreement will in any event be effective, unless the same will be in writing as signed by the Parties hereto, and then such waiver or consent will be effective only in the specific instance and for the specific purpose given.  No waiver will waive, or otherwise affect, any other provision of, or the rights and obligations of the Parties under, this Agreement.

**Section 9.07**     No Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assignees only.  Except as provided in this paragraph, no Party hereto may assign this Agreement or any of its rights, interests, or obligations hereunder without the express written consent of the other Parties, which consent will not be unreasonably withheld.  Nevertheless, any of the Parties can assign this Agreement, including all of their rights, interests, and obligations to such Party's affiliates, to an entity controlling, controlled by, or under common control with such Party, or a purchaser of all or substantially all of such Party's assets, subject to notice to the other Parties of the assignment.

**Section 9.08**     Subcontracting.  The Program Parties may use subcontractors to assist in providing the Services to be performed under this Agreement provided that they will continue to be responsible for all acts and omissions of their subcontractors.  All Program Party subcontractors will be subject to the confidentiality provisions of this Agreement and execute an appropriate BAA.

**Section 9.09**     Exclusivity.  The rights granted to the Parties pursuant to this Agreement will be deemed to be their exclusive rights with respect to the subject matter of this Agreement, and the exclusive standing to enforce this Agreement shall belong to the Parties.  No person or entity not a signatory to this Agreement shall be or have standing to enforce any rights as a third party beneficiary under this Agreement.

**Section 9.10**     Compliance with Applicable Law.  In carrying out its respective obligations and responsibilities under this Agreement, each of the Parties agrees to observe and comply with all applicable statutes, laws, regulations, judicial orders, and the rules and requirements of governmental authorities having jurisdiction over the Parties or the subject matter of this Agreement.

**Section 9.11**     Force Majeure.  In the event that either Party is unable to perform any of its obligations under this Agreement because of natural disaster, civil disobedience, acts of war (declared or undeclared), or actions or decrees of governmental bodies (any of these events which is referred to as a *"Force Majeure* Event"), the Party who has been so affected will immediately notify the other Parties and will do everything possible to resume performance.  Upon receipt of such notice, all obligations under this Agreement will be immediately suspended.  If the period of non-performance exceeds ten (10) business days from the receipt of notice of the *Force Majeure* Event, the Party whose ability to perform has not been so affected may, by giving written notice, terminate this Agreement without liability.

**Section 9.12**     Enforceability; Severability.  This Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.  If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such determination will not impair or affect the validity, legality or enforceability of the remaining provisions thereof, and each provision is hereby declared to be separate, severable and distinct.

**Section 9.13**     Entire Agreement.  This Agreement constitutes the entire agreement and understanding between the Parties with respect to the matters referred to herein and supersedes any prior agreements, understandings, negotiations and discussions, whether written or oral.  All schedules attached to this Agreement and initialed by each of the Parties are expressly made a part of, and incorporated by reference into, this Agreement.

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc. (Effective as of 01/01/2016)

TBG00002399

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

**Section 9.14**    Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument and Agreement. Facsimile signatures and/or electronically submitted signatures will be deemed originals.

**Section 9.15**    Survival. The following Sections shall survive the termination or expiration of this Agreement and shall remain effective as to Included Claims, to the extent applicable, through the end of the Run-Out Period and Post-Termination Defense Period:  Sections 2.03 (a)-(d), 2.04, 2.05, 2.06, 2.07, 3.01(d)-(h), 4.01, 4.02, 5.01, 5.02, 5.03, 5.04, 5.05, 6.01, 6.02, 6.03, 7.01, 7.02, 8.02. 8.03, 9.03, 9.04, 9.05, 9.06, 9.09, 9.10, 9.11, 9.12, and this Section 9.15. In addition, the terms of the Business Associate Agreement (to the extent applicable) shall survive the termination or expiration of this Agreement in accordance with the terms provided therein.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURES ON NEXT PAGE]*

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

Page 16 of 29

TBG00002400

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement by their duly authorized representatives as of the Contract Date set forth above.

**DELEGATE:**

CLAIMS DELEGATE SERVICES, LLC, a Florida limited liability company

By: _Richard T. Hirsch_    Date Signed: 1/22/2016
~~Brent Furse~~, CEO    Richard T. Hirsch
President/CLO
Address:    420 Technology Parkway, Suite 200, Norcross, GA 30092, Attention: Brent Furse
Phone: _____ / Fax: _____

**AMPS:**

ANASAZI MEDICAL PAYMENT SYSTEMS, INC., an Arizona corporation

By: _Mike Dendy_    Date Signed: 1/21/2016
Mike Dendy, CEO

Address:    420 Technology Parkway, Suite 200, Norcross, GA 30092, Attention: Mike Dendy
Phone: _____ / Fax: _____

**COMPANY/PLAN:**

CENTRAL VALLEY AG COOPERATIVE
signing on its own behalf, as Plan Sponsor, and as
Plan Administrator on behalf of the Plan

By: _Tim Esser_    Date Signed: 1.19.16
Name: _Tim Esser_, Title: _SVP of HR_
Address: _PO Box 489    York, NE 68467_
Attention: _Tim Esser_
Phone: _402.362.8464_ / Fax: _402.362.8410_

**THIRD PARTY ADMINISTRATOR:**

THE BENEFIT GROUP, INC.

By: _____    Date Signed: 1.20.16
Name: _Natalie Skutt_, Title: _VP GC_
Address: _11906 Arbor #100_
Attention: _Legal_
Phone: _402.932.0242_ / Fax: _____

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

TBG00002401

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

## SCHEDULE 1

### *LEGAL CLUB OF AMERICA MEMBERSHIP PLAN*

Members and their family will have access to a nationwide network of plan attorneys that have contracted with Legal Club to provide free and discounted legal services. Through the Advocacy Program, members will be referred to a plan attorney based on language, area of law, and location.

**BENEFIT FEATURES:**

Free Legal Services:  The following services are available at no charge from a Legal Club of America plan attorney.

- Initial phone consultation for each new legal matter (no time limit);
- Initial face-to-face consultation for each new legal matter (no time limit);
- Review of independent legal documents (6 page maximum per document, no limit to the number of new independent documents);
- Plan attorneys will help Members represent themselves in small claims court;
- When deemed appropriate by the plan attorney, he or she will write letters on the Member's behalf (one letter per legal matter, with no limit on the number of new legal matters); and
- When deemed appropriate by the Plan attorney, he or she will make phone calls on the Member's behalf (one phone call per legal matter, with no limit on the number of new legal matters)

NOTE:  Upon request, a Plan attorney will prepare a free Simple Will for the Covered Employee, as well as update the Will annually at no charge (a Simple Will with Minors Trust is available for $250).  In addition, a state specific, web based, Living Will form is available to Members at no charge. Using this form, a Living Will can be completed by the Member and notarized by a Notary Public, and should then be stored in a safe location where it will be readily accessible if needed.

Deeply Discounted Legal Services*:  There are various commonly used legal services for which plan attorneys have agreed to charge a one-time, deeply discounted fee, such as (such as traffic ticket defense, name changes, simple divorce, spouse/child non-support, regular incorporations, Chapter 7 Bankruptcy and personal real estate closings). Rates and information about these and other flat fee services are available upon request).

*Court costs and filing fees additional.*

Guaranteed Low Hourly Rate:  Plan attorneys have contracted to never charge more than $125.00 per hour, or when appropriate, give Members a 40% discount off their usual and customary hourly rate, whichever is greater, for legal care that goes beyond the free and discounted services described above.

Retainers:  In the case of extended legal care, plan attorneys may ask the member for a retainer.  Any retainer sought will be computed by multiplying the number of hours a plan attorney believes a case will take, by the appropriate discounted hourly plan rate. For instance; 10 hours x $125.00 = a retainer of $1,250.00.  Any unused portion of the retainer will be returned to the member.

Contingency Fee Discounts:  The contingency fee discount will be a 10% reduction of the state maximum rate or the attorney's usual rate, whichever is lower.

*In many states, Attorney liability may require Plan Attorneys to obtain a retainer from the member prior to providing some of the free member benefits. Such a retainer, if required in connection with Protective Efforts, will be taken care of by the Claims Delegate.*

TBG00002402

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

## EXHIBIT A

### *RECOMMENDED MODIFICATIONS FOR REFERENCE BASED REIMBURSEMENT PLAN*

**The New Plan Document must include and integrate into the structure of the Plan the following information, definitions, terms, provisions and concept in a manner that CDS determines to be reasonably satisfactory:**

*[SEE ATTACHED __ PAGES]*

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

TBG00002403

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

**EXHIBIT B**

**NEW PLAN DOCUMENT**

The undersigned hereby acknowledge that the attached New Plan Document, consisting of ___ pages, has been accepted as of _____, 2015:

*PLAN ADMINISTRATOR*

Company Name: _____

By: _____    Date Signed: _____

Name: _____    Title: _____

*PLAN SPONSOR*

Company Name: Central Valley Ag

By: *Tim Esser*    Date Signed: 1.19.16

Name: Tim Esser    Title: SVP HR

*DELEGATE*

Company Name: Claims Delegate Services

By: *Richard T. Hirsch*    Date Signed: 1/22/2016

Name: Richard T. Hirsch    Title: President/CLO

*TPA*

Company Name: THE BENEFIT GROUP, INC

By: *Natalie Smith*    Date Signed: 1.20.16

Name: Natalie Smith    Title: VP GC

TBG00002404

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

**EXHIBIT C**

**FORM OF BUSINESS ASSOCIATE AGREEMENT**

This BUSINESS ASSOCIATE AGREEMENT ("Agreement"), is entered into by and between the CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN (the "Plan") and ANASAZI MEDICAL PAYMENT SYSTEMS, INC., an Arizona corporation ("Contractor"; and together with the Plan, the "Parties" 'and each a "Party"), providing services as a claim auditor for the service and/or benefit of the Plan, effective as of January 1, 2016 (the "Effective Date").

The Plan is a Covered Entity.  In the performance of its obligations, the Plan may engage other parties to perform certain aspects of its function(s).  The relationship between the Plan and Contractor is for purposes of handling the review and evaluation of billed charges on hospital and facility medical claims and making permitted payment level calculations in accordance with the terms of the Plan.  Contractor, by this Agreement, is a subcontractor of the Plan.  The Plan and Contractor acknowledge and agree they are obligated by law to meet the applicable provisions of the HITECH Act and regulations issued thereunder.

**WHEREAS,** the Parties wish to enter into or have entered into an arrangement ("Arrangement") whereby Contractor will provide certain services to the Plan  and, in providing those services, Contractor may have access to Protected Health Information ("PHI") (defined below) and may maintain, transmit and receive Electronic Protected Health Information ("EPHI") (defined below) (PHI and EPHI are collectively referred to herein as PHI or Protected Health Information; EPHI will be used when only EPHI is being referenced); and

**WHEREAS,** the Plan and Contractor intend to protect the privacy and provide for the security of any PHI which shall be  disclosed to Contractor pursuant to the Arrangement, in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA") and regulations promulgated thereunder by the United States Department of Health and Human Services ("HHS"), the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), as incorporated in the American Recovery and Reinvestment Act of 2009, and other applicable laws; and

**WHEREAS,** the HHS has promulgated the Standards for Privacy of Individually Identifiable Health Information, 45 CFR Part 160 & Part 164, subparts A & E (the "Privacy Rule"), and the Security Standards for the Protection of EPHI, 45 CFR Part 160 & Part 164, subparts A & C (the "Security Rule").  The Privacy Rule and the Security Rule implement the privacy and security requirements set forth in the Administrative Simplification provisions of HIPAA; and

**WHEREAS,** the Plan and Contractor intend to preserve the confidentiality and security of PHI obtained by Contractor pursuant to the Arrangement, in compliance with the HIPAA Privacy and Security Rule (defined below), and HITECH Act, prior to any disclosure of the PHI to Contractor. The specific provisions are set forth in, but not limited to, Title 45, Sections 164.306, 164.308(b), 164.314(a) and (b), 164.502(e) and 164.504(e) of the Code of Federal Regulations and are applicable to this Agreement.

**WHEREAS,** the Privacy Rule provides, among other things, that a Covered Entity (as defined below) and its Business Associate(s) are permitted to disclose PHI (as defined below) to a subcontractor and allow the subcontractor to create or receive PHI, if the Covered Entity and/or their Business Associate(s) obtain satisfactory assurances in the form of a written contract that the subcontractor will appropriately safeguard the PHI; and

**WHEREAS,** the Security Rule provides, among other things, that a Covered Entity and its Business Associate(s) may permit a subcontractor to create, receive, maintain, or transmit EPHI (as defined below) on the Covered Entity's behalf, if the Covered Entity and its Business Associate(s) obtain satisfactory assurances in the form of a written contract that the subcontractor will appropriately safeguard the EPHI; and

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc. (Effective as of 01/01/2016)

Page **21** of 29

TBG00002405

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

**WHEREAS,** the Plan has entered into an agreement with Contractor whereby Contractor will perform services for the Plan that will require the Plan to disclose PHI or EPHI received from, or created or received by the Plan,; and

**WHEREAS,** The purpose of this agreement is to comply with the requirements of HIPAA and its implementing regulations (45 C.F.R. Parts 160-64), any applicable privacy laws, any applicable security laws, the HITECH Act and its implementing regulations, Title V of the Gramm-Leach-Bliley Act (15 U.S.C. §6801 et seq.) and any applicable implementing regulation(s) issued by the Insurance Commissioner or other regulatory authority having jurisdiction.

**NOW THEREFORE,** Contractor and the Plan agree as follows:

1.      <u>Definitions</u>. As used in this Agreement, the following terms shall have the indicated meaning. Capitalized terms used, but not otherwise defined, in this Agreement shall have the same meaning as those terms in 45 CFR Sections 160.103 and 164.501. The definitions below which set forth a reference to the Code of Federal Regulations are defined HIPAA terms, and such definitions are incorporated herein as though set forth in full. In addition, terms within this section may be defined pursuant to the HITECH Act. A change to the HIPAA or HITECH Regulations which modifies any defined HIPAA or HITECH term, or which alters the regulatory citation for the definition shall be deemed incorporated into this Agreement.

     (a) <u>Arrangement</u>. Means the agreement, either with or without a written contract, between the Plan and Contractor, whereby Contractor provides or will provide certain services to the Plan and, in providing those services, may have access to PHI.

     (b) <u>Breach</u>. Shall mean the illegal or unauthorized acquisition, use, access, or disclosure of PHI which compromises the security, confidentiality, privacy or integrity of that information pursuant to the HITECH Act and any regulations thereunder.

     (c) <u>Business Associate.</u> Means an individual or entity performing a function or activity on behalf of, or provides a service that involves the creation, use or disclosure of PHI.

     (d) <u>C.F.R.</u> "C.F.R." means the Code of Federal Regulations.

     (e) <u>Covered Entity</u>. Shall mean the self-insured employee group health and welfare benefit plans, as defined, and shall also mean the insurer(s) of the certain fully-insured health and welfare benefit plans, as defined. It shall also have the meaning given to the term under the Privacy and Security Rule, including, but not limited to, 45 CFR Section 160.103.

     (f) <u>Data Aggregation</u>. Shall have the meaning given to the term under the Privacy and Security Rule, including, but not limited to, 45 CFR Section 164.501.

     (g) <u>Designated Record Set</u>. "Designated Record Set" has the meaning assigned to such term in 45 C.F.R. 164.501.

     (h) <u>EPHI</u>. "EPHI" has the meaning assigned to such term in 45 C.F.R. 160.103, limited to the information created or received by Contractor from or on behalf of the Plan.

     (i) <u>Health Care Operations</u>. Shall have the meaning given to the term under the Privacy and Security Rule, including, but not limited to, 45 CFR Section 164.501.

     (j) <u>Individual</u>. "Individual" shall have the same meaning as the term "Individual" in 45 C.F.R. 160.103 and shall include a Person who qualifies as the Individual's personal representative in accordance with 45 C.F.R. 164.502 (g).

     (k) <u>Limited Data Set.</u> Shall mean PHI excluding direct identifiers of the individual or of relatives, employers, or household members of the individual. (*See* 45 C.F.R. 164.514(e)(2)).

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc. (Effective as of 01/01/2016)

TBG00002406

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

(l) Offshore. Shall mean outside the United States of America.

(m) Person. "Person" shall mean any natural person, unincorporated association or organization, joint venture, trust, court, or any entity of any kind, including business and governmental entities.

(n) Privacy and Security Rule. Shall mean the Standards for Privacy of Individually Identifiable Health Information and the Security Standards for the Protection of Electronic Protected Health Information that is codified at 45 CFR parts 160 and 164.

(o) Protected Health Information. "PHI" shall have the same meaning as the term "PHI", as defined by 45 C.F.R. 160.103, limited to the information created or received by Contractor from or on behalf of the Plan. "PHI" includes "EPHI."

(p) Required By Law. "Required By Law" shall have the same meaning as the term "required by law" in 45 C.F.R. 164.103.

(q) Secretary. "Secretary" shall mean the Secretary of HHS or his designee.

(r) Security Incident. "Security Incident" shall mean the attempted or successful unauthorized access, use, disclosure, modification or destruction of information or interference with system operations in an information system. "Security Incident" does not include unsuccessful security attempts to penetrate Contractor's computer networks or servers that are insignificant, trivial and occur on a daily basis, including but not limited to scans or pings.

(s) Security Standards. Shall mean those security standards promulgated or to be promulgated pursuant to HIPAA and other applicable federal or state regulations or statutes.

(t) Unsecured PHI. "Unsecured PHI" means PHI not secured in accordance with guidance issued by the U.S. Department of Health and Human Services under the HITECH Act §13402(h) and applicable regulations thereunder.

I.    **APPLICABLE LAW COMPLIANCE OVERVIEW**

The following section is written in concert with the remainder of this agreement, and incorporates all terms drafted thereto.

Contractor is subject to the HIPAA privacy rules and the HITECH Act, and shall adopt a privacy policy, the terms of which are incorporated herein by reference.

Privacy safeguard obligations may include, but are not limited to: (1) holding such PHI in confidence and using, or further disclosing it only for the purposes for which Business Associate disclosed it to agent, subcontractor or other third party or as required by law; (2) providing notification to Business Associate (who shall in turn promptly notify Covered Entity) of any instance in which the agent, subcontractor or other third party becomes aware in which the confidentiality of such PHI was breached; and (3) transmitting or sharing any PHI to any recipient Offshore without first obtaining written consent from Covered Entity as to such Offshore transmission.

The Plan is permitted to disclose PHI, as defined in the HIPAA privacy rules, to Contractor to the extent that such PHI is necessary for the Plan to carry out its administrative functions, including retention of Contractor to provide services.

Contractor shall not use or further disclose PHI other than as permitted or required by applicable plan documents or as required by all applicable law, including but not limited to the HIPAA privacy rules or the HITECH Act. When using or disclosing PHI or when requesting PHI, Contractor shall make reasonable

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc. (Effective as of 01/01/2016)

TBG00002407

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

efforts to limit the PHI retained, obtained, and/or utilized to the minimum amount necessary to accomplish the intended purpose of the use, disclosure or request.

Contractor shall promptly report to the Plan any improper use or disclosure of PHI of which it becomes aware.

Contractor shall provide adequate protection of PHI by ensuring that: (i) only those employees who work on issues related to healthcare will have access to the PHI provided by the Plan; (ii) restricting access to and use of PHI to only the employees identified in clause (i) above and only for the functions performed by Contractor on behalf of the Plan; (iii) requiring any who receive PHI to abide by the applicable privacy rules and laws; and (iv) using Contractor's established disciplinary procedures to resolve issues of noncompliance by the employees identified above.

If feasible, Contractor shall return or destroy all PHI received, and retain no copies of such information when no longer needed for the purpose for which disclosure was made. If such return or destruction is not feasible, Contractor shall limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible.

Contractor shall provide the Plan, and plan participants with the following rights: (i) the right to access to their PHI in accordance with 45 C.F.R. §164.524; (ii) the right to amend their PHI upon request and incorporate any such amendment into a participant's PHI in accordance with 45 C.F.R. §164.526; and (iii) the right to an accounting of all disclosures of their PHI in accordance with 45 C.F.R. §164.528.

Contractor shall make its books, records, and internal practices relating to the use and disclosure of PHI received available to HHS for verification of compliance with the HIPAA privacy rules and HITECH Act and applicable regulations thereunder.

<u>Minimum Necessary Information.</u>  In any instance when PHI is used, requested or disclosed under this Agreement or in accordance with other agreements that exist between the parties to this agreement, the Parties will use or disclose only the minimum amount of PHI necessary to accomplish the intended purpose as required by the Security Rule and HITECH Act.

<u>Use by Workforce.</u>  Members of the Parties' workforces will be advised of their obligations to protect and safeguard PHI. Appropriate disciplinary action will be taken against any member of the Parties' workforce who uses or discloses PHI in contravention of this Agreement.

<u>Security Policies.</u>  Administrative, technical, and physical safeguards and security policies that comply with all applicable laws and regulations shall be maintained.

## II.    OBLIGATIONS OF CONTRACTOR

### Section 1.  <u>Use of PHI</u>

Contractor shall not, and shall ensure that its directors, officers, employees, contractors and agents do not, use PHI received from the Plan in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if used by the Contractor, except that Contractor may use PHI (i) for Contractor's proper management and administrative services, or (ii) to carry out legal responsibilities of Contractor.

Contractor may use and disclose the minimum necessary PHI created, transmitted or maintained for or received from Business Associate(s) and Covered Entity in order to provide certain services and obligations, provided no use or disclosure would violate the HIPAA regulations or the HITECH Act and regulations, provided Business Associate(s) and Covered Entity made the use or disclosure.

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc. (Effective as of 01/01/2016)

TBG00002408

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

**Section 2.  Disclosure of PHI**

Contractor shall not, and shall ensure that its directors, officers, employees, contractors and agents do not, disclose PHI received from the Plan in any manner that would constitute a violation of the Privacy Rule or HITECH Act if disclosed by the Contractor, except that Contractor may disclose PHI in a manner permitted pursuant to this Agreement or as required by law.

Contractor may use PHI if necessary (i) for the proper management and administration of Contractor, (ii) to carry out the legal responsibilities of Contractor, or (iii) to provide Data Aggregation services relating to the Health Care Operations of the Plan. Contractor further represents that, to the extent it requests the Plan to disclose PHI to Contractor; such request will only be for the minimum PHI necessary for the accomplishment of Contractor's purpose in performing its duties and responsibilities under the Arrangement.

To the extent Contractor discloses PHI to a third party, Contractor must obtain, prior to making such a disclosure: (i) reasonable assurances from such third party that such PHI will be held confidential as provided pursuant to this Agreement, and only disclosed as required by law or for the purposes for which it was disclosed to such third party; and (ii) an agreement from such third party to immediately notify Contractor of any breaches of the confidentiality of the PHI, to the extent it has knowledge of such breach.

**Section 3.  Safeguards Against Misuse of Information**

Contractor agrees that it will implement all appropriate safeguards to prevent the use or disclosure of PHI, other than permitted or required by the terms and conditions of this Agreement.

**Section 4.  Reporting of Disclosures of PHI**

Contractor shall, within five (5) days of becoming aware of a disclosure of PHI in violation of this Agreement by Contractor, its officers, directors, employees, contractors, or agents, or by a third party to which Contractor disclosed PHI pursuant to Section 2 of this Agreement, report any such disclosure to the Covered Entity.

(1) Legal or Authorized Disclosure Reporting.  To the extent permitted by applicable law, Contractor shall document each disclosure made of an individual's PHI to a third party.  Such report is to include the affected individual's name, the person or entity to whom the PHI was disclosed, what was disclosed, why the information was disclosed, the date of such disclosure and any other information necessary to comply with the relevant statutes and regulations.  Where Contractor is contacted directed by an individual based on information provided to the individual by Business Associate, and where required by the HITECH Act and/or any accompanying regulations, Contractor can make such report available directly to the individual.

(2) Breach Reporting. Contractor shall report to Covered Entity any Breaches of PHI after Contractor knows or should reasonably have known of Breach. Contractor shall cooperate with Covered Entity in investigation the Breach and meeting Covered Entity's obligations under HITECH Act and other security breach notification laws. Breaches shall be reported in writing (and in the format requested by Covered Entity) and shall, contain at least the following information:
    (a) Identify nature of Breach;
    (b) Identify elements of PHI which were breached or part of the Breach;
    (c) Identify who was responsible for Breach;
    (d) Identify who received PHI;
    (e) Identify what mitigating actions Contractor took or will take;
    (f) Identify Contractor contact information to enable Covered Entity to obtain additional information should it be required; and
    (g) Provide other information as Covered Entity may reasonable request.

(3) Security Incident Reporting.  Contractor shall report to Covered Entity after Contractor knows, or reasonably should have known, of such Security Incident, any Security Incident which Contractor becomes

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

Page 25 of 29

TBG00002409

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

aware. Upon Covered Entity's request, Contractor shall report any attempted unauthorized access, use, or disclosure, modification, or destruction of EPHI.

### Section 5.  Mitigation of Harmful Effects

Contractor agrees to mitigate, to the extent practicable, any harmful effect that is known to Contractor of a use or disclosure of PHI by Contractor in violation of the requirements of this Agreement.

### Section 6.  Agreements by Third Parties

Contractor shall enter into an agreement with any agent or subcontractor that will have access to PHI that is received from, or created or received by Contractor on behalf of the Plan pursuant to which such agent or subcontractor agrees to be bound by the same restrictions, terms, and conditions that apply to Contractor pursuant to this Agreement with respect to such PHI.

### Section 7.  Access to Information

Within five (5) days of a request by the Plan for access to PHI about an individual, Contractor shall make available to the Plan such PHI for so long as such information is retained by Contractor, and will not hinder the Plan from meeting the requirements of 45 CFR Section 164.524. In the event any individual requests access to PHI directly from Contractor, Contractor shall within five (5) days forward such request to the Plan. Any denials of access to the PHI requested shall be the responsibility of the Plan.

### Section 8.  Availability of PHI for Amendment

Within ten (10) days of receipt of a request from the Plan for the amendment of an individual's PHI (for so long as the PHI is retained by Contractor), Contractor shall provide such information to the Plan for amendment and incorporate any such amendments in the PHI as required by 45 C.F.R. §164.526. Contractor shall also incorporate any such amendments in the PHI as required by 45 CFR Section 164.526. Any denials of requested amendments shall be the responsibility of the Plan.

### Section 9.  Accounting of Disclosures

Within ten (10) days of notice by the Plan to Contractor that it has received a request for an accounting of disclosures of PHI (for so long as the PHI is retained by Contractor), Contractor shall make available to the Plan such information as is in Contractor's possession and as is required for the Plan to make the accounting required by 45 C.F.R §164.528. At a minimum, Contractor shall provide the Plan with the following information: (i) the date of the disclosure; (ii) the name of the entity or person who received the PHI, and if known, the address of such entity or person; (iii) a brief description of the PHI disclosed; and (iv) a brief statement of the purpose of such disclosure which includes an explanation of the basis for such disclosure. In the event the request for an accounting is delivered directly to Contractor, Contractor shall within five (5) days forward such request to the Plan. It shall be the Plan's responsibility to prepare and deliver any such accounting requested.  Contractor hereby agrees to implement an appropriate recordkeeping process to enable it to comply with the requirements of this Section.

### Section 10.  Availability of Books and Records

Upon reasonable notice, Contractor hereby agrees to make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Contractor on behalf of the Plan available to the Secretary of Health and Human Services for the purposes of determining the Plan's and Contractor's compliance with the Privacy Standards.

### Section 11.  Liability

The Plan shall not be liable for Contractor's privacy violations.

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

TBG00002410

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

**Section 12. Training**

Contractor shall provide appropriate training regarding the requirements of this Agreement to any employee accessing, using or disclosing PHI and shall develop and implement a system of sanctions for any employee, agent or subcontractor who violates this Agreement.

**Section 13. Indemnification**

The Parties shall indemnify and hold harmless each other from and against any and all losses, claims, expenses (including, but not limited to, reasonable attorney's fees), damages, injuries, demands, or lawsuits brought against or sustained by either Party in whole or in part, as a result of, or arising out of a breach of this Agreement by the other Party or its agents or subcontractors, including but not limited to any unauthorized use or disclosure of PHI.

**Section 14. Notice of Request for Data**

Contractor agrees to notify the Plan within five (5) days of Contractor's receipt of any request, subpoena, or judicial or administrative order to disclose PHI. To the extent the Plan decides to assume responsibility for challenging the validity of such request, subpoena or order, Contractor agrees to cooperate with the Plan in such challenge.

**Section 15. The Plan's Obligations**

The Plan shall notify Contractor of any limitations in the Plan's ability to use or disclose PHI to the extent that such limitations may affect Contractor's use or disclosure of PHI.

**III.    DURATION**

This Agreement will have operational effect unless modified by a subsequent writing or one party notifies the other in writing of its intent to terminate the contract sixty (60) days in advance.

Effect of Termination

(1) Except as provided in paragraph (2) of this subsection, upon termination of this Agreement for any reason, Contractor shall return or destroy all PHI received from the Plan, or created or received by Contractor on behalf of the Plan. This provision shall apply to PHI that is in the possession of subcontractors or agents of Contractor. Contractor shall retain no copies of the PHI.

(2) In the event Contractor determines that returning or destroying the PHI is infeasible, Contractor shall provide to the Plan notification of the conditions that make return or destruction infeasible. Upon notifying the Plan that return or destruction of PHI is infeasible, Contractor shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Contractor maintains such PHI.

(3) Any other provision of this Agreement notwithstanding, this Agreement and the Arrangement may be terminated by the Plan upon ten (10) days prior written notice to Contractor in the event that Contractor materially breaches any obligation of this Agreement and fails to cure the breach within such ten (10) day period; provided, however, that in the event that termination of this Agreement and the Arrangement is not feasible, in the Plan's sole discretion, then the Plan shall have the right to report Contractor's breach to the Secretary of the Department of Health and Human Services.

(4) Notwithstanding any rights or remedies set forth in this Agreement or provided by law, the Plan retains all rights to seek injunctive relief to prevent or stop the unauthorized use or disclosure of PHI by Contractor, any of its agents or subcontractors, or any third party who has received PHI from Contractor.

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc. (Effective as of 01/01/2016)

Page 27 of 29

TBG00002411

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

(5) The Plan may terminate this Agreement, effective immediately, if (i) Contractor is named as a defendant in a criminal proceeding for a violation of HIPAA, the HIPAA Regulations or other security or privacy laws, or (ii) a finding or stipulation that Contractor has violated any standard or requirement of HIPAA, the HIPAA Regulations or other security or privacy laws is made in any administrative or civil proceeding in which Contractor has been joined.

## IV.    MISCELLANEOUS

(a) Regulatory References. A reference in this Agreement to a section in the Privacy Rule or the Security Rule means the section as in effect or as amended.

(b) Amendment. Upon the enactment of any law or regulation affecting the use or disclosure of PHI, or the publication of any decision of a court relating to any such law or the publication of any interpretive policy or opinion of any governmental agency charged with the enforcement of any such law or regulation, either party may, by written notice to the other party, and by mutual agreement, amend the Agreement in such manner as such party determines necessary to comply with such law or regulation.  If the other party disagrees with such amendment, it shall so notify the first party in writing within thirty (30) days of the notice. If the parties are unable to agree on an amendment within thirty (30) days thereafter, then either of the parties may terminate the Agreement on thirty (30) days written notice to the other party.  Contractor and the Plan agree to amend this Agreement to the extent necessary to allow either Party to comply with the Privacy Rule (45 CFR Parts 160 and 164), the Standards for Electronic Transactions (45 CFR Parts 160 and 162), and the Security Standards (45 CFR Part 142) (collectively, the "Standards") promulgated or to be promulgated pursuant to HIPAA and other applicable federal or state regulations or statutes. Contractor and the Plan will fully comply with all applicable Standards and other applicable federal or state regulations or statutes and will amend this Agreement to incorporate any provisions required by the Standards, such regulations or statutes.

(c) Survival. The obligations of Contractor under Article III of this Agreement shall survive the termination of this Agreement, and Article V shall survive the termination of this Agreement.

(d) Interpretation. Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits the Covered Entity to comply with the Privacy Rule and the Security Rule. In the event of any inconsistency or conflict between this Agreement and any other agreement between the parties, the terms, provisions and conditions of this Agreement shall govern and control.

(e) No Third Party Beneficiaries. Nothing expressed or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person or entity, other than the Plan, Contractor and their respective successors and assigns, any rights, remedies, obligations or liabilities whatsoever.

(f) Other Amendments. This Agreement may be amended or modified only in writing signed by the Parties.

(g) Waiver. No change, waiver or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation on any other occasion.

(h) Notice. Any notice to the other Party pursuant to this Agreement shall be in writing sent by a national overnight delivery service, registered or certified mail, return receipt requested, or hand delivered, addressed to each Party as follows:

To the Plan:
CENTRAL VALLEY AG COOPERATIVE
2803 N. Nebraska Avenue
York, NE 68467

Attention: _____

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

TBG00002412

DocuSign Envelope ID: 22699BC6-E29A-4FA5-BB17-72B21DC59CB8

To Contractor:
ANASAZI MEDICAL PAYMENT SYSTEMS, INC.
420 Technology Parkway, Suite 200
Norcross, GA 30092

Attention: _____

(I) <u>Effect on Arrangement</u>. The provisions of this Agreement shall prevail over any provisions of the Arrangement that conflict with or are inconsistent with any provision of this Agreement. All other terms of the Arrangement shall remain in full force and effect.

(j) <u>Costs</u>. Each Party, at its own expense, shall provide and maintain the personnel, equipment, hardware, software, services (including without limitation telecommunications services) and testing necessary to comply with the privacy and security provisions of this Agreement.

(k) <u>Governing Law</u>.  This Agreement is entered into and accepted in the state of the original defending party.  As such, this Agreement and all questions relating to its validity, interpretation, performance, and enforcement shall be governed by and construed in accordance with the laws of the state of the original defending party without regard to conflicting choice of laws provisions.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Agreement Effective Date.

**CONTRACTOR**

ANASAZI MEDICAL PAYMENT SYSTEMS, INC.

By: _Mike Dendy_
Name: Mike Dendy
Title: CEO
Date: 1/21/2016

**PLAN**

CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN

By: _Tim Esser_
Name: Tim Esser
Title: SVP of HR
Date: 1.5.16

RBR Program Services Agr. by and among CDS, AMPS, Central Valley Ag Cooperative and The Benefit Group, Inc.
(Effective as of 01/01/2016)

Page 29 of 29

TBG00002413