**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **CENTRAL VALLEY AG COOPERATIVE, for itself and as Fiduciary of the Central Valley Ag Cooperative Health Care Plan; and CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**DANIEL K. LEONARD, SUSAN LEONARD, THE BENEFIT GROUP, INC., ANASAZI MEDICAL PAYMENT SOLUTIONS, INC., CLAIMS DELEGATE SERVICES, LLC, LINUS G. HUMPAL, and GMS BENEFITS, INC.,**<br><br>**Defendants.** | **8:17CV379**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on several motions.  For the reasons discussed below, the Defendants' Motions for Summary Judgment, ECF Nos. 257, 263, and 270, will be granted.  The Plaintiffs' Motion for Partial Summary Judgment, ECF No. 273, will be denied.  Because this action will be dismissed, the Court will not address the Motions in Limine, ECF Nos. 223, 243, 347, 350, 352, 355, and 371, and they will be denied as moot.

## FACTUAL BACKGROUND

In compliance with the Court's local rules, the parties submitted numbered statements of undisputed facts and corresponding responses.  While the Court will not list here every statement of fact admitted by the several parties, it has thoroughly reviewed

all the facts and evidence submitted.[1]  Unless otherwise indicated, the following facts are undisputed for purposes of the pending Motions for Summary Judgment.

## I.  The Parties and the ERISA Plan

Central Valley Ag Cooperative ("Central Valley")[2] is a Nebraska corporation with its principal place of business in York, Nebraska.  Central Valley provides farm planning, supplies, and services to members of its cooperative in Nebraska, Kansas, and Iowa. Central Valley Non-Stock and United Farmers were separate entities that each had their own group employee health and welfare plan prior to the entities' corporate merger in 2014. After the merger, Central Valley provided its employees the Central Valley Ag Cooperative Health Care Plan ("Central Valley Plan" or "Plan"), which was a qualified employee welfare plan within the definition of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461.  In addition to health coverage offered by the Central Valley Plan, individual employees could choose to purchase additional insurance including a Vision Benefit Plan ("VSP") as well as insurance against accidents, critical illness, and cancer, directly from the Plan's broker.  Those individual policies were not part of the Plan.

Central Valley's Plan was overseen by an informal Benefits Committee in charge of selecting and managing the benefits, including health insurance, offered to employees.

---

[1] The Court is mindful of the difficulty the parties encountered when attempting to maintain a well-organized record in this case, given the volume of exhibits and the fact that many exhibits were restricted. That said, the disarray of the record, including mislabeled exhibits, references to exhibits attached to depositions, illegible exhibits, and documents filed upside down, prolonged the Court's review of the motions.

[2] Effective September 1, 2014, United Farmers Cooperative ("United Farmers") merged with Central Valley.  Following the merger, United Farmers changed its name to Central Valley Ag Cooperative.

The Benefits Committee members included Central Valley's President, Carl Dickinson; Senior Vice President for Human Resources, Tim Esser; Senior Vice President of Member Services, Peggy Hopwood; and Central Valley's current Chief Financial Officer, Don Swanson. Dickinson, Hopwood, and Swanson were employees of United Farmers before the merger. In July or August 2015, Central Valley's Vice President of Risk Management, Rick Smithpeter, was added to the Benefits Committee. Dickinson had ultimate decision-making authority over Plan selection for the 2015 and 2016 Plan years.

Defendant GMS Benefits, Inc. (GMS) is the trade name for Group Marketing Services, Inc. GMS provides broker and employee benefit plan consulting services to employers. Defendants Susan Leonard and Daniel Leonard are the President and Vice-President, respectively, of Group Marketing Services, Inc., and its sole shareholders. United Farmer hired GMS as its broker in 2005 and GMS continued in that capacity for Central Valley in 2014 following the merger. GMS is not named as a fiduciary of the Central Valley Plan in any document describing, establishing, or related to the Plan for any Plan year. At no time were GMS, Susan Leonard, or Daniel Leonard fiduciaries with respect to the Central Valley Plan.

In 2013, Defendant The Benefit Group, Inc. (Benefit Group), was the third-party administrator for the United Farmers Cooperative Health Care Plan (the "United Farmers Plan"). Hopwood Dep. Ex. 77, ECF No. 264-1. In 2015 and 2016, Central Valley engaged Benefit Group to provide administrative services for the Plan, governed by an administrative services agreement. Esser, on behalf of Central Valley, signed the administrative services agreement for the 2015 Plan Year, effective January 1, 2015 (the "2015 ASA"), s*ee* ECF No. 264-13, and signed another administrative services agreement

with Benefit Group for the 2016 Plan Year, effective January 1, 2016 (the "2016 ASA"), *see* ECF No. 264-15. The 2015 and 2016 ASAs stated that Benefit Group was not a fiduciary under the Plan by virtue of paying benefits in accordance with the Plan's rules. Under both administrative services agreements, Central Valley retained "all final authority and responsibility for the Plan and its operation." *See id.* at 1, PageID.7467.   The administrative services agreements also stated that "Employer [Central Valley] shall have final authority in determining the eligibility of claims to be paid by the Plan." *Id.* No documents governing the Central Valley Plan in either 2015 or 2016 identify Benefit Group as a fiduciary of the Central Valley Plan.

Defendant Anasazi Medical Payment Solutions, Inc. d/b/a Advanced Medical Pricing Solutions (AMPS) provides medical bill review (MBR) services to employee benefit plans. AMPS provided MBR services to the United Farmers Plan and then to the Central Valley Plan in 2015. Defendant Claims Delegate Services, LLC (CDS)[3] was a wholly owned subsidiary of AMPS providing reference-based reimbursement ("RBR") services to employee benefit plans. CDS was not involved in providing MBR services and did not provide any services to Central Valley or the Central Valley Plan before January 1, 2016. However, CDS provided RBR services to the Central Valley Plan in 2016.  AMPS also provided MBR services to support CDS's RBR services during the 2016 Plan Year.

## II.  MBR and the 2015 Plan Year

In each year relevant to this case, Central Valley selected the type of benefits the Plan would offer. For the 2015 Plan Year, Central Valley chose the option with the lowest

---

[3] In its briefing, Central Valley's references to AMPS include CDS.  Accordingly, for purposes of this Memorandum and Order and unless otherwise indicated, the Court's references to AMPS also include CDS.

monthly payment, specifically the option that included AMPS providing MBR services. Effective January 1, 2015, Central Valley entered into a Medical Bill Review Addendum (the "MBR Agreement") with Benefit Group. Esser read the MBR Agreement before signing it on Central Valley's behalf and was authorized to enter into the MBR Agreement. Before entering into the MBR Agreement, no Central Valley representative ever spoke to anyone at AMPS or CDS.

Under the MBR program, Benefit Group would receive claims from Plan participants and would forward the claim to AMPS.  AMPS would then submit the claim to its proprietary database for review. The AMPS review process would determine whether the claim included charges that were inappropriate and/or excessive. Following this review, AMPS would issue a "recommended allowable payment" amount to Benefit Group, recommending the amounts that should be paid on certain hospital and facility claims. *See* Humpal Dep. Ex. 16 § 2.7, ECF No. 264-9.  Benefit Group would then send Central Valley the payment recommendation for each claim. For each claim, Central Valley could accept AMPS's recommendations, or reject AMPS's recommendations and pay the Preferred Provider Organization (PPO) contracted rate, if available. Hopwood Dep. 74:19-75:1; 75:15-19; 85:2-88:5, ECF No. 262-5; *see also* MBR Agreement § 2.7, ECF No. 262-11 ("All final determinations and decisions as to eligibility, benefit availability, correctness or appropriateness of charges billed by a provider, and all determinations whether any bill is payable under a benefit plan, are the responsibility of Client [Central Valley].").  Each Central Valley representative who approved funding requests for the 2015 Plan Year was authorized to do so by Central Valley.

The MBR Agreement also set AMPS's fee for Plan Year 2015. It provided that AMPS's fee for MBR services was "equal to 30% of Savings." MBR Agreement, Attachment A, ECF No. 262-11, PageID.6099. The MBR Agreement defined "savings" as "the difference between the lower of either (a) the original total charges billed by the provider or (b) the amount of such charges that would normally be paid by [Central Valley] and its member under its existing contract with the provider, <u>less</u> the allowable amount recommended by AMPS." *Id.* Attachment A of the MBR Agreement further provided that

> If AMPS has received a percentage of Savings payment from Client on a claim in accordance with this Attachment A, but such claim later is subsequently successfully challenged in the appeals process by the provider and a higher adjusted charge is recommended by AMPS and paid by Client, then upon receipt by AMPS of verification of such payment and a copy of the applicable revised or supplemental Explanation of Payment, AMPS shall credit or reimburse TPA for the account of Client for such proportionate amount of percentage of Savings fees previously paid or currently due to AMPS.

*Id.* Essentially, if Central Valley accepted the AMPS recommendation, and savings were achieved, Central Valley retained 70% of the savings and AMPS retained 30% of the savings. Humpal Dep. Ex. 16, Attachment A, Benefit Group 2383, ECF No. 264-9. The 30% AMPS fee was paid by Central Valley through a funding request submitted by Benefit Group. Benefit Group would then forward the 30% fee to AMPS. AMPS would then pay back to Benefit Group a percentage of the savings.

Healthcare providers became concerned about their payments from the Plan under the MBR program. In July 2015, Central Valley's PPO network, First Health, threatened to terminate Central Valley's access to the network because of AMPS's MBR program and the repricing of already discounted hospital claims below PPO contracted rates. In November 2015, First Health terminated Central Valley's access to the network. Because

First Health terminated Central Valley's access to the network, Central Valley sought out a different type of plan for the 2016 Plan Year.

## III.  RBR and the 2016 Plan Year

In the fall of 2015, GMS proposed several types of plans to Central Valley for health insurance for the 2016 Plan Year. The proposals included an option to use reference-based reimbursement (RBR) for hospital and facility claims.  Under an RBR program, the plan sets payment levels at a certain percentage of Medicare as a reference.  Central Valley asserts that it wanted payment levels set at 185% of Medicare for "metropolitan" providers and 200% of Medicare for rural providers.  Central Valley asserts that Linus Humpal, President of Benefit Group, opined that hospitals would be happy to accept 185% of Medicare.

Central Valley also wanted to avoid a practice known as balance billing.  Balance billing occurs when a health insurance plan receives a claim from a hospital and pays benefits that are less than the full amount of the hospital charges.  The hospital may then send the patient a bill for the balance that the health insurance plan did not pay.  While presenting options for the 2016 Plan Year, John Powers of AMPS told The Benefit Group that there would be less balance billing with RBR than MBR.  The Benefit Group doubted this assertion because there would be a larger number of claims eligible for review under RBR than MBR.  Robin Wall of AMPS confirmed there would be more balance billing under RBR. Inman Dep. 31:13-7, ECF No. 266-18.  Central Valley was aware that balance billing was a possibility under RBR. Dickinson Dep. 177:12-19, Filing No. 266-6; Hopwood Dep. 78:20-79:8, 149:1-3; ECF No. 266-3; *see also* ECF No. 264-30.

7

Central Valley chose the RBR option for the 2016 Plan Year and, in connection with its choice of the RBR plan design option, Central Valley adopted a new plan document (the "RBR Plan Document" or the "2016 Plan Document"). Under the 2016 Plan Document, Central Valley served as Plan Sponsor and Plan Administrator, and was the Plan's named fiduciary. As the Plan's named fiduciary, Central Valley had the obligation to ensure that the RBR Plan Document complied with applicable law. Esser read and signed the RBR Plan Document and was authorized to sign the RBR Plan Document.

The RBR Plan Document appointed CDS as a fiduciary for the purpose of serving as a "Claims Delegate" to, among other things, "review and make benefit determinations on all post-service Hospital and Facility Claims." RBR Plan Doc. at 3, ECF No. 264-25, PageID.7620. AMPS and CDS would review all hospital and facility charges and would then determine a fair and reasonable amount for the services. Humpal Dep. Ex. 8, Benefit Group2194-95, ECF No. 264-6. Central Valley, as the Plan Administrator, was appointed as "[t]he named fiduciary for all other purposes." *Id.* Central Valley had a fiduciary obligation to oversee the fiduciary duties delegated to CDS.

The RBR Plan Document set the Permitted Payment Level ("PPL") for hospital and facility claims at 160% of the Medicare allowable amount or, if greater, 135% of the Cost of the Covered Services, with a cap of 180% of the Medicare allowable amount. The RBR Plan Document further provided that if CDS believed it would serve the best interests of the Plan and Plan participants, in its sole discretion, CDS could "increase reimbursement for Allowable Expenses . . . by up to 30% of the amount of the Permitted Payment Levels set forth above." *Id.* at 72, PageID.7689 (*e.g.*, up to 208% of Medicare.)

8

Under the RBR Plan Document,

the Plan Administrator [Central Valley] and CDS shall jointly have the discretion to make a Benefit Determination to pay charges in any amount on Hospital or Facility Claims, but only when, in light of the specific facts and circumstances relating to the incident of care in question, such increased payment is otherwise Reasonable and: (i) it has been clearly and definitively established that the payment of a lesser amount could not in good faith be considered to represent fair and equitable consideration for the Services included in the Claim, or (ii) it is rationally determined to be necessary, appropriate and in the best interests of the Plan and its Participants to make such increased payment under the circumstances, taking into consideration the availability of alternative sources of the Services in question in the relevant geographic locale or area, and the value of maintaining Provider relationships for purposes of future access to such Services in that locale or area; or (iii) in circumstances where applicable law or regulation otherwise clearly requires the Plan to pay such charges in such amounts.

*Id.* at 72-73, PageID.7689-90.  On January 19, 2016, the same day that Central Valley adopted the 2016 Plan Document, Esser read and signed the RBR Program Services Agreement (the "RBR Agreement") on behalf of Central Valley and the Plan, and was authorized to enter into the RBR Agreement.

Once the 2016 Plan Year was underway, Benefit Group sent hospital and facility claims to CDS through an electronic clearinghouse.  CDS then used AMPS's proprietary database to re-price hospital and facility claims in accordance with the PPLs set forth in the RBR Plan Document.  Once CDS reviewed the claim, it would recommend a payment amount to Benefit Group.  Benefit Group then sent weekly funding requests to Central Valley with copies to GMS identifying each claim that Benefit Group proposed to pay in a given week.  The funding requests listed amounts to be paid with Plan assets on a claim-by-claim basis for claims submitted to the Plan. Central Valley sent emails approving claims for payment. Each Central Valley representative who approved Benefit Group funding requests for the 2016 Plan Year was authorized to do so by Central Valley.

9

Central Valley alleges that beginning in or about May 2016, providers began to tell Plan participants that they would be billed directly for their services.  As the year progressed, some Central Valley Plan participants began receiving balance bills from providers. Participants received balance bills at a rate much higher than any party anticipated.  Additionally, on or about May 19, 2016, several hospitals who were part of the First Health PPO network filed a lawsuit against the "Central Valley Ag Flexible Benefit Plan" and several other plans alleging that the plans were obligated to pay the full PPO rates on certain MBR claims reviewed by AMPS.

To attempt to address payment issues, CDS negotiated direct payment contracts with several providers.  On July 20, 2016, CDS executed a direct contract with York General Hospital on behalf of the Central Valley Plan, which specified that all claims aside from inpatient surgical claims would be paid at 185% of the Critical Access Hospital Medicare rate.  On September 30, 2016, CDS executed a direct contract with Memorial Heath Care Systems in Seward on behalf of the Central Valley Plan, which specified that claims would be paid at the lesser of 100% of billed charges or 180% of the Critical Access Hospital Medicare rate. At the end of 2016, at Central Valley's direction, AMPS re-priced and Benefit Group reprocessed and paid certain claims at 204% of the Medicare rate.

Central Valley decided not to renew the RBR Agreement beyond the 2016 Plan year. Beginning in the summer or fall of 2016, Smithpeter was tasked with negotiating claims on Central Valley's behalf and began a series of direct negotiations with several hospitals. Thereafter, Central Valley entered into agreements with several hospitals in which Central Valley agreed to pay a percentage of the charges billed by the hospitals.

**IV.  Stop Loss**

10

Central Valley engaged GMS to procure excess liability (stop-loss) coverage for claims submitted to the Plan for Plan Year 2016. GMS offered Central Valley a choice of stop-loss policies that had different terms.  The Benefit Group acted as a wholesaler for insurance brokers with respect to stop-loss coverage by obtaining quotes from carriers and providing them to brokers/agents. Benefit Group solicited bids from stop-loss carriers for Plan Year 2016 and provided those bids to GMS for presentation to Central Valley. The proposals for stop-loss insurance solicited by Benefit Group and presented to Central Valley by GMS were from Companion Life (Montgomery Management) and U.S. Fire.

GMS recommended that Central Valley switch from its Companion stop-loss contract to a U.S. Fire stop-loss contract because there was a 28.74% rate increase if Central Valley renewed the Companion policy—a $1.7 million difference.  Neither AMPS nor CDS had any involvement in soliciting, selecting, or recommending stop-loss insurance to the Central Valley Plan.  Six months after The Benefit Group provided the stop-loss quote to GMS, on March 31, 2016, Central Valley signed an Application for Excess Insurance with U.S. Fire. Central Valley made the final decision about which stop-loss carrier to select, and it signed and approved all stop-loss contracts relating to the Plan.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action."  *Briscoe v. Cty.*

*of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)).  In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor."  *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)).  Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."  *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The moving party need not produce evidence showing "the absence of a genuine issue of material fact."  *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325).  Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial."  *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial."  *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042).

"[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" for trial and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

Central Valley asserts eight causes of action against each of the Defendants. The causes of action fall under two theories of recovery under ERISA. First, Central Valley alleges that Defendants breached their fiduciary duty to the Plan under 29 U.S.C. §§ 1109(a) and 29 U.S.C. § 1132(a)(2). Second, Central Valley alleges that Defendants breached their fiduciary duty under 29 U.S.C. § 1106(b) by engaging in prohibited transactions under ERISA.[4] Central Valley's claims under its first theory fail because,

---

[4] To support its theories, Central Valley argues that Defendants devised a five-step scheme to defraud Central Valley and keep charging fees:

Step 1: Market AMPS's MBR services to Central Valley knowing the MBR services did not work with the local PPO networks;

Step 2: Create a false plan document to present to a PPO network indicating the network's claims would only be audited for billing errors;

Step 3: Create another plan document to be presented to Central Valley which indicated that PPO network claims would be audited both for errors and for excessive charges, but with Central Valley as the Plan Administrator having final authority to determine whether PPO network claims were excessive;

13

with the limited exception of CDS in 2016, the Defendants were not Plan fiduciaries nor did they become de facto fiduciaries.  Central Valley's claims under its second theory fail because the transactions at issue were not prohibited by the Plan.

## I.  Breach of Fiduciary Duty

Section 1132(a)(2) states that "[a] civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."   Under § 1109(a), a fiduciary who breaches its duties under ERISA "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary."  To establish a breach of fiduciary duty, a plaintiff must show that "(1) a plan fiduciary (2) breach[ed] an ERISA-imposed duty (3) causing a loss to the plan." *Leckey v. Stefano*, 501 F.3d 212, 225-26 (3d Cir. 2007), *as amended* (Dec. 21, 2007) (citing *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995)). Central Valley has failed to prove these elements as a matter of law because Defendants were not plan fiduciaries nor did they become "de facto" fiduciaries. Further, there is no evidence of breach of an ERISA-imposed duty.

### A.  Defendants as Named Fiduciaries

A fiduciary's duties under ERISA "have been described as 'the highest known to the law.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir.1982)).  "In every case charging

---

Step 4: Hide fees in agreements and disclosure documents;

Step 5: Increase fees and undisclosed kickbacks by reducing claims below the agreed amounts without seeking the requisite approval from Central Valley as the Plan Administrator.

Central Valley Br. at 13-14, ECF No. 277, Page.ID 14407-09 (paraphrased).

breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).  "ERISA does not regulate nonfiduciaries or provide a remedy for a nonfiduciary's misconduct." *Sparks v. Mo-Kan Iron Workers Pension Fund*, 765 F. Supp. 566, 568 (W.D. Mo. 1990).  The Supreme Court has specifically stated that "damages may not be recovered against ERISA non-fiduciaries."  *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 914 (8th Cir. 1994).[5] "[W]here the facts are not in question, whether a party is an ERISA fiduciary is 'purely a question of law.'" *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (quoting Kayes v. Pac. Lumber Co., 51 F.3d 1449, 1458 (9th Cir. 1995)).

With respect to an ERISA plan, a person is a fiduciary

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

---

[5] S*ee also Fink v. Union Cent. Life Ins. Co.*, 94 F.3d 489, 493 (8th Cir. 1996) ("As a nonfiduciary, Pankow is not liable for damages under ERISA, and the Finks' complaint requests only a damages award."); *see also Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994) ("A majority of the Supreme Court has made clear its view that Congress's omission to impose on nonfiduciaries a duty not to participate knowingly in an ERISA fiduciary's breach of fiduciary obligations was not inadvertent; that Congress knew that at common law (including in that term the judge-made law of equity) nonfiduciaries were subject to "knowing participation" liability in trust cases, and knowing this decided not to cast the net of ERISA liability that wide."); *Reich v.  Rowe*, 20 F.3d 25,  28 (1st Cir.  1994) ("On June 1, 1993, the Supreme Court held in a five to four decision that ERISA does not permit a civil suit for money damages against nonfiduciaries who knowingly participate in a fiduciary breach."); G*rp. Hospitalization & Med. Servs. v. Merck-Medco Managed Care, LLP*, 295 F. Supp. 2d 457, 462 (D.N.J. 2003) ("A plaintiff cannot assert an ERISA fiduciary duty claim unless it asserts the claim against an ERISA fiduciary.").

29 U.S.C. § 1002(21)(A).[6]  The "term fiduciary is to be broadly construed."  *Olson v. E.F. Hutton & Co.*, 957 F.2d 622, 625 (8th Cir. 1992).  However, "[a] person is a fiduciary only with respect to those portions of a plan over which he [or she] exercises discretionary authority or control." *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d 623, 632 (8th Cir. 2001) (quoting *American Fed'n of Unions Local 102 v. Equitable Life Assurance Soc.*, 841 F.2d 658, 662 (5th Cir. 1988)). "We look to the substance of the transaction in deciding whether a person is a fiduciary or whether the relationship is more contractual than fiduciary." *Hunter v.  Philpott*, 373 F.3d 873, 876 (8th Cir. 2004). "Persons who provide professional services to plan administrators 'are not ERISA fiduciaries unless they 'transcend the normal role' and exercise discretionary authority.'" *Paul Revere*, 241 F.3d at 632 (internal citations omitted).[7]

Federal regulations provide guidance about professional services that do not rise to the level of fiduciary actions:

> D-2 Q: Are persons who have no power to make any decisions as to plan policy, interpretations, practices or procedures, but who perform the following administrative functions for an employee benefit plan, within a framework of policies, interpretations, rules, practices and procedures made by other persons, fiduciaries with respect to the plan:
>
> (1)    Application of rules determining eligibility for participation or benefits;
>
> (2)    Calculation of services and compensation credits for benefits;
>
> (3)    Preparation of employee communications material;

---

[6] There is no allegation that any Defendant rendered investment advice to the Plan making subsection (ii) inapplicable to this case.

[7] *See also Board of Trustees of Western Lake Superior Piping Industry Pension Fund v. American Benefit Plan Adm'rs, Inc.*, 925 F.Supp. 1424, 1429-30 (D.Minn. 1996) (granting summary judgment in favor to third party administrator because the plan administrator was not ERISA fiduciary where it operated under the strict supervisory requirements of employer and plan documents, and where no facts established its discretion over the acts alleged.).

(4)     Maintenance of participants' service and employment records;

(5)     Preparation of reports required by government agencies;

(6)     Calculation of benefits;

(7)     Orientation of new participants and advising participants of their rights and options under the plan;

(8)     Collection of contributions and application of contributions as provided in the plan;

(9)     Preparation of reports concerning participants' benefits;

(10)    Processing of claims; and

(11)    Making recommendations to others for decisions with respect to plan administration?

A: No. Only persons who perform one or more of the functions described in section 3(21)(A) of the Act with respect to an employee benefit plan are fiduciaries. Therefore, a person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

29 CFR 2509.75-8 at D-2.  The regulations and interpretive case law demonstrate that "discretion" is the "benchmark of fiduciary status under ERISA pursuant to the explicit wording of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)." *Johnston*, 241 F.3d at 632 (citing *Maniace v. Commerce Bank of Kansas City*, 40 F.3d 264, 267 (8th Cir. 1994)).  Except for CDS, Central Valley has not shown that the Defendants acted as fiduciaries.

### 1. Benefit Group

Central Valley acknowledges that Benefit Group was not a named fiduciary in either the 2015 or 2016 Plan Years.  A third-party administrator becomes a fiduciary only if it assumes discretionary authority over a plan, even if the administration contract states

17

that the third-party administrator has no discretionary authority. *Harold Ives Trucking Co. v. Spradley & Coker, Inc.*, 178 F.3d 523, 526 (8th Cir. 1999). The Court must determine whether Benefit Group exercised discretionary authority over Plan assets.

A person is a fiduciary "to the extent . . . he exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Courts have stated that "the right to write checks on plan funds is 'authority or control respecting management or disposition of its assets.'" *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997). Thus, the "words of the ERISA statute, and its purpose of assuring that people who have practical control over an ERISA plan's money have fiduciary responsibility to the plan's beneficiaries, require that a person with authority to direct payment of a plan's money be deemed a fiduciary." *Id.* However, "[c]ustody of plan assets alone cannot establish control sufficient to confer fiduciary status." *McLemore v. Regions Bank*, 682 F.3d 414, 423 (6th Cir. 2012); *see also Briscoe v. Fine*, 444 F.3d 478, 494 (6th Cir.2006) ("Our reading of ERISA's statutory definition will not extend fiduciary status to every person who exercises mere possession, or custody over the plans' assets."). The court in *IT Corp.* specifically explained: "If a fiduciary tells a bookkeeping service to send a check for $950 to Mercy Hospital, the bookkeeping service does not thereby become a fiduciary." *IT Corp.*, 107 F.3d at 1419.

Central Valley argues that Benefit Group was a fiduciary because it had authority to write checks on behalf of the Plan. However, Central Valley's own understanding of Benefit Group's role demonstrates that Benefit Group lacked discretionary authority. Instead, Benefit Group was like a bookkeeper or claims processor. By Central Valley's own description, "[Benefit Group] sent [Central Valley] as Plan Administrator 'weekly

funding requests' or invoices for the amounts due these providers, and [Central Valley] sent the [Central Valley] Plan money to Benefit Group, which then paid those bills on behalf of the [Central Valley] Plan."  Central Valley Br. at 12, ECF No. 323 (citing ECF No. 277-1, ¶ 20, 55, 56).  The authority to pay bills on behalf of the Plan was contingent upon Central Valley's approval of the funding requests.  Benefit Group did not have authority to direct payment of Plan money except as expressly approved by Central Valley and, according to Central Valley's own representative, Benefit Group never made a payment or used Plan funds without Central Valley authorization.  *See* Dickinson Dep. 80:20-25, 275:7-15, ECF No. 266-6.  The evidence demonstrates that Benefit Group performed purely administrative functions, and only at the direction of Central Valley.  *See* 29 C.F.R. § 2509.75-8 D-2.  Accordingly, Benefit Group was not a fiduciary.

Central Valley specifically argues that Benefit Group became a fiduciary because of (1) the way Benefit Group designed the Plan, (2) the way Benefit Group administered costs-savings mechanisms for claims processing, and (3) Benefit Group's decision to retain AMPS and CDS.  However, none of these circumstances made Benefit Group a fiduciary of the Plan.  First, Plan design does not trigger a fiduciary duty.  The Supreme Court has stated that "ERISA's fiduciary duty requirement simply is not implicated where [a plan's settlor] makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999); *see also Trenton v. Scott Paper Co.*, 832 F.2d 806, 809 (3d Cir. 1987) (design of plan was "purely a corporate management decision," not a fiduciary decision).  Central Valley, as the Plan administrator and fiduciary, had discretion to accept or reject the proposed plan design.

19

Central Valley approved and signed the 2015 and 2016 Plans and there is no evidence that Benefit Group somehow forced or manipulated Central Valley to adopt the Plans. Accordingly, plan design does not implicate any fiduciary duties.

Central Valley's second argument fails because Benefit Group processed claims in compliance with the terms of the Plan and the MBR and RBR Agreements.  Benefit Group routinely notified Central Valley when a claim was processed under the MBR Addendum. *See, e.g.*, ECF No. 266-17; Inman Dep. 211:17-212:22, ECF No. 266-18. Central Valley reviewed amounts of the AMPS/CDS payment recommendations and had the discretionary authority to overrule the recommendation.  Central Valley provided no evidence that Benefit Group acted outside the terms of the Plan or the MBR or RBR agreement.  Accordingly, Benefit Group did not breach a fiduciary duty by following Central Valley's instructions in paying claims under the terms of the Plan.

Finally, Central Valley argues that Benefit Group breached a fiduciary duty by recommending that the Plan retain AMPS and CDS to provide services to the Plan. Central Valley provides no legal support for this argument. The Medical Bill Review Services Addendum Central Valley signed expressly stated that it was Central Valley's desire to retain AMPS, through Benefit Group, to perform medical bill review services. *See* MBR Addendum at 1, ECF No. 262-11.  There is no legal basis to hold Benefit Group liable for Central Valley's decision to enter into contracts with AMPS. Accordingly, Benefit Group is entitled to summary judgment on Central Valley's claims related to the retention of AMPS/CDS by Central Valley.

### 2.  AMPS

AMPS was not an ERISA fiduciary for the 2015 Plan Year because it was not the ultimate decision maker on claims.  ERISA fiduciary status does not attach "simply by performing administrative functions and claims processing within a framework of rules established by the plan especially when the ultimate decision belonged to the plan." *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 477 (7th Cir. 2007).  In other words, an administrator is not a fiduciary if an ERISA plan retains authority to accept or reject a recommendation, and the defendant is not the "final authority" or "final arbiter" of the decision. *See In re Express Scripts, Inc., PBM Litig.*, No. 4:05-MD-01672 SNL, 2008 WL 2952787, at *12 (E.D. Mo. July 30, 2008).

For the 2015 Plan Year, Central Valley was a participant in the First Health PPO network and it utilized AMPS only for MBR services. *See* AMPS Requests for Admissions ("RFA") Nos. 35, 44, ECF No. 259-2.  No plan document for the 2015 Plan Year named AMPS as a fiduciary. *See* AMPS RFA Nos. 5-6. In the 2015 Plan Year, AMPS reviewed claims it received from Benefit Group and made recommendations on those claims, which Central Valley either approved or rejected in its capacity as Plan Administrator.  Central Valley retained final authority over claims decisions, including the appropriateness of charges on eligible claims. *See* MBR Addendum § 2.7, ECF No. 262-11, PageID.6097.[8] Moreover, Central Valley at times rejected recommendations made by AMPS on claims.

---

[8] "AMPS shall have no responsibility to accept or reject any claim or bill for payment . . . . All final determinations and decisions as to eligibility, benefit availability, correctness or appropriateness of charges billed by a provider, and all determinations whether any bill is payable under a benefit plan, are the responsibility of Client." *Id.*

*See, e.g.,* Hopwood Dep. 75:15-19; 85:2-88:5, ECF No. 262-5.  Because Central Valley was the ultimate decisionmaker, AMPS was not a fiduciary in Plan Year 2015.[9]

### 3.  GMS & Leonards

In briefing, Central Valley acknowledged that GMS and the Leonards were not fiduciaries.  Accordingly, they cannot be directly liable for breach of fiduciary duty.  Central Valley's argument with respect to GMS is that they "misplaced [their] loyalty" and knowingly participated in fiduciary breaches by Benefit Group.  Accordingly, Central Valley's arguments against GMS and the Leonards are contingent on the arguments against Benefit Group.

### B.  Whether Defendants Became "De Facto" Fiduciaries

Central Valley argues that even if the Defendants were not named fiduciaries in Plan documents, they became fiduciaries by acting contrary to the Plan and collecting undisclosed fees.  A non-fiduciary, performing purely ministerial functions cannot be held liable for breach of fiduciary duty. *Harold Ives Trucking*, 178 F.3d at 526. However, if a non-fiduciary "assumes discretionary authority . . . it must be held to have acted as a fiduciary."  *Id.*  Central Valley argues that Benefit Group and AMPS became de facto fiduciaries for the 2015 and 2016 Plan Years by acting contrary to each year's plan document.

### 1.  Alleged False 2015 Plan Documents

For 2015, Central Valley argues that Benefit Group and AMPS became de facto fiduciaries and breached their duties by creating and submitting false plan documents to

---

[9] CDS was a limited, named fiduciary under the RBR program in the 2016 Plan Year. Central Valley's claims for breach are addressed below.

First Health in order to advance their scheme.  Central Valley alleges that, in the false document, Benefit Group represented that the PPO network claims would only be audited for duplicate or inaccurate bundling of charges, not for whether they were usual and customary or reasonable.  Central Valley alleges that Benefit Group then created another plan document to submit to Central Valley.  In the document submitted to Central Valley, claims could be audited for errors and excessive charges, with no distinction between in-network and out-of-network claims.

The evidence does not show that Benefit Group presented a false plan document to gain access to the First Health network.  Central Valley wanted access the First Health PPO Network through Premier Healthcare Exchange, Inc. ("PHX") effective January 1, 2015. On November 28, 2014, Benefit Group sent PHX a copy of the draft 2015 Central Valley Plan document for approval. *See* ECF No. 313-8, Ex. 81.  The draft 2015 Plan document was submitted to PHX on November 28, 2014, and the Plan document, eventually signed by Central Valley, contained identical claims-auditing language which allowed claims-auditing for excessive charges.  Both documents stated:

> In addition to the Plan's medical record review process, the Plan Administrator may use its discretionary authority to utilize an independent bill review and/or claim audit program or service for a complete claim. While every claim may not be subject to a bill review or audit, the Plan Administrator has the sole discretionary authority for selection of claims subject to review or audit.

> The analysis will be employed to identify charges billed in error and/or charges that are not Usual and Customary and/or Medically Necessary and/or Reasonable, if any, and may include a patient medical billing records review and/or audit of the patient's medical charts and records.

> Upon completion of an analysis, a report will be submitted to the Plan Administrator or its agent to identify the charges deemed in excess of the Usual and Customary and/or Reasonable amounts or other applicable provisions, as outlined in this Plan Document.

> Despite the existence of any agreement to the contrary, the Plan Administrator has the discretionary authority to reduce any charge to a Usual and Customary and/or Reasonable charge, in accord with the terms of this Plan Document.

*See* ECF No. 300-10 at 142; ECF No. 313-8 at 10.  The language submitted to First Health and adopted by Central Valley authorized the auditing of claims for both errors and excessive charges.  Accordingly, there is no evidence that Benefit Group submitted false plan documents.

Because the 2015 Plan document Central Valley signed allowed for auditing of claims for excessive charges, Benefit Group was not acting contrary to the Plan document by submitting claims to AMPS for review for excessive charges. Central Valley's CEO acknowledged that Central Valley knew AMPS was going to review claims for excessive charges under the MBR program in the 2015 Plan Year.  *See* Dickinson Dep. 44:8-11, ECF No. 266-6. Central Valley has presented no evidence that Benefit Group or AMPS violated any guidelines for claims auditing under the 2015 Plan Document.

Further, Central Valley has not identified any claim that AMPS handled improperly and admits that Central Valley approved the weekly funding requests and issued payments under for the 2015 Plan Year.  The MBR Addendum stated that Central Valley decided whether to pay the PPO amount or AMPS's MBR recommendation: "All final determinations and decisions as to eligibility, benefit availability, correctness or appropriate-ness of charges billed by a provider, and all determinations whether any bill is payable under a benefit plan, are the responsibility of Client [Central Valley]." ECF No. 264-9 at a 3. Central Valley's CEO confirmed that this is how the MBR program worked both in plan documents and in practice.  *See* Dickinson Dep. 275:7-15, ECF No. 266-6. In fact, Central Valley chose not to use the AMPS recommendations on numerous

occasions and instead paid the PPO rate. *See* Hopwood Dep. 74:19-75:1; 75:15-19; 85:2-88:5, ECF No. 266-3; ECF No. 266-10; ECF No. 266-11.  There is no evidence that AMPS/CDS or Benefit Group defrauded First Health or Central Valley, nor is there any evidence that they acted contrary to 2015 Plan Year documents.  Accordingly, they did not become fiduciaries or violate a fiduciary duty on that basis.

### 2.  Representations About the 2016 RBR Plan

For 2016, Central Valley argues that Benefit Group and AMPS are de facto fiduciaries because they made representations about the RBR program that caused a loss to the Plan.  Central Valley claims that the misrepresentations fall in four categories: (1) whether RBR was appropriate for Central Valley; (2) the amount and impact of balance billing; (3) the negotiation of direct contracts; and (4) what the permitted payment level would be.

### a.  Whether RBR was appropriate for Central Valley

The first alleged misrepresentation is based on an email dated June 26, 2016, from Jacquie Damgaard of CDS to Kirk Fallbacher, CFO of AMPS.  *See* ECF No. 325-24 at 2, PageID.20199.  In the email, Damgaard stated that Rick Hirsch, CDS in-house counsel,

> thinks that RBR is not even appropriate for [Central Valley], but they came in with a bunch of companies who had MBR and were moved over to RBR, due to Benefit Group being sued for their actions with the network they were utilizing before. There was just no analysis about whether RBR was appropriate for any of the companies –just "We have to keep their business so RBR it is approach."

*Id.*

Even ignoring the lack of context and layers of hearsay in the email, the statements do not support a claim for breach of fiduciary duty under ERISA.  Opinions are not actionable for fraud under common law. *See Ed Miller & Sons v. Earl*, 502 N.W.2d 444,

453 (Neb. 1993) ("To constitute fraud, a misrepresentation must be an assertion of fact, not merely an expression of opinion."). Central Valley provides no support for its assertion that the opinion of an AMPS employee constitutes a breach of fiduciary duty under ERISA. Further, the email is dated several months after Central Valley decided to participate in the RBR program. Central Valley admitted that no one at AMPS or CDS ever spoke to anyone at Central Valley before the RBR program was implemented. Accordingly, there is no evidence that this statement is an actionable misrepresentation.

### b.  Impact of Balance Billing

Central Valley also argues that AMPS and Benefit Group misrepresented the impact of balance billing under the RBR plan. Central Valley's argument is based on an email dated July 11, 2015, from John Powers to Emily Langdon, former general counsel for Benefit Group, stating "[s]uprisingly enough, the appeals and balance billing issues have been significantly lower with RBR than MBR, mostly due to no PPO to object." ECF No. 300-1 at 51.

This statement does not support a claim for breach of fiduciary duty under ERISA. First, the statement was made several months before Central Valley adopted the RBR plan. "No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary" 29 U.S.C. § 1109(b). Neither AMPS nor Benefit Group was a fiduciary under the 2016 Plan at the time of the email.

Second, there is no evidence that Central Valley was ever told there would be less balance billing under RBR than MBR. Benefit Group did not believe Powers's statement, and Robin Wall of AMPS corrected Powers's statement, confirming there would likely be

more balance billing under RBR. Brown Dep. 119:11-121:22, ECF No. 266-7; Inman Dep. 31:12-33:2, ECF No. 266-18. Central Valley admitted it knew balance billing was a possibility under the RBR program. Dickinson Dep. 177:12-19, ECF No. 266-6; Hopwood Dep. 78:20-79:8; 149:1-3, ECF No. 266-3. Further, Powers's statements about the amount or impact of balance billing were opinions, not statements of fact. *See Ed Miller*, 502 N.W.2d at 453. Central Valley has not provided evidence that it relied on Powers's statements or that it would have been reasonable to do so.  Accordingly, the statements do not constitute an actionable breach under ERISA.

### *c.  Statements about direct contracts*

Central Valley's "ultimate goal" under the RBR program was to obtain direct contracts with providers—agreements between the Plan and providers about reimbursement rates.  Central Valley argues that AMPS and Benefit Group breached their fiduciary duty to the Plan by failing to adequately negotiate direct contracts.  However, Central Valley admitted that, when it signed the RBR Agreement, it knew there were no direct contracts in place; that no one promised there would be direct contracts in place by any particular time; and that the negotiation of direct contracts was not a requirement under the RBR Agreement. Dickinson Dep. 141:22-25; 144:8-13, ECF No. 266-6; Central Valley Response to Requests for Admissions No. 245, ECF No. 259-2 at 38. Because Central Valley knew it did not have direct contracts with providers and knew that the RBR Plan did not require direct contracts, AMPS's failure to immediately obtain direct contracts was not a breach of fiduciary duty.

### *d.  Permitted payment levels*

Finally, Central Valley claims AMPS and Benefit Group breached a fiduciary duty to the Plan by manipulating the permitted payment level used to present the RBR savings analysis to make the RBR program seem more attractive to Central Valley. Specifically, Central Valley argues that it told AMPS that Central Valley wanted permitted payment levels set at 185% of Medicare for "metropolitan" providers and 200% of Medicare for rural providers. Central Valley argues that AMPS led Central Valley to believe that providers would accept these payment levels, even though AMPS knew that area providers were accustomed to receiving payment at Medicare plus 323%. Central Valley further asserts that AMPS and Benefit Group changed the 2016 Plan Document to accept 160% of Medicare.

Central Valley has not demonstrated that AMPS or Benefit Group made any misrepresentations about payment levels in the 2016 RBR Plan. Central Valley offered no evidence that AMPS or Benefit Group illegally changed the 2016 Plan Document to accept payments of 160% of Medicare or that Central Valley was led to believe that the document contained a different acceptable payment level. Central Valley was the only party who signed the 2016 Plan Document. ECF No. 264-6 at 99. Further, the 2016 Plan permitted payment levels above 160% of Medicare. The Plan document stated that the Plan could pay claims up to 208% of Medicare, or "in any amount" subject to the agreement of Central Valley and CDS. ECF No. 264-6 at 72-73. Any pre-2016 Plan Year opinions or predictions about what providers might accept did not create a fiduciary duty and are not actionable under ERISA.

### 3.  *Stop-Loss Carrier*

Central Valley claims that Benefit Group acquired and breached a fiduciary duty by pushing Central Valley to use U.S. Fire as its stop-loss carrier without disclosing that U.S. Fire would provide a kickback to Benefit Group. Central Valley's claim is legally insufficient because "it is well settled that merely selling insurance to a plan by itself does not create a fiduciary relationship under ERISA." *In re Ins. Brokerage Antitrust Litig.*, No. CIV. 04-5184, 2008 WL 141498, at *5 (D.N.J. Jan. 14, 2008) (citation omitted). As noted above, a party who provides advice to an ERISA plan, but does not control whether the plan will accept the advice, is not a fiduciary. *See Am. Fed'n of Unions*, 841 F.2d at 664 (holding that a party providing advice to an ERISA fund was not a fiduciary where he "had no control over whether the Fund would accept or reject its advice to self-insure."). There is no evidence that Benefit Group exercised decision-making power on behalf of the Central Valley Plan as to which stop-loss contract Central Valley would adopt.

Central Valley also argues that Benefit Group and GMS were fiduciaries with respect to stop-loss because "Central Valley as Plan Administrator for the Central Valley Plan relied on Benefit Group (and GMS), as its trusted advisors, to provide honest, accurate advice regarding the placing of its stop-loss policy." Central Valley Br. at 32, ECF No. 323. However, in its Response to Benefit Group's Statement of Material Facts, Central Valley states: "[Central Valley] only learned through discovery in this case and by Benefit Group's own admissions, that Benefit Group solicited bids from stop loss carriers." Central Valley Response to Undisputed Facts at 33 ¶¶ 148-49, ECF No. 323-1. This case was filed on October 11, 2017. It would be impossible for Central Valley to have relied on advice from Benefit Group as a "trusted advisor" regarding procuring stop-loss when it

admits it did not even know Benefit Group was involved in procuring stop-loss until discovery in this case.

Further, GMS was Central Valley's registered agent for stop-loss coverage. Leonard Dep. 132:1-7, ECF No. 266-1. Central Valley engaged GMS to procure stop-loss coverage for claims submitted in the 2016 Plan Year. As Central Valley's insurance agent, GMS shopped stop-loss options on behalf of Central Valley and presented them to Central Valley for consideration. Dickinson Dep. 87:2-25; 90:10-13, No. 266-6 (Q: "Central Valley ultimately had the ability to listen to Mr. Leonard's recommendations or go a different way [regarding stop loss], though?" A. "Oh absolutely, yes."). Thus, the evidence shows that advice regarding stop-loss coverage for the 2016 Plan Year came from Central Valley's broker, not Benefit Group. Accordingly, Central Valley has not shown that Benefit Group owed or breached a fiduciary duty to the Plan based on Central Valley's selection of a stop-loss carrier.

### 4. CDS's Review During 2016 Plan Year

Central Valley argues that CDS breached its fiduciary duty to the Plan during 2016 by causing providers to be reimbursed at rates that were lower than what was reasonable and customary in the geographic region. During the 2016 Plan Year, CDS had a fiduciary duty limited to its administration of hospital and facility claims.  Central Valley argues that CDS should have authorized high payments during 2016.

Central Valley's claim against CDS fails for several reasons.  First, CDS did not owe a fiduciary duty to the Plan to set the payment levels in the 2016 Plan Document. "[A]dherence to [an] agreement with a plan administrator does not implicate any fiduciary duty where the parties negotiated and agreed to the terms of that agreement in an arm's-

length bargaining process." *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1003 (8th Cir. 2016).  Until the 2016 Plan Document was signed, Central Valley "remained free to reject its terms and contract with an alternative service provider offering more attractive pricing or superior investment products."  *Id.*  Central Valley does not identify any claims that CDS administered in a manner inconsistent with the 2016 Plan Document. If Central Valley wanted to include higher Medicare reference points than those included in the 2016 Plan Document, it could have done so.  CDS's fiduciary duty did not arise until the Plan Document was signed. Further, under the Plan Document, Central Valley could have requested that it and CDS exercise their joint discretion to pay more in Plan funds on any claim.  CDS cannot breach a fiduciary duty by directing that claims be paid according to the reimbursement levels contained in the RBR Plan Document.

Second, CDS did not have a duty under the Plan to avoid balance billing.  Unless specifically required, a plan administrator is under no duty to avoid balance billing.  *See Clark v. Group Hospitalization and Medical Servs, Inc.*, No. 10–CV–333, 2010 WL 5093629 (S.D. Cal. Dec. 7, 2010).  In *Clark*, a plan participant-plaintiff brought (1) an ERISA claim against the plan administrator alleging that the administrator erred by failing to calculate the proper benefit level based on the plan terms; and (2) a state-law claim alleging that the plan was administered in such a way as to expose participants to balance billing. *Id.* at *3, 5. The *Clark* plaintiff argued that its state-law balance-billing claim should not be preempted by ERISA because it "raises a separate legal duty—a duty to keep plan members out of the billing process by paying non-contracting emergency physicians a 'customary and reasonable rate.'" *Id.* at 5. Plaintiff contended that the balance-billing claim "does not trigger a duty under ERISA or the Plan's specific terms," and so "the

balance billing issue is separate and independent from an improper denial of benefits claim." *Id.* at *5. The court agreed, reasoning that the state-law balance-billing claim "does not concern denial of benefits under ERISA provisions or the Plan itself." *Id.* at *6.

The court's reasoning in *Clark* is persuasive. Like the plan in Clark, the 2016 Plan Document imposed no affirmative duty to avoid balance-billing. Neither CDS nor AMPS had a duty under ERISA to prevent balance-billing, a practice that hospitals may or may not choose to employ after a plan pays less than billed charges on a claim. Instead, balance-billing was an inherent risk assumed by Central Valley when it opted for the lower cost RBR program over a traditional PPO network plan. As noted above, Central Valley was aware when it adopted the RBR program that balance-billing was a risk. Further, statements in the 2016 RBR Plan Documents and educational materials notified Plan participants of the possibility of balance-billing. *See* Esser Dep. 268:5-21; 243:24-4; 274:15-20, ECF No. 262-6; ECF No. 276-10. Accordingly, AMPS and CDS did not violate any ERISA fiduciary duties solely because Plan participants were exposed to balance-billing. Central Valley has not demonstrated that CDS breached a fiduciary duty to the Plan.

### 5. *Conclusion*

For the reasons stated, with the exception of CDS for Plan Year 2016, none of the Defendants was an ERISA fiduciary for purposes of this action. Central Valley retained final, discretionary authority over all parts of Plan administration and none of the parties acted outside of its duties described in the Plan documents. Further, although CDS was a limited, named fiduciary under the 2016 Plan Document, there is no evidence that it

acted contrary to Plan.  Accordingly, Defendants are entitled to summary judgment on Central Valley's breach-of-fiduciary-duty claims.

## II. Prohibited Transactions

Central Valley alleges that the Defendants, directly or by implication, violated fiduciary duties to the Plan by engaging in prohibited transactions.  "The transactions prohibited by § 1106 tend to be those in which 'a fiduciary might be inclined to favor [a party in interest] at the expense of the plan's beneficiaries.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009) (quoting *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000)). Relevant to this case, ERISA prohibits two types of transactions.  First, 29 U.S.C. § 1106(a) plan fiduciaries "shall not cause the plan" to enter into certain transactions with a party in interest.  These transactions include lending of money or credit between the plan and a party in interest; furnishing of goods or services between the plan and a party in interest; and transferring plan assets to or for the benefit of a party in interest.  Second, 29 U.S.C. § 1106(b) prohibits certain transactions between a plan and plan fiduciary.[10]

---

[10] Section 1106(b) states:

(b) **Transactions between plan and fiduciary** A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

33

Neither 29 U.S.C. § 1106(a) nor § 1106(b) expressly prohibits excessive and unreasonable services to an ERISA plan. However, § 1106(a) prohibits a fiduciary from engaging "in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a).  Section 1106 is designed to prevent "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). Central Valley argues that transactions between AMPS and Benefit Group in Plan Years 2015 and 2016 constituted self-dealing and the Defendants are liable for their acquiescence to the transactions.[11]

### A. *Fees Under the 2015 MBR Program*

Central Valley argues that Benefit Group and AMPS violated a de facto fiduciary duty through undisclosed kickbacks to Benefit Group during the 2015 Plan Year. According to Central Valley, Benefit Group and AMPS concocted a scheme as far back as 2013, creating template contracts that showed AMPS would receive 30% of savings to a plan, while AMPS and Benefit Group had a side agreement in which AMPS promised to give 7.5% of the savings back to Benefit Group. Central Valley argues that this scheme violated ERISA's prohibition on self-dealing.

---

[11] As noted above, except for CDS in 2016, none of the parties was a direct or de facto fiduciary. Thus, the prohibited-transaction statutes would not apply.  Further, there is no evidence that any party caused the Plan to enter into any prohibited transactions with that party or any other party in interest. Central Valley, the named fiduciary, entered into transactions on behalf of the Plan. Central Valley made all decisions regarding what plan design to adopt and what fees and claims to pay. *See, e.g.*, Dickinson Dep. 109:1-8; 275:7-10; 275:11-15; 80:20-25, ECF No. 266-6; Harris Dep. Ex. 210, ECF No. 262-15, PageID.6146.

The evidence does not support Central Valley's allegations.  First, Central Valley was aware that Benefit Group could receive rebates and commissions from cost-containment companies. In the 2015 ASA, Central Valley authorized Benefit Group to "receive administration commissions, fees and/or rebates from various contracted vendors including but not limited to: . . . cost containment companies . . . ." ECF No. 264-13 at 8. Central Valley also signed an ERISA Disclosure stating that "If the Employer [Central Valley] has chosen to participate in certain programs offered through third party vendors, including but not limited to cost containment, TPA [The Benefit Group] may receive…a percentage of any savings generated for TPA services in implementing and managing such programs." ECF No. 264-16.  Central Valley, through its Vice President, admitted that AMPS's MBR services were cost-containment services and that Benefit Group could receive compensation from cost-containment companies.  *See* Esser Dep. 62:10-15, 71:13-17, ECF No. 266-2.  Accordingly, Central Valley had notice that Benefit Group could receive compensation from AMPS.

Second, Benefit Group and AMPS did not breach any fiduciary duty by failing to disclose the specific percentage of savings that AMPS paid to Benefit Group.  Central Valley cites no authority for its argument that Benefit Group and AMPS were required to disclose the specific percentage Benefit Group received from AMPS.  Further, there is no evidence that Benefit Group misrepresented the amount it received or that Central Valley even asked about the specific percentage Benefit Group received.

Finally, there is no evidence that the compensation AMPS paid to Benefit Group affected Plan funds in any way.  In the MBR Addendum, Central Valley agreed to pay AMPS 30% of savings under the MBR program. ECF No. 264-9 at 4.  Central Valley

suggests that if AMPS was willing to pay Benefit Group 7.5% of the total savings, then AMPS was willing to accept 22.5% of total savings for its services. Thus, according to Central Valley, the "undisclosed" fee to Benefit Group resulted in a loss to the Plan.

Central Valley's theory fails to show a loss to the Plan. The evidence shows that Benefit Group provided significant services to support MBR including screening claims under the MBR criteria, processing claims, and assisting with balance-billing. Inman Dep. 16:15-17:17, ECF No. 266-18. AMPS compensated Benefit Group for these services using AMPS's funds, not Plan assets, under a separate Claims Services Agreement. "Customer [The Benefit Group] shall receive 7.5% of the Savings in consideration of Customer's administrative functions supporting AMPS Services." ECF No. 300-6 at 67. If Benefit Group had not provided these services under the MBR Program, AMPS or some other vendor would have had to perform the services. There is no evidence that AMPS would have performed all the MBR services for 22.5% of savings as Central Valley suggests. Accordingly, there is no evidence that these payments affected Plan funds.

### 2. Fees in the 2016 RBR Program

Central Valley has not shown that Benefit Group or AMPS engaged in a prohibited transaction during the 2016 Plan Year. In 2016, AMPS and Benefit Group entered into the RBR Agreement with the Central Valley Plan for AMPS to be paid a 10% fee on all claims subject to RBR. Central Valley alleges that for the 2016 Plan Year, Benefit Group billed the Plan 12.5% for AMPS's services and then hid both the overcharge and a 2.5% kickback to Benefit Group.

Central Valley's argument mischaracterizes the parties' agreements for the 2016 Plan Year. In November 2015, Central Valley was told that the RBR fee would be 12.5%

of gross billed charges, not 10% as Central Valley argues. The 12.5% fee was listed under Option 3 in a proposal submitted to Central Valley by its broker, GMS. ECF No. 264-21. Smithpeter even asked GMS to confirm that Option 3 contained a typo and that the fee was 12.5% not 12%. *See* ECF No. 264-24 at 2; *see also* Smithpeter Dep. 145:4-148:22, ECF No. 266-8. GMS confirmed that the RBR fee would be 12.5%. ECF No. 264-24 at 2.

Central Valley knew that of the 12.5% RBR fee AMPS/CDS would receive 10%, leaving 2.5% to Benefit Group. *See* RBR Program Servs. Agreement at 9, ECF No. 264-30, PageID 7779.   When it was discovered that the RBR Agreement contained a scrivener's error because Benefit Group's 2.5% fee was mistakenly omitted from the final RBR Agreement, Benefit Group sent an amendment to Central Valley's broker, GMS, setting forth the 2.5% fee. Skutt Depo. 219:16-220:11; 229:4-13, ECF No. 324-1. Moreover, in every iteration of the Complaints in this case, Central Valley has alleged that "Under the terms of the RBR Agreement" AMPS/CDS was to be paid 10% and Benefit Group was paid 2.5% of gross billed hospital claims. ECF No. 60 at 31, ¶ 96; ECF No. 1, at 21, ¶ 88; ECF No. 34 at 25, ¶ 95; ECF No. 35 at 26, ¶ 95.  There is no evidence of a "scheme" to hide Benefit Group's 2.5% fee under the RBR Plan. Accordingly, there is no evidence that Benefit Group engaged in self-dealing.

## CONCLUSION

The undisputed evidence fails to establish a material issue of fact as to whether any of the Defendants were ERISA fiduciaries or breached fiduciary duties to the Plan. Further, the evidence does not demonstrate that any parties engaged in transactions prohibited by ERISA.  Accordingly,

IT IS ORDERED:

37

1.    Defendants' Motions for Summary Judgment, ECF Nos. 257, 263, and

      270, are granted;

2.    Plaintiff's Motion for Partial Summary Judgment, ECF No. 273, is denied;

3.    The Motions to Exclude and Motions in Limine, ECF Nos. 223, 243, 347,

      350, 352, 355, and 371, are denied as moot;

4.    This action is dismissed, with prejudice; and

5.    A separate judgment will be entered.


Dated this 30th day of August 2019.

                              BY THE COURT:

                              s/Laurie Smith Camp
                              Senior United States District Judge