IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CENTRAL VALLEY AG COOPERATIVE and CENTRAL VALLEY AG COOPERATIVE HEALTH CARE PLAN, | ) ) ) ) ) | CASE NO. 8:17-CV-379 |
| Plaintiffs, | ) ) | |
| v. | ) ) | **BRIEF IN SUPPORT OF MOTION FOR ATTORNEY FEES** |
| DANIEL K. LEONARD; SUSAN LEONARD; THE BENEFIT GROUP, INC.; ANASAZI MEDICAL PAYMENT SOLUTIONS, INC. d/b/a ADVANCED MEDICAL PRICING SOLUTIONS; CLAIMS DELEGATE SERVICES, LLC; and GMS BENEFITS, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

Central Valley Ag Cooperative's ("CVA") scorched earth litigation tactics in this case are so egregious that they require that CVA, and its attorneys, pay The Benefit Group Inc.'s and Linus G. Humpal's (collectively "The Benefit Group") fees in defending CVA's frivolous claims. CVA acted in bad faith by making allegations in this lawsuit that CVA knew or should have known were false or were made with reckless disregard of whether they were true. Early in the litigation, The Benefit Group's counsel sent four Rule 11 letters to CVA's counsel explaining why CVA's allegations lacked merit and provided documents disproving CVA's allegations. Rather than withdraw its false claims, CVA plowed forward throwing mud against the wall to see what would stick. Nothing did. CVA and its attorneys should

now be required to reimburse The Benefit Group for the unnecessary fees CVA caused The Benefit Group to incur in defending this action.

## BACKGROUND

### The Original Complaint

On October 11, 2017, CVA filed its original verified complaint. Filing No. 1. In its Complaint, CVA made a number of scandalous and false allegations accusing The Benefit Group of engaging in an interstate criminal conspiracy to defraud the CVA Plan. CVA alleged that as a result of these alleged actions, the Plan suffered $3 million in damages. CVA knew, or should have known, its allegations were false or were made without any good faith basis.

CVA knew that The Benefit Group acted only as a third party administrator for the Plan and not as a fiduciary. The Plan documents CVA signed as plan sponsor expressly provide: **"CLAIMS ADMINSITRATOR [THE BENEFIT GROUP] IS NOT A FIDUCIARY**. A Claims Administrator [The Benefit Group] is not a fiduciary under the Plan by virtue of paying claims in accordance with the Plan's rules as established by the Plan Administrator." (Filing No. 264-7) (Filing No. 264-6) (bold in original). Despite knowing that The Benefit Group was not a fiduciary of the Plan, CVA alleged that The Benefit Group breached fiduciary duties.

CVA went "nuclear" in its complaint alleging that Defendants engaged in "indictable" acts of theft or embezzlement from an employee benefit plan in violation of 18 U.S.C. § 664, and asserting that Defendants were thieves, fraudsters, and racketeers. (Filing No. 1 ¶¶ 154, 157). CVA had no basis to accuse Defendants of criminal activity.

Plaintiffs alleged "56. Although they had a legal duty to do so, AMPS and CDS, for themselves and through Humpal and TBG, never disclosed to the Plan or CVA that the methodologies for health claims established by RBR would assuredly subject Plan participants to balance billing and collection efforts by health care providers." (Filing No. 1). This allegation was preposterous considering the RBR Agreement signed by CVA, and the 2016 Plan signed by CVA, expressly refers to "balance billing" or a "balance bill" more than two dozen times and contemplate a specific program to deal with balance billing. Upon reviewing the RBR Agreement and the 2016 Plan as part of CVA's Motion for a TRO, this Court found: "The practice of 'balance billing' by AMPS and Claims Delegate—which is at the heart of Plaintiffs' [CVA's] causes of action—appears to have been contemplated by the parties at the time they entered into the RBR Services Agreement." (Filing No. 33 at ECF p. 16). In granting Defendants' Motions for Summary Judgment, this Court cited to testimony from CVA's own executives in finding "Central Valley was aware that balance billing was a possibility under RBR. Dickinson Dep. 177:12-19, Filing No. 266-6; Hopwood Dep. 78:20-79:8, 149:1-3; ECF No. 266-3; *see also* ECF No. 264-30." (Filing No. 372 at ECF p. 7).

In an attempt to intimidate The Benefit Group, CVA went so far as to sue The Benefit Group's President, Mr. Humpal, *personally* despite the fact that CVA expressly pled that at all times Mr. Humpal was acting "within the course and scope of such partnership, agency, or employment" with The Benefit Group. (Filing No. 1 at ECF p. 6, ¶ 25). CVA never had a good faith basis to sue Mr. Humpal personally, and its vexatious claims against him did not survive a motion to dismiss.

**CVA's Motion for a TRO**

CVA also filed a motion for a temporary restraining order ("TRO") with its complaint. Filing No. 3. CVA's Motion for a TRO was not brought in good faith. At the TRO hearing, CVA stated "And we submit to this Court that the urgency is about stopping from that what they believe is underlying criminal behavior or we wouldn't be here under RICO from continuing to occur." (34:9-12).

Despite claiming that a TRO should be entered to stop "underlying criminal behavior," less than two weeks earlier, on September 28, 2017, CVA signed a run-out services agreement ***extending*** The Benefit Group's services through December 31, 2017. (Filing No. 21-1 at ECF p. 102). Under questioning from the Court during the TRO hearing, CVA admitted it signed the extension agreement in bad faith. "So in order to keep the process moving as much as possible, **the client went ahead and entered into that agreement, knowing that we would be shortly filing the lawsuit and also this motion for temporary restraining order**." (9:22-25)(emphasis added). This shows that CVA knew there was no emergency that required a TRO, but it filed one anyway. CVA knew that The Benefit Group was not engaged in criminal activity or, as fiduciary of the Plan, CVA wouldn't have extended its services agreement with The Benefit Group less than two weeks earlier.

Documents produced by CVA in discovery show that on May 22, 2017—almost five months *before* filing its lawsuit, CVA's senior management team had a discussion regarding "Potential Recovery - Breach of Contract and/or Fiduciary Duty." (Filing No. 375-9). CVA's 41 page, 163 paragraph verified complaint, and motion for a TRO with brief, was not

cobbled together at the last minute. Clearly, CVA had been working on these claims for some time—as it admits before it signed the extension agreement. For CVA to claim there was some emergency that required a TRO wasted the parties' and the Court's time and resources.

During the October 17, 2017 TRO hearing, CVA identified Mr. Kenedy as its forensic accounting expert whom it had already retained.

- "The Court: what's the name of the forensic auditor?
  Ms. Barrow: it's from the Lutz accounting firm, Bill Kennedy and Taylor Pugh." (12:7-9)

- "And the forensic audit in the expedited forensic audit is necessary for the client and the plan to know where the money is, who has been paid the money, in what amount, and for what reason." (52:1-4)

- "Until a forensic audit is done, we really are not going to know on what basis these people paid themselves and were precisely how they applied the various schedules that we see in the documents."

(54:5-8).

With no evidentiary support, during the TRO hearing CVA's counsel stated that CVA was concerned that the Defendants were stealing money from the Plan.

THE COURT:  And in your later comments, you seem to at least imply that one or more of the defendants may actually be stealing money from the plan. Is that your -- is that what you want me to infer?
MS. BARROW:  Yes, your Honor, that is our concern. (54:9-13).

Although CVA had the contractual right under its administrative services agreement ("ASA") with The Benefit Group to conduct an audit, it never requested an audit *before* filing its lawsuit. As this Court noted: "It does not appear that Central Valley exercised its audit powers under the Plan or the Administrative Services Agreement before this litigation." (Filing No. 33). Rather than obtain the facts first, CVA filed this lawsuit making outrageous

allegations, and then sought facts to support its claims after the fact. CVA's "shoot first ask questions later" approach greatly and needlessly increased The Benefit Group's defense costs as it was forced to knock down one specious allegation after another.

**The Court Denies CVA's Motion for a TRO**

On October 26, 2017, this Court denied CVA's motion for a TRO. Filing No. 33.

**The First Rule 11 Letter**

On October 27, 2017, The Benefit Group's counsel sent a Rule 11 letter to CVA's counsel outlining the many factual inaccuracies in CVA's complaint. (Filing No. 46-2). The Benefit Group put CVA on notice that it would seek sanctions if The Benefit Group pursued its frivolous claims. In response, CVA filed an Amended Complaint.

**The First Amended Complaint**

On October 31, 2017, CVA filed an Amended Complaint. Filing No. 34. Perhaps unhappy with having lost its TRO and having received a Rule 11 letter, despite it having nothing to do with the merits of its claim, CVA took a pot shot at opposing counsel in the First Amended Complaint: "Thalken and Fraser Stryker P.C. LLO is representing TBG in violation of the Model Rule of Professional Conduct 1.9(a) because, at the time it entered an appearance on behalf of TBG, it was still representing the Flex Benefit Plan (i.e., the CVA Plan) and the interests of CVA and TBG are materially adverse and CVA and the Plan have not consented to such representation." Filing No. 34 at ECF p.32. In fact, as CVA knew, the Flex Plan signed a conflict waiver contained in the engagement letter.

**Second Rule 11 Letter**

On November 8, 2017, The Benefit Group sent a Second Rule 11 letter again pointing out why CVA's Amended Complaint was frivolous and putting CVA on notice that The Benefit Group would seek its attorney fees. (Filing No. 46-3).

CVA's counsel responded in a letter dated November 15, 2017. CVA's letter is an example of CVA's attitude in this litigation. CVA's counsel stated:

> I am responding to your November 9 correspondence, because you have told my partner, Ms. Barrow, that she somehow is violating super-secret 'Omaha rules' of practice and doesn't understand the way things are done here. I have been practicing in this city longer than you have, I dare say, and I am very comfortable with every word in every pleading we have filed, and the manner in which we have conducted ourselves.

(Filing No. 142-10). CVA's counsel added that The Benefit Group's counsel had only a "rudimentary understanding of ERISA." Filing No. 142-10 at ECF p. 2.

**Second Amended Complaint**

A month after its original filing, without first obtaining leave of Court, on November 15, 2017, CVA filed a Second Amended Verified Complaint doubling the damages it was seeking from $3 million to $6 million (actually $18 million considering CVA sought treble damages under RICO). (Filing No. 35). The Benefit Group incurred significant attorney fees in preparing a motion to dismiss the Second Amended Complaint which was filed on December 28, 2017 (Filing No. 36) with a 38 page brief pointing out the flaws in CVA's claims. (Filing No. 37). After receiving the Defendants' respective briefs, and recognizing the flaws in its pleading, on January 4, 2018, CVA filed a motion for leave to file a Third Amended Complaint—CVA's fourth complaint in less than three months. (Filing No. 43).

7

**Third Rule 11 Letter**

In an attempt to head-off CVA making additional false allegations, on January 3, 2017, The Benefit Group sent a letter to CVA's counsel expressing concern that:

> In reviewing Plaintiffs' proposed Third Amended Complaint, we are troubled by the fact that in an apparent attempt to avoid dismissal, CVA is now either making up information, or is knowingly attempting to mislead the court. Because your client may not have told you the whole story, I am providing you additional information you may not have had, in hopes that you will not violate Rule 11 by signing a pleading containing false and misleading statements. While there are other falsehoods in the proposed Third Amended Complaint, below are some of the more glaring examples.

(Filing No. 47-1).

The Rule 11 letter explained why neither The Benefit Group nor Humpal were fiduciaries to the Plan. Recognizing that the Plan documents state that The Benefit Group was not a fiduciary, in an attempt to avoid dismissal, in paragraph 40 CVA proposed to allege "At no time during 2014, 2015, 2016, and through mid-October of 2017 neither TBG nor Humpal contacted CVA or the Plan for direction as the payment of a claim or vendor invoice." CVA knew or should have known that this allegation was completely false. The Rule 11 letter detailed how The Benefit Group submitted weekly funding requests to CVA who approved every payment made by the plan—something CVA already knew. (Filing No. 47-1). As demonstrated on summary judgment by the weekly e-mails from CVA approving weekly funding requests with statements like "approved for payment," and testimony from CVA's representatives that they approved every penny spent by the Plan, CVA knew that The Benefit Group sought direction from CVA on every claim and that CVA approved every payment made by the Plan. The Rule 11 letter stated: "But it is beyond the pale for CVA to now feign ignorance and claim it [CVA] had no idea about the amounts paid on

claims or the fees paid to AMPS/CDS when those claims and fees were clearly itemized in the funding requests which CVA approved." (Filing No. 47-1).

In a letter dated January 4, 2018, CVA responded stating: "You seem to ignore that the Original and Second Amended Complaint were both verified by the client and cited to specific documents created by Defendants and in this counsels' possession." (Filing No. 46-6). That CVA verified under oath that these false statements were true, makes CVA's actions worse, not better.

**<u>Fourth Rule 11 Letter</u>**

In a letter dated February 13, 2018, The Benefit Group's counsel requested that CVA provide the good faith basis for some of the new allegations that in the proposed amended Complaint. For example, CVA proposed to allege: "The scheme perpetrated upon CVA, the Plan and the participants caused all non-hospital provided medications, i.e., those filled by participants at pharmacies, to pay $3.00 per prescription filled to Defendants as a kickback. This revenue was never disclosed to CVA, the Plan or the participants and constituted Plan assets that should have been deposited into the Plan account." (Filing No. 43-2 at ECF p. 24). Attempting to head off going down yet another rabbit hole, The Benefit Group unequivocally stated that "This allegation is false. If you have information proving its truth, or the allegation is directed at one of the other defendants, I would like to know and see the evidence." (Filing No. 47-1).

CVA also claimed that payments to Catamaran were not authorized because Catamaran was not licensed to do business in the state. CVA knew that Catamaran was the

Plan's Pharmacy Benefit Manager. CVA knew that Catamaran merged with OptumRx. As

The Benefit Group pointed out:

> This should not be a mystery to CVA considering that every CVA Plan
> member was issued a prescription drug benefit card with OptumRx or
> Catamaran's name on it so that members could fill their prescriptions. For
> CVA to suggest that payments made to Catamaran were for 'third party non-
> medical providers' or were unauthorized because Catamaran was not
> registered with the Secretary of State ignores the reality that OptumRx merged
> with Catamaran and that these expenses were to purchase prescription drugs,
> not for vendor fees.

(Filing No. 47-1).

CVA also alleged, without any evidentiary support, that The Benefit Group and

Mr. Humpal were skimming interest off of accounts. The Benefit Group explained that this

was impossible considering the funds in question were held in a non-interest bearing

account. The Benefit Group provided CVA evidence that the account was non-interest

bearing.

> Once again, CVA's allegations are simply made up. I am enclosing a letter
> from American National Bank where The Benefit Group maintains its
> accounts. The letter confirms that the account in which money related to the
> CVA Plan was deposited, was and always has been, a non-interest bearing
> account. Now that you are armed with this information, CVA has absolutely
> no good faith basis to allege that the Defendants were comingling funds for
> the purposes of skimming interest off of a non-interest bearing account.

(Filing No. 47-1)

On February 13, 2018, CVA's counsel responded. Rather than be up front regarding

the basis of its claims, CVA's counsel stated that CVA wasn't going to voluntarily provide

any information to The Benefit Group and that The Benefit Group would have to use the

discovery process to learn the basis for CVA's claims. CVA stated:

I imagine your investigation into the $3.00 prescription kickback issue has consisted of asking your client about it. Though we are not obligated at this early stage to provide more detail than we have already provided on this, I will let you know that we have one or more witnesses prepared to testify that Mr. Humpal has personally boasted of this fact. The accounting records seem to support this as well, though they are quite a (deliberate) mess. I trust that bit of information will put this issue to rest for you at this point. The remainder of the issues you have addressed in this most recent letter have already been responded to in detail on several occasions. **We do not have to try this case today, and thankfully, you are not the trier of fact. You can avail yourself of the discovery process going forward, to determine exactly how we know what we know. We're not going to allow you to bait and bully us into providing an even greater level of detail and evidence than we have already provided thus far.**

I asked Mr. Jeffries and his colleagues to please consider consulting with an independent, sophisticated employee benefits expert, and to conduct a thorough review of even just the records you all have allowed us to see at this point. I implore you to consider doing the same. Even better, a thorough review of all the records you have access to, but have not yet provided to us, seems that it would be in order before blustering about Rule 11 sanctions. Simply asking your client, or attorneys in your office who used to work for your client, is a poor substitute for the effort you should expend in this regard.

(Filing No. 375-6). Rather than just provide the names of the "one or more witnesses" or the documents supporting these false allegations, CVA's counsel made it clear that CVA would not cooperate and Defendants were going to have to engage in lengthy and expensive discovery in order to ferret out the basis for CVA's claims.

## **Motion to Dismiss Order**

Consistent with The Benefit Group's position, on March 29, 2018, Magistrate Judge Zwart entered an order recommending that The Benefit Group's motion to dismiss CVA's RICO claim be dismissed and that Mr. Humpal be dismissed as a party. (Filing No. 59). CVA did not object to the recommendation. On May 1, 2018, this Court adopted the

Magistrate's Recommendation in its entirety and dismissed the RICO claim and Mr. Humpal as a party. (Filing No. 59).

On May 7, 2018, CVA filed its Third Amended Complaint which contained many of the same false allegations which The Benefit Group addressed in its correspondence to CVA's counsel. (Filing No. 60).

**The Kenedy Affidavit**

While CVA was suing the Defendants, it was also meeting in private with The Benefit Group's regulator, the Nebraska Department of Insurance. On April 3, 2018, CVA's expert, Mr. Kenedy, signed an affidavit which CVA submitted to the Nebraska Department of Insurance. The affidavit attached a six page report identifying the information The Benefit Group voluntarily provided to CVA in the audits conducted after the TRO hearing. (Filing No. 142-13). Mr. Kenedy stated:

- "TBG provided canceled checks and monthly invoices for premiums paid by Central Valley in 2014, 2015, and 2016. **Lutz confirmed with Central Valley that the amounts shown as paid by TBG matched the amounts remitted per Central Valley's records to ensure TBG's detail of premiums was complete and accurate.**" (Filing No. 142-13 at ECF p.3) (emphasis added).

- "TBG also provided detail of amounts funded by Central Valley for claims. **We understand that funding requests were provided to Central Valley on a weekly basis.** Based on the funding requests, Central Valley would provide funds to TBG to fund claims. **Lutz confirmed with Central Valley, that the amounts received per TBG matched Central Valley's records. No material variances were noted.**" (Filing No. 142-13 at ECF p.4) (emphasis added).

- "Lutz obtained Claims Detail History Reports from TBG for claims paid in 2014, 2015, and 2016. This detail includes each claimant, date of service, date of claim received, date paid, service provider, description of service, amount paid, check number, and claim number. **Immaterial variances were noted** between the cash remitted above and the claims paid detail noted below (however, total variance of $39,462)." (Filing No. 142-13 at ECF p.4) (emphasis added).

12

As of April 3, 2018, CVA knew The Benefit Group had not stolen from the Plan, that CVA approved all payments of claims and fees, and that there were no material variances. Apparently dissatisfied with Mr. Kenedy's findings, CVA hired a different expert.

## CVA Refuses to Streamline its Complaint

CVA's 50 page, 165 paragraph Third Amended Complaint lumped all of the Defendants together by alleging generically that "Defendants" did X or Y. As a result, the Defendants served lengthy and detailed discovery on CVA in an attempt to separate out what allegations applied to what Defendant. During the initial conference with the Court, CVA objected to Defendants' discovery as too broad. Judge Zwart was not persuaded by CVA's argument considering the broad nature of CVA's allegations. Judge Zwart indicated that if CVA was going to make broad allegations it should expect to receive broad discovery, and encouraged CVA to identify which allegations applied to which Defendants. Magistrate Judge Zwart entered an order stating: "To promote the goals outlined in Rule 1 of the Federal Rules of Civil Procedure, the parties shall promptly confer in good faith to streamline both the allegations within the complaint and the corresponding discovery requests, thereby avoiding global allegations which, in turn, prompt global discovery served on or received from each defendant." Filing No. 77. CVA chose to stand by its generic allegations in its Third Amended Complaint which required Defendants to engage in lengthy discovery to determine what allegations applied to what Defendants, needlessly increasing the costs of discovery.

**The BKD Audit**

The second accounting firm CVA hired to audit the Plan, BKD, also did not find support for CVA's allegations. In connection with the BKD audit, in September and October of 2018, CVA's senior executives sent letters to BKD stating:

> We have reviewed the reports of all transactions processed by **third-party servicers,** and, based on our review, **we believe the transactions shown in the reports are valid and in accordance with our instructions to the third-party processor**.
>
> ***
> We have no knowledge of any known or suspected:…(b) Fraudulent financial reporting or misappropriation of assets involving others that could have a material effect on the financial statements.
>
> ***
> We have no knowledge of any allegations of fraud or suspected fraud affecting the Plan received in communications from participants, former participants, regulators, third-party services or others.

(Filing No. 264-34)(Filing No. 264-35)(emphasis added). Thus, a year after filing this lawsuit, CVA represented to its auditors that all of the transactions processed by The Benefit Group were valid and in accordance with CVA's instructions, and that there was no fraud, while representing to this Court that The Benefit Group was engaging in fraudulent and unauthorized activity. This is bad faith.

**CVA Certifies Under Oath that the Plan Suffered No Harm from Fraud and there were No Prohibited Transactions**

After conducting two audits, one by Mr. Kenedy of Lutz and one by BKD, in October and November of 2018 CVA signed under penalty of perjury Form 5500s which it submitted to the U.S. Department of Labor. In Schedule H of the Form 5500 for each year at issue, CVA admitted in (f) that the Plan did not suffer a loss "that was caused by fraud or

14

dishonesty." CVA also admitted under penalty of perjury in (d) that there were no nonexempt transactions with any party-in-interest, i.e., there were no prohibited transactions. (Filing Nos. 264-36; 264-37; 264-38; 264-39).

| | | | Yes | No | Amount |
|---|---|---|---|---|---|
| c | Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked.) ................................ | 4c | | X | |
| d | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 4a. Attach Schedule G (Form 5500) Part III if "Yes" is checked.) ................................ | 4d | | X | |
| e | Was this plan covered by a fidelity bond? ................................ | 4e | X | | 5000000 |
| f | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? ................................ | 4f | | X | |

*Schedule H (Form 5500) 2016*     Page 4- 1

Id.

Compare CVA's sworn statements to the Department of Labor that the Plan suffered no loss as a result of fraud or dishonesty and that there were no prohibited transactions to what it alleged against The Benefit Group in its Third Amended Complaint:

**Claim 6: Breach of Fiduciary Duty Under §502(a)(3) by TBG for Engaging in a Prohibited Transaction**

149. TBG further breached its responsibility, obligations, and duties as a fiduciary by engaging in transactions prohibited by 29 U.S.C. §1106, including: (a) providing services to the Plan **for which it knowingly and fraudulently received excessive and unreasonable compensation**; and (b) dealing with the assets of the Plan for its own interest and account. **None of the exemptions set forth in 29 U.S.C. §1108 [the prohibited transaction exemptions]** are applicable to these transactions.

Filing No. 60. CVA's sworn statements to the Department of Labor are irreconcilable with its allegations against The Benefit Group in this case. Given CVA's sworn admissions in the Form 5500s a year after filing this lawsuit, and after conducting two audits, CVA's continued litigation against The Benefit Group was in bad faith.

15

## CVA's Interrogatory Answers Impose Unnecessary Costs on the Benefit Group

Because CVA's counsel would not provide information regarding the factual basis of its claims outside of formal discovery, The Benefit Group served formal discovery on CVA. Approximately 10 months after CVA filed its lawsuit, on August 28, 2018, The Benefit Group received CVA's answers to The Benefit Group's interrogatories. CVA had to have known that its interrogatory answers were not true. For example, in answering Interrogatory No. 3, CVA stated "TBG violated the 2016 Administrative Services Agreement by taking 'PPO Fees' **when TBG knew that there were no PPO agreements in place during 2016**, which occurred throughout 2016 and about which breach all employees of TBG and AMPS involved in processing claims would have known at the time." (Filing No. 375-8 at ECF p. 4)(emphasis added). In answer to Interrogatory No. 4, CVA stated: "Plaintiff is also aware that in 2016, TBG was taking a 'P.P.O. Fee; each month **when it is clear that there were no PPO agreements in place**." (Filing No. 375-8 at ECF p. 6)(emphasis added).  But as CVA knew, the Plan did have a physician's only PPO agreement in place in 2016 called PHCS/Multiplan. (Filing No. 266-2, Esser Dep. 133:7-136:18). Tim Esser, CVA's Senior Vice President of Human Resources, signed the client joinder agreement to obtain access to the Multiplan PPO network effective January 1, 2016. (Filing No. 375-7 at ECF p. 25)(Filing No. 266-2, Esser Dep. 131:6-132:6).

> Q. Okay. But you don't dispute that CVA had a PPO agreement for physicians only in 2016; correct?
> A. Correct.

(Filing No. 266-2, Esser Dep. 132:3-6). It was clear CVA had a PPO in place in 2016. For CVA to claim the opposite was bad faith.

16

CVA's interrogatory answers that there was no PPO in place in 2016 caused The Benefit Group to expend unnecessary resources in disproving CVA's false claim. The Benefit Group attempted in good faith to avoid having to litigate this issue. For example, on November 13, 2018, The Benefit Group's counsel requested that CVA abandon this claim so the parties could narrow the issues in dispute:

> Counsel:
>
> Attached as a supplemental production is the Multiplan Client Services Agreement I mentioned during yesterday's call (TBG14092-14114). The Form Joinder Agreement signed by CVA was previously produced in discovery. A copy is attached. See TBG6381.
>
> Rene and Michaelle, Please advise if CVA is still claiming that in 2016 "it is clear that there were no PPO agreements in place" as CVA answered under oath in response to The Benefit Group's Interrogatory No. 4. Like CVA's $3 per prescription allegation (which I understand CVA has now abandoned) I'd like to further narrow the issues where possible.

(Filing No. 375-7). CVA did not withdraw its false interrogatory answers, which required The Benefit Group to incur unnecessary fees in discovery and in litigating this issue.

In its answer to Interrogatory No. 6, CVA stated "Plaintiff has been able to identify the following vendors that were never disclosed to the Plan, nor were they authorized to charge the Plan separately for their services, as their fees were to be 'at AMPS expense': ePlan LLC, American Health Holdings, Inc., Premier Healthcare Exchange, Inc., and In Ventive Medical Management." (Filing No. 375-8). Fees for these vendors were listed in the weekly funding requests which CVA approved. (Filing No. 271). Peggy Hopwood signed a letter in June 2014, shortly before CVA merged with UFC, acknowledging that Premier Healthcare Exchange ("PHX") and American Health Holdings ("AHH") would be providing services to the Plan. (Filing No. 264-5) (Filing No. 266-3, Hopwood Dep. 55:6-58:13).

CVA's broker, GMS, provided reports to CVA regarding services PHX was performing for the Plan. (Filing No. 266-6, Dickinson Dep. 285:3-9). During the 2015 Mid-Year Review, GMS provided CVA a "PHX Summary Report" identifying a performance overview of the savings, and net savings after PHX's fee, that Premier Healthcare Exchange had provided for the CVA Plan. (Filing No. 264-19). CVA's 30(b)(6) corporate representative admitted that CVA approved payments to these entities. (Filing No. 266-8, Smithpeter Dep. 291:6-295:16).

> Q. Do you agree that if TBG listed a payment and a weekly funding request identifying payments that were to be made to American Health Holding, Premier Healthcare Exchange or ePlan and CVA authorized payments of those amounts, that, in fact, CVA authorized those payments?
> MS. BAUMERT: Form, foundation, legal conclusion.
> A. Yes.

(Filing No. 266-8, Smithpeter Dep. 295:8-16). Given this clear evidence, all of which CVA was aware of, it is simply outrageous for CVA to state, under oath, that these vendors were never disclosed to CVA, and to have its expert claim that CVA suffered more than $277,000 in damages relating to supposedly unauthorized payments to these vendors when CVA expressly authorized the payments. (Filing No. 228 at ECF p. 3)(Filing No. 230 at ECF p. 3).

In the face of this clear evidence refuting these claims, CVA plowed forward. CVA never amended its interrogatory answers to remove these false statements. CVA's refusal to acknowledge what the documents, and testimony from its senior executives, prove CVA knew, imposed unnecessary costs on The Benefit Group in having to litigate issues that should never have been in dispute.

**CVA is Admonished by the Court**

Magistrate Judge Zwart had a front row seat to CVA's litigation tactics. More than a year into the litigation, at the conclusion of a November 16, 2018 hearing, Judge Zwart expressed that the Court was "frustrated" with CVA's antics and constantly changing allegations by stating that it seemed to the Court that CVA was just "throwing something against the wall to see if it's going to stick…." ([Filing No. 1](#)24 at 1:58:30). Unfortunately, Judge Zwart was correct, and The Benefit Group suffered the consequences by having to constantly respond to CVA's ever changing litany of made up allegations incurring significant attorney fees in the process.

**The Rachel Harris Report**

On January 29, 2019, CVA provided an expert report of its new damages expert, Rachel Harris. Harris opined that CVA "overpaid" a total of $1,788,209 in AMPS fees in 2015 and 2016. (Filing No. 226, Harris Dep. 22:13-17). However, the evidence established that the total amount of fees CVA actually paid to AMPS during this timeframe was only approximately $1.3 million. Given that CVA only paid about $1.3 million in AMPS fees, Harris admitted in her deposition that her ultimate conclusion that CVA *overpaid* $1.8 million in AMPS fees was mathematically impossible. (Filing No. 226, Harris Dep. 61:5-8).

One of the many flaws in Harris' analysis is that she assumed AMPS generated fees on every claim processed by The Benefit Group. Of the tens of thousands of claims The Benefit Group processed for CVA, AMPS only charged fees on a small subset of 2015 claims (about 268 claims) which met the Medical Bill Review (MBR) criteria. (Filing No. 262-1 at ECF p.2). In 2016, AMPS only charged fees relating to Hospital and Facility charges—a

limited subset of approximately 2,000 claims—not on every claim The Benefit Group processed. (Filing No. 262-2 at ECF p. 2).

Harris testified that in preparing her report she spoke with no one other than CVA's lawyers. (Filing No. 226, Harris Dep. 8:15-22). Harris was instructed by CVA's lawyers to calculate fees on *every* claim with *no* exclusions. (Filing No. 226, Harris Dep. 225:12-15). This is unbelievable considering CVA knew, or should have known, that AMPS did not charge a fee on every claim processed by The Benefit Group. For example, in its operative complaint, CVA pled that under the 2016 RBR Agreement, AMPS only generated fees on "gross hospital claims." (Filing No. 60, ¶ 96) (emphasis in original). CVA also alleged: "In addition, the RBR Program Services Agreement provides that TBG, as the Third Party Administrator ('TPA') will 'process all **Hospital Claims**, all Hospital Claim Appeals, and will be responsible for making benefit determinations on first Appeals and sending out required notices regarding such determinations in accordance with the Plan Document.'" (Filing No. 60, ¶ 37) (emphasis added).

Harris' report was so obviously flawed that Defendants requested that CVA withdraw it. CVA refused. That forced The Benefit Group to spend thousands of dollars preparing a *Daubert* motion, brief, and evidence, to have Harris's opinions excluded. CVA opposed the *Daubert* motion by stating: "TBG has knowingly filed a motion to exclude a report on which Plaintiff does not intend to rely." (Filing No. 298). Taking yet another nonsensical position, after refusing to withdraw Harris's report, CVA admitted it was not going to rely on Harris' report, but that The Benefit Group's motion to exclude Harris' opinions should be denied anyway. Ultimately, CVA abandoned Harris' flawed opinions by not listing her as a witness

20

on its witness list. (Filing No. 344). It is through this type of vexatious litigation tactic that CVA imposed unnecessary costs on The Benefit Group.

**CVA Refuses to Stipulate to a Document Only it Signed**

The Benefit Group has acknowledged it made a mistake early in discovery in preparing an exhibit for a request for admission by attaching signature pages to a draft plan document believing the signature page went with the document. When The Benefit Group learned of its mistake, counsel sent an e-mail to all counsel explaining what happened and requesting that CVA stipulate what the correct document signed by CVA was "so we're all in agreement as to what the 2015 Plan Document is." (Filing No. 365-4). CVA refused to stipulate, claiming it needed to take additional depositions. "Tim, until we are able to confirm through witnesses the details of what you recount below, we are unable to stipulate as you propose below." (Filing No. 365-4) CVA did not need to take additional depositions to determine what document only CVA signed.

After The Benefit Group acknowledged that Deposition Exhibit 10 was not the 2015 Plan Document signed by CVA, in depositions CVA continued to unfairly represent to a witness that Exhibit 10 was what The Benefit Group claimed was the 2015 Plan Document, knowing that was not true. (Filing No. 266-18, Inman Dep. 261-4-263:12). CVA's unreasonable position needlessly expanded discovery and imposed unnecessary costs on The Benefit Group.

**CVA Refuses to Produce Evidence Regarding its Claimed Damages**

In its supplemental interrogatory answers, CVA identified "$138,610.13 in fees to Kutak Rock" as a substantive element of damages. (Filing No. 354-7 at ECF p. 3). However,

21

CVA only produced a heavily redacted version of the Kutak Rock invoices which made it impossible to determine exactly what work Kutak Rock had done. After a meet and confer failed, The Benefit Group was forced to file a motion to compel production of the unredacted invoices. (Filing No. 178). The Court granted The Benefit Group's motion (Filing No. 256).

The unredacted invoices are further evidence of CVA's bad faith. They revealed that by no later than September 5, 2017, more than a *month* before this lawsuit was filed, CVA had hired Kutak Rock to represent CVA in the state court lawsuit. (Filing No. 375-10). According to Kutak Rock's billing records, on October 5, 2017, Kutak Rock had drafted a letter to TBG's counsel, which was never sent, regarding Kutak's entry of appearance in the state court case. (Filing No. 375-10 at ECF p. 7). On October 12, 2017 Kutak Rock had a "Telephone conference with Ms. Baumert concerning **timing of filing and appearance**." (Filing No. 375-10 at ECF p. 8) (emphasis added). This conversation occurred the day after this lawsuit was filed and five days **before** the October 17, 2017, TRO hearing. The day before the TRO hearing another entry states: "Correspondence with Ms. Baumert **regarding timing of appearance** and contacts with the Perlowski firm." (Filing No. 375-10 at ECF p. 8) (emphasis added).

Despite having substitute counsel lined up a month before filing its lawsuit, it appears CVA's counsel manipulated the timing of Kutak Rock's appearance in the state court lawsuit, and went forward with a Motion for TRO claiming CVA would suffer irreparable harm if Defendants were not enjoined from defending CVA in the state court lawsuit. This issue

could have been avoided with a phone call or Kutak Rock simply entering an appearance in the state court lawsuit. There was no reason to file a motion for a TRO.

## CVA Grinds Out Depositions

Depending on how one counts the joint 30(b)(6)/individual depositions[1], CVA took a minimum of 13 depositions in this case. CVA deposed six current and former employees of The Benefit Group. CVA then took a 30(b)(6) deposition of The Benefit Group which required The Benefit Group to re-produce four of the witnesses whom CVA had already deposed. Of the 13 depositions CVA took in this case, at least ten of them were taken after January 2019. (Filing Nos. 192-195; 197; 198, 215, 220, 266-7, 266-18, etc.). With few exceptions, CVA used the full seven hours of testimony time for each deposition making for incredibly long days. For example, CVA's combined deposition of John Powers/30(b)(6) of AMPS/CDS began at 9:09 a.m. and ended at 8:16 p.m.—over 11 hours. (Filing No. 313-1). But CVA wasn't done. CVA demanded to continue Power's deposition. The second day of his deposition started at 11:12 a.m. and ended at 5:52 p.m.—almost another seven hours. CVA concluded the day by deposing AMPS's other corporate representative, Stewart Karge, from 6:00 p.m. to 8:19 p.m., for a total of over 20 hours of depositions over two days. Both the number and length of CVA's depositions imposed unnecessary fees and costs on The Benefit Group.

---

[1] Some of the deponents were produced for a single deposition covering testimony in both their individual capacity and as 30(b)(6) corporate representatives. For example, Powers, Langdon, and Susan Leonard were produced for depositions in their individual capacities and as 30(b)(6) witnesses. In addition, after deposing Humpal, Maschka, Inman, and Brown in their individual capacities, The Benefit Group subsequently produced those same witnesses for a second time as its 30(b)(6) representatives in separate depositions.

**CVA Accuses The Benefit Group of Creating a False Plan Document**

Unable to gain traction on any of its claims, at the eleventh hour CVA made up, out of whole cloth, an entirely new allegation to try to manufacture a conspiracy. Without any evidentiary support, in its brief in support of its motion for partial summary judgment CVA accused The Benefit Group's former general counsel of submitting a "false plan document" to First Health in an attempt to trick the PPO into granting CVA access to the PPO network. This was supposedly the linchpin of a multi-year conspiracy. The evidence proved that the plan document The Benefit Group submitted to First Health contained the same claims auditing language as the plan document CVA signed. This Court found: "The evidence does not show that Benefit Group presented a false plan document to gain access to the First Health network." (Filing No. 372 at ECF p. 23). This was yet another in a long line of vexatious attempts by CVA to throw mud against the wall to see if it would stick.

**CVA Names Opposing Trial Counsel as a Witness**

CVA's unreasonable litigation tactics extended to its very last filings in this case. For no good reason, CVA listed The Benefit Group's trial counsel as a witness in an apparent back door attempt to have him disqualified, or at a minimum to harass him and needlessly impose costs on The Benefit Group. The Eighth Circuit has harshly criticized the tactic of calling opposing trial counsel as a witness as a "harassing practice… that does nothing for the administration of justice but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process." Shelton v. Am. Motors Corp., 805 F.2d 1323, 1330 (8th Cir. 1986).

In an unauthorized sur-reply brief, CVA claimed that The Benefit Group's trial counsel was a necessary witness because "The actual issue before the Court is which of the 2015 Plan Documents TBG was *operating* under." (Filing No. 370 at ECF p. 1) (emphasis in original). Trial counsel had already certified that he had no personal knowledge of what plan document The Benefit Group operated under. "I have no personal knowledge of what plan document CVA signed or The Benefit Group used in its operations." (Filing No. 365-1 at ECF p. 2). Once again, CVA's unreasonable litigation tactics forced The Benefit Group to incur unnecessary fees in responding to CVA's harassing litigation tactics.

## ARGUMENT

## I.   THE COURT SHOULD ORDER CVA AND ITS ATTORNEYS TO PAY THE BENEFIT GROUP'S ATTORNEY FEES AND COSTS.

### A.   Under the factors set forth by the Eighth Circuit, The Benefit Group is entitled to its attorney fees.

ERISA authorizes a Court to award a prevailing defendant reasonable attorney fees in defending an ERISA lawsuit. "In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney fee and costs of action *to either party.*" 29 U.S.C. § 1132(g)(1) (emphasis added). This Court also has inherent authority to award The Benefit Group its fees.

> Federal courts have the inherent power to assess attorney fees in narrowly defined circumstances, despite the so-called 'American rule,' which prohibits fee shifting in most cases. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991) (*Chambers*). Courts have established limited exceptions to the American rule, however, such as "when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46 (quoting other cases).

Lamb Eng'g & Constr. Co. v. Neb. Pub. Power Dist., 103 F.3d 1422, 1434-35 (8th Cir. 1997). In addition, 28 U.S.C. § 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Where an attorney "conducted the litigation in a manner that escalated costs unnecessarily and vexatiously" the Court may award attorney fees. Lupo v. R. Rowland & Co., 857 F.2d 482, 486 (8th Cir. 1988) (quoting Bastien v. R. Rowland & Co., 116 F.R.D. 619 (E.D. Mo., 1987)).

"When considering whether to award such fees, the Eighth Circuit has set forth general guidelines for district courts to follow, including the five factors set forth in *Westerhaus.*" Sheehan v. Guardian Life Ins. Co., 372 F.3d 962, 968 (8th Cir. 2004)(citing Martin, 299 F.3d at 972)); Lawrence v. Westerhaus, 749 F.2d 494, 494 (8th Cir. 1984)). The five Westerhaus factors are:

  (1) the degree of culpability or bad faith of the opposing party;
  (2) the ability of the opposing party to pay attorney fees;
  (3) whether an award of attorney fees against the opposing party might have a future deterrent effect under similar circumstances;
  (4) whether the parties requesting attorney fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
  (5) the relative merits of the parties' positions.

Westerhaus, 749 F.2d at 495-96. These factors are guidelines and are "by no means exclusive or to be mechanically applied." Martin v. Ark. Blue Cross & Blue Shield, 299 F.3d 966, 972 (8th Cir. 2002). Each of these factors weighs in favor of awarding fees to the Benefit Group in this case.

26

### 1.    CVA was culpable and acted in bad faith.

This was a lawsuit that should never have been filed. The fundamental premise of CVA's lawsuit was The Benefit Group and Mr. Humpal were fiduciaries of the Plan. CVA knew that The Benefit Group and Mr. Humpal were not fiduciaries. CVA was the plan sponsor and named fiduciary of the Plan. CVA knew that CVA alone decided which plan design to adopt. This was made patently obvious during the depositions of Peggy Hopwood, Tim Esser and Carl Dickinson, all of whom agreed that Mr. Dickinson made all decisions regarding the Plan design and that the "buck stopped" with Mr. Dickinson.

CVA knew it signed the MBR Addendum and RBR Agreement authorizing AMPS/CDS to review claims for excessive charges. CVA knew that hospitals might push back by balance billing employees. CVA knew that CVA approved every penny spent by the Plan before it was spent. All of this knowledge was in CVA's control without having to perform *any* discovery.  Moreover, CVA acknowledged that not a single claim was processed contrary to the terms of the Plan. At the end of the day, CVA simply had buyer's remorse regarding the Plans it adopted, and tried to use its superior financial resources to squeeze its service providers by making outlandish allegations that they were engaged in an interstate criminal conspiracy to defraud the Plan.

Despite knowing the truth, in an attempt to saddle The Benefit Group as a "de facto fiduciary" so it could seek damages and attorney fees under ERISA, CVA made up an alternative universe where The Benefit Group made all of the decisions for the Plan. For example, in its operative complaint CVA falsely alleged:

34.    On claims incurred from January 1, 2014 through December 31, 2017, TBG determined what health care providers would be paid by the Plan, and

27

what vendors would be paid, and in what amount. **TBG never requested any direction from CVA or the Plan as to amounts to pay health care providers or vendors on any participant, spouse or beneficiary claim.** TBG never disclosed individual claim or vendor invoice information to CVA or the Plan in any fashion that would have permitted CVA to exercise discretion concerning payment or be put on notice of an impropriety with regard to the claim administration process.

(Filing No. 60 at ECF p. 7)(emphasis added). This was patently false.

Contrast CVA's allegation with the evidence of CVA's own e-mails and testimony. The Benefit Group sent e-mails to CVA advising it of the AMPS MBR recommendations. Weekly funding requests itemized every payment that the Plan would make on a claim by claim basis. The evidence established that CVA approved *every* payment made by the Plan on *every* claim. It was only after CVA approved the claims that The Benefit Group made the payments. Based on the clear evidence, this Court found:

Benefit Group did not have authority to direct payment of Plan money except as expressly approved by Central Valley and, according to Central Valley's own representative, Benefit Group never made a payment or used Plan funds without Central Valley authorization. *See* Dickinson Dep. 80:20-25, 275:7-15, ECF No. 266-6. The evidence demonstrates that Benefit Group performed purely administrative functions, and only at the direction of Central Valley. *See* 29 C.F.R. § 2509.75-8 D-2. Accordingly, Benefit Group was not a fiduciary.

(Filing No. 372 at ECF p. 19). Because CVA knew that The Benefit Group submitted to CVA every claim for approval, it was bad faith for CVA to allege that "TBG never requested any direction from CVA or the Plan as to amounts to pay health care providers or vendors on any participant, spouse or beneficiary claim" in an attempt to transform The Benefit Group into a fiduciary.

CVA can't say it wasn't warned. Early in the case, The Benefit Group sent at least four Rule 11 letters explaining to CVA that its claims were false and frivolous and providing

documents refuting CVA's allegations. CVA responded with scorn stating that The Benefit Group's counsel had only a "rudimentary understanding of ERISA" and that counsel shouldn't listen to his client. The Benefit Group cooperated with CVA providing tens of thousands of pages of documents and electronic files to the two separate accounting firms CVA retained to audit the plan. Despite this litigation, The Benefit Group voluntarily sat down with BKD to explain how things were accounted for. In contrast, when The Benefit Group pressed CVA for details on specific allegations CVA made, CVA essentially told The Benefit Group to pound sand, and that The Benefit Group would have to use the tools of formal discovery to get information out of CVA.

From the outset of this case, CVA threw one frivolous allegation after another against the wall to see what might stick. None did. Below is a partial listing of CVA's allegations that unnecessarily multiplied the proceedings and needlessly imposed costs on The Benefit Group.

- CVA claimed TBG and Mr. Humpal were engaged in an interstate criminal conspiracy to defraud the Plan[2] when two separate audits conducted by CVA's experts concluded that nothing was stolen.

-  CVA claimed TBG was skimming interest[3] when early on The Benefit Group provided evidence that the accounts in question were not interest bearing.

- CVA claimed TBG took a $3 per prescription kickback[4] when there was zero evidence to support this claim which CVA ultimately abandoned.

- CVA claimed Defendants created an unauthorized multiple employer welfare arrangement ("MEWA") which caused CVA to self-report to a regulator. No regulatory action was taken because CVA was wrong that The Benefit Group created a MEWA, and that issue simply died.

---

[2] Filing No. 1 at ECF p. 35 (alleging RICO violations).
[3] Filing No. 60 at ECF p. 9 ¶ 41
[4] Filing No. 60 at ECF p. 1 ¶66k

- CVA claimed it overpaid $1.8 million in AMPS fees[5] even though CVA paid far less than that amount in total and CVA's expert admitted her opinion was impossible.

- CVA claimed TBG must have stolen $85,000 in payments to St. Francis Hospital which were allegedly never received when The Benefit Group presented copies of checks cashed by St. Francis which refuted this claim.

- CVA claimed TBG made $277,000 in supposedly "unauthorized" payments to American Health Holding, ePlan, and Premier Healthcare Exchange, even though payments to all of those vendors were included in the weekly funding requests which CVA agreed it approved.

- CVA signed interrogatory answers claiming that "TBG violated the 2016 administrative services agreement by taking PPO fees when TBG knew that there were no PPO agreements in place during 2016..." When it answered this interrogatory under oath, CVA knew that in 2016 it did have a physician's only PPO network called PHCS Multi-Plan in place. (Filing No. 266-2, Esser Dep. 133:7-136:18).

- CVA claimed TBG received unauthorized payments from the pharmacy benefits manager, stop-loss carrier, and other vendors even though the ASAs signed by CVA expressly authorized receipt of compensation from these vendors.

- In summary judgment briefing CVA claimed that the 12.5% RBR fee was an undisclosed kickback even though in every version of complaint CVA filed in this case it alleged "Under the terms of the RBR Agreement, AMPS was to be paid, at most, 10 percent of all *gross hospital claims* submitted to the Plan (whether or not the Plan's terms allowed such claims), and TBG was paid 2.5 percent of all *gross hospital claims* (in addition to its administration fees)" (Filing No. 60 at ECF p. 31, ¶ 96) (Filing No. 1, at ECF p. 21, ¶ 88) (Filing No. 34 at ECF p. 25, ¶ 95) (Filing No. 35 at ECF p. 26, ¶ 95), and e-mail communications confirm that before entering into the RBR Agreement, CVA's Risk Manager asked about the RBR fee and was told it was 12.5%.

- CVA claimed it relied on The Benefit Group with respect to which stop-loss contract to purchase while this Court found "It would be impossible for Central Valley to have relied on advice from Benefit Group as a 'trusted advisor' regarding procuring stop-loss when it admits it did not even know Benefit Group was involved in procuring stop-loss until discovery in this case." (Filing No. 372 at ECF p. 29-30).

This list could go on and on. Because of CVA's litigation tactics in advancing arguments that

CVA knew or should have known were untrue, The Benefit Group was stuck in an endless

---

[5] Filing No. 226 (Harris Dep. 61:5-8)(admitting her opinion regarding overpayments is mathematically impossible).

loop of CVA throwing mud against the wall only to have The Benefit Group expend significant resources to knock CVA's allegations down with facts.

When CVA's experts, Bill Kenedy and BKD, did not support CVA's claims, CVA abandoned them and hired a new expert who came up with an impossible conclusion—that CVA overpaid AMPS more than CVA actually paid AMPS. When Harris's opinions were shown to be impossible, CVA refused to withdraw her opinions requiring more unnecessary motion practice—a *Daubert* motion. CVA then opposed the *Daubert* motion stating that it wasn't relying on Harris's report resulting in more wasted fees.

"[K]nowing and unreasonable conduct" constitutes "bad faith" for purposes of justifying award of attorneys' fees. *Yonker Constr. Co. v. Western Contracting Corp.*, 935 F.2d 936, 942 (8th Cir. 1991). "[T]he requisite bad faith may be inferred from the absolute lack of merit in the litigant's actions." Moore's Federal Practice § 54.171[2][c][iii] (3d ed. 1997). There is no justification for CVA advancing claims without any good faith basis, especially when CVA knew, or should have known, that what it was claiming was false. There is a line between zealous advocacy and bad faith. CVA repeatedly cross that line.

> ## 2.    CVA has the ability to pay the attorney fees The Benefit Group incurred because of CVA's vexatious litigation tactics.

In each of 2015, 2016 and 2017, CVA had approximately $1.2 **billion** in *annual* revenue—$3.6 billion total. (Filing No. 266-6, Dickinson Dep. 22:14-23) (Filing No. 142-2 at ECF p.4)(showing $1.4 billion in sales in 2018 and $1.1 billion in 2017). CVA apparently gave its attorneys a blank check to engage in scorched-earth litigation, needlessly imposing fees on Defendants. As of February 15, 2019, the date CVA served its Supplemental Interrogatory answers, CVA claimed it had incurred "In excess of $1,000,000.00 in attorney's

fees in this litigation to date." (Filing No. 264-40 at ECF p. 3). This was *before* CVA took over ten all-day depositions in March and April and the parties litigated the summary judgment motions and prepared for the pre-trial conference.

CVA spared no expense in advancing its specious claims. It used its own attorney fees as a Sword of Damocles threatening Defendants that they would be ordered to pay CVA's fees. A letter from CVA's counsel dated February 13, 2018 stated: "Of course, you're free to do whatever you want. And, truly, other than wasting my client's time and money (at least temporarily, **until we inevitably recover fees from the Defendants**), we would welcome the opportunity to argue before the Court again." (Filing No. 375-5)(emphasis added).

One who lives by the sword, dies by the sword. Just as CVA had the ability to pay its attorneys to engage in vexatious litigation, CVA has the ability to pay The Benefit Group's attorney fees incurred because of CVA's vexatious litigation tactics. CVA was aware that The Benefit Group was a small company with only approximately 20 employees. (Filing No. 267-1). CVA was aware that The Benefit Group's insurer had denied CVA a defense in this case. CVA used its superior financial resources to attempt to grind The Benefit Group into submission through vexatious litigation. As a result, Mr. Humpal had to transfer $292,000 from his personal savings to The Benefit Group to pay attorney fees in an attempt to save his company from CVA's false allegations and ridiculous $6 million demand. (Filing No. 375-15). CVA caused this mess. While The Benefit Group will never be made whole, CVA has the means to clean up part of the mess it caused by paying The Benefit Group's attorney fees.

### 3. An award of attorney fees will deter future plaintiffs from bringing and prosecuting actions in bad faith.

Ordering CVA to pay The Benefit Group's attorney fees will send a clear message to future plaintiffs that there is a cost to prosecuting frivolous claims, and prosecuting claims in an unreasonable manner. CVA was under the mistaken belief that the ERISA attorney fee provision gave CVA a free swing at the Defendants with no consequences. Awarding The Benefit Group its fees will deter future plaintiffs from engaging in the litigation tactics exhibited by CVA in this case. Large businesses like CVA will have to think twice before trying to bully small companies with vexatious litigation.

### 4. An award of attorney fees will benefit plan participants by deterring plan fiduciaries from bringing frivolous claims and wasting plan assets.

Awarding The Benefit Group its attorney fees will benefit plan participants in the long run. By bringing this action, and prosecuting it in a vexatious manner, CVA wasted over $1 million in its own attorney fees. Plan participants will be benefitted if fiduciaries understand that they cannot behave in the manner CVA behaved in this case. Perhaps the next fiduciary will think twice before wasting plan assets by filing a specious lawsuit and litigating it in a vexatious manner.

### 5. CVA's claims against Mr. Humpal and The Benefit Group were meritless.

All of CVA's claims against Mr. Humpal, and its RICO claims, did not even survive a motion to dismiss. For the reasons discussed at length in this brief, and in the numerous filings before the Court, including The Benefit Group's Motion for Summary Judgment, CVA's claims against The Benefit Group and Mr. Humpal were meritless. The Benefit

Group was not a fiduciary and it did not engage in any prohibited transactions. The Benefit Group did not cause the Plan to do anything. CVA, as the fiduciary of the Plan, signed the contracts, made all decisions, and approved payment of all claims and all fees charged to the Plan. Unhappy with the business decisions CVA made, CVA attempted to transfer blame for its decisions onto The Benefit Group. As detailed above, CVA raised one meritless allegation after the other only to have them shot down with facts. The behavior CVA exhibited in this lawsuit should not be tolerated.

### B.      The Benefit Group should be awarded $690,398.60.

CVA's vexatious litigation tactics caused The Benefit Group to incur not less than $690,398.60[6] in attorney fees and costs through August 30, 2019 in defending CVA's meritless claims. A detailed summary of the work performed justifying these fees is included in The Benefit Group's index of evidence. (Filing No. 375-2). The Court should order CVA and its attorneys to pay The Benefit Group this amount.

"The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rates." *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 851 (8th Cir. 2002).

> This Court has recognized that the *Johnson* factors should be considered as they bear on calculating the lodestar. Those factors are: (1) time and labor required; (2) novelty and difficulty of issues; (3) skill required; (4) loss of other employment; (5) customary fee; (6) whether fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) amount involved and results obtained; (9) counsel's experience, reputation, and ability; (10) undesirability of case; (11) nature and length of relationship with clients; and

---

[6] This amount includes taxable court costs. The Benefit Group will file a separate bill of costs to recover its taxable court costs. The amount awarded in the Bill of Costs should be deducted from this fee application. This amount does not include the costs of preparing this motion.

(12) awards in similar cases. *Johnson v. Georgia Highway Express,* 488 F.2d 714, 717 (5th Cir. 1974).

Shiller v. Sarpy Cty., No. 8:03CV365, 2005 U.S. Dist. LEXIS 29383, at *2 n.1 (D. Neb. Nov. 10, 2005) (Smith Camp, J.). These factors weigh in favor of a significant attorney fee for The Benefit Group.

"Citing *Hensley,* the Supreme Court in *Farrar v. Hobby,* stated that '" the most critical factor' in determining  the reasonableness of a fee award 'is the degree of success obtained.'" 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992). Stutzka v. Walters, No. 8:02CV72, 2006 U.S. Dist. LEXIS 36109, at *4-5 (D. Neb. May 30, 2006) (Smith Camp, J.). Here, the degree of success obtained is obvious: all of CVA's claims against The Benefit Group and Mr. Humpal were dismissed, with prejudice. The Benefit Group was 100% successful on the merits of the case.

This was a lengthy and complex ERISA and RICO case which was aggressively litigated. The case involved novel and difficult issues relating to medical bill review and reference based reimbursement programs involving thousands of claims. CVA retained one of the nation's largest law firms to represent it. CVA's counsel represented to the Court on more than one occasion that she was not an ERISA expert which is why her partner from the New Orleans office who is an ERISA expert was brought in as lead counsel. This demonstrates that a high degree of skill was necessary to litigate this case.

This was "bet the company" high stakes litigation for The Benefit Group, a small company when measured against CVA's $1.2 billion in annual revenue. Had CVA prevailed in its quest for a $6 million judgment, it is likely that The Benefit Group would have had to declare bankruptcy, and twenty people would have lost their jobs. (Filing No. 375-15).

Because of the all-consuming nature of this case, counsel was prevented from working on matters for other clients for extended periods of time while working on this case. Fraser Stryker was compensated for its services on this case on an hourly basis. Approximately $170,000 in fees owed to Fraser Stryker remain unpaid.

CVA spared no expense in prosecuting this case, racking up over a million dollars in attorney fees by February 2019, before another dozen all-day depositions were taken, and summary judgment motions and pretrial filings were prepared. The Benefit Group's fee application for defending this entire case is 30% less than what CVA claimed it incurred in attorney fees as of February 2019. That CVA's own attorney fees were so high before significant additional discovery and motion practice occurred demonstrates both how CVA was attempting to grind the Defendants with its litigation tactics and the reasonableness of The Benefit Group's fee application relative to CVA's fees.

Through August 31, 2019, The Benefit Group's attorneys and associated professionals spent more than 2,422 hours defending against CVA's claims over the almost two years of litigation. (Filing No. 375-2). Below is a table summarizing the hours spent, hourly rates charged, and total fees billed by Fraser Stryker professionals in defending this lawsuit:

| Professional | Total Hours | Total Fees |
|---|---|---|
| Timothy J. Thalken, Partner | 1421.40 | $426,678.00 |
| Emily R. Langdon, Partner | 802.40 | $207,624.50 |
| Brandon J. Crainer, Associate | 105.50 | $ 22,856.00 |
| Elizabeth A. Culhane, Partner | 31.90 | $  7,718.00 |
| Joseph E. Jones, Partner | 12.80 | $  4,978.00 |
| John J. Waters, Associate | 1.00 | $    220.00 |
| Randy Drummond, Paralegal-IT | 37.30 | $  5,547.50 |
| Penny Page, Paralegal | 3.10 | $    507.50 |

| Professional | Total Hours | Total Fees |
|---|---|---|
| Computer Specialist | 6.60 | $      672.00 |
| **Totals** | **2422.00** | **$676,801.50** |

The hourly rates charged by The Benefit Group's attorneys are reasonable. "When determining reasonable hourly rates, district courts may rely on their own experience and knowledge of prevailing market rates." Hanig v. Lee, 415 F.3d 822, 825 (8th Cir. 2005). This Court may review its own decisions to determine what is a reasonable rate. See Petrone v. Werner Enters., No. 8:11CV401, 2018 U.S. Dist. LEXIS 21606, at *17 (D. Neb. Feb. 9, 2018) (Smith Camp, J.) ("To determine what would qualify as a reasonable rate in the prevailing Omaha market, the court reviewed and analyzed reported decisions from this court over the past several years involving attorney fee awards." ). "This Court has generally approved rates of between $225-$325/hour for partners with less than 25 years of experience and rates of $175-$200 for work done by associates." Id. at *21.

Tim Thalken was lead trial counsel for The Benefit Group in this case. (Filing No. 375-1). He attended every deposition but one, attended all court hearings except for the TRO hearing, was responsible for all motions and briefing, took the lead in deposing CVA's experts, Rachel Harris and Jean Reed, and CVA's executives, Tim Esser and Peggy Hopwood, and extensively questioned Carl Dickinson, Rick Smithpeter, and Mike Deren during their depositions. Mr. Thalken was involved in all facets of this case from the beginning. This case was very complex involving more than a hundred thousand pages of documents and hundreds of deposition exhibits.

Mr. Thalken is a partner with 18 years of experience litigating complex multi-million dollar cases. During the course of this case, the hourly rate he charged The Benefit Group

ranged from $285-$305 per hour, which is a discounted rate from his standard hourly rate. Almost four years ago, on December 18, 2015, Judge J. Russell Derr of the District Court of Douglas County, Nebraska, entered an order finding that "A fee of $335.00 per hour is a reasonable fee for Mr. Thalken's services" in a complex intellectual property/tortious interference/breach of contract/anti-trust suit which Mr. Thalken second-chaired. The $285-$305 per hour rates in this case as lead trial counsel are reasonable.

Emily Langdon is a partner with 11 years of experience. (Filing No. 375-14). Her hourly rates ranged from $240 to $265 per hour. As the former in-house General Counsel of The Benefit Group, Ms. Langdon had extensive knowledge regarding the issues involved in this lawsuit and was instrumental in responding to CVA's discovery and in providing strategic advice. Ms. Langdon has extensive experience with ERISA and provided key counsel in responding to CVA's ERISA claims.

Elizabeth Culhane is a former Eighth Circuit law clerk and a partner with 12 years of litigation experience in complex cases. (Filing No. 375-11). She successfully represented The Benefit Group during the TRO hearing and assisted with strategy, discovery, the Motion to Dismiss, and other motion practice. Her hourly rate varied from $240 to $250 per hour.

Brandon Crainer is an associate and former federal law clerk with 8 years of litigation experience. (Filing No. 375-12). He assisted with research, motion practice, and represented The Benefit Group during the deposition of AMPS' expert witness. His hourly rate ranged from $210 to $220 per hour.

Joe Jones is one of Fraser Stryker's most experienced litigators. (Filing No. 375-13). Over his 40 year career, he has litigated complex cases across the country, including ERISA

cases, and has tried over 75 jury trials. Mr. Jones provided strategic counsel during key points in the litigation. His hourly rate ranged from $380 to $390 per hour.

Because of the volume of electronic documents in this case, Fraser Stryker relied on paralegals and computer specialists to process data and assist with discovery, streamlining attorney review. (Filing No. 375-1). Hourly rates for these services ranged from $100 to $150 per hour. Fraser Stryker also incurred costs relating to computer based research through LEXIS and PACER costs relating to the voluminous filings in this case.

## <u>CONCLUSION</u>

A common criticism of the civil justice system is that it is too expensive and takes too long. This case is a good example. CVA made false allegations in this lawsuit, which it knew or should have known were false, and which needlessly imposed costs on The Benefit Group. It took The Benefit Group almost two years and almost $700,000 in attorney fees to clear its name. Because of the cost of defending against CVA's vexatious litigation tactics, even by winning on the merits, The Benefit Group lost. Awarding The Benefit Group its attorney fees would go a long way to providing some measure of justice to The Benefit Group for what CVA and its attorneys have put it through, and would send a clear message to future litigants that there are consequences for engaging in the types of scorched earth litigation tactics employed by CVA here. The Benefit Group respectfully requests that the Court award it its reasonable attorney fees incurred in defending this lawsuit.

DATED this 13th day of September, 2019.

Respectfully submitted,

THE BENEFIT GROUP, INC., LINUS G.
HUMPAL, Defendants,

By:    /s/ Timothy J. Thalken
        Timothy J. Thalken, #22173
        Joseph E. Jones, #15970
        Elizabeth A. Culhane, #23632
        Brandon J. Crainer, #24891
        FRASER STRYKER PC LLO
        500 Energy Plaza
        409 South 17th Street
        Omaha, NE  68102
        (402) 341-6000
        (402) 341-8290 - fax
        tthalken@fslf.com
        jjones@fslf.com
        eculhane@fslf.com
        bcrainer@fslf.com
        ATTORNEYS FOR DEFENDANTS

2203457 v3