IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CENTRAL VALLEY AG COOPERATIVE, for itself and as Fiduciary of the Central Valley Ag Cooperative Health Care Plan;<br><br>Plaintiff,<br><br>vs.<br><br>DANIEL K. LEONARD, SUSAN LEONARD, THE BENEFIT GROUP, INC., ANASAZI MEDICAL PAYMENT SOLUTIONS, INC., CLAIMS DELEGATE SERVICES, LLC, and GMS BENEFITS, INC.;<br><br>Defendants. | 8:17CV379<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on several post-judgment motions: The Defendants' Motions for Attorney Fees, ECF Nos. 374, 377, and 381, and Motion for Sanctions, ECF No. 378; and the Plaintiff's Motion to Stay, ECF No. 396, and Motion to File Sur-Reply, ECF No. 408. For the reasons stated, the Motions for Attorney Fees will be granted, in part. The remaining motions will be denied as moot.

**BACKGROUND**

Central Valley Ag Cooperative ("Central Valley") provided its employees with the Central Valley Ag Cooperative Health Care Plan ("Central Valley Plan" or "Plan"), which was a qualified employee welfare plan within the definition of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461. Defendant GMS Benefits, Inc. (GMS) provided broker and employee benefit plan consulting services to Central Valley. Defendants Susan Leonard and Daniel Leonard are the President and Vice-President, respectively, of GMS (GMS, Susan Leonard, and Daniel Leonard are referred to

collectively as the "GMS Defendants"). Central Valley engaged Defendant The Benefit Group, Inc. (Benefit Group) to provide administrative services for the Plan, governed by an administrative services agreement. Defendant Anasazi Medical Payment Solutions, Inc. d/b/a Advanced Medical Pricing Solutions (AMPS) provided medical bill review (MBR) services to the Plan. Defendant Claims Delegate Services, LLC (CDS) provided reference-based reimbursement (RBR) to the Plan.

On October 11, 2017, Central Valley filed its original complaint. On the same day, Central Valley filed a motion for temporary restraining order and preliminary injunction. Central Valley alleged that the Defendants breached their fiduciary duty to the Plan under ERISA. Central Valley also alleged that Defendants engaged in a criminal enterprise, in violation of the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Central Valley sought to recover Plan assets; to acquire restitution for lost Plan assets resulting from Defendants' actions in breach of fiduciary duties; to receive payment for damages arising from prohibited and party-in-interest transactions; and to receive damages for Defendants' RICO violations.

The Court denied Central Valley's request for a TRO. Central Valley failed to demonstrate a threat of irreparable harm because it "was aware of the Defendants' alleged breaches of fiduciary duty months—or years—before [Central Valley] requested the TRO." Mem. and Order, ECF No. 33 at 8. The Court also recognized that Central Valley could have audited claims before initiating litigation but failed to do so. *See id.* at 12. Central Valley also failed to show it was likely to succeed on its claims. Plan documents raised questions about whether Defendants were fiduciaries. Further, the practice of "balance billing" by AMPS and CDS—the principal wrongdoing alleged—had

2

been contemplated by the parties at the time they entered into the respective service agreements. Accordingly, Central Valley did not demonstrate that a TRO or preliminary injunction was appropriate.

Central Valley filed two amended complaints in early 2018. Defendants moved to dismiss the first amended complaint and sent letters to Central Valley, referencing Rule 11, asserting that Central Valley's claims were meritless. Central Valley then sought leave to file a third amended complaint. Central Valley's proposed third amended complaint made similar allegations under ERISA and RICO and alleged that Defendants converted Plan assets to themselves. Defendants opposed the amendment and argued that Central Valley's claims should be dismissed entirely. In March 2018, Magistrate Judge Zwart recommended that Central Valley be permitted to file its third amended complaint with certain ERISA claims, but recommended that the RICO claims be dismissed, and that Defendant Linus Humpal be dismissed as a party. Findings and Recommendation, ECF No. 59. No party opposed the Findings and Recommendation and on May 1, 2018, the Court adopted it in its entirety. ECF No. 59. On May 7, 2018, Central Valley filed the Third Amended Complaint. ECF No. 60.

At about the same time, in April 2018, accounting firm Lutz of Omaha, Nebraska, returned its report of an audit of Central Valley's financial health. Central Valley had engaged Lutz to review the Plan's financial information for Plan years 2014 through 2017. Accountant Bill Kenedy of Lutz signed an affidavit that summarized the results of the audit and included a report. The report noted Lutz's understanding that, under the Plan, "funding requests were provided to Central Valley on a weekly basis. Based on the funding requests, Central Valley would provide funds to [Benefit Group] to fund

claims." Audit Report at 3, ECF No. 142-13. To complete the audit, Benefit Group "provided detail of amounts funded by Central Valley for claims." *Id*. at 4. The report stated that "Lutz confirmed with Central Valley, that the amounts received per [Benefit Group] matched Central Valley's records. No material variances were noted." *Id*.

Discovery commenced after Defendants responded to the Third Amended Complaint, which contained several broad allegations against the Defendants collectively. As a result, the Defendants' initial discovery requests centered on determining which allegations applied to each Defendant. Central Valley objected to the discovery requests as being overly broad. Following a telephonic scheduling conference before Judge Zwart in July 2018, she directed the parties to "promptly confer in good faith to streamline both the allegations within the complaint and the corresponding discovery requests, thereby avoiding global allegations which, in turn, prompt global discovery served on or received from each named defendant." Order at 1-2., ECF No. 77. There is no indication in the record that Central Valley ever streamlined its allegations or, until the summary judgment phase, ever identified which claims related to each Defendant.

As discovery progressed, Central Valley completed another audit, this time engaging accounting firm BKD. In preparation for the audit, Central Valley sent letters to the auditors stating that

> We have no knowledge of any known or suspected: . . . (b) Fraudulent financial reporting or misappropriation of assets involving others that could have a material effect on the financial statements.
>
> \*\*\*
>
> We have no knowledge of any allegations of fraud or suspected fraud affecting the Plan received in communications from participants, former participants, regulators, third-party services or others.

4

\*\*\*

> We have reviewed the reports of all transactions processed by third-party servicers, and, based on our review, we believe the transactions shown in the reports are valid and in accordance with our instructions to the third-party processor.

ECF Nos. 264-34, 264-35. Following the audit, in November 2018, Central Valley submitted a Form 5500[1] to the United States Department of Labor for each year applicable to this action. In "Schedule H" of the forms, Central Valley affirmed that the Plan did not suffer a loss "that was caused by fraud or dishonesty" and "there were no nonexempt transactions with any party-in-interest." ECF Nos. 264-36; 264-37; 264-38; 264-39.

As discovery in the lawsuit continued, in January 2019, Central Valley provided a report of its expert on damages, Rachel Harris. Harris opined that Central Valley "overpaid" a total of $1,788,209 to AMPS for fees in 2015 and 2016. Harris Dep. 22:13-17, ECF No. 226. Yet the evidence established that the total amount of all fees Central Valley actually paid to AMPS during this timeframe was approximately $1.3 million. Given that Central Valley only paid about $1.3 million to AMPS for fees, Harris admitted in her deposition that her conclusion that Central Valley overpaid nearly $1.8 million to AMPS for fees was mathematically impossible. Harris Dep. 61:5-8, ECF No. 226. Harris explained that counsel for Central Valley instructed her to assume that a fee was paid to AMPS and CDS on every claim processed by Benefit Group, even though many of the claims were wholly unrelated to services performed by AMPS and CDS.

---

[1] During the summary judgment phase, Central Valley represented to Defendants that it would amend its Form 5500s. Central Valley has not presented evidence that it did so.

Because of the flaws in Harris's report, Defendants requested that Central Valley withdraw Harris as an expert. Central Valley refused and instead moved to supplement her report. AMPS and CDS filed oppositions to the motion to supplement Harris's report and deposition and filed a detailed *Daubert* motion to exclude Harris's testimony. *See* ECF No. 243. On May 15, 2019, Judge Zwart denied Central Valley's motion to supplement Harris's opinion and deposition, concluding that Central Valley had "possessed [relevant] information for at least five weeks before moving to supplement Harris' opinions. And even when the motion was filed, it was not supported by any evidence disclosing Harris' new opinions or the need for more time to disclose them." Order at 11-12, ECF No. 311. Ultimately, Central Valley abandoned Harris's testimony and did not list her as a trial witness in its pretrial disclosures. *See* ECF. No. 344.

After extensive discovery, Defendants moved for summary judgment. The Third Amended Complaint asserted eight causes of action against the Defendants. The causes of action fell within two theories of recovery under ERISA. First, Central Valley alleged that Defendants breached their fiduciary duty to the Plan under 29 U.S.C. §§ 1109(a) and 29 U.S.C. § 1132(a)(2). Second, Central Valley alleged that Defendants breached their fiduciary duty under 29 U.S.C. § 1106(b) by engaging in prohibited transactions under ERISA. The Court granted summary judgment against Central Valley, concluding that it failed to show Defendants acted contrary to the express terms of the Plan and supporting documents; that Defendants were not fiduciaries; and that Defendants did not breach any fiduciary duties. Mem. & Order, ECF No. 372.

## DISCUSSION

### I. Fee Award Under ERISA

Under the "American Rule," each party normally bears the cost of litigation. *Martin v. Arkansas Blue Cross & Blue Shield*, 299 F.3d 966, 969 (8th Cir. 2002). However, "ERISA's fee-shifting provision unambiguously gives the district court discretion to award attorney fees to 'either party.'" *First Nat. Bank & Tr. Co. of Mountain Home v. Stonebridge Life Ins. Co.*, 619 F.3d 951, 956 (8th Cir. 2010) (quoting 29 U.S.C. § 1132(g)). In determining whether to award fees, district courts consider several factors, "but these factors need not be applied mechanically." *Pendleton v. QuikTrip Corp.*, 567 F.3d 988, 994 (8th Cir. 2009) (citing *Martin v. Ark. Blue Cross & Blue Shield,* 299 F.3d 966, 969 (8th Cir.2002)). The factors, known as the "*Westerhaus* factors" are:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal qeustion [sic] regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Sheehan v. Guardian Life Ins. Co.*, 372 F.3d 962, 968 (8th Cir. 2004) (quoting *Lawrence v. Westerhaus,* 749 F.2d 494, 495 (8th Cir.1984)). For the reasons discussed below, each of the relevant factors favors an award against Central Valley.

### A. Culpability and Relative Merits of the Parties' Positions

For similar reasons, both the first and fifth factor weigh in favor of an award of attorneys' fees. In assessing the first factor, courts consider "'the degree of blameworthiness' between the parties . . . rather than 'narrowly considering whether the [losing party] had acted in bad faith.'" *Johnson v. Charps Welding & Fabricating, Inc.*, No. CV 14-2081, 2018 WL 4829185, at *2 (D. Minn. Oct. 4, 2018) (quoting *Trs. of the Eighth Dist. Elec. Pension Fund v. Wasatch Front Elec. & Constr., LLC*, 598 F. App'x

7

563, 566 (10th Cir. 2014)). "A losing plaintiff . . . will not necessarily be found 'culpable' but may be only in error or unable to prove his case." *Marquardt v. North Am. Car Corp.*, 652 F.2d 715, 720 (7th Cir. 1981). However, where a plaintiff pursues "meritless litigation in an almost haphazard fashion" and "chang[es] legal theories" over years of litigation, an award of fees is appropriate. *Foley v. Bethlehem Steel Corp.*, 30 F. Supp. 2d 366, 368 (W.D.N.Y. 1998). Similarly, the fifth factor "weighs heavily in favor of awarding attorney's fees to defendant" where the "plaintiff's claims were clearly baseless[.]" *See Foley*, 30 F. Supp. 2d at 368.

### *1. RICO Claims*

With respect to Central Valley's RICO claims, these factors weigh in favor of an attorneys' fee award because the claims were clearly baseless. Central Valley claimed that one or more of the Defendants was stealing money from the Plan. TRO Hearing Tr. at 54:9-13, ECF No. 85. Central Valley offered no evidence and only minimal explanation to support these claims. Despite alleging that Defendants were stealing from the Plan, Central Valley continued to rely on at least one of the Defendants—Benefit Group—for claims processing after filing this lawsuit. In ruling on the TRO, the Court could not "discern from the Complaint how any representations were false, nor [could] it identify how Defendants misappropriated any Plan funds." Mem. & Order at 17, ECF No. 33.

Despite multiple attempts to amend the original complaint, Central Valley was never able to identify false representations or the criminal enterprise to support a RICO claim. Judge Zwart ultimately recommended dismissal, reasoning that Central Valley's accusations of fraud were conclusory and continued to be nothing more than a

recitation of the elements of RICO. F&R at 39-40, ECF No. 58. Central Valley did not object to the Magistrate Judge's Findings and Recommendation and the RICO claims were dismissed. Because Central Valley's RICO claims lacked substance from the beginning of the lawsuit, the factors of culpability and relative merits of the parties' positions favor an attorneys' fee award for the time the RICO claims were pending.

### *2. Breach-of-Fiduciary-Duty Claims*

With respect to Central Valley claims for breach of fiduciary duty, these two factors also weigh in favor of an attorneys' fee award. Although Central Valley pursued various theories for its breach-of-fiduciary-duty claims, they all failed for essentially the same reason: Central Valley could not show that Defendants acted outside the scope of the Plan and its supporting documents. As stated in the Court's Memorandum and Order on summary judgment, ECF No. 372, Central Valley produced no evidence that Defendants violated Plan documents, or acted to defraud Central Valley or the Plan, or engaged in illegal self-dealing.

Central Valley knew or should have known that its ERISA claims lacked merit. At the beginning of the lawsuit, Central Valley argued that the Defendants violated their fiduciary duty by using balance billing when processing claims. However, in ruling on Central Valley's motion for TRO, the Court noted that the express language of Plan documents raised doubt that Defendants were fiduciaries, let alone that they violated any fiduciary duty, and the Plan documents explicitly contemplated the use of balance billing. ECF No. 33 at 16.

Central Valley continued to pursue theories that Defendants overused balance billing but also claimed that the Defendants acted outside their duties under the Plan

9

documents. For example, Central Valley's Third Amended Complaint contained an allegation that Benefit Group never "contacted [Central Valley] or the Plan for direction as [to] the payment of a claim or vendor invoice." ECF No. 60 at 8. This allegation served as the basis for Central Valley's claim that Benefit Group exercised fiduciary control over Plan funds. However, Central Valley should have known these allegations would be unsupported by evidence. Before Central Valley filed its Third Amended Complaint, Benefit Group provided copies of emails that it submitted as weekly funding requests to Central Valley, all of which Central Valley approved.

Moreover, relatively early in the litigation Central Valley received the opinions of two separate auditors that confirmed claims had been processed in accordance with the Plan. The audit prepared by Lutz noted that, with immaterial variation, Benefit Group only paid claims for the amounts Central Valley approved. In another audit, Central Valley represented to auditors that it had no knowledge of suspected fraudulent misappropriation of Plan assets by third-party service providers. Central Valley also affirmed that, based on its own review, the transactions shown in audit reports were "valid and in accordance with our instructions to the third-party processor." ECF Nos. 264-34, 264-35. Central Valley's President, Carl Dickinson, admitted in his deposition that he was unable to identify a single claim that was not paid in accordance with Plan Documents. *See* Dickinson Dep. at 249:12-18, ECF No. 266-6. Following the second audit, Central Valley affirmed that the Plan did not suffer a loss "that was caused by fraud or dishonesty" and "there were no nonexempt transactions with any party-in-interest." ECF Nos. 264-36; 264-37; 264-38; 264-39. Despite significant evidence that claims had been paid in accordance with the Plan, and despite Central Valley's own

10

admissions and affirmations that no fraud had taken place, Central Valley persisted in its claims that Defendants had conspired to defraud the Plan and engaged in prohibited transactions.

Central Valley alleged that Benefit Group and AMPS breached their fiduciary duties to the Plan when they "violated the 2016 Administrative Services Agreement by taking 'PPO Fees' when" they knew that there were no PPO agreements in place during 2016." ECF No. 375-8 at 4. Yet Tim Esser, Central Valley's Senior Vice President of Human Resources, signed an agreement, effective on January 1, 2016, to obtain access to a PPO network. ECF No. 375-7 at 25. Esser admitted at his deposition that Central Valley had a PPO agreement in place for 2016. Esser Dep. 132:3-6, ECF No. 266-2.

Central Valley also prolonged litigation through unnecessarily aggressive litigation tactics or errors. For example, after depositions revealed significant errors in the report of Central Valley's damages expert, Central Valley refused to withdraw the expert, forcing some of the Defendants to prepare *Daubert* motions. In moving to supplement their expert's report, Central Valley failed to support its motion with any evidence disclosing the new opinions or the need for more time to disclose the new opinions. *See* Order at 11-12, ECF No. 311.

At the conclusion of a November 16, 2018, hearing, Judge Zwart stated that the Court was "frustrated" with Central Valley's changing allegations, and stated that it seemed Central Valley was "throwing something against the wall to see if it's going to stick . . . ." ECF No. 124 at 1:58:30. At the summary judgment stage, Central Valley's legal theories shifted again. For the first time in the litigation, Central Valley alleged that

Defendants had become "de facto fiduciaries" by devising a five-step scheme to defraud Central Valley and keep charging fees. Central Valley alleged that the Defendants falsified Plan documents and somehow hid their fees from Central Valley to engage in undisclosed self-dealing and kickbacks. Central Valley Br. at 13-14, ECF No. 277, Page.ID 14407-09 (paraphrased). As stated in the Court's Memorandum and Order on summary judgment, Central Valley failed to provide any evidence of fraud and knew, through Plan documents and agreements, that Defendants would receive commissions and fees. *See* Mem. & Order at 34-36, ECF No. 372.

In sum, Central Valley's claims lacked merit from the beginning of the lawsuit. The operative agreements and Plan documents, along with facts established before litigation, showed a lack of any evidence of breaches of fiduciary duties or prohibited transactions, much less RICO violations. Moreover, Central Valley pursued "meritless litigation in an almost haphazard fashion" and "changed legal theories" over years of litigation. See *Foley*, 30 F. Supp. 2d at 368. Accordingly, the first and fifth factors weigh in favor of some award of attorneys' fees.

### B. Central Valley's Ability to Satisfy Attorneys' Fee Award

To determine whether a corporate party can satisfy a fee award, Courts look to the company's financial position. *See Johnson v. Charps Welding & Fabricating, Inc.*, No. CV 14-2081, 2018 WL 4829185, at *2 (D. Minn. Oct. 4, 2018). Courts have also reasoned that "ability to pay the fee award was demonstrated by the large sums it previously had paid to its own attorneys." *See Credit Managers Ass'n of S. California v. Kennesaw Life & Acc. Ins. Co.*, 25 F.3d 743, 749 (9th Cir. 1994).

Central Valley likely can satisfy an attorneys' fee award. Evidence produced during discovery demonstrated that Central Valley had more than $1 billion in annual revenue for each of the applicable Plan years. *See* Dickinson Dep., 22:14-23, ECF No. 266-6 (testifying that Central Valley's annual revenue in 2015, 2015, and 2017 was "about 1.2 billion" in each of those years). Evidence also showed that Central Valley had assets of more than $500 million for the year ending August 31, 2018. *See* ECF No. 142-2. By March 2019, Central Valley had incurred more than $1 million in attorneys' fees in this litigation. Because of Central Valley's financial position and the sums paid to its own attorneys, it is likely able to satisfy an attorneys' fee award.

### C. Benefit to Plan Participants or Resolution of Legal Question

Under the fourth *Westerhaus* factor, courts evaluate "the benefit of the suit to all participants in an ERISA plan or the resolution of a significant legal question[.]" *See Westerhaus*, 749 F.2d 494. This factor, however, is relevant only to whether plaintiffs should be awarded attorneys' fees. *Marquardt v. N. Am. Car Corp.*, 652 F.2d 715, 721 (7th Cir. 1981). Because Defendants submitted the request for a fee award, this factor has no bearing on whether attorneys' fees should be awarded in this case. *See Mendez v. Teachers Ins. & Annuity Assoc. & College Ret. Equities Fund*, 982 F.2d 783, 789 (2d Cir. 1992) ("[F]ailure to satisfy this factor need not preclude an award of attorney's fees."); *Monkelis v. Mobay Chem.*, 827 F.2d 935, 937 (3d Cir. 1987) (awarding ERISA defendant attorneys' fees and recognizing that the benefit factor was "not relevant").

### D. Deterrence

One of ERISA's purposes is "to protect, among other things, 'the interests of participants in employee benefit plans and their beneficiaries.'" *Martin v. Arkansas Blue*

*Cross & Blue Shield*, 299 F.3d 966, 973 (8th Cir. 2002). Accordingly, courts have expressed concern about awarding fees to successful ERISA defendants because "such awards may prevent plaintiff-trustees from seeking unpaid contributions in the future." *Johnson*, No. CV 14-2081, 2018 WL 4829185, at *2; *see also Trs. of Twin Cities Bricklayers, Fringe Benefit Funds v. McArthur Tile Corp.*, No. 03cv5497, 2005 WL 1140610, at *2 (D. Minn. May 11, 2005). However, an award of fees may be proper where "the deterrent effect will be beneficial upon those who contemplate speculative and duplicative litigation on thinly based grounds." *Monkelis*, 827 F.2d at 937. Under this factor, an award is meant only to deter "other persons acting under similar circumstances." *See Seitzman v. Sun Life Assurance Co. of Canada*, 311 F.3d 477, 485-86 (2d Cir. 2002) (holding that similarly worded factor used in Second Circuit is "carefully phrased" to "deter crooked claimants while insulating anyone who asserts a colorable claim.").

In *Johnson*, the court concluded that "there is an interest in deterring over-zealous and inadequate litigation in ERISA cases." No. CV 14-2081, 2018 WL 4829185, at *2. The court awarded attorneys' fees to successful defendants because plaintiffs had "not presented evidence to support their claims, or they failed to cite with particularity the facts to support those claims." *Id*. Further, the plaintiffs "engaged in sloppy discovery, inconsistent use of expert reports, and filed unnecessary motions with duplicative and unsupported arguments." *Id*. For these reasons, the deterrence factor weighed in favor of a fee award. *Id*.

The reasoning in *Johnson* is instructive here. Like the plaintiffs in *Johnson*, Central Valley did not present evidence to support its claims. It submitted inconsistent

14

discovery responses and changed its legal theories, none of which had merit. While bearing in mind the objectives underlying ERISA and the goal of protecting plan participants, an attorneys' fee award in this case is appropriate to deter plan administrators from engaging in wasteful litigation against processors who carry out their duties in good faith.

## II. Amount of Award

Because each of the relevant *Westerhaus* factors weighs in favor of an attorneys' fee award, the Court must determine the appropriate amount. To calculate a reasonable attorney's fee, "courts typically begin by using the lodestar method[,]" which "multiplies the number of hours reasonably expended by the reasonable hourly rates." *Brewington v. Keener*, 902 F.3d 796, 805 (8th Cir. 2018) (quoting *Hanig v. Lee*, 415 F.3d 822, 825 (8th Cir. 2005)). "When determining reasonable hourly rates, district courts may rely on their own experience and knowledge of prevailing market rates." *Id*. "There is no precise rule or formula for making these determinations." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436-37 (1983)). "At that point, other factors 'may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.''" *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 965 (8th Cir. 2012). (quoting *Hensley*, 461 U.S. at 434). The district court should also consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).[2] *See Marez*, 688 F.3d at 966 n.4. "[M]any of these factors

---

[2] Although not expressly discussed, in determining the reasonable rate the Court has considered the factors outlined in *Johnson v Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir 1974). The factors include: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained;

15

usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley*, 461 U.S. at 434 n.9. This Court has considered the fee requests of each group of Defendants in light of these factors.

### A. Benefit Group and Humpal

Benefit Group and Humpal request a fee award of $690,398.60 based on approximately 2,450 hours of work provided by the Fraser Stryker law firm in Omaha, Nebraska. Partner rates ranged between $258 and $390 per hour and associate rates ranged between $220 and $260 per hour. The Court concludes these rates are reasonable in the Omaha community for attorneys of comparable experience. *See Powers v. Credit Mgmt. Servs.*, No. 8:11CV436, 2016 U.S. Dist. LEXIS 164362, at *10 (D. Neb. Nov. 29, 2016). Having reviewed the supporting materials, the Court concludes that the number of hours should be reduced to reflect duplicative entries and entries with insufficient detail. Benefit Group and Humpal did not make a separate request for costs but acknowledged that the total amount requested reflected potentially duplicative costs. The Court concludes that an award of $600,000.00 is adequately supported by the evidence and is appropriate for fees and costs.

### B. AMPS and CDS

AMPS and CDS engaged two law firms[3] to defend to them in this suit: Arnall Goden Gregory, LLP (AGG) as primary counsel and Cline Williams in Omaha, Nebraska, as local counsel. AGG requests a total of $902,230.73 for total attorney time

---

(9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

[3] The amount requested for AMPS and CDS for a fee award is somewhat less clear. Rather than request a specific total amount in their motion or briefing, AMPS and CDS included the affidavits and billing records for the attorneys and firms involved. The amount requested in the affidavits is less than the amount represented by the evidence and billing records. Nevertheless, the Court has used the affidavits as a starting point and, for the reasons discussed, will reduce the award further.

spent on this matter. The amount is based on nearly 2,500 hours of attorney and paralegal time based on rates between $330 and $377 per hour for associates and rates between $450 and $540 per hour for partners. Cline Williams charged $77,919 in fees representing approximately 315 hours of work. Associate rates ranged between $160 and 195 per hour and partner rates ranged between $250 and $325 per hour.

The Court will not grant the full amounts requested. First, the rates charged by AGG were not reasonable for Nebraska. "Reimbursement for work performed by out-of-town lawyers charging out-of-town rates is generally permitted only when in-town counsel with expertise in a particular area cannot be located." *Powers v. Credit Mgmt. Servs.*, No. 8:11CV436, 2016 U.S. Dist. LEXIS 164362, at *7 (D. Neb. Nov. 29, 2016) (citing *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140-41 (8th Cir. 1982)).

It is recognized that "attorneys specializing in complex areas of the law may be entitled to a higher, non-local rate because the attorneys' familiarity with law will enable them to handle the case in a shorter time period than local counsel." *Shirt v. Hazeltine*, 2006 U.S. Dist. LEXIS 42206, at *7-8 (D.S.D. June 22, 2006) (citing *Planned Parenthood, Sioux Falls Clinic v. Miller,* 70 F.3d 517, 519 (8th Cir. 1995)). Yet AMPS and CDS have not shown that local counsel lacked the necessary expertise, and there is no evidence that the case moved more efficiently because of AGG's expertise. The other Defendants in this case retained local counsel at local rates and obtained the same result as AMPS and CDS. Accordingly, the award will be reduced to reflect a reasonable local rate for the work performed by AGG.

The Court will also reduce the number of hours expended because some of the work performed was duplicative or not described in sufficient detail. While the Court

17

acknowledges that the parties' interests were not completely aligned, there is no obvious reason that fees awarded to AMPS and CDS should be significantly higher than those awarded to Benefit Group. Accordingly, the Court concludes a fee of $600,000.00 is appropriate.

Although AMPS and CDS also request costs and expenses of approximately $130,000.00, some of the costs appear to be unrecoverable through the pending Motion, such as costs that are also listed in AMPS and CDS's Bill of Costs. Further, AMPS and CDS request costs for clerical and research items that are generally included in a firm's overhead. *See e.g., Emery v. Hunt*, 272 F.3d 1042, 1048 (8th Cir. 2001); *Hernandez v. Bridgestone Ams. Tire Operations*, LLC, 2015 U.S. Dist. LEXIS 180195, at *4 (S.D. Iowa Jun. 17, 2015). AMPS and CDS also claim approximately $100,000 in "e-discovery costs." As courts in this circuit have recognized, the Eighth Circuit has not addressed "whether costs associated with e-discovery are recoverable." *Associated Elec. & Gas Ins. Servs. v. BendTec, Inc.*, No. CV 14-1602, 2016 WL 740409, at *2 (D. Minn. Feb. 24, 2016). Considering each of these circumstances, the Court will reduce the request for costs to $40,000.

### C. GMS Benefits, Daniel Leonard, and Susan Leonard

Defendants GMS Benefits, Daniel Leonard, and Susan Leonard (the "GMS Defendants") request attorneys' fees in the amount of $274,983.17 based on approximately 945 hours of work. Central Valley does not object to the rates requested and Court finds that the rates are reasonable and consistent with attorneys in the Omaha community. After a review of the evidence supporting the GMS Defendants' request, the Court concludes that a slight reduction is warranted for inadequate

18

documentation and duplication of effort. Accordingly, the Court concludes that an award of $250,000.00 is appropriate for the GMS Defendants.

## CONCLUSION

For the reasons stated, the unique circumstances of this case merit an award of attorneys' fees under ERISA. Accordingly,

IT IS ORDERED:

1. The Defendants' Motions for Attorney Fees, ECF Nos. 374, 377, and 381, are granted in part, and Defendants are awarded the following amounts in attorneys' fees and expenses:

    a. Defendants The Benefit Group, Inc., and Linus G. Humpal are awarded $600,000.00 in attorneys' fees and costs;

    b. Defendants Anasazi Medical Payment Solutions, Inc., and Claims Delegate Services, LLC, are awarded $640,000.00 in attorneys' fees and costs;

    c. Defendants GMS Benefits, Inc., Susan Leonard, and Daniel K. Leonard are awarded $250,000.00 in attorneys' fees and costs; and

2. All other pending motions are denied as moot.

Dated this 6th day of February 2020.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge